**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNDER SEAL,

     Plaintiffs,

     v.

UNDER SEAL,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case: 1:22−cv−00675
Assigned To : Mehta, Amit P.
Assign. Date : 3/11/2022
Description: Gen. Civil (E−DECK)

**JURY TRIAL DEMANDED**

**ORIGINAL COMPLAINT**
**UNDER FEDERAL**
**FALSE CLAIMS ACTS**

**FILED *IN CAMERA* AND**
**UNDER SEAL PURSUANT**
**TO 31 U.S.C. § 3730(b)(2)**

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER IN PACER**

**DO NOT PUT IN PRESS BOX**

RECEIVED

MAR 1 1 2022

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES OF AMERICA   :
*ex rel.* SUSAN DARIA LANDINO, M.A.,   :   **Civ. No.**
HEIDI LOCKWOOD, PhD,   :
and NITA MAIHLE, PhD   :
  :
      **Plaintiffs,**   :   **ORIGINAL**
  :   **COMPLAINT UNDER**
  :   **FEDERAL**
    v.   :   **FALSE CLAIMS ACT**
  :
  :
YALE UNIVERSITY   :   **FILED *IN CAMERA* AND**
Office of the General Counsel   :   **UNDER SEAL PURSUANT**
2 Whitney Avenue, 6th Floor   :   **TO 31 U.S.C. § 3730(b)(2)**
New Haven, CT 06520-8255   :
  :   **DO NOT ENTER IN**
  :   **PACER**
      **Defendant.**   :
  :   **DO NOT PUT IN PRESS**
  :   **BOX**
  :
  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**RECEIVED**

MAR 1 1 2022

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION.................................................................................. 2

II.   JURISDICTION AND VENUE............................................................................ 7

III.  PARTIES. ............................................................................................................. 7

    A.   Plaintiff.......................................................................................................... 7

    B.   Relators. ......................................................................................................... 8

    C.   Defendant....................................................................................................... 11

IV.   THE LAW: FEDERAL FALSE CLAIMS ACT AND FEDERAL FUNDS
    REGULATIONS. .................................................................................................. 13

    A.   FCA Overview. ............................................................................................. 13

    B.   Federal Grant Regulations........................................................................... 15
        a.   HHS Grant Requirements for Federal Funds.................................... 15
        b.   NIH Grant Requirements For Federal Funds.................................... 20

    C.   Federal Grant Funds Allocation and Reporting Requirements.................. 25

    D.   Federal Law Imposes Fiduciary Duties on a University and Liability for
        Title IX Violations......................................................................................... 27
        a.   HHS and NIH Enforce Compliance with Their Stated Funding
            Requirements........................................................................................ 27
        b.   FCA Claims Are Applicable to Federal Funds Granted to Higher
            Education Institutions. ......................................................................... 30
        c.   Title IX Compliance Is an Enumerated Public Policy That Is Enforceable
            Through FCA by HHS and NIH......................................................... 32

    E.   The United States Previously Sued Yale and Other Universities Under the
        FCA for Similar Research Grant Violations. .............................................. 34

V.    YALE'S HISTORY OF SYSTEMIC VIOLATIONS OF MANDATED
    TITLE IX COMPLIANCE. ................................................................................. 36

    A.   Pre-VRA Title IX and Clery Act Violations............................................... 36

    B.   VRA Obligations. ......................................................................................... 39

    C.   Public Post-VRA Title IX and Clery Act Violations.................................. 41
        a.   Professor Thomas Pogge. .................................................................... 41
        b.   School of Management. ........................................................................ 42
        c.   The Spanish and Portuguese Department. ......................................... 45
        d.   Professor Michael Simon. ................................................................... 46
        e.   Association of American Universities Campus Sexual Climate Surveys... 47
        f.   Professor Eugene Redmond. ............................................................... 48

VI.   YALE AND ITS SENIOR LEADERSHIP KNOWINGLY HAVE MADE
    FALSE STATEMENTS AND CERTIFICATIONS REGARDING ITS
    NONCOMPLIANCE WITH TITLE IX.............................................................. 50

A.   Relators Are Fact Witnesses to Yale's Noncompliance.................................... 50
     a.   Relator Nita Maihle, PhD................................................................. 51
     b.   Relator Susan Daria Landino, MA.................................................... 72
     c.   Relator Heidi Lockwood, PhD. ........................................................ 77
B.   Witness Declarations of Title IX Violations. ........................................... 85
     a.   Jane Doe 1 (Statement by Mary Doe 1). ......................................... 85
     b.   Jane Doe 2 (Statement by John Doe 1)............................................ 87
     c.   Jane Doe 3......................................................................................... 89
     d.   Jane Doe 6......................................................................................... 91
     e.   Jane Doe 7......................................................................................... 93
     f.   Jane Doe 10....................................................................................... 95
     g.   Jane Does 8 & 9. ............................................................................... 96
     h.   Jane Doe 5......................................................................................... 98
VII. DAMAGES. ........................................................................................................ 100

*THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK*

## ORIGINAL COMPLAINT

**COME NOW**, through the undersigned counsel, Relators Susan Daria Landino, M.A., Dr. Heidi Lockwood and Dr. Nita Maihle, on behalf of themselves and the United States of America ("United States") bring this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA") to recover monetary damages, civil penalties, and all other remedies for knowing and systemic violations of the federal higher education and research grant programs (collectively "Federal Higher Education and Research Grant Funding").

Yale University ("Yale" or "University") has knowingly engaged in systemic violations of the Federal False Claims Act ("FCA") through research grant fraud and related Title IX non-compliance. These violations give rise to FCA liability. Yale has made false statements and certifications concerning undisclosed research grant fraud, including but not limited to conflicts of interest, violating federal rules for management of the costs related to Federal Higher Education and Research Grant Funding. These false statements and certifications made to secure federal grants extend to Yale's non-compliance with Title IX of the Educational Amendments of 1972. This federal civil rights law statutorily bars sex discrimination in educational programs offered by recipients of federal funds distributed by the Department of Health and Human Services ("HHS") and the National Institutes of Health ("NIH") as grants or cooperative agreements (collectively, "Title IX Claims"). Together, these laws require Yale – as a recipient and fiduciary of federal funds – to remain in compliance at all times with all applicable public policies enumerated by HHS and NIH as a condition to receiving

1

federal funds. Yale has failed to do so, and due to its false statements and certifications, the University has received more than $6 billion in HHS funding since 2008.

Relators have direct knowledge of Yale's violations from multiple perspectives, including direct interactions with senior leadership at Yale. Relator Susan Daria Landino was a staff member in a central and high-level administrative office at Yale and also at the Yale School of Medicine; Relator Dr. Heidi Lockwood was a PhD candidate working on her dissertation and teaching undergraduates in the Philosophy Department; and Relator Dr. Nita Maihle was a senior faculty member at Yale School of Medicine.

Relators hereby allege as follows:

## I.    <u>NATURE OF THE ACTION</u>.

1.    This is a *qui tam* action under the Federal False Claims Act. The False Claims Act was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War." 132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman). The law allows a private person with knowledge of a fraud to bring an action in federal district court for herself, the United States, and the individual states and to share in any recovery. The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

2.    In this *qui tam*, Relators allege that Defendant Yale University ("Yale" or "University" or "Defendant") knowingly made and caused to be made false statements and claims to the United States that misrepresented Yale's compliance with Title IX and HHS and NIH Federal Research Grant Funding requirements in order to obtain Federal Higher Education and Research Grant Funding.

3.      Relators' first-hand evidence, further corroborated by numerous Jane Doe declarations of those victimized by Yale's violations, reveals a pattern of campus-wide noncompliance, false statements, and false certifications by Yale senior leadership who have failed to comply with Title IX statutory obligations as fiduciaries responsible for the administration of federal funds. As described herein, the FCA's remedial nature imposes false presentment and false statement liability on Yale for violating fundamental statutory protections of students as a prerequisite to receiving federal funds.

4.      Numerous federal agencies have regulations enforcing Title IX and conditioning the receipt of federal funds upon full compliance, including the Department of Education ("ED"), the Department of Defense, and the Department of Health and Human Services ("HHS"). HHS specifically requires (i) a certification on each discretionary grant and cooperative agreement application and (ii) an Assurance of Compliance kept on file at HHS that the organization complies with all applicable public policies, including Title IX. HHS plainly states that any necessary and appropriate action with respect to the recipient or the award may be taken "if a grant is awarded on the basis of false or misrepresented information, or if a recipient does not comply with these public policy requirements." The National Institutes of Health ("NIH") further requires certification of compliance with Title IX prior to any award and throughout the duration of the award. Certification of that compliance comes in the form of a signature on each application from an Authorized Organization Representative because, as the NIH makes clear, their grants are awarded to organizations, not individual investigators.

5.      The eligibility to receive government funds through HHS and NIH is expressly conditioned on truthful and accurate statements and certifications that the

school is fully compliant with federal law. Yale's knowing, systemic Title IX violations, as evidenced herein through faculty to student misconduct, as well as retaliation against Relators, render the University's certifications to HHS and NIH false, and therefore, give rise to False Claims Act ("FCA") liability.

6.      Consistent with the core allegations in this Complaint, federal agencies have highlighted policies to punish sexual harassers and the educational institutions that shield them. The U.S. National Academy of Sciences ("NAS") has acted to expel members found guilty of sexual harassment, which NAS categorizes as among the most egregious violations of their Code of Conduct. To that end, NAS removed two if its members due to sexual misconduct, and NIH has removed 75 principal investigators from federal grants due to sexual harassment and other hostile workplace claims.

7.      Yale's repeated false statements and false certifications of compliance with research grant and related Title IX requirements impose FCA liability. This Complaint includes summaries of nine illustrative, previously undisclosed Jane Doe declarations exemplifying a larger pattern of systemic violations by Yale and knowledge and participation of its senior leadership. Relators provide contextual information on an even greater number of events in which Yale engaged in similar Title IX violations.

8.      Multiple characteristics of Yale's conduct verify the systemic nature of the alleged violations. *First*, the sexual harassment and/or retaliation experienced by Relators and the Jane Doe declarants took place in separate parts of the University over time. *Second*, a consistent core group of Yale senior leadership has been responsible for the violations and subsequent cover up. *Third*, similar violations occurred before and after Yale's 2012 resolution of Title IX violations. In the seminal 2003 *Kelly v. Yale* case, a

4

federal court found sufficient evidence of Yale's "deliberate indifference" to sexual harassment and denied Yale's motion for summary judgment, ultimately leading to a settlement. Further, the Department of Education's Office for Civil Rights ("OCR") investigation into a "sexually hostile environment" resulted in a 2012 Voluntary Resolution Agreement ("VRA") and civil penalties. ***And fourth***, there is a distinct pattern cutting across all the violations in which Yale senior leadership have acted to silence victims, including Relators, by discouraging them from asserting their Title IX rights, and/or retaliating against them for insisting on and advocating for the rights of others. Among other aspects, the evidence of this pattern of conduct reveals that Yale senior leadership:

   a. pressures Title IX victims to sign improper non-disclosure agreements to shield the public release of victims' information;

   b. creates barriers for victims to report to police or to file Title IX complaints with the University-Wide Committee on Sexual Misconduct ("UWC");

   c. misrepresents the UWC process by tricking victims into filing complaints through an intermediary, resulting in victims not getting the full range of UWC procedural rights;

   d. conducts biased UWC investigations and hearings accusing complainants of "causing" the Title IX violation (sexual harassment);

   e. ignores Title IX complainants' requests for accommodations and interim measures required under the law;

   f. fails to train faculty, staff, and students adequately according to the terms of the VRA and federal law;

g.  refuses to discipline faculty who "groom" students and then exploit sexual relationships with them; and

h.  tolerates retaliatory harassment against victims or their advocates through tactics such as isolation, open hostility, public recrimination and humiliation, refusals of expected career-related assistance (e.g. writing recommendation letters), reductions in salary, and various other adverse employment actions.

9.    The allegations related to these specific violations are presented in two groups of cases. *Part VII.A.* details research grant fraud and Relators' experiences of retaliation by Yale to deter Relators from assisting victims in violation of related Title IX requirements, all done to maintain Yale's federal grant funding. *Part VII.B.* addresses nine Jane Doe declarations involving sexual assault and harassment Title IX claims. In all cases, Yale took steps to protect the named faculty or student harasser, rather than the student victim, through various methods intended to silence the victim entirely, prevent any investigation of the student's complaints, or keep the victim from accessing their rights. When viewed together, the breadth, depth, and intentionality of Yale's violations and noncompliance with HHS and NIH requirements create FCA liability.

10.    As a result of Defendant's fraudulent course of conduct, as alleged herein, the United States as well as students and their families, faculty, and administrators – at Yale and other universities – have been and continue to be substantially damaged.

11.    This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2). It will not be served on Defendant until the Court so orders. A disclosure of substantially all material evidence and information Relators possess has

been served on the Attorney General of the United States and the United States Attorney for the District of Columbia pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4.

## II.    JURISDICTION AND VENUE.

12.    This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relators seek remedies on behalf of the United States for Defendant's violations of 31 U.S.C. § 3729. Some of these violations occurred in the District of Columbia, and Defendant transacts substantial business within the District of Columbia, including with HHS, NIH, and additional government agencies.

13.    This Court may exercise personal jurisdiction over Defendant under D.C. Code § 13-423(1).

14.    This Complaint has been timely filed within the period prescribed by 31 U.S.C. § 3731(b). The allegations and transactions set forth in this Complaint have not been publicly disclosed prior to filing, in accordance with 31 U.S.C. § 3730(e).

15.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because the Defendant resides, transacts business, and/or is qualified to do business in this District. In addition, during the period covered by this action, Defendant committed the acts proscribed by the False Claims Act in this judicial District.

## III.    PARTIES.

### A.    Plaintiff.

16.    Plaintiff United States of America brings this action by and through its administrative agencies with regulations enforcing Title IX and conditioning the receipt

of federal funds upon compliance, including the Department of Health and Human Services ("HHS") and the National Institutes of Health ("NIH"), which administer federal higher education and research grant funding (collectively "Federal Higher Education and Research Grant Funding").

### B.    Relators.

17.    Relator Susan Daria Landino, M.A. was employed at Yale from August 1999 to November 2012, specifically to develop public safety educational programming for the Office of Vice President Linda Lorimer. She reported directly to Associate VP Martha Highsmith, who reported to VP Linda Lorimer, who reported to President Richard Levin. Relator Landino attended VP meetings, as well as weekly command-level fully-sworn Yale Police Department staff meetings. Her work at Yale involved providing victim support services. Additionally, she compiled Clery Act Report data during her first several years; however, Yale relieved her of Clery Act Report responsibility after she identified and reported internally Yale's falsification of crime statistics data. From 2010 to November 2012 Relator Landino worked as a project manager for the Chief Medical Officer and Associate Dean for Clinical Affairs at the Yale School of Medicine.

18.    Relator Landino's position as an advocate for dozens of survivors of sexual misconduct at Yale provided her with access to both the public safety and the vice presidents' offices, giving Relator Landino a unique window into Yale's violations and knowledge of Yale senior leadership. Relator Landino advocated for systemic Title IX civil rights compliance, as well as for specific campus members from Yale College; departments within the Graduate School of Arts and Sciences, including English,

Chemistry and Physical Sciences, Spanish and Portuguese and School of Music; the Divinity School; School of Management; and Yale Medical School.

19.     Relator Dr. Heidi Lockwood received a Ph.D. in philosophy from Yale in 2009 and is now a tenured Professor of Philosophy at Southern Connecticut State University (SCSU) in New Haven, Connecticut. During her tenure as a graduate student, she spent much of her time advocating for survivors of serious faculty sexual misconduct in the Philosophy Department. Since completing her Ph.D., she has spent time supporting victims of faculty sexual misconduct in different schools across the University, including the Graduate School of Arts & Sciences, the School of Music, Yale Law School, and Yale College.

20.     Dr. Lockwood was a member of the organizing team for the 2019 Faculty and Staff Sexual Misconduct Conference funded by the National Science Foundation (grant no. HRD-1836685). She was asked to review the National Academics of Sciences Engineering and Medicine 2018 study, "Sexual Harassment of Women: Climate, Culture, and Consequences in Academic Sciences, Engineering, and Medicine" by the *Washington Post*, and has been quoted or cited by other news organizations including the *New York Times*, the *Guardian*, the *Chronicle of Higher Education*, *Inside Higher Education*, *BuzzFeed,* the *Verge*, and *Huffington Post*.

21.     Relator Dr. Nita Maihle was recruited by Yale School of Medicine (YSM) through the endowed Senior Women in Medicine Professorship (SWMP), designed to increase the representation of senior women conducting research in YSM research laboratories. Previously, Dr. Maihle was at the Mayo Clinic in Rochester, MN and founded the Tumor Biology Program. She also held two prestigious postdoctoral

9

fellowships at the Cold Spring Harbor Laboratory and the National Cancer Institute. Dr. Maihle has received numerous honors and awards, including the 2013 Distinguished Alumni Award from her alma mater, the Albert Einstein College of Medicine at Yeshiva University.

22.     Dr. Maihle served on the Yale faculty as a full professor from 2003 until 2013. During that time, Dr. Maihle witnessed pervasive sexual harassment at YSM contributing to a high turnover rate specific to female professors. Female trainees and junior faculty members were targeted by YSM senior male faculty, commonly making lewd comments, catcalling, and whistling at females in YSM hallways. Additionally, as a competitor for and a recipient of federal research grants, Dr. Maihle observed YSM's frequent abuse of federal grants, including violations of federal rules for management of the costs related to federally funded research grants and related Title IX non-compliance, giving Dr. Maihle direct knowledge relating to the research grant claims alleged herein. The disparate treatment Dr. Maihle received, as well as being retaliated against for her efforts to address gender discrimination and Title IX violations at YSM, led her to leave YSM in 2013. Dr. Maihle became the Associate Cancer Center Director (Education) for the Georgia Cancer Center at the Medical College of Georgia, Augusta University. More recently, Dr. Maihle began a new position as Associate Cancer Center Director (Research) at the University of Mississippi Medical Center.

23.     By virtue of their positions and responsibilities at Yale, as well as their consistent interactions with faculty, staff, administration, and students during and after their departure, each Relator obtained knowledge of Yale's noncompliance with the University's Title IX and Clery Act obligations and the University's fraudulent

certifications of compliance in order to gain access to federal funds. Each Relator became aware of Defendant's fraudulent conduct, as alleged herein. Pursuant to 31 U.S.C. § 3730(e)(4)(B), Relators are the "original source" of the information provided herein regarding Yale's unlawful conduct. They have direct and independent knowledge of the allegations set forth herein. Relators state that the information concerning Defendant's misconduct was not disclosed publicly prior to their disclosure to the United States.

### C.    Defendant.

24.    Yale enrolls more than 12,000 undergraduate, graduate, and professional students and employs over 4,500 faculty members. In the past decade, Yale reports receiving more than $300 million annually from HHS and at least an additional $100 million annually from other federal entities for grant and contract income.

25.    Grant and contract income (also known as sponsored research) was Yale's third largest source of revenue, accounting for 20% of total revenue for both fiscal year end 2020 and 2019, and 19% in 2021. Yale reported receiving $877 million in 2021, $837 million in 2020, and $824 million in 2019 (a 6.4% increase from 2019 to 2021), which resulted from Yale faculty securing "highly competitive research funding from federal, state, and foundation sources." For 2021, $669 million or 76% of sponsored research funds received were federal government funds, $506 million of which was primarily HHS funding through NIH. NIH has awarded more than 877 grants to Yale in a range of disciplines.

26.    In 2021, Yale had a $378 million surplus from operations on a generally accepted accounting principles ("GAAP") basis. The University also receives significant funding from the National Science Foundation, the Department of Energy, the

Department of Defense, and student aid awards from the ED. Additional funds are received from the State of Connecticut and non-government sources, which provided $220 million in 2020.

27.    Yale School of Medicine represents the largest budget unit for Yale, at 51% of the University's 2021 total operating revenue. Yale School of Medicine performs significant research for federal, state, and corporate entities. Research funded by the federal government represents 79% of total research performed at the School of Medicine in 2021 with NIH providing the largest component at 88%.

28.    Of note, Yale School of Medicine received 82% of the University's grant and contract income in 2021, meaning that HHS awarded 18% of grants to Yale at large.

29.    To attain these federal funds, Yale has created a multi-pronged system to assist in the application process and maintenance of federal grants and other awards. Yale has multiple offices to promote and support faculty, staff, and students in their pursuit of sponsored research. These offices sit under the umbrella of the Office of Research Administration. Yale's Faculty Research Management Services ("FRMS") "provides non-medical school departments and their principal investigators with the resources and expert knowledge needed to compete for, manage, and renew sponsored awards" to more than 70 separate departments. FRMS is a conduit to the Office of Sponsored Projects, Yale's body that reviews and approves proposals submitted to all sponsors, for interpreting, negotiating, and accepting grants and contracts for sponsored projects funded by federal and state agencies, as well as other public and private sources.

30.    As a statutory condition precedent to receiving these funds, Yale faculty, staff, and students applied for grants and awards, and in doing so, certified Title IX

compliance, among other certifications. Yale repeatedly violated their HHS obligations through false statements/records and false certifications.

31.    Yale is organized and existing under the laws of Connecticut and can be served through its General Counsel's Office, 2 Whitney Avenue, Mail Code 480, P.O. Box 208255, New Haven, CT, 06520-8255.

## IV.    THE LAW: FEDERAL FALSE CLAIMS ACT AND FEDERAL FUNDS REGULATIONS.

### A.    FCA Overview.

32.    The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made to the United States; or (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. §§ 3729(a)(1)(A)-(B), (G).

33.    The False Claims Act also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(C).

34.    A statement is "false" if it is an affirmative misrepresentation or a material omission. *See Mikes v. Straus*, 274 F.3d 687, 696-98 (2nd Cir. 2001); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp.2d 35, 43 (D. Mass. 2000) (an

13

"omitted material fact," such as the existence of illegal kickbacks, may be actionable under the FCA); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732 (7th Cir. 1999) (observing that a half-truth may amount to a false statement under the FCA in certain circumstances); *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) (finding that false progress reports may constitute false statements under the FCA); *United States ex rel. Fry v. Guidant Corp.*, 2006 WL 2633740, *10-11 (M.D. Tenn. Sept. 3, 2006) (finding representation was rendered false by concealment of material information). *Cf. Clearwater, Inc. v. Sebelius,* No. 09-13922, 2010 (U.S. App. LEXIS 17274, 2010 WL 3258871 (11th Cir. Aug. 19, 2010) (material omission of a healthcare provider on application submitted to Medicare automatically forfeits and excludes the provider from receiving any payment for services performed, even where the services were actually performed); W. Page Keeton, Prosser & Keeton on the Law of Torts § 106, at 738 (5th ed. 1984) ("[H]alf the truth may obviously amount to a lie, if it is understood to be the whole.").

35.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

36.    The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the

money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. §§ 3729(b)(2)(A)(i)-(ii). A request or proposal for a federal grant or research funds constitutes a claim under the False Claims Act. *U.S. ex rel. Sarafoglou v. Weill Med. College of Cornell Univer.*, 451 F. Supp.2d 613, 617-19 (S.D.N.Y. 2006).

37.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

      **B.**    **Federal Grant Regulations.**

        **a.**  **HHS Grant Requirements for Federal Funds.**

38.     HHS awards grants under more than 300 programs, making it the largest grant-awarding agency in the federal government. The HHS grant programs are the responsibility of 12 separate operating divisions ("OPDIVs"), including the National Institutes of Health ("NIH").

39.     The HHS GPS reflects HHS requirements as specified in 45 C.F.R. § 74 and § 92. Specifically, 45 C.F.R. § 92.101 enumerates prohibited discrimination, including general prohibitions that "[e]xcept as provided in Title I of the Affordable Care Act ("ACA"), an individual shall not, on the basis of race, color, national origin, sex, age, or disability, be excluded from participation in, be denied the benefits of, or otherwise be

subjected to discrimination under any health program or activity to which this part applies." (45 C.F.R. § 92.101(a)(1)).

40.    Specific prohibitions against discriminatory actions are also detailed, including:

> (i) Each covered entity must comply with the regulation implementing Title IX, at § 86.31(b)(1) through (8) of this subchapter. Where this paragraph cross-references regulatory provisions that use the term "student," "employee," or "applicant," these terms shall be replaced with "individual."
>
> (ii) A covered entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination on the basis of sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals on the basis of sex.

(45 C.F.R. §§ 92.101(b)(3)(i); (ii)).[1]

41.    Title IX, in turn, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."[2]

42.    Each and every application submitted to HHS requires two certifications of compliance with applicable public policies, including Title IX: first in the form of an Authorized Organizational Official signature on every application and second in an Assurance of Compliance also signed by an Authorized Organizational Official.

---

[1] A "covered entity" is defined as "[a]n entity that operates a health program or activity, any part of which receives Federal financial assistance". (45 C.F.R. § 92.4).

[2] United States Department of Education, Title IX and Sex Discrimination (rev. Apr. 2015), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html.

43.    HHS has promulgated regulations at 45 C.F.R. § 86, titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," for the purpose of effectuating compliance with Title IX. 45 C.F.R. § 86.4(a) states:

> General. Every application for Federal financial assistance for any education program or activity shall as condition of its approval contain or be accompanied by an assurance from the applicant or recipient, satisfactory to the Director, that the education program or activity operated by the applicant or recipient and to which this part applies will be operated in compliance with this part. ***An assurance of compliance with this part shall not be satisfactory to the Director if the applicant or recipient to whom such assurance applies fails to commit itself to take whatever remedial action is necessary in accordance with § 86.3(a) to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination whether occurring prior or subsequent to the submission to the Director of such assurance.*** (emphasis added)

44.    The regulation clearly states that Title IX compliance requires eliminating existing discrimination, as well as the effects of past discrimination. Further, the importance placed on each organization's Title IX compliance is laid bare with the language requiring compliance both prior and subsequent to the assurance's submission.

45.    In the HHS GPS, HHS reiterates the agency's emphasis on compliance with all applicable public policies, as well as the obligation and accountability delegated to the organization based on the signature of the Authorized Organizational Official.

> As indicated in Part I, ***by signing the application, the authorized organizational official certifies that the organization will comply with applicable public policies.*** Once a grant is awarded, the recipient is responsible for establishing and maintaining the necessary processes to monitor its compliance and that of its employees and, as appropriate, subrecipients and contractors under the grant

with these requirements; taking appropriate action to meet the stated objectives; and informing the OPDIV of any problems or concerns. ***If a grant is awarded on the basis of false or misrepresented information, or if a recipient does not comply with these public policy requirements, the OPDIV or other cognizant office may take any necessary and appropriate action with respect to the recipient or the award.***[3] (emphasis added)

46.     Title IX is applicable to all applications from and awards to domestic entities.[4] Beyond the application signature certifying compliance, it is codified that any applicant seeking to receive funds from the agency must provide an Assurance of Compliance with Title IX, as well as other public policies. (45 C.F.R. § 86.4(a)).

47.     Pursuant to 45 C.F.R. § 86.4(c), HHS publishes a document titled Form HHS-690 ("Assurance of Compliance") signed by an Authorized Organizational Official of the applicant organization that provides in relevant part:



DEPARTMENT OF HEALTH AND HUMAN SERVICES
## ASSURANCE OF COMPLIANCE

ASSURANCE OF COMPLIANCE WITH TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, SECTION 504 OF THE REHABILITATION ACT OF 1973, TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, THE AGE DISCRIMINATION ACT OF 1975, AND SECTION 1557 OF THE AFFORDABLE CARE ACT

The Applicant provides this assurance in consideration of and for the purpose of obtaining Federal grants, loans, contracts, property, discounts or other Federal financial assistance from the U.S. Department of Health and Human Services.

THE APPLICANT HEREBY AGREES THAT IT WILL COMPLY WITH:

1.  Title VI of the Civil Rights Act of 1964 (Pub. L. 88-352), as amended, and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 80), to the end that, in accordance with Title VI of that Act and the Regulation, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the Applicant receives Federal financial assistance from the Department.

2.  Section 504 of the Rehabilitation Act of 1973 (Pub. L. 93-112), as amended, and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 84), to the end that, in accordance with Section 504 of that Act and the Regulation, no otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity for which the Applicant receives Federal financial assistance from the Department.

3.  Title IX of the Education Amendments of 1972 (Pub. L. 92-318), as amended, and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 86), to the end that, in accordance with Title IX and the Regulation, no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any education program or activity for which the Applicant receives Federal financial assistance from the Department.

---

[3] https://www.hrsa.gov/sites/default/files/grants/hhsgrantspolicy.pdf at II-2.
[4] https://www.hrsa.gov/sites/default/files/grants/hhsgrantspolicy.pdf at II-4.

48.    The assurance includes language that the applicant "recognizes and agrees that the United States shall have the right to seek judicial enforcement of this assurance"[5] and Form HHS-690 remains in effect for as long as the federal financial assistance is extended. (45 C.F.R. § 86.4(b)(3)).

49.    Each federal department or agency that has the power to provide federal financial assistance to any education program or activity (by loan, grant, or contract) is both authorized and directed to effectuate the provisions of 20 U.S.C. § 1681 by issuing rules, regulations, or orders of general applicability. (20 U.S.C. § 1682).

50.    HHS GPS directs that fraud, waste, or abuse related to HHS grants or use of grant funds includes, but is not limited to, embezzlement, misuse, or misappropriation of grant funds or property, and false statements, whether by organizations or individuals.[6] Additionally, HHS GPS states that the government may pursue administrative, civil, or criminal action under a variety of statutes that relate to fraud and false statements or claims.[7] "***Even if a grant is not awarded, the applicant may be subject to penalties if the information contained in or submitted as part of an application, including its***

---

[5] HHS Assurance of Compliance Form, *available at* https://www.hhs.gov/sites/default/files/forms/hhs-690.pdf.

[6] https://www.hrsa.gov/sites/default/files/grants/hhsgrantspolicy.pdf at I-7.

[7] The Program Fraud and Civil Remedies Act of 1986, 31 U.S.C. §§ 3801 *et seq.*, provides for the imposition by HHS of civil penalties and assessments against people who knowingly make false, fictitious, or misleading claims to the federal government for money, including money representing grants, loans, or benefits. A civil penalty of not more than $5,000 may be assessed for each such claim. If a grant is awarded and payment is made on a false or fraudulent claim, an assessment of not more than twice the amount of the claim, up to $150,000, may be made in lieu of damages. The Criminal False Claims Act, 18 U.S.C. § 287 and § 1001, provides for criminal prosecution of a person who knowingly makes or presents any false, fictitious, or fraudulent statements, representations, or claims against the United States. Violations carry a maximum sentence of 5 years imprisonment (or 8 years for offenses involving international or domestic terrorism) and/or a fine. The Civil False Claims Act, 31 U.S.C. § 3729(a), provides for imposition of penalties and damages by the United States, through civil litigation, against any person who knowingly makes a false or fraudulent claim for payment, makes or uses a false record or false statement to get a false claim paid or approved, or conspires to defraud the federal government to get a false claim paid. A "false claim" is any request or demand for money or property made to the United States or to a contractor, grantee, or other recipient, if the federal government provides or will reimburse any portion of the funds claimed. Civil penalties of $5,500 to $11,000 may be imposed for each false claim, plus damages of up to three times the amount of the false claim.

*certifications and assurances, is found to be false, fictitious, or fraudulent.*"[8] The certification of compliance with Title IX, as relevant herein, is a statement so heavily relied upon by the federal government that the applicant could be subject to penalties for false certifications even if they do not receive the grant. Thus, the receipt of government funds and even the mere application for HHS grants are conditioned upon continued compliance with Title IX and additional applicable regulations.

51.    Both NIH and NCI, from whom Yale has received significant funds, are divisions of HHS.

### b.  NIH Grant Requirements For Federal Funds.

52.    HHS states that NIH is the world's premier medical research organization. Its mission is to improve human health by increasing scientific knowledge related to disease and health. NIH carries out its mission through the conduct of intramural and extramural support of biomedical and behavioral research, research training, research infrastructure, and communications. NIH makes extramural awards though its institutes and centers.[9]

53.    Since 1998, when NIH issued its own NIH Grants Policy Statement ("NIH GPS"), its funds have been governed by the NIH GPS.[10] Similar to HHS, NIH requires compliance with applicable public policy, including Title IX for the both the application alone, as well as for the grant award. NIH GPS calls the signatory an Authorized Organization Representative ("AOR"), which it defines as "[t]he individual named by the applicant organization, who is authorized to act for the applicant and to assume the

---

[8] https://www.hrsa.gov/sites/default/files/grants/hhsgrantspolicy.pdf at I-8 (emphasis added).

obligations imposed by the Federal laws, regulations, requirements, and conditions that apply to grant applications or grant awards."[11]

54.    The NIH GPS specifically states that "[b]efore NIH may make an award to a domestic organization, the AOR must certify, by means of the signature on the application, that the organization has on file with the HHS Office for Civil Rights a one-time Assurance of Compliance with the statutes described in this subsection."[12] The subsection then lists five statutes, including Title IX.[13]

55.    While NIH deems the signature on the application to certify that the organization has an Assurance of Compliance on file, this should not be perceived as NIH placing less importance on compliance with public policy requirements. To the contrary, NIH seems to go a step beyond HHS with a section of their website dedicated to anti-harassment and specifically to anti-sexual harassment.[14] "The National Institutes of Health (NIH) does not tolerate pervasive or severe harassment of any kind, including sexual harassment, whether it is within the agency, at research organizations that receive NIH funding, or anywhere else NIH-funded activities are conducted."[15]

56.    To that end, in September 2018, NIH Director Francis S. Collins, Ph.D. issued a statement entitled "Changing the culture of science to end sexual harassment".[16] It marked the launch of NIH's anti-sexual harassment website and further emphasized the

---

[9] http://www.nih.gov.
[10] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.
[11] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf at I-9.
[12] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf at IIA-13.
[13] https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf at IIA-14.
[14] https://grants.nih.gov/grants/policy/harassment/policy-requirement.htm; https://www.nih.gov/anti-sexual-harassment.
[15] https://www.nih.gov/anti-sexual-harassment.
[16] https://www.nih.gov/about-nih/who-we-are/nih-director/statements/changing-culture-science-end-sexual-harassment.

need for transparency, as well as the need to hold NIH accountable. It also reiterated that "NIH funding is awarded to institutions, not to individuals."[17]

57.    The NIH anti-sexual harassment website allows concerned parties to file complaints about funded scientists directly with NIH.[18] As of 2018, NIH reported receiving complaints of behavioral misconduct against 314 grantees. As of June 2021, NIH had resolved approximately 163 cases involving sexual harassment. NIH sent letters of inquiry to 131 institutions upon receipt of a complaint. In 48 of the reported cases, the institutions substantiated the sexual harassment complaints through their own investigations. In 54 of the reported cases, the primary investigator ("PI") was removed from the NIH grant. In 50 of the reported cases, the PI left the institution before NIH could remove them from the grant.[19]

58.    Further, since 2020, NIH has required institutions to report when a Program Director ("PD") or PI is removed from a grant due to harassment.[20] In a June 11, 2020 Guidance Regarding Change in Status, Including Absence of PD/PI and Other Key Personnel Named in the Notice of Award (Notice Number NOT-OD-20-124), NIH clarified its expectations for NIH recipients "to provide safe and healthful working conditions for their employees and foster work environments conducive to high-quality research." Such environments do not include harassment, bullying, retaliation, or hostile working conditions. If an institution wishes to change the status of a PD/PI or other Senior/Key Personnel, approval must be sought from NIH and the specific reasons for the

---

[17] https://www.nih.gov/about-nih/who-we-are/nih-director/statements/changing-culture-science-end-sexual-harassment.
[18] https://public.era.nih.gov/shape/public/notificationForm.era.
[19] https://www.insidehighered.com/news/2021/06/28/nih-says-75-grantees-have-been-removed-due-harassment-complaints.
[20] https://grants.nih.gov/grants/guide/notice-files/NOT-OD-20-124.html.

change must be reported to NIH. Such reporting is required if the identified individual withdraws from the project entirely, is absent from the project during any continuous period of three months or more, or reduces the time devoted to the project by 25% or more from the level that was approved at the time of initial competing year award.[21]

59.    NIH enumerates the required standards to which it holds NIH organizational recipients. Every organization receiving NIH funds must (1) have systems, policies, and procedures in place to manage research activities in accordance with our standards and requirements; and (2) comply with federal laws, regulations, and policies protecting the rights and safety of individuals working on NIH-funded projects.[22]

60.    NIH further clarifies that it is not sufficient to comply on paper, rather NIH expects that institutions:[23]

**NIH expects that institutions:**

- develop and implement policies and practices that foster a harassment-free environment;
- maintain clear, unambiguous professional codes of conduct;
- ensure employees are fully aware and regularly reminded of applicable laws, regulations, policies, and codes of conduct;
- provide an accessible, effective, and easy process to report harassment, and provide protection from retaliation;
- respond promptly to allegations to ensure the immediate safety for all involved, investigate the allegations, and take appropriate sanctions; and
- inform NIH of administrative actions that removes senior/key personnel on an NIH award.

61.    NIH's reporting requirements assume the institutions are in compliance with the systems, policies, and procedures required by NIH and federal laws. If the institutions falsely report compliance, or fail to disclose facts material to noncompliance, then NIH funding related to false statements and certifications compliance are at risk.

---

[21] *See Id.*
[22] https://grants.nih.gov/grants/policy/harassment/policy-requirement.htm.
[23] *See Id.*

62.    Further, a February 2019 statement signed by NIH Director Francis S.

Collins, Ph.D. and six additional NIH directors, stated:

> Sexual harassment does not just damage the careers of those who have encountered it, it can leave deep scars and psychological effects that reverberate for a lifetime. The reports of scientists and students shared through the #MeTooSTEM movement portray a heartbreaking story of opportunities lost, pain suffered, and a systemic failure to protect and defend. ***To all those who have endured these experiences, we are sorry that it has taken so long to acknowledge and address the climate and culture that has caused such harm. The National Academies report on sexual harassment of women in science (link is external) found that "federal agencies may be perpetuating the problem of sexual harassment." We are concerned that NIH has been part of the problem. We are determined to become part of the solution.***[24]

63.    It should be noted that while these more recent statements are important,

NIH has required compliance with public policy, especially non-discrimination on the

basis of sex, for years. This is documented in their statements dating back to 2015 (*See*

NOT-OD-15-152).[25]

64.    Finally, in addressing enforcement, NIH stated:

> NIH grants are awarded to organizations, not to individual investigators…Typically, in an instance where the principal investigator or co-principal investigator named on the notice of award is placed on administrative leave because of the need to investigate an allegation of sexual harassment, the awardee organization would request a change of senior/key personnel supporting the NIH grant. If NIH learns that an awardee organization is not complying with the terms and conditions of award, NIH may take enforcement action within our oversight authorities, which may include suspending or even terminating the grant. NIH generally seeks to work with the awardee organization as appropriate, to help bring them back into compliance with

---

[24]    https://www.nih.gov/about-nih/who-we-are/nih-director/statements/update-nihs-efforts-address-sexual-harassment-science (emphasis added).
[25] https://www.nih.gov/anti-sexual-harassment/statements-notices.

the terms and conditions of the award. Depending on the circumstances, NIH can also consider enforcement action such as suspension of funding, or we can coordinate with other offices including law enforcement or the HHS Office of Inspector General, to consider a referral for debarment or suspension.[26]

65.    At bottom, in light of the hostile environment created by Yale's direct actions and failures to properly address sexual harassment, NIH should adhere to its stated protocols and debar or suspend Yale from NIH Federal Higher Education and Research Grant Funding.

**C.    Federal Grant Funds Allocation and Reporting Requirements.**

66.    Important to cost reporting is effort reporting. Effort is the proportion of time spent on any activity and expressed as a percentage of the total professional activity for which an individual is employed by the institution. Effort reporting involves reasonable estimates, total effort must equal 100% and effort is not based on a 40-hour week. Effort reports often present total percentages of payroll distributions to be used as a starting point, since it is often assumed that payroll distribution is monitored and revised based on effort expended. The percentages may be revised during certification based on actual expended effort, and this after-the-fact confirmation is necessary for compliant effort reporting.[27]

67.    Effort reporting permits the government to verify that labor charges are appropriate based on the amount of work performed, that cost sharing is performed as promised, and that sponsored research is appropriately classified. The institution can use the effort reporting to assure that faculty and others are working in areas as expected or

---

[26] https://nexus.od.nih.gov/all/2019/02/28/update-on-nihs-efforts-to-address-sexual-harassment-in-science/.
[27] In 2013, OMB proposed Uniform Guidance to consolidate eight separate OMB circulars into a single regulation governing federal grant rules. The Uniform Guidance went into effect at the end of 2014, leaving the core of federal regulations unchanged.

promised, that payroll distribution and labor cost sharing is appropriate, and that state teaching requirements or Medicare time reporting are accurate. Specific requirements for universities include, for example, confirmation of personnel costs charged to sponsored agreements, and certifications that encompass all employee activities on an integrated basis (effort) by an individual with knowledge of all of the employee's activities.[28]

68.    Further, each federal awarding agency is charged with establishing policies for federal awards, including rules surrounding conflict of interest.[29] National Science Foundation ("NSF") states that it "encourages the increased involvement of academic researchers and educators with industry and private entrepreneurial ventures, but recognizes that such interactions carry with them an increased risk of conflict of interests." To mitigate this risk, NSF enumerates its policies, including requiring each grantee organization to maintain an appropriate written and enforced conflict of interest policy and that all conflict of interest for each award be managed, reduced, or eliminated prior to the expenditure of the award funds.[30] HHS maintains a separate office to enforce violations, including conflicts of interest, the Office of Research Integrity ("ORI").[31]

69.    Additionally, each entity receiving federal funds "must disclose in writing any potential conflict of interest to the federal awarding agency or pass-through entity in accordance with applicable federal awarding agency policy."[32] Yale has a website dedicated to federal grant spending policies and procedures that notes the need for faculty, staff, and students to be aware of and avoid or properly manage conflicts of

---

[28] OMB Circular A-21: Educational Institutions.
[29] 2 C.F.R. § 200.112 Conflict of Interest.
[30] https://www.nsf.gov/pubs/policydocs/pappguide/nsf16001/aag_4.jsp.
[31] https://ori.hhs.gov/conflicts-interest-and-commitment.
[32] *Id.*

interest.[33] Specifically noted on Yale's website is 2 C.F.R. § 200 Uniform Guidance and a separate page titled "Appropriate Use of University Research Funds".[34]

> **D.    Federal Law Imposes Fiduciary Duties on a University and Liability for Title IX Violations.**
>
> > **a.  HHS and NIH Enforce Compliance with Their Stated Funding Requirements.**

70.    HHS and NIH requirements impose a duty on both the individual applicant as well as the organization at large. Enforcement actions can result in grant requests being disallowed, requiring return of funds, termination of the grant or even debarment – denying the applicant and/or the institution the right to apply for additional grants for a specified time period. Individuals have been debarred or terminated based on falsifying data submitted with their applications or reporting false information during the course of their grant.[35] Further, organizations or institutions have been penalized by HHS and NIH for multiple issues related to grant funding, including, but not limited to, failure to abide by general organization requirements, akin to Title IX compliance.

71.    Notably, Head Start, a national program that promotes school-readiness of low-income children by providing the children and their families with health,

---

[33] https://your.yale.edu/research-support/conflict-interest/coi-policies-procedures.
[34]    https://your.yale.edu/research-support/office-sponsored-projects/award-management/2-cfr-part-200-uniform-guidance; https://provost.yale.edu/policies/appropriate-use-university-research-funds.
[35] *See* HHS Departmental Appeals Board, Docket 82-16, Dec. 340 (1982) (NIH grant to scientist at UCLA was withheld because scientist violated regulations regarding human experimentation); HHS Departmental Appeals Board, Appellate Division, Docket 85-178, Dec. 823 (1987) (Professor of physiology and biophysics at University of Mississippi Medical Center debarred for fabricating data, publishing false data, and using the false data in an application for a renewal grant); HHS Departmental Appeals Board, Docket A-93-30, Dec. 1409 (1993) (Scientist debarred for fabricating data while serving as a research fellow at the NIH); HHS Departmental Appeals Board, Research Integrity Adjudications Panel, Docket A-93-117, Dec. 1446 (1994) (Scientist at University of Pittsburgh debarred for falsifying the data he submitted with his NIH grant application); HHS Departmental Appeals Board, Appellate Division, Docket A-97-98, Dec. 1677 (1999) (Scientist at Baylor College of Medicine debarred for falsifying data he submitted with NIH grant application); HHS Departmental Appeals Board, Docket A-15-27, Dec. 2638 (2015) (Medical device company executive barred from participating in federal healthcare programs for four years after he sold, adulterated and misbranded medical devices).

educational, nutritional, social, and other services to enhance their cognitive, social and

emotional development, is a recipient of HHS funding. HHS has terminated Head Start

grants for failure to comply with public policies or failure to follow funding guidelines.[36]

72.    As a recipient of HHS funding, Head Start is required to comply with

HHS public policy requirements, including policies against sexual abuse. In 2014, Head

Start terminated a grant because the grantee did not have appropriate procedures in place

to adequately handle allegations of child sexual abuse, specifically that a Head Start

teacher had molested a student. (*See* HHS Departmental Appeals Board, Appellate

Division, Docket A-14-108, Dec. 2611 (2014)).[37] The termination followed a finding that

Head Start had failed to comply with "regulations requiring that grantees (1) implement

policies and procedures for handling cases of suspected or known child abuse, (2) ensure

that no child will be left alone or unsupervised, and (3) ensure that staff not engage in

corporal punishment or physical abuse" as well as a finding that Head Start failed to

comply with the "requirement that grantees establish and implement procedures for the

ongoing monitoring of their programs." (*Id.*). In upholding the termination, among the

factors considered by the Appellate Board was the fact that the teacher accused of sexual

---

[36] *See* HHS Departmental Appeals Board, Appellate Division, Docket A-94-38, Dec. 1489 (1994) (Administration for Children and Families ("ACS"), under HHS, terminated Head Start grant to daycare association due to poor administration and violations of labor law); HHS Departmental Appeals Board, Appellate Division, Docket A-99-5, Dec. 1689 (1999) (Head Start grant terminated because grantee did not comply with educational and health related requirements); HHS Departmental Appeals Board, Appellate Division, Docket A-2000-4, Dec. 1749 (2000) (Head Start grant terminated because grantee organization failed to remedy an internal conflict of interest and failed to submit requested documents to grantor); HHS Departmental Appeals Board, Appellate Division, Docket A-04-62, Dec. 1976 (2005) (Head Start grant terminated because grantee didn't provide quality programming and didn't keep adequate records); HHS Departmental Appeals Board, Appellate Division, Docket A-10-90, Dec. 2377 (2011) (Head Start grant terminated because grantee had poor recordkeeping system); HHS Departmental Appeals Board, Appellate Division, Docket A-12-120, Dec. 2489 (2012) (Head Start grant terminated for poor management and administration of programs); HHS Departmental Appeals Board, Appellate Division, Docket A-15-33, Dec. 2670 (2015) (Head Start grant terminated because grantee was using corporal punishment on children); HHS Departmental Appeals Board, Appellate Division, Docket A-15-39, Dec. 2797 (2017) (Head Start grant terminated due to physically dangerous facilities and fire hazards).
[37] https://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2611.pdf.

28

abuse continued to work at the Head Start center for two years following the report of sexual abuse and later was promoted to run a special program. (*Id.*).

73.    Of course, HHS has not restricted its enforcement actions to Head Start, but has extended its compliance requirements to multiple organizations,[38] including those within the U.S. States, Puerto Rico, and the U.S. Virgin Islands based on noncompliance with enumerated public policies.[39] Among those organizations are higher educational institutions.[40]

---

[38] *See* HHS Departmental Appeals Board, Appellate Division, Docket A-03-11, Dec. 1878 (2003) (Medical testing laboratory barred from receiving payment through federal healthcare programs due to noncompliant testing process); HHS Departmental Appeals Board, Appellate Division, Docket A-03-62, Dec. 1910 (2004) (Grant to a community business development organization was terminated because grantee organization veered far from the planned project they had laid out in their application); HHS Departmental Appeals Board, Appellate Division, Docket A-06-78, Dec. 2063 (2007) (Grant to addiction recovery group terminated due to poor financial management); HHS Departmental Appeals Board, Appellate Division, Docket A-08-97, Dec. 2207 (2008) (Administration for Children and Families ("ACS"), under HHS, terminated grant to Native American tribe related to native language learning because tribe was not meeting objectives and deadlines that had been established in the tribe's application); HHS Departmental Appeals Board, Appellate Division, Docket A-11-113, Dec. 2476 (2012) (Grant to science company was terminated because company repeatedly failed to comply with requirements regarding the disclosure of financial and scientific data to grantor); HHS Departmental Appeals Board, Appellate Division, Docket A-14-26, Dec. 2575 (2014) (Grant to nonprofit community health center was terminated because center failed to do periodic reviews of its service quality/utilization).

[39] *See* HHS Departmental Appeals Board, Appellate Division, Docket 889-45, Dec. 1202 (1990) (Ohio penalized with reduction in federal funding because the State child support enforcement program was noncompliant with the Social Security Act); HHS Departmental Appeals Board, Appellate Division, Docket A-04-43, Dec. 1995 (2005) (Nevada was subject to financial penalty that reduced TANF grant funds because the State did not meet target for enforcing child support); HHS Departmental Appeals Board, Appellate Division, Docket A-04-40, Dec. 1993 (2005) (Puerto Rico punished by reduction in TANF grant funds because Puerto Rico did not meet their target for enforcing child support); HHS Departmental Appeals Board, Appellate Division, Docket A-06-75, Dec. 2074 (2007) (Wyoming was subject to financial penalty that reduced grant funds because Wyoming did not meet target for enforcing child support); HHS Departmental Appeals Board, Appellate Division, Docket A-13-95, Dec. 2552 (2013) (Rhode Island was subject to financial penalty due to its failure to participate in a program required by its TANF grant); HHS Departmental Appeals Board, Appellate Division, Docket A-17-117, Dec. 2943 (2019) (U.S. Virgin Islands penalized by reduction in State Family Assistance Grant because the Islands did not meet their target for enforcing child support).

[40] *See* HHS Departmental Appeals Board, Appellate Division, Docket 78-4, Dec. 82 (1980) (Bloomfield College's request for disbursement of grant money was disallowed and it had to refund some of the money it had previously received because an audit revealed that the college has misrepresented its commitments in its application and had not been spending as much of its own money on the project as it claimed); HHS Departmental Appeals Board, Appellate Division, Docket 79-204, Dec. 145 (1981) (Washington State University's request for disbursement was disallowed because it was overcharging for labor costs); HHS Departmental Appeals Board, Appellate Division, Docket 86-116, Dec. 808 (1986) (University of North Dakota's request for disbursement of grant money was disallowed because the university tried to use grant money to pay a federal employee for things he already should have been doing as part of his federal job);

**b. FCA Claims Are Applicable to Federal Funds Granted to Higher Education Institutions.**

74.     FCA liability of educational institutions for violations of federal funding regulations based on false certifications of compliance is well-established.[41] In *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1168, 1177 (9th Cir. 2006) the Court found that hundreds of millions of dollars in funds granted under Title IV were based on false statements made to the government, which were material to the

HHS Departmental Appeals Board, Appellate Division, Docket A-92-114, Dec. 1350 (1992) (University of Iowa's request for disbursement was disallowed because it had taken the funds meant for a certain researcher and rebudgeted them to instead cover the salary for a new researcher without obtaining permission from grantor); HHS Departmental Appeals Board, Appellate Division, Docket A-97-042, Dec. 1640 (1998) (North Carolina University's request for disbursement of grant money was disallowed because the university's structuring of salaries double counted costs); HHS Departmental Appeals Board, Appellate Division, Docket A-99-74, Dec. 1714 (1999) (University of Arizona's request for disbursement of grant money was disallowed because the university did not abide by the terms of its application. Specifically, it allowed people to work less than full time schedules and it made significant changes to the planned project that was outlined in the application).

[41] *See U.S. ex rel. Hamilton v. Yavapai Community College District et al.*, 3:12cv08193 (D. Ariz. 2019) (denying summary judgment as to FCA claims of false certifications to the VA regarding student enrollment in order to receive federal funds); *U.S. ex rel. Rose et al v. Stephens Institute dba Academy of Art University*, 909 F.3d 1012 (9th Cir. 2018) (denying defendant's motion for summary judgment and holding that relators' claims regarding student financial aid and incentive compensation were material and issues of fact); *U.S. ex rel. Beauchamp et al v. Academi Training Center, Inc.*, 1:11cv00371 (E.D. Va. 2017) (denying defendant's motion for summary judgment as to relators' FCA claims that defendant presented false claims and false statements to the Government in order to obtain federal funds); *U.S. ex rel. Miller v. Weston Educational, Inc. dba Heritage College*, 840 F.3d 494 (8th Cir. 2016) (following the Supreme Court's remand, the Court of Appeals held that a fact issue regarding defendant's pre-contract knowledge and intent precluded summary judgment as to FCA fraud inducement claims); *U.S. ex rel. Laporte et al v. Premier Education Group, L.P. et al*, 1:11cv03523 (D.N.J. 2016) (denying summary judgment motion as it pertains to relators' FCA claims that defendant violated the incentive compensation ban and falsified grades and attendance records in order to receive federal funds); *U.S. ex rel. Powell et al v. American Intercontinental University, Inc,. et al*, 1:08-cv-2277 (N.D. Ga. 2016) (denying defendants' motion for summary judgment as to relators' claims of unlawful incentive compensation, which amounted to false claims of compliance under Title IV through PPA certifications); *U.S. and the State of Florida ex rel. Christianson et al v. Everglades College, Inc. dba Keiser University*, 16-10849; 16-11839 (S.D. Fla. 2017) (finding after bench trial that defendants violated the ban on incentive compensation and were guilty under the FCA for falsely certifying compliance); *James Carter et al v. Bridgepoint Education, Inc., Ashford University, LLC et al*, 10-cv-1401 (S.D. Cal. 2015) (denying defendants' motion for summary judgment against relators' claims that defendants violated Title IV through false certifications due to incentive compensation in order to receive federal funds); *U.S. ex rel. v. American University of Beirut*, 1:14cv06899 (S.D.N.Y. 2014) (case was settled and dismissed based on relator claims, including the university's false certifications of non-discrimination in order to collect federal funds through USAID); *U.S. ex rel. Sobek v. Education Management, LLC*, 10-131 (W.D. Pa. 2013) (denying defendants' motion to dismiss relating to false certifications of compliance submitted by defendants to receive federal student loan funding); *U.S. ex rel. Gatsiopoulos et al v. ICM School of Business and Medical Careers et al*, 1:2009cv21720 (S.D. Fla. 2010) (denying defendants' motion to dismiss relators' FCA claims on incentive compensation).

government's payment of funds.[42] Specifically, the *Hendow* plaintiffs alleged that the University of Phoenix knowingly made false promises to comply with the government's enumerated policy banning incentive compensation. Compliance with the stated policies was a threshold matter for eligibility to receive federal funds. The *Hendow* Court found that the controlling statutes were "not ambiguous exhortations of an amorphous duty," but explicitly conditioned "participation and payment on compliance with, among other things, precise requirements that relators allege that the University knowingly disregarded." *Id.* at 1176.

75.    Further, the court found that *if "conditions of participation were not conditions of payment, there would be no conditions of payment at all—and thus, an education institution could flout the law at will*." *Id.* (emphasis added). The *Hendow* Court held, and the *Seibert* Court later agreed, that "[t]hese conditions are also 'prerequisites,' and 'the sine qua non' of federal funding, for one basic reason: if the University had not agreed to comply with them, it would not have gotten paid." (*Siebert v. Gene Sec. Network, Inc.*, 2013 WL 3052882, N.D.Cal. 2013 (citing *Hendow* at 1176)).

76.    *Siebert* was an FCA case in which the plaintiff alleged that Gene Security Network, Inc. falsely certified compliance with NIH requirements when it applied for three research grants. The district court, relying on *Hendow*, found that plaintiff's allegations of defendant's false certifications were material to NIH's decision to award and fund the grants.[43] Similarly, in *Jones ex rel. United States v. Massachusetts Gen.*

---

[42] *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1168, 1177 (9th Cir. 2006). The *Hendow* court invoked a 1996 case against the Los Angeles Unified School District, wherein it found that "False Claims Act liability can attach under the theory of false certification…" Id at 1171; *see United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265.

[43] The case survived motions to dismiss and summary judgment, though ultimately was dismissed based on a jury's findings that defendant had not made false statements.

*Hosp.*, 780 F.3d 479 (1st Cir. 2015), the First Circuit Court of Appeals held that plaintiff's FCA claims against Massachusetts General Hospital, Brigham & Women's Hospital, Harvard Medical School, Harvard University, and specified individuals survived defendants' summary judgment motion because NIH's award of the $12 million grant relied on potentially false information. *See Jones ex rel. United States v. Massachusetts Gen. Hosp.* 780 F.3d at 486.

77.     As cemented in *Hendow*, *Siebert* and *Jones*, a government agency's award of funds relies on statements and certifications of compliance with specified regulations from the grantee. If the grantee provides false statements and certifications at the time of the application and/or does not continue to comply with the stated regulations at any point after the award, that noncompliance is material to the government's granting of the award, and the organization should, at a minimum, be stripped of its funds.

78.     A recent example of this enforcement can be found in the March 2019 settlement between the United States and Duke University resolving FCA claims that Duke submitted applications and progress reports for federally funded environmental and health research grants containing falsified data in order to obtain millions of dollars in federal grants from NIH and the Environmental Protection Agency ("EPA"). Duke agreed to pay $112.5 million to resolve the allegations covering grants during 2006-2018.[44]

### c. Title IX Compliance Is an Enumerated Public Policy That Is Enforceable Through FCA by HHS and NIH.

79.     Title IX is an enumerated public policy with which organizations applying for funds to HHS and NIH must always comply. That certification of compliance is a

---

[44] https://www.justice.gov/opa/pr/duke-university-agrees-pay-us-1125-million-settle-false-claims-act-allegations-related.

material factor in the government's decision to award funds. It is such an important requirement to HHS and NIH that false certifications in applications alone, absent the award of funding, are punishable.

80.    It is imperative to enforce the public policies enumerated by HHS and NIH, specifically Title IX, for as the Supreme Court stated: "when there is a legal right without a legal remedy, the right has little meaning." *N.A.A.C.P. v. Medical Ctr., Inc.*, 599 F.2d 1247, 1255 (3rd Cir. 1979) (citing *Sullivan v. Little Hunting Park*, 396 U.S. 229, 238 (1969); *see also Fynes v. Weinberger*, 677 F.Supp. 315 (E.D.Pa. 1985)).

81.    As a policy, Title IX is not different from Title VI. As the United States Supreme Court stated in *Cannon v. University of Chicago*, there should be no difference in the evaluation of compliance whether it is for Title VI or Title IX.

> Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefited class. ***Both statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination.*** *Cannon v. University of Chicago et al.*, 441 U.S. 677 (1979).

82.    Congress enacted Title IX in 1972 which was followed by the Department of Health, Education and Welfare (HHS' predecessor) promulgating regulations implementing the statute in 1974. Merely two years later, the Secretary began taking action against sex discrimination in a higher education institution, as evidenced in *Iron Arrow Honor Society v. Heckler*. The Secretary "notified the University's President of its determination that the University was rendering 'significant assistance' within the meaning of the regulation to Iron Arrow" by permitting the all-male society to perform its

initiation ceremony on university property. *Iron Arrow Honor Society v. Heckler*, 363 U.S. 67, 68 (1983).

83.    The university president ultimately banned Iron Arrow from returning to campus as a university organization and from conducting its activities on campus "until it discontinues its discriminatory membership policy." *Iron Arrow* at 69. Further, the university stated that the school's position would be unchanged, regardless of the outcome of the lawsuit Iron Arrow filed against the university and the Secretary. Based on this assurance, the case was declared moot, but the import of the government's position and an appropriate response by the school to avoid further discrimination is clear. It is both clear and the complete antithesis of Yale's actions, as detailed below.

       E.      **The United States Previously Sued Yale and Other Universities Under the FCA for Similar Research Grant Violations.**

84.    The FCA applies to a university that receives federal funds to conduct research but fails to comply with applicable statutes and regulations. Yale is a recidivist violator in this regard. In December 2008, Yale entered into a civil settlement with the Connecticut U.S. Attorney's Office to resolve allegations that it violated the FCA in the management of almost $3 billion in federally funded research grants awarded to Yale between January 2000 and December 2006.[45] More than 30 federal agencies had granted Yale funds with over 94% of the funds granted by the Department of Health and Human Services, the National Science Foundation, the Department of Energy, the Department of Defense, and the National Aeronautics and Space Administration. The settlement addressed more than 6,000 grants awarded to Yale.

---

[45] https://oig.nasa.gov/docs/pr2009-B.pdf.

85.    The government investigation found two areas of systemic violations. **First**, Yale researchers improperly transferred charges to federal grant accounts, which were not allocable, meaning that the charges were unrelated to the basis for the grant. This violated the requirement that cost transfers to a federal grant account must be allocable to the particular grant account. Researchers were allegedly motivated to carry out these wrongful transfers when the federal grant was near its expiration date, and they needed to spend down the remaining grant funds; otherwise, the unspent funds would be required to be returned to the government.

86.    **Second**, Yale researchers submitted time and effort reports for work performed during the summer to federal grants when, in fact, much of the work was unrelated to the grant. As a rule, salary charges to federal grants for researcher time and effort must reflect actual time and effort spent on a particular grant. Researchers were allegedly motivated to carry out these wrongful charges because they are not paid their academic-year salary by Yale during the summer. In effect, Yale made false claims for payment by shifting the payment of researcher salaries to the United States for work unrelated to the grants and for which Yale should have paid.

87.    Yale paid $7.6 million to settle the false claims associated with the pattern of federal grant fraud. As part of the global resolution, the settlement agreement with the United States provides, among other aspects, that in the future Yale will not charge any unallowable costs directly or indirectly to any contracts with or grants from the United States.

88.     In addition to Duke University's $112.5 million settlement in 2019 for falsifying data to obtain millions of dollars in grants from NIH and EPA,[46] in July 2016, DOJ and HHS OIG announced a $9.5 million settlement with Columbia University for improperly seeking and receiving excessive cost recoveries in connection with research grants funded by NIH.[47] Additionally, in April 2020, Rice University entered into a settlement to pay more than $3.7 million to resolve claims it engaged in a pattern and practice of improperly charging NSF research and development awards.[48]

## V.    YALE'S HISTORY OF SYSTEMIC VIOLATIONS OF MANDATED TITLE IX COMPLIANCE.

### A.  Pre-VRA Title IX and Clery Act Violations.

89.     Yale has a long history of Title IX violations. In the 1980 landmark case, *Alexander v. Yale*, 631 F.2d 178 (2d Cir. 1980), five students sued the University after it refused to establish a centralized grievance mechanism for addressing incidents of sexual misconduct. The students alleged that the University engaged in a pattern and practice of "neglecting and refusing to consider seriously complaints of sexual harassment of women students" and denied educational benefits in violation of Title IX.

90.     The district court agreed that Yale's procedures for handling complaints of sexual harassment were inadequate, and the suit prompted universities across the country to institute grievance procedures.[49] Yale created the Sexual Harassment Grievance Board

---

[46]https://www.justice.gov/opa/pr/duke-university-agrees-pay-us-1125-million-settle-false-claims-act-allegations-related.

[47]https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-95-million-settlement-columbia-university-improperly.

[48] https://www.justice.gov/usao-sdtx/pr/rice-university-pays-resolve-claims-it-defrauded-federal-grant-program

[49] *See* 631 F.2d at 183. The majority of the *Alexander* plaintiffs were dismissed on technical grounds, because they had graduated from the University. The one claim that was permitted to go to trial was dismissed because the plaintiff could not prove she actually received a benefit, and thus did not establish

("SHGB") thereafter. Notably, Vice President Linda Lorimer, discussed in Section VI.A.b, worked in the Office of the General Counsel at the time of this complaint and wrote Yale's grievance procedures. The SHGB and the Executive Committee ("ExComm") were the two primary avenues for addressing sexual misconduct at Yale. In reality, these mechanisms never fulfilled Yale's Title IX obligations, and iterations of these committees over the years continue to be used by Yale as a cover purporting to comply with Title IX obligations, but failing at every turn. EXHIBIT C is a Summary Timeline of Yale's Pre-VRA Title IX Violations.

91.    Due to Yale's consistent and frequent Title IX violations over the decades, the Department of Education ("ED") began an investigation of Yale in 2004 under the Clery Act. The investigation confirmed three Clery Act reporting violations, indicating overt and active suppression by Yale and its senior leadership of the required reporting of data on sex offenses.[50] ED first informed Yale of its noncompliance with Clery Act in a 2010 report and detailed its conclusions in a 2011 letter to University President Richard Levin.[51] In May 2013, ED fined Yale for not reporting four sex offenses in its Annual Campus Security Report in 2001 and 2002, and for improperly and intentionally excluding Yale New Haven Hospital from the reporting on crime statistics in order to falsely underreport the crime data.[52] This represents one of the years Relator Landino confronted Martha Highsmith and others with the fact that Yale was underreporting

---

quid-pro-quo sexual harassment had occurred (student earned a C in the class taught by the professor she alleged engaged in sexual misconduct).

[50] *See* Cynthia Hua & Julia Zorthian, Yale fined $165,000 for Clery Act Violations, *Yale Daily News* (May 17, 2013), https://yaledailynews.com/blog/2013/05/17/after-seven-year-investigation-yale-fined-165000-for-clery-act-violations/.

[51] *Id.*

[52] Yale was initially informed by ED that they would be fined $165,000 but ultimately, the school was fined $155,000. *See* Campus Safety Staff, Dept. of Ed Reduces Clery Fine for Yale, CAMPUS SAFETY (Jul. 17, 2013), https://www.campussafetymagazine.com/news/dept-of-ed-reduces-clery-fine-for-yale/.

sexual assaults, and as a result, Relator Landino was barred from working on the crime

statistics portion of the Clery Act Report going forward.

92.     Yet, even after this enforcement by ED, Yale continued to flout its duty to

Title IX requirements. Based on a March 2011 formal complaint filed by sixteen Yale

students and alumni reporting the sexually hostile environment at Yale for which Yale

did nothing to curb, ED began another investigation into Yale.[53] However, ED limited its

investigation to student-on-student sexual misconduct in the undergraduate program and

focused on the following issues:

> (1)     Yale's failure to designate a Title IX coordinator
> and inform students and employees of that designation (34
> C.F.R. § 106.8(a));
>
> (2)     Yale's failure to adopt and publish grievance
> procedures providing for prompt and equitable resolution
> of complaints of sex discrimination (34 C.F.R. § 106.8(b));
> and
>
> (3)     Yale's failure to respond promptly, effectively, and
> equitably to a notice of sexual harassment leading to a
> hostile environment (34 C.F.R. § 106.31(a) and (b)).[54]

93.     The investigation revealed Yale's systemic noncompliance with Title IX's

most fundamental obligations.[55]

94.     To satisfy ED's OCR, Yale implemented a university-wide system for

allegations of sexual misconduct made both informally and formally. On July 1, 2011, the

University-Wide Committee on Sexual Misconduct ("UWC") became operational as

Yale's primary mechanism to promptly and equitably respond to complaints of sexual

---

[53] Jordi Gasso, Breaking: DOE's Office of Civil Rights to Investigate Yale for "Hostile Sexual Environment," *Yale Daily News* (Mar. 31, 2011), https://yaledailynews.com/blog/2011/03/31/breaking-does-office-for-civil-rights-to-investigate-yale-for-hostile-sexual-environment/.

[54] *See* Ltr from T. Hibino, Regional Director, OCR to D. Robinson, Yale VP and General Counsel, dated June 15, 2012. https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01112027-a.pdf.

[55] *Id.*

harassment under Title IX both informally and formally.[56] On paper, a formal process through the UWC purportedly involved an investigation conducted by an outside factfinder, followed by a hearing, and could result in sanctions if the accused student is found to have violated Yale's rules on sexual misconduct.[57]

### B. VRA Obligations.

95.     Yale entered into a Voluntary Resolution Agreement ("VRA") with OCR in 2012.[58] The goal of the VRA was to ensure that Yale "has an environment and culture in which all students feel safe and well supported, and that it responds promptly and effectively to incidents of sexual harassment and violence" consistent with the requirements of Title IX. Among other things, the VRA sets forth heightened requirements for the Title IX Coordinator; requirements for University grievance procedures addressing sexual misconduct; training for both students and faculty on Title IX responsibilities and issues related to sexual misconduct; dedication of University resources to the University's Sexual Harassment and Assault Response Education Center ("SHARE"); and it compels the University to engage in, at a minimum, annual climate assessments. It also required Yale to report annually to OCR regarding its compliance efforts. The agreement was signed by Dorothy Robinson, Yale's Vice President and General Counsel at the time.

96.     According to the VRA, all Title IX Coordinators and UWC members are to be trained annually on the University's obligations under Title IX; regulations regarding sexual misconduct and relevant resources available on campus; the UWC's

---

[56] *Id.*
[57] *Id.*
[58] *See* Voluntary Resolution Agreement, Yale University Compl. No. 01-11-2027 (June 11, 2012). https://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-b.pdf.

procedures, including accepting, processing, and investigating complaints of sexual misconduct; interacting with victims of sexual misconduct; gathering relevant evidence and assessing it in the Title IX context; the importance of confidentiality, fair process, impartiality, and applicable legal standards, safety considerations when determining interim measures and disciplinary sanctions; and any other topics deemed relevant. Similar trainings are to be held annually for Yale Police Department officers, residential college deans and masters, SHARE staff, freshman counselors, freshman and sophomore students, leaders of registered student groups and varsity teams, and any other populations identified through applicable assessments referenced in the agreement.

97.    The University, by signing the VRA, agreed to ensure that the SHARE Center has adequate resources to provide services to students, including 24/7 "on call" counselors, and to increase awareness of the Center's services through a new comprehensive website. The University also agreed to conduct assessments of the campus climate "with regard to gender discrimination, sexual misconduct, and Title IX, seeking input from students and student groups, including women's groups, as well as a wide variety of other sources."[59] These assessments are to take place annually at a minimum, and these will be considered in identifying future actions needed to "ensure that [Yale] maintains an environment that is safe and supportive to all students and in compliance with Title IX."[60] Significantly, the University also agreed to maintain records of *all* informal and formal complaints; continue to promote responsible drinking; continue efforts to expand and promote student leadership councils to promote norms of responsible conduct; and continue to study and address issues related to hazing.

---

[59] *Id.*
[60] *Id.*

### C. Public Post-VRA Title IX and Clery Act Violations.

#### a. Professor Thomas Pogge.

98.    Notwithstanding the VRA, Yale continued to fail to comply with Title IX after the OCR investigation concluded. For example, in 2015, a Yale graduate named Fernanda Lopez Aguilar filed a complaint against Yale with OCR. In it, she raised concerns about Yale's continuing inadequate response to her complaints of sexual harassment, first lodged in 2010, alleging that Yale philosophy professor, Thomas Pogge, had assaulted her and made unwelcome advances when she worked for him on a Yale-sponsored trip to Chile.[61] After she refused his advances, Pogge retaliated by rescinding his offer of a paid postgraduate fellowship at Yale's Global Justice Program. When Lopez Aguilar reported the sexual harassment to Yale, the response by the senior leadership was to offer a bribe in the amount of $2,000 to sign a nondisclosure agreement.[62]   Lopez Aguilar nevertheless filed a formal complaint against Pogge, for which Yale held a hearing and found Pogge not responsible for sexual harassment. Although the initial harassment occurred before the VRA, OCR was investigating Yale during the time of Lopez Aguilar's 2011 formal complaint. Press coverage later specified that Pogge had been accused of sexual harassment during his tenure at Columbia University[63] before coming to Yale. Yale was fully aware of the accusations but hired

---

[61] Hailey Fuchs & Adelaide Feibel, Students revive misconduct allegations against three Yale professors, *Yale Daily News*, (Dec. 16, 2017), https://yaledailynews.com/blog/2017/12/16/students-organize-response-to-saloveys-e-mail-on-sexual-misconduct/.

[62] Noah Remnick, After a Professor is Cleared of Sexual Harassment, Critics Fear 'Cultural Silence' at Yale, the *New York Times*, (Jul. 8, 2016), https://www.nytimes.com/2016/07/09/nyregion/a-yale-professor-is-cleared-of-sexual-harassment-but-concerns-linger.html.

[63] Pogge had been accused of sexual harassment during his time at Columbia University. Particularly, an allegation of sexual harassment was brought against him in 1995, which raised questions about whether Yale was aware of the allegation when Pogge was hired. While University officials stated they were unaware of this allegation, Pogge stated that they were well informed about this. *Id.* ("Professor Pogge said that a University representative had asked him about the Columbia case while he was being recruited, in

him anyway. Yale was also made aware of multiple other potential complaints but refused to investigate. These complaints included allegations of sexual misconduct from 8 women of color across 3 continents, several of whom alleged *quid pro quo* offers of perks in exchange for sex, as well as allegations of sexual abuse by a family member.

### b. School of Management.

99.    Additionally, in December 2013, Professor Constance Bagley in the Yale School of Management ("SOM") sued Yale alleging a pattern of gender and age discrimination, as well as retaliation.[64]  Bagley is a Stanford undergraduate and Harvard Law School-educated professor. When hired, Bagley agreed to join Yale SOM as a Professor in the Practice, the first woman ever to hold that status.[65]  She was told that her initial five-year appointment would be renewed in perpetuity; that she would be a "full-time voting member of the faculty on all matters except tenure appointments;" and that no Professor in the Practice had ever been denied renewal.[66]

100.    During her first four years at Yale, Bagley co-developed the course, "State and Society," for which she won the Excellence in Teaching Award. She authored several publications published in nationally recognized journals and magazines in addition to co-authoring a new edition of a book described by Business Insider as "perhaps the most useful business book you can ever read." All of this was done alongside Bagley's role as the primary architect of Yale's new policies on sexual misconduct, including serving as a core member of the UWC.

---

2007. Professor Benhabib, who served on Professor Pogge's selection committee, said that she and other committee members had heard about the Columbia case but did not discuss it.").

[64]Ryan Gittler, Bagley discrimination lawsuit dismissed, *Yale Daily News*, (Feb. 22, 2017), https://yaledailynews.com/blog/2017/02/22/bagley-discrimination-lawsuit-dismissed/.

[65]  *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332 (D. Conn. 2014).

[66] *Id.*

101.     Despite her academic accomplishments, and due to her participation with the UWC and what it stood for, instead of reaping the rewards of her work and receiving her "guaranteed" appointment renewal, her renewal process became completely different from all previous (male) Professors in the Practice. During her time at Yale, she was treated in a publicly sexist and demeaning manner by the SOM Dean, Edward Snyder, and professor of management who co-taught the "State and Society" course with her, Douglas Rae.[67] In particular, Rae would publicly mock and demean her, including by mocking a woman's voice, consuming entire class sessions, ignoring Bagley, or blocking her access to the table with her copy of the teaching case and notes during class sessions.[68] Snyder angrily refused to consider her for a promotion to an endowed tenured professorship, the Nierenberg Chair of Corporate Governance.[69]

102.     Pursuant to Bagley's initial contract and Yale SOM policies, she was notified that a committee chaired by Professor Paul Bracken would review her "accomplishments" and prepare a report on her case, which would then be voted on by the Yale SOM senior faculty.[70] The committee unanimously recommended reappointment based on its positive assessment of her scholarship, teaching, and service to Yale.[71] Nevertheless, when Yale SOM's Board of Permanent Officers ("BPO"), which consists of Yale SOM tenured faculty, met to decide on her reappointment,[72] Rae falsely suggested that there were deficiencies in Bagley's teaching of the "State and Society"

---

[67] Id.
[68] Id.
[69] Id.
[70] Id.
[71] Id.
[72] Id.

course with him.[73] The BPO ultimately voted against her reappointment, and Snyder decided to follow their recommendation even though he was not bound by it.[74]

103.    Bagley filed a formal complaint of discrimination, prompting President Salovey to appoint the Harte Committee to investigate and draft a report regarding the decision not to reappoint her. The Harte Committee prepared two reports, dated November 28, 2012 ("Harte Report") and March 3, 2013 ("Revised Harte Report"), both of which were submitted for review to Salovey.[75] The Harte Report concluded that Bagley's non-renewal may have been influenced by reactions to her gender in combination with other factors.[76] After Bagley provided the Harte Committee with the 2012 "State and Society" course evaluations, the Revised Harte Report was released, with the challenged false statements deleted.[77] Then, Yale convened yet a third, three-member committee to review Bagley's reappointment decision and articulate the review standards for Professors in the Practice,[78] chaired by Edieal J. Pinker.[79] Although Bagley was not permitted to review the Pinker Report because it was deemed "confidential," she was told that the Pinker Committee found her teaching, scholarship, and citizenry exemplary.[80] Even though these multiple efforts to conjure reasons for the refusal to renew her contract were unsuccessful,[81] the BPO again voted against renewing Bagley's contract as a Professor in the Practice.[82]

---

[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*

104.    The gender-based animus she faced was retaliatory for her advocacy of positions that did not conform to the wishes of the Yale Office of the General Counsel and the Yale leadership at large. Yale's choice to ask Bagley, an untenured faculty member, to take a leadership role in forming and then co-chairing the UWC was significant for a number of reasons, including that Bagley could easily be removed from her position if she did not sufficiently follow Yale leadership's orders. The information on Bagley's lawsuit and the early days of the UWC indicate that Bagley likely did not act in the manner that Yale leadership wanted. For instance, when Bagley pointed out to Yale Office of the General Counsel attorney, Susan Sawyer, problems with the structure of the UWC and suggested changes that would bring the structure into compliance with Title IX, Sawyer became hostile towards her. Bagley herself identified the risk she faced when she raised concerns that her advocacy on behalf of women at Yale would negatively impact her reappointment at SOM with UWC Co-Chair, Michael Della Rocca.[83] Unsurprisingly, Della Rocca, who also served as Chair of the Philosophy Department that refused to discipline Pogge in response to Lopez-Aguilar's complaints, took no action.[84]

### c.  The Spanish and Portuguese Department.

105.    Yet another example of Yale's failure to comply with Title IX was evident in 2014 as the Spanish and Portuguese Department ("S&P") garnered attention for repeated sexual harassment and related misuse of power allegations.[85] In 2017, the *Yale*

---

[83] *Id.*

[84] *Id.*

[85] Emma Platoff, Spanish Portuguese department faces budget woes, chilly environment, *Yale Daily News* (Nov. 20, 2014), https://yaledailynews.com/blog/2014/11/20/spanish-portuguese-department-faces-budget-woes-chilly-environment/. In 2014, the S&P department faced budget-related problems, which made it difficult for them to compete with peer institutions. These financial issues were enhanced by the secretive nature of the department chairs who controlled the budget. A graduate student quoted in the article asked to remain anonymous for fear of retaliation from the department and stated that the department chair can ruin a person's career with a recommendation letter.

*Daily News* detailed how Susan Byrne, a former S&P professor, filed a lawsuit claiming that she faced sexual harassment and bullying from professors in the S&P department and was denied tenure for speaking out against it.[86] The lawsuit alleges that Roberto Gonzalez Echevarria, a professor of Hispanic and comparative literatures in S&P, repeatedly made crude comments to and about female professors in the department, played with the hair of undergraduate and graduate students, and kissed Byrne on the mouth without her consent in front of hundreds of colleagues at a 2014 party.[87]

### d. Professor Michael Simon.

106.     In an even more recent article, the *Yale Daily News* detailed sexual harassment in the Yale School of Medicine ("YSM").[88] In 2013, the UWC found Michael Simons, a cardiology professor at the Yale School of Medicine, responsible for sexually harassing an Italian postdoctoral associate, Annarita Di Lorenzo, and creating a hostile work environment for Di Lorenzo's then boyfriend and now husband.[89] He was removed as chief of cardiology for 18 months.[90] In 2018, Yale medical faculty rallied against the University investing Simons with an endowed chair, a title typically reserved to honor senior faculty members that often includes supplementary funding.[91] When members of the Committee on the Status of Women in Medicine met with School of Medicine Dean Robert Alpern and Chief Diversity Officer Darin Latimore to protest this decision,

---

[86] Rachel Treisman, Former Spanish prof alleges sexual harassment, retaliatory firing in lawsuit, *Yale Daily News* (Jul. 7, 2017), https://yaledailynews.com/blog/2017/07/07/former-spanish-prof-alleges-sexual-harassment-retaliatory-firing-in-lawsuit/.
[87] *Id.*
[88] Serena Cho, Open Secrets: #MeToo in the Med School, *Yale Daily News* (Nov. 5, 2018), http://features.yaledailynews.com/blog/2018/11/05/open-secrets-metoo-in-the-med-school/.
[89] *Id.*
[90] Tamar Lewin, Yale Medical School Removes Doctor After Sexual Harassment Finding, the *New York Times* (Nov. 14, 2014), https://www.nytimes.com/2014/11/15/us/yale-medical-school-sexual-harassment.html.
[91] Serena Cho, Open Secrets: #MeToo in the Med School, *Yale Daily News* (Nov. 5, 2018), http://features.yaledailynews.com/blog/2018/11/05/open-secrets-metoo-in-the-med-school/.

Alpern said that he had an "obligation" to defend Simons while implying that he found his behavior to be defenseless.[92] Yet, according to court records, Alpern gave Simons the opportunity to relinquish the endowed chair title, and in that case, "the university would pay an annual amount equivalent to the payout from the chair, approximately $140,000 per year, with adjustments each year to reflect the expected growth in the financial value of the chair."[93] As further proof of Yale protecting grants over Title IX obligations, YSM Dean Robert Alpern, confronted with the sexual harassment allegations against Dr. Michael Simons, said, "What can I do? He has two grants."

> **e. Association of American Universities Campus Sexual Climate Surveys.**

107.    Yale participated in two Association of American Universities' (AAU) campus sexual climate surveys, which compiled data from students at 27 universities in 2015 and in 2019.[94] The results of the 2015 survey – which were described as "extremely disturbing" by Yale President Peter Salovey – showed that 16.1 of survey respondents had been victims of sexual misconduct while at Yale.[95] It also revealed that Yale students are subjected to sexual harassment and sexual assault at a rate significantly higher than the national average, and that they often face reporting barriers. Salovey was elected to the Board of the AAU in 2017.[96] In 2019, the AAU survey showed that once again, graduate women at Yale reported the highest rate of non-consensual sexual contact.

---

[92] *Id.* at para. 7.
[93] Serena Cho, Stripped of endowed chair, Simons files lawsuit against Yale, *Yale Daily News* (Oct. 22, 2018), https://yaledailynews.com/blog/2018/10/22/stripped-of-endowed-chair-simons-files-lawsuit-against-yale/.
[94] Yale AAU 2015 Climate Survey on Sexual Misconduct.
[95] Serena Cho, Yale participates in national sexual climate survey, *Yale Daily News* (Feb. 5, 2019), https://yaledailynews.com/blog/2019/02/05/ct-open-leaves-new-haven/.
[96] Hailey Fuchs, Salovey joins AAU board, *Yale Daily News* (Nov. 8, 2017), https://yaledailynews.com/blog/2017/11/08/salovey-joins-aau-board/.

Further, among the 33 institutions surveyed, Yale had the highest rate of students who reported that they were "pressured NOT to report or file a complaint."[97]

108.    The barriers in reporting are evident in the discrepancies between the anonymous climate survey reports and the officially reported sexual assaults at Yale. Since 2012, Yale has published semi-annual Provost Reports of Sexual Misconduct Complaints.[98] These reports have knowingly underreported incidents of sexual misconduct, consistent with Yale's long history of stifling reporting. While the Spring 2019 Report reflects the highest number of complaints compared to any prior reporting period, it represents only a fraction of the sexual assaults at Yale, and even for those reported assaults, Yale has failed to comply with its Title IX obligations.

109.    This failure is evident in Yale's own Provost Reports on Sexual Misconduct. The June 2020 Report, which compiles reported complaints from July 1, 2019 to December 31, 2019, identifies 59 sexual harassment complaints made to the Title IX Coordinator; yet not one of those complaints was forwarded to Yale's University-Wide Committee on Sexual Harassment ("UWC"). Further, of 38 reported sexual assault complaints, only one was reviewed by the UWC. Similarly, in the September 2019 Report, compiling reported complaints from January 1, 2019 to June 30, 2019, of the 88 reported sexual harassment complaints, 84 were addressed by the Title IX Coordinator, and only one was reviewed by the UWC.

### f.    Professor Eugene Redmond.

110.    Finally, in August 2019, an Independent Investigation was performed by former U.S. Attorney for the District of Connecticut, Deirdre M. Daly, regarding decades

---

[97] *See* Exhibit D.
[98] Provost Reports of Sexual Misconduct Complaints 2012-2019.

of sexual abuse perpetrated by Yale Professor D. Eugene Redmond.[99] Yale failed to honor its Title IX obligations and to protect its students for over 25 years, as evidenced by the abuse from the same violator that had been reported to Yale from 1994 through 2018. The report found that the YSM Professor and former Morse College advisor sexually assaulted five students affiliated with his University research in St. Kitts[100] and engaged in sexual misconduct with at least eight other undergraduate, graduate, and high school students even after the 1994 report and investigation. "[T]he 1994 investigation was flawed, but far more problematic was YSM's failure to institute a meaningful oversight mechanism to ensure that Redmond's interactions with students was monitored."[101] This lack of monitoring is most evident from the 1994 committee's finding that Yale was accountable for the events at the St. Kitts facility and recommended the St. Kitts summer program for students be suspended; yet between 1999 and 2018, Yale paid approximately $7 million that it received from NIH to Axion Research Foundation, a non-profit organization founded by Redmond, used for Redmond's research projects and to fund student work in St. Kitts.[102]

111.    EXHIBIT D is a report prepared by Relators that quantitatively documents Yale's status as the least compliant public or private higher educational institution in the country. The report aggregates data from three separate metrics to compare Yale's Title IX compliance (or lack thereof) with other higher education institutions. Specifically, the report aggregates and interprets data from The Academic Sexual Misconduct Database, Individual Institution Title IX Reports, and the 2015 and 2019 Association of American

---

[99] Professor Redmond Report.
[100] *Id.* From 1985 through 2008, NIH and Yale awarded Redmond's research projects approximately $38.3 million.
[101] *Id.*
[102] *Id.*

Universities ("AAU") Campus Climate Surveys. All three separate data sets establish that Yale is the least compliant institution when compared to universities of both similar and larger size. Importantly, all of this data tracks the time period after 2012 when the Department of Education ("ED") investigated and concluded that Yale violated Title IX, resulting in the heightened Voluntary Resolution Agreement ("VRA") contractual requirements. Yale's established pattern of knowing violations after the 2012 VRA and its year-after-year ranking as the least compliant institution are significant factors evidencing Yale's fraudulent scheme to falsely certify its compliance in violation of the False Claims Act.

112.   What emerges is a decades-long pattern and practice of Yale's noncompliance with Title IX and a coordinated effort to conceal the true scope of the violations from federal regulators perpetrated by senior leadership due to concerns that any further enforcement by the United States would interfere with federal funding. The evidence of this conduct is discussed in Parts VII.A-C.

## VI.    YALE AND ITS SENIOR LEADERSHIP KNOWINGLY HAVE MADE FALSE STATEMENTS AND CERTIFICATIONS REGARDING ITS NONCOMPLIANCE WITH TITLE IX.

### A. Relators Are Fact Witnesses to Yale's Noncompliance.

113.   Relators have firsthand experience of Yale's research grant fraud and related Title IX non-compliance either through assisting individual victims or by engaging in programmatic or policy work designed to improve Yale's treatment of victims or both. Relators had different statuses in different parts of the University: one was a senior faculty member at a Yale professional school; another was a staff member in a central and high-level administrative office; and one was a PhD candidate in a graduate

department. Nevertheless, each experienced Yale's retaliatory actions for assisting victims of research grant fraud, and Title IX and Clery Act violations, and each have knowledge of Yale's false statements and false certifications concerning knowing noncompliance with HHS and NIH grant requirements.

### a. Relator Nita Maihle, PhD.

114.    Dr. Maihle was recruited by Yale School of Medicine ("YSM") through the endowed Senior Women in Medicine Professorship ("SWMP"), designed to increase the representation of senior women conducting research at Yale. Previously, Dr. Maihle was at the Mayo Clinic in Rochester, MN, where she founded the Tumor Biology Program. She also held two prestigious postdoctoral fellowships at the Cold Spring Harbor Laboratory and with the National Cancer Institute. Dr. Maihle has received numerous honors and awards, including the 2013 Distinguished Alumni Award from her alma mater, the Albert Einstein College of Medicine at Yeshiva University. Dr. Maihle served on faculty at Yale as a full professor from 2003 until 2013.

115.    Yale created the SWMP because YSM had very few senior women, and the majority of female faculty who came left quickly. Dr. Maihle witnessed pervasive sexual harassment at YSM and came to understand the high turnover rate. Female trainees and junior faculty members[103] were targeted by YSM senior male faculty commonly making lewd comments, catcalling, and whistling at them in YSM hallways. During research seminars, senior male faculty such as Professors Richard Hochberg[104]

---

[103] Of    the    5    females    hired    only    one    remains    at    Yale:    Barbara    Ehrlich.    *See* https://medicine.yale.edu/pharm/people/barbara_ehrlich.profile.
[104] When Dr. Maihle first began at YSM, Richard Hochberg was Senior Faculty in the Department. Over the five years that she was there, he was promoted to the Head of Division of Research in the Department and ultimately, became Vice Chair of Research.

and Hal Berman would show slides of young, female staff technicians sitting on their laps and would generally treat the sexual exploitation of Yale women as a "job perk."

116.    Harassing behaviors occurred in YSM meetings, presentations, and the Friday afternoon networking happy hours where senior male faculty commented on the junior women's bodies and clothing rather than treating them as peers, mentees, and students. YSM senior male faculty encouraged excessive alcohol consumption by junior women at these happy hours, pairing off with them after the junior women were drunk. YSM junior women often told Dr. Maihle they felt they had to attend these happy hours to achieve success. Dr. Maihle objected to the parties to OB/GYN Department Chair Charles J. Lockwood, but he attended the parties himself and did nothing to stop the known abuse.

117.    Regardless of the fact—or perhaps because of the fact—that her professional accomplishments far exceeded many of the YSM senior male faculty, Dr. Maihle was not welcomed at Yale, particularly by the worst harassers, such as Hochberg and Berman, who went as far as to test Dr. Maihle to see how she would react to being harassed. At a YSM party, Berman asked her to dance. Berman's wife was with him, so Dr. Maihle thought the invitation odd, but she figured he was trying to include her. As soon as they began dancing, visible to everyone, Berman grabbed Dr. Maihle's buttocks. She immediately pushed him away.

118.    Sexual harassment complaints against male faculty were often discussed and dismissed by everyone except Dr. Maihle in faculty meetings where the accused faculty harassers were being considered for appointment, tenure, or promotion. Dr. Maihle was usually the only woman in the room as such faculty meetings were closed to

anyone not a faculty member above a certain rank. For instance, at a January 2011 meeting, the Promotion & Tenure Committee discussed Dr. Thomas Rutherford, his history of sexual harassment, related legal actions since 2003, and current complaints against him. Interim Chair of the OB/GYN Department Peter E. Schwartz referenced Dr. Joseph Schlessinger, who had a sexual harassment lawsuit settled by Yale in 2006, and noted that "it didn't hurt him." Dr. Hochberg, later Jane Doe A's harasser, said to Dr. Maihle, "Well it seems such lawsuits don't do much harm even to our chairs…now do they?" Even though Rutherford was going to be promoted because the male faculty supported him, when Dr. Maihle refused to vote in favor of the promotion, Schwartz made a veiled threat to her, saying "You know, Nita, the corporation [meaning Yale] doesn't like it when we don't have a unanimous vote."

119.    Rutherford then recommended another accused harasser, Dr. Richard Bercik, for reappointment. When Schwartz read aloud a formal sexual harassment complaint against Bercik, all the committee members (except Dr. Maihle) laughed. Rutherford then said he had a "come to Jesus" talk with Bercik, causing more titters, and the committee voted to reappoint Bercik.

120.    In early 2009, Annie Le, the Ph.D. candidate later sexually assaulted and murdered by a Yale laboratory technician, was a student in one of Dr. Maihle's classes. Le approached Dr. Maihle, wanting to work in Dr. Maihle's laboratory, but Dr. Maihle had to turn down Le's request due to Dr. Maihle's planned work at Harvard during that academic semester. Le was required to remain unprotected in the laboratory of the now-convicted technician who sexually assaulted and murdered her.

121.    As Dr. Maihle was the only female senior faculty member in OB/GYN with a joint appointment in pharmacology, junior women faculty and trainees reached out to Dr. Maihle frequently, seeking her help to cope with and end the sexually harassing and exploitative culture of YSM. Dr. Maihle openly objected in meetings to lewd comments made about other women at YSM and actively tried to protect the junior women from the YSM senior male faculty's predatory behavior. She also gave advice to YSM women and sometimes referred them to YSM Dean Robert Alpern's Office to file a formal complaint.

122.    In February 2012, Dr. Maihle supported Jane Doe A, a former OB/GYN faculty member in filing a complaint with the University-Wide Committee on Sexual Harassment ("UWC") concerning Professor Hochberg's repeated sexual advances. The inappropriateness of the advances was exacerbated by the fact that Hochberg knew Jane Doe A had come to YSM with her husband, who also was a member of the OB/GYN Faculty. Ultimately, the UWC found against Hochberg, which led to his demotion, though he remained on faculty.

123.    In light of Dr. Maihle standing up for junior women at YSM by abstaining from voting to retain or promote two YSM accused harassers (one of whom had been accused by multiple victims), and by helping Jane Doe A, Dr. Maihle experienced retaliation that soon escalated to multiple tangible adverse actions. First, between 2003 and 2009, YSM required Dr. Maihle to move her assigned laboratory space assignment five times, an unprecedented number, and forced her to bear much of the moving costs, even while on an approved sabbatical at Harvard that benefitted YSM through Dr. Maihle's precision medicine research with Clay Christensen. In one example, partly

54

through Dr. Maihle's connections at Harvard, Yale recruited a new cancer center director, Tom Lynch. Soon after his recruitment Yale's cancer center was among the first in the country (if not the first), under Lynch's leadership to develop a "molecular tumor board." This was one of the first applications and formalizations of precision medicine in a cancer center.

124.    The second example occurred in Fall 2011 at a Promotions and Tenure ("P&T") meeting. When Dr. Maihle objected to a derogatory comment Hochberg made while reviewing a junior woman faculty member, Hochberg responded by telling her to "shut up." Instead of reprimanding Hochberg, Interim Chair of the OB/GYN Department Peter E. Schwartz demanded to meet the next day with Dr. Maihle and informed her, without prior notice, that YSM recently reviewed her "performance." Dr. Maihle asked for the review's details, but Schwartz refused to share.

125.    Third, YSM reduced Dr. Maihle's salary three times between 2010 and 2012 without justification. Such reductions totaled more than the 20% annual reduction allowed under the department's published reduction policy. Yale also obstructed Dr. Maihle's attempts to get her salary and research budget covered by a prestigious appointment at the National Cancer Institute ("NCI"), an honor for which nobody else in her YSM department had qualified. Dr. Maihle's OB/GYN Chair, Charles Lockwood, refused to permit her to accept the Inter Programmatic Agreement even though it would have paid up to 100% of her uncommitted salary. Around the time of Dr. Maihle's third salary reduction, 2012-2013, she was also denied a routine request for a fully-funded visiting female scientist to work in her laboratory.

126.   In his interim leadership capacity, Schwartz also warned that "in the absence of significant improvement, […] [Maihle] should anticipate a further reduction in FY 2013-2014." Dr. Maihle immediately responded to Schwartz disputing his claims in a letter detailing her accomplishments and followed up twice, only to receive a response claiming she had misrepresented her productivity.[105] Dr. Maihle did not respond to Schwartz's June or July emails for fear that she would face further retaliation.

127.   Despite the discriminatory treatment, Dr. Maihle received numerous governmental and non-governmental grants while at YSM. Her career totals around $22 million in direct funding, despite the history of YSM senior male faculty not crediting female scientists for their work. For example, Berman co-opted a National Institute of Child Health and Human Development grant on Women's Reproductive Health Research that Dr. Maihle wrote while at the Mayo Clinic without giving Dr. Maihle any credit for her work by positioning himself improperly as the grant Research Director.

128.   Dr. Maihle also reported YSM leadership for conflict of interest violations, which were ignored. In 2008, based on a major government investigation into Yale's widespread noncompliance with federal grant requirements covering $3 billion in 6,000 grants from 30 federal agencies—including DHS, DOD, and NASA, between January 2000 and December 2006—Yale was fined and specific scientists, including Dr. Maihle, were required to attend "percent effort certification" training. Based on Dr. Maihle's firsthand experience, and despite federal authorities fining Yale in 2008, Yale continued to use federal funds unrelated to the grants and to defraud the federal government in new profitable ways, using funds for non-grant start-up projects.

---

[105] Letters between Dr. Maihle and YSM Chair Schwartz, YALE00000815 – YALE00000827.

129.    Dr. Maihle witnessed a pattern of federal funds routinely used by YSM senior male faculty to support non-grant projects to pay University fellows, clinical residents, post docs, graduate students, or other trainees for work on their biotech companies. This conduct was identical to what federal authorities identified in 2008 resulting in the grant fraud settlement, and it continued unabated thereafter. Science graduate students are forced to work in support of the biotech company their principal investigator founded on work that may not serve their best career interest; in this capacity, they are often directly and indirectly pressured to generate data that supports a company's financial interest. These budding scientists are forced to serve YSM senior male faculty, thus perpetuating the conflict.

130.    Dr. Maihle sat on the thesis committee of two students who informed her that they were required to use federal grant funds to support their thesis work. The following Yale faculty exemplify this behavior of abusing federal funds through violations of conflict of interest, sexual harassment, and general gender based discrimination, though the fraud is by no means limited to them:

        a.    Harold R. Behrman, PhD. Behrman began his tenure at Yale in 1975 as Director of Reproductive Biology in the Department of Obstetrics and Gynecology with a joint appointment in Pharmacology. He was promoted to professor in 1981 and served at YSM for more than 30 years. He died in 2008.[106]

        Behrman went as far as to test Dr. Maihle to see how she would react to being publicly harassed. At a YSM party, Behrman asked her to dance.

---

[106] https://higherlogicdownload.s3.amazonaws.com/SSR/fbd87d69-d53f-458a-8220-829febdf990b/UploadedImages/Documents/behrman.pdf

Behrman's wife was with him, so Dr. Maihle thought the invitation odd but figured he was trying to include her. As soon as they began dancing, visible to everyone, Behrman grabbed Dr. Maihle's buttocks. She immediately pushed him away.

Behrman, along with Hochberg, showed the slides of young female staff technicians sitting on their laps to in a Yale auditorium of 200 people, including residents and other research trainees. Behrman also co-opted a National Institute of Child Health and Human Development grant on Women's Reproductive Health Research that Dr. Maihle wrote while at the Mayo Clinic, without giving Dr. Maihle any credit for her work, by positioning himself improperly as the grant Research Director.

b. <u>Richard Bercik, MD</u>. Bercik is currently employed at YSM as an Associate Professor of Clinical Obstetrics, Gynecology & Reproductive Sciences, where he has worked since 2003.[107]

Dr. Maihle attended a YSM faculty meeting at which Bercik was recommended for reappointment by Rutherford. When Schwartz read aloud a formal sexual harassment complaint against Bercik, all the committee members (except Dr. Maihle) laughed. Rutherford then said he had a "come to Jesus" talk with Bercik, causing more titters, and the committee voted to reappoint Bercik.

c. <u>Robert L. Camp, PhD, MD</u>.[108] Associate Research Scientist in Pathology. Camp has been PI for eight NIH grants from 2001-2008 totaling

---

[107] https://medicine.yale.edu/profile/richard_bercik/
[108] https://medicine.yale.edu/profile/robert_camp/.

$1,017,484, all while associated with Yale. Five of the grants titled "Analysis of Late Recurrence in Breast Cancer," related to HistoRx. He has been PI for numerous grants including: (i) K08 ES011571 NIEHS (noted for HistoRx): 5 grants from 2001-2005 totaling $553,521; (ii) R21 CA116265 NCI: 2 grants from 2005-2006 totaling $277,916; (iii) R21 CA125277 NCI: 1 grant in 2008 totaling $186,047; (iv) R0 CA115756 NCI (related to work with Rimm; PI Harriet M. Kluger of Yale): 4 grants from 2005-2008 totaling $1,113,952; and (v) P50 CA121974 NCI (related to work with Rimm; co-PI Harriet M. Kluger of Yale as of 2018 and 2019; Schlessinger also was a PI on this grant): This grant has been renewed multiple times a year from 2006 through 2019, totaling over $47 million.

A former trainee of David L. Rimm's, Camp became faculty in Rimm's department and worked with Rimm on HistoRx and also worked on grants for which Schlessinger has been PI.

Camp has been at Yale since his student days, earning both his PhD and his MD from YSM in 1992 and 1997, respectively. He then did his residency at Yale-New Haven Hospital in 2000 and since then has been an Associate Research Scientist in Pathology at YSM, the same position he holds today.[109]

Camp has additionally received awards from Yale in 2013, including the Charles W. Bohmfalk Prize (Medical Student Teaching), which comes

---

[109] https://medicine.yale.edu/profile/robert_camp/

with a $5,000 award,[110] and he was an invited speaker for Inspiring

Yale.[111]

d. <u>Erol Fikrig, MD</u>. Fikrig previously served as a Fellow at YSM and

currently holds the positions of Waldemar Von Zedtwitz Professor of

Medicine (Infectious Diseases) and Professor of Epidemiology (Microbial

Diseases) and of Microbial Pathogenesis; and Section Chief of Infectious

Diseases at Yale School of Medicine.[112] He also has a laboratory in his

name.[113]

Fikrig had a 'shadow PI', "Ray L.", who directed a staff of grant writers,

SBIRs, etc., but Fikrig was the actual scientific director of his commercial

lab, leaving little if any separation between Fikrig's 'academic lab' and

commercial lab.

e. <u>Richard Hochburg, PhD</u>. Hochberg is Professor Emeritus of Obstetrics,

Gynecology, and Reproductive Sciences and Senior Research Scientist at

Yale School of Medicine.[114]

Hochberg, along with Behrman, showed the slides of young female staff

technicians sitting on their laps to the Yale auditorium of 200 people.

Later Dr. Maihle attempted to help Jane Doe A report Hochberg's

repeated sexual advances.

---

[110] In 2012 the prize came with a $5,000 award. http://www.sciedcc.com/wp-content/uploads/2014/03/BohmfalkAwardLetter.pdf
[111] https://www.inspiringyale.com/news/2015/3/19/iy-speaker-spotlight-robert-camp-school-of-medicine
[112] https://medicine.yale.edu/profile/erol_fikrig/
[113] https://medicine.yale.edu/lab/fikrig/
[114] https://medicine.yale.edu/profile/richard_hochberg/

At a faculty meeting discussing Schlessinger's sexual harassment lawsuit, Hochberg said to Dr. Maihle, "Well it seems such lawsuits don't do much harm even to our chairs…now do they?" In Fall 2011, at a Promotions and Tenure meeting, when Dr. Maihle objected to a derogatory comment Hochberg made while reviewing a junior woman faculty member, Hochberg responded by telling her to "shut up."

f.  <u>Edward Kuczynski</u>. Kuczynski served as the Associate Chair of the OBGYN Department at Yale from 2002 through 2010. Kuczynski was forced to leave Yale when it became apparent that he lied about his education and credentials.

Yale covered up this embarrassment, and Kuczynski went on to work at other prestigious institutions such as University of Houston, Tufts Medical Center, and Stanford University. Currently, he is employed at University of California, San Francisco.

Kuczynski was instrumental in organizing the weekly alcohol binges and often personally purchased the alcohol. Of note, Kuczynski and Lockwood attended trips to Professor Redmond's St. Kitts location referenced in Section V.C.f. These trips were the basis of decades of sexual abuse.

g.  <u>Harvey J. Kliman, MD, PhD.</u>[115] Research Scientist in Obstetrics, Gynecology, and Reproductive Sciences; Director, Reproductive and Placental Research Unit. Kliman essentially sponsors his research by running a private consulting practice (re: specialized placental pathology) out of his 'home'—using departmental resources to drum up his

---

[115] https://medicine.yale.edu/profile/harvey_kliman/.

business.[116] His Endometrial Function Test ("EFT") and PlacentASD Test are advertised on Yale's website.[117] Kliman has been PI for seven NIH grants from 1986-2011 totaling $1,489,055. PlacentASD Test funding includes: (i) NIH grants: ES11269 and ES015359 (not Yale); (ii) STAR grants: R829388 and R833292; and (iii) Yale University Reproductive and Placental Research Unit.

Kliman has been at Yale since 1991 and is currently employed at YSM as a Research Scientist in Obstetrics, Gynecology, and Reproductive Sciences; and Director of the Reproductive and Placental Research Unit.[118] He is touted as having "over ten patents, including the patent for the Endometrial Function Test (EFT)" and is credited with the development of the "Kliman" method of trophoblast purification. He further served on the YSM Admissions Committee from 2011 to 2015.

The Kliman Laboratories are a part of YSM's Reproductive and Placental Research Unit.[119]

h.  Charles J. Lockwood, MD. Since 2014, Lockwood has been employed as Senior Vice President for the USF Health; Dean of the Morsani College of Medicine; and Professor of OBGYN and Public Health at the University of South Florida. Prior to that he was Dean of The Ohio State University College of Medicine, and earlier chaired the OBGYN Departments at Yale

---

[116]    This    was    permitted    by    former    YSM    Chair    Charles    Lockwood.    *See* https://medicine.yale.edu/profile/charles_lockwood/.
[117]                                                              https://medicine.yale.edu/obgyn/kliman/infertility/eft/; https://medicine.yale.edu/obgyn/kliman/autism/asd/.
[118] https://medicine.yale.edu/profile/harvey_kliman/
[119] https://medicine.yale.edu/obgyn/kliman/

and NYU. Lockwood also has served as Executive Vice President at Tampa General Hospital since 2015.

Lockwood continues to be employed as an Adjunct Professor of Obstetrics, Gynecology, and Reproductive Sciences at YSM.[120] He previously completed his fellowship at Yale-New Haven Hospital in 1989. Dr. Maihle objected to the weekly alcohol-fueled on-campus parties to Lockwood when he was Chair of the OB/GYN Department, but he attended the parties himself and did nothing to stop the known abuse.

Further, Lockwood, serving as Department Chair, obstructed Dr. Maihle's attempts to get her salary and research budget covered by a prestigious appointment at the National Cancer Institute ("NCI"), an honor for which nobody else in her YSM department had qualified. Lockwood, refused to permit her to accept the Inter Programmatic Agreement, even though it would have paid up to 100% of her uncommitted salary.

Of note, Kuczynski and Lockwood attended trips to Professor Redmond's St. Kitts location referenced in Section V.C.f. These trips were the basis of decades of sexual abuse.

i.  David L. Rimm, MD, PhD.[121] Professor of Pathology and of Medicine (Medical Oncology); Director of Pathology Tissue Services; Director of Translational Pathology. Rimm has served on advisory boards for Genentech, Novartis, BMS, Perkin Elmer, Dako, ACD, Avida, OptraScan,

---

[120] https://www.usf.edu/research-innovation/rf/bios/charles-lockwood.aspx
[121] https://medicine.yale.edu/profile/david_rimm/.

Metamark Genetics, and Genoptix.[122] Rimm has been PI or Project Leader for over 53 NIH grants from 1998 through 2019, totaling $11,963,769. Rimm co-founded Metamark Genetics, Inc. and HistoRx, Inc. ("HistoRx"). HistoRx was founded with fellow Yale Department of Pathology colleague Robert L. Camp. HistoRx was formerly backed by a Novartis subsidiary, but was purchased in 2012 by Genoptix. HistoRx has exclusive license to the AQUA™ technology developed by Rimm and Camp at Yale and was supported in part by over $2.65 million in grants to Yale from (i) Patrick and Catherine Weldon Donaghue Foundation for Medical Research: 1 grant in 1999 for $550,000 (to D.L.R.); (ii) K08 ES11571 NIEHS (to R.L.C.): 5 grants from 2001-2005 totaling $553,521; (iii) R01 GM57604 NCI (to D.L.R.): 5 grants from 1998-2002 totaling $1,061,014; and (iv) U.S. Army DAMD17-01-1-0463 (to D.L.R.): 1 grant in 2000 for $490,500. From 2012 and 2018, Rimm's laboratory received over $1.5 million in NIH grants.

Rimm has been at Yale since 1994 and completed his residency at the Yale-New Haven Hospital. He is currently employed at YSM as Professor of Pathology and of Medicine (Medical Oncology); Director of Pathology Tissue Services; and Director of Translational Pathology at Yale School of Medicine.[123] Further, Yale has created the Rimm Lab for which Rimm is the Principal Investigator.[124]

---

[122] https://www.bcrf.org/researchers/david-rimm.
[123] https://medicine.yale.edu/lab/rimm/profile/david_rimm/
[124] https://medicine.yale.edu/lab/rimm/

Rimm illegally allocated federal grant funds to pay a student to develop the algorithms underpinning the technological basis for Rimm's company, HistoRx. Later, the student was rewarded with a Yale faculty position in Rimm's department.

j.  <u>Thomas Rutherford, MD, PhD</u>. In 2017, Rutherford joined the University of South Florida's Gynecological and Oncology Division. He currently is employed there as Director of the USF Health Morsani College of Medicine Department of Obstetrics and Gynecology; Director of USF Medical School gynecology oncology fellowship program, and Director of Surgical Quality at the Tampa General Hospital Cancer Center.[125] *Interestingly, there is no mention of Rutherford on the USF website.*

Rutherford came to USF from Western Connecticut Health Network (WCHN), where he was network physician director of cancer services from 2015 to 2017. Prior to that he was Professor and Division Director of gynecologic oncology, and Director of the gynecologic oncology fellowship at YSM.

In February 2020, Rutherford was acquitted after jury trial of allegations of medical battery, negligent infliction of emotional distress, and failure to disclose the nature of the procedure before he performed it.[126] Rutherford was accused of performing a painful procedure on a patient who was known to be sensitive since she had previously been a victim of sexual

---

[125] https://hscweb3.hsc.usf.edu/blog/2017/03/13/top-ovarian-cancer-expert-joins-usf-lead-gynecologic-oncology-care-research/

[126] Lauren Wood v. Thomas J. Rutherford, MD et al, FBTCV156050929S, Superior Court, Judicial District of Fairfield at Bridgeport; https://www.ctpost.com/local/article/Trial-begins-for-Stratford-woman-who-sued-Yale-15072078.php

assault. According to the lawsuit, on May 14, 2014, on the advice of Rutherford, the woman went to the Yale University Gynecologic Center for an examination. During the examination, Rutherford "without any warning or notice or consent from the plaintiff, intentionally, wantonly or without the exercise of due care forcefully inserted his fingers" into the woman's pelvic area, the suit states.

In 2003, a registered nurse who headed the labor and delivery unit filed a lawsuit claiming that Rutherford flew "out of control" while his patient lay on the operating table, "bleeding and unattended." Her suit charged that Rutherford "ranted" and became "emotionally incapacitated" when nurses tried to stop him from using a set of surgical tools brought to the room by his assistants. The nurse further claimed that Rutherford had been suspended from the hospital once for losing his temper and that a psychiatrist had been asked to observe his behavior during a surgery.[127]

Also reported was a 19-year-old patient who claimed that she had consulted Rutherford in Fall 2002 for a second opinion on whether she should have a hysterectomy. She claimed he performed a rectal exam on her without asking, after she refused to let him do a diagnostic procedure her regular doctor had already performed. The patient said the rectal exam caused her to bleed and cry in pain, already sore from a previous surgery. Further reported were five former patients who accused Rutherford in

---

[127] https://www.courant.com/news/connecticut/hc-xpm-2003-06-28-0306281738-story.html

lawsuits of negligence, including one woman who dropped her case in exchange for a confidential sum of money.[128]

Rutherford, an accused harasser, recommended Bercik for reappointment at a YSM faculty meeting Dr. Maihle attended. When Schwartz read aloud a formal sexual harassment complaint against Bercik, all the committee members (except Dr. Maihle) laughed. Rutherford then said he had a "come to Jesus" talk with Bercik, causing more titters, and the committee voted to reappoint Bercik.

k. <u>Joseph Schlessinger, PhD</u>.[129]    William H. Prusoff Professor of Pharmacology; Chair, Pharmacology; Co-Director, Cancer Biology Institute. Schlessinger has a well-known disdain for Yale's "interfering" policies. He has been PI for 51 NIH grants from 1985-2017. 25 grants are associated with Yale spanning from 2004-2017 totaling $6,255,297.

Schlessigner has been with Yale since 2001 and has held the title of William H. Prusoff Professor of Pharmacology; Chair, Pharmacology; Co-Director, Cancer Biology Institute at Yale School of Medicine, from then until today.[130] He has received numerous awards and holds many national positions, including election to the National Academy of Science, to the American Academy of Sciences, to the European Academy of Sciences,

---

[128] https://www.courant.com/news/connecticut/hc-xpm-2003-06-28-0306281738-story.html
[129] https://medicine.yale.edu/profile/joseph_schlessinger/.
[130] https://medicine.yale.edu/profile/joseph_schlessinger/

and to the Institute of Medicine of the National Academies.[131] The Schlessinger Lab is a marquis laboratory at YSM.[132]

In 2006, a YSM former secretary, Mary Beth Garceau, sued Yale for monetary damages, charging that Schlessinger, then head of the Department of Pharmacology, sexually harassed her throughout her three-year employment and Yale did nothing to stop him.[133] Garceau alleged that Schlessinger initiated numerous conversations with her about sex, the size of her breasts and the style of her underwear. During her first months at the Department of Pharmacology, according to the complaint, he told her about his sexual infidelity during his business travels and bragged about the number of women he had slept with. In several incidents over the next year, Schlessinger showed Garceau pictures of naked women and, on one occasion, a hard-core pornography website, the complaint alleged. Schlessinger claimed that a photo of a naked woman without a head was his wife, Irit Lax, an assistant professor in the Pharmacology Department, the complaint stated. While he was showing Garceau the photo, according to the account, Lax walked in and started yelling at her husband.

In 2006, Yale reached a settlement based on these allegations and then Yale promoted Schlessinger, ostensibly because he brings in a large amount of grant funds.[134]

---

[131] https://medicine.yale.edu/lab/schlessinger/profile/joseph_schlessinger/
[132] https://medicine.yale.edu/lab/schlessinger/
[133] https://yaledailynews.com/blog/2006/12/01/univ-faces-harassment-lawsuit/
[134] Caitlin Roman, Univ. faces harassment lawsuit, *Yale Daily News* (Dec. 1, 2006), https://yaledailynews.com/blog/2006/12/01/univ-faces-harassment-lawsuit/.

1.  Peter E. Schwartz, MD. Schwartz is currently employed at YSM as the John Slade Ely Professor of Obstetrics, Gynecology, and Reproductive Sciences; and Vice Chair of Gynecology. Schwartz has been a member of the Yale Cancer Center since he joined YSM faculty in 1975; and he was a resident at Yale-New Haven Hospital in 1971.[135] He has received numerous awards, including The Yale Medicine Distinguished Clinical Career Award in 2020.

    In June 2010, the Supreme Court of Connecticut upheld a $12 million award against Yale, as employer of Schwartz and two other doctors, for medical malpractice, based in part on Schwartz misreading a pathology report and then inappropriately delegating the surgery to a surgical fellow, against Yale policy.[136]

    Dr. Maihle also recalled a Promotion & Tenure Committee meeting discussing sexual harassment complaints against Rutherford. The conversation turned to the fact that Yale settled a sexual harassment lawsuit on behalf of Schlessinger, to which Schwartz noted "it didn't hurt him." And when Dr. Maihle refused to vote to promote Rutherford, Schwartz told her, "You know, Nita, the corporation [meaning Yale] doesn't like it when we don't have a unanimous vote."

    At that same meeting, when Rutherford recommended Bercik for reappointment, Schwartz read aloud a formal sexual harassment complaint

---

[135] https://medicine.yale.edu/profile/peter_schwartz/
[136] https://www.nhregister.com/news/article/EDITORIAL-Doctors-lies-added-to-woman-s-pain-11605823.php

against Bercik, to which all the committee members (except Dr. Maihle) laughed.

Further, in a Fall 2011 Promotions and Tenure Committee meeting, when Dr. Maihle objected to Hochberg's derogatory comments regarding junior women faculty, Schwartz, the Interim Chair, demanded to meet the next day with Dr. Maihle and informed her, out of the blue, that YSM had recently reviewed her "performance." Having received no notice that she was being reviewed, Dr. Maihle asked for, but Schwartz refused to share, the review's details. Schwartz ultimately was the author of multiple letters to Dr. Maihle telling her to anticipate salary reductions and falsely accused her of misrepresenting her productivity.

m. <u>William C. Sessa, PhD.</u>[137] Alfred Gilman Professor of Pharmacology and Professor of Medicine (Cardiology); Vice Chairman, Pharmacology; Director, Vascular Biology & Therapeutics Program. Sessa is Schlessinger's right hand at Yale, and together they developed the Cavtherix[138] technology at Yale. Sessa has been PI for 95 NIH grants during 1995-2019, all associated with Yale. During 2004-2019, the grants total $26.47 million; 2018-2019 alone is over $3 million.

Sessa has been at Yale since 1993 and currently holds the titles of the Alfred Gilman Professor of Pharmacology and Professor of Medicine

---

[137] https://medicine.yale.edu/profile/william_sessa/.
[138] https://gust.com/companies/cavtherix.

(Cardiology); Vice Chairman of Pharmacology; and Director of Vascular Biology & Therapeutics Program at Yale School of Medicine.[139]

Sessa additionally serves on the Yale-UCL Collaborative, since 2011, as a member of on the Joint Strategy Committee, to provide opportunities for high-level scientific research, clinical and educational collaboration across the institutions involved: Yale University, Yale School of Medicine, Yale-New Haven Hospital and UCL (University College London) and UCL Partners. Sessa also has a laboratory named after him at YSM.[140]

Notably, in his leadership role as Vice Chairman of Pharmacology, in 2015, he declined to comment on Yale's reduction in assigned punishment to fellow-professor Michael Simons' sexual misconduct.[141] Fellow YSM professors either took a similar approach or commented only on Simons' accomplishments in his academic role, except for the Woman's Faculty Forum. The surprise change in punishment by YSM Dean Robert Alpern was reported in the *New York Times*, with one faculty member, who chose to remain anonymous to protect their privacy, and speculated that the reason different actions were taken in the Simons and Schlessinger cases had more to do with administrators' priorities. "I can only speculate that the difference was in the amount of pressure applied from the highest echelons of the Yale administration," the source said, noting that different administrations were involved in the two cases. The *New York Times'* article suggested that, unlike Schlessinger, Simons was originally kept in

---

[139] https://medicine.yale.edu/profile/william_sessa/
[140] https://medicine.yale.edu/lab/sessa/
[141] https://yaledailynews.com/blog/2015/02/05/simons-calls-treatment-unfair-but-faculty-disagree/

his leadership position, because of the amount of grant money he brought in. Simons brought nearly $5 million of grant money to the University in the last three fiscal years, and never brought in less than $1.5 million over the past five years.

### b. Relator Susan Daria Landino, MA.

131.    Susan Daria Landino was hired in August 1999 for a newly created job at Yale to develop public safety educational programming for the Office of VP Linda Lorimer. At her interview, Associate VP Martha Highsmith told Landino that Yale was creating the position because "of the Suzanne Jovin murder" which created a "perception problem" for Yale. Landino was employed at Yale through November 2012, the last two years at Yale School of Medicine. She was responsible for assisting in the compilation of educational programming information for the Clery Act Report during her tenure and crime data for the 2002-2003 Clery Act Report, but Yale removed the latter responsibility from her portfolio after she voiced concerns about the fact that Yale was falsifying crime statistics data. Landino confronted Associate VP Highsmith and Yale attorney Caroline Hendel during a meeting held to tally the crime statistics for the Clery Act Report. Thereafter, Associate VP Highsmith never again permitted Landino to work on the crime statistics for the Clery Act Report and caused adverse actions affecting her work and professional reputation.[142]

132.    Landino's many efforts to bring Yale into compliance with both Title IX and Clery Act were stymied. Landino was told by Associate VP Highsmith, "this is not your job," when Landino raised concerns that survivors were not provided Title IX

---

[142] ED Student Financial Aid Clery Act Team: Mary Gust (Director), James L. Moore, III, Donald Tatum, Kimberly Smalls, Brian Siegel, Esq., Mark Malboeuf.

services. Landino became aware that Yale leadership talked students out of their Title IX civil rights to report to police and knowingly failed to provide federally mandated assistance.[143]

133.    Landino's decade-long position as an advocate for dozens of survivors of sexual misconduct at Yale provided her with access to both the public safety and the vice president's offices, giving Landino a unique window into Yale's violations of Title IX and Clery Act that have contributed to particularly severe gender-based violence at Yale, including but not limited to Yale College, Graduate School of Arts and Sciences' Departments of English, Chemistry and Physical Sciences, Spanish and Portuguese, the School of Music, the Divinity School, School of Management, and Yale School of Medicine.

134.    Landino attended VP meetings, as well as weekly command-level fully-sworn Yale Police Department ("YPD") staff meetings through 2010. She reported directly to Associate VP Highsmith, who reported to VP Linda Lorimer, who reported to President Richard Levin. During her tenure at Yale, Landino witnessed leadership repeatedly and knowingly deny their obligations under Title IX.

135.    Landino reported Title IX violations and cover-up concerns directly to Presidents Levin (2010) and Salovey (2014), and she had direct communication with leadership, including former VP Lorimer; former Associate VP and Advisor to President Highsmith; Lead Title IX Coordinator Stephanie Spangler; VP of HR Michael Peel; AVP HR Donna Cable; YSM Title IX Coordinator Merle Waxman; and Director of EEO Valarie Stanley.

---

[143] Landino provided information of deliberate Clery Act failures to ED Office of Student Financial Aid for their investigation that began in 2004. Due to underreporting sexual assaults, Yale was fined $165,000 in 2013. Yale plead the fine down to $155,000. ED Letter to Yale July 2013.

136. The majority of Landino's work at Yale involved providing public safety educational programming and victim support services, but institutional barriers prevented her from providing required support. During her tenure at the vice president's office, Landino was inexplicably not permitted to mention sexual harassment and assault in her public safety student orientations.

137. Landino was working in the VP's office in 2009 when Yale laboratory technician, Raymond Clark, sexually assaulted and murdered Annie Le, a Ph.D. graduate student in YSM's Biological and Biomedical Sciences program. Because of her work and what she observed in her position in the VP's office, Landino concluded that Yale's Title IX failures were a significant cause of the sexual assault and murder. These failures included the utter absence of any prevention measures, training, or adequate responses to sexual harassment and gender-based violence throughout the University, including within Le's program. In addition, because of her position, Landino learned through multiple sources of a culture of silence and complicity surrounding abuse in Le's department, created by the chair, Joseph Schlessinger.[144] After Le's sexual assault and murder, VP Highsmith further silenced Landino and blocked her from public safety meetings.

138. In 2004, at YPD Chief Perrotti's request, Landino helped Natasa Mateljevic report to the YPD the series of rapes she suffered on campus, unaware at the time that other Yale staff had notice of the abuse, but failed to assist Mateljevic in reporting to police while she continued to be raped. The perpetrator was arrested,

---

[144] A former YSM secretary alleged that Schlessinger sexually harassed her throughout her three-year employment, and the University did nothing to stop it. Allegations included Schlessinger's repeated lewd observations and suggestions to her, from telling jokes about penis size to showing her hard-core pornography. In 2006, Yale reached a settlement based on these allegations and then Yale promoted Schlessinger, ostensibly because he brings in a large amount of grant funds. Caitlin Roman, Univ. faces harassment lawsuit, *Yale Daily News* (Dec. 1, 2006), https://yaledailynews.com/blog/2006/12/01/univ-faces-harassment-lawsuit/.

convicted, and remains in jail. Following the conviction, Yale fired Mateljevic, a rising scientist with excellent evaluations, without cause. When Mateljevic complained through counsel, Yale's attorney, Harold Rose, advised Mateljevic to "stand in line" with those complaining about gender discrimination and demanded an NDA, which Mateljevic refused. Through these actions, Rose indicated that there were other victims at Yale whom Yale presumably treated similarly and attempted to strong-arm into signing NDAs rather than support their rights under Title IX.

139.    With significant effort, Landino and YPD Chief Perrotti set up court advocate training for Landino to help students with police and criminal courts. Associate VP Highsmith stopped this critical training, thwarting Landino's ability to help rape survivors exercise their Title IX civil rights to report to police. Relator Landino has debriefed five long-time law enforcement people who have detailed their observations of Yale's systemic mishandling of sexual assaults and repeated obstruction of the processes.

140.    Undeterred, Landino continued efforts to initiate sexual assault prevention and response programs. At the time, Yale directed students to report sexual assault to residential college masters and deans, another example of noncompliance with Title IX regulations. This unlawful practice underlines the experiences of Jane Does 1 and 2. Residential college masters and deans would advise counseling and discourage reporting to police. Students were then diverted to Yale's Mental Health & Counseling Center (then called "Mental Hygiene") director Carol Goldberg. Further, Yale would emphasize to students that their rape would become public if they reported to police, in effect, talking students out of their civil rights and into a "choice" to remain quiet. Former YPD Detective Peter Brano told Landino that survivors were ferried to Mental Hygiene,

dissuaded from reporting to police, and then months later, "the victim would come to me, and I couldn't do anything for them because evidence was never collected."[145]

141.    YPD Chief Perrotti recognized that offering support to survivors who wanted to press charges helped the YPD improve its public safety work. Landino became a confidante with whom he often shared his disappointment and frustration that Yale leadership—including VP Lorimer, Associate VP Highsmith, lead general counsel Dorothy Robinson, and the residential college masters and deans—interfered with state-mandated police work.[146]

142.    In 2006 Landino prepared and presented written best practices to Associate VP Highsmith, Yale College Deans and ExComm members, Betty Trachtenberg and Jill Cutler, in an attempt to bring Yale into Title IX compliance. Landino's improvements included peer programs and ways to change the re-traumatizing ExComm process, underlining the need for ExComm training. During her tenure, Landino fielded multiple complaints about ExComm, yet these efforts were rejected by Associate VP Highsmith and the Yale College Dean's Office. Assistant Dean Cutler claimed in an email to Landino that ExComm members were adequately trained with a pamphlet.

143.    Through her continued attempts to raise issues of noncompliance with Title IX and Clery Act obligations, Landino exposed herself to years of on-the-job retaliation and her first termination. Her boss, Associate VP Martha Highsmith, expressed extreme anger about Landino's efforts. On one occasion, she shoved Landino's chair so

---

[145] Brano debriefed to Landino in November 2012 and for the next 18 months about Yale's illegal practices.
[146] The YPD union made several public complaints against the administration, including that Yale did not allow crimes to be properly investigated — including, potentially, investigations into allegations of sexual misconduct. Tapley Stephenson, *Yale police ratify new contract*, *Yale Daily News* (Oct. 27, 2011) https://yaledailynews.com/blog/2011/10/27/yale-police-ratify-new-contract/.

forcefully during a fit of verbal abuse that Landino had to catch herself from falling to the carpet. On another occasion after Landino had reported to HR, VP Lorimer screamed so hostilely at Landino that VP Lorimer's spit hit Landino's face and arms.

144.    In January 2010, Landino notified Yale leadership, including President Levin, of her concerns with the noncompliance by the University. Several weeks later, Landino was terminated without cause. In order to be re-hired, Landino accepted a temporary job in Yale's School of Medicine ("YSM") in October 2010, where she learned of more instances of sexual harassment, violence, and Yale's obstruction in the reporting process. When her boss at YSM heard that he was "inheriting enemies from [her] on the other side of campus," he terminated her again in November 2012. Less than one year after Landino's first termination, in March 2010, Yale students filed their Title IX discrimination complaint with OCR.

### c.  Relator Heidi Lockwood, PhD.

145.    Dr. Heidi Lockwood received a PhD in philosophy from Yale in 2009 and is now a tenured Professor of Philosophy at Southern Connecticut State University (SCSU) in New Haven, Connecticut. She began her Ph.D. at MIT in the 1990s, but left after being sexually harassed by her adviser. During her tenure as a Yale graduate student, she spent much of her time advocating for survivors of sexual misconduct from philosophy faculty. Since completing her Ph.D., she has spent time supporting victims of faculty sexual misconduct in different schools across the University, including the Graduate School of Arts & Sciences, the School of Music, Yale Law School, and Yale College.

146.    Dr. Lockwood became aware of faculty sexual misconduct at Yale during her first year as a graduate student. Several senior graduate students advised her against taking courses with Professor Jules Coleman because of his reputation for demanding *quid pro quo* sex. The Chair of the Philosophy Department, Michael Della Rocca (later Chair of the University-Wide Committee on Sexual Misconduct), confirmed to Dr. Lockwood that he and other Yale leadership were aware of the concerns with Coleman's conduct.

147.    As an ABD ("all but dissertation") student working on her dissertation in Fall 2007, Dr. Lockwood learned that the problem of faculty sexual misconduct was not limited to Coleman. Two Yale College undergraduate students asked her for advice on course selections, and when she recommended a course offered by Philosophy Associate Professor Troy Cross, they explained Cross had had sex with multiple students. The two undergraduates said they did not want to take a course with Cross because they did not want to be required to "have sex with him in order to get an A." Dr. Lockwood expressed concerns about Cross' reputation at a meeting of women faculty and graduate students later that semester. Two senior philosophy female faculty forcefully warned Dr. Lockwood after the meeting not to "criticize" Cross.

148.    During a second conversation with one of the two students, Jane Doe B, Dr. Lockwood learned that Jane Doe B claimed that she was raped by Cross. She could find nowhere to report this, but ultimately spoke with the Chair of ExComm in December 2007. ExComm interviewed Jane Doe B in January 2008 and referred the case to the Yale Police Department. Dr. Lockwood provided three interviews to YPD Lead Detective Peter Brano during the spring 2008 semester. On one of these occasions, February 1,

2008, Detective Brano informed Dr. Lockwood that he had been reading her emails and was aware that she was a mentor for another undergraduate, Jane Doe C, whom he believed was being groomed by Cross. Brano explained further that President Levin had assigned Jane Doe B a 24/7 bodyguard to protect her from further harm from Professor Cross; that the YPD had interviewed eighteen different witnesses and uncovered evidence of a pattern of sexual assault; and that the YPD was evaluating Cross as a possible suspect in the 1998 murder of Yale undergraduate Suzanne Jovin, which Dr. Lockwood had not heard of prior to that.[147] According to Brano, the YPD was concerned that Jane Doe C might be at risk of being sexually assaulted by Cross—or worse—but the University refused to either warn or protect Jane Doe C. Brano justified this by arguing that if anything happened to Jane Doe C, her family would be able to file a suit against Yale which would give them "enough money to name a building after her at Yale." He also directed Dr. Lockwood not to speak with Jane Doe C and threatened her with obstruction charges if she did so. He suggested that if she "really cared" about Jane Doe C, she might meet with her and watch for signs of sexual violence such as "small cuts or nicks and bite marks"—provided that she didn't explain why she was meeting.

149.    Dr. Lockwood decided to risk the obstruction charges and met with Jane Doe C on February 14, 2008, to warn her that the YPD believed she was in danger.

150.    Dr. Lockwood also documented what she had been told in two emails to Philosophy Department Chair Della Rocca, who confirmed that the YPD had also informed him about both the potential link between Cross and the Jovin murder, and the

---

[147] The inclusion of Detective Brano's statement that the YPD investigated Professor Cross' involvement in the Jovin murder is not a commentary on the veracity of that assertion. Rather, it provides important perspective into what Yale authorities believed at the time and how that informed their actions or their failure to act appropriately regarding student safety and the University's Title IX obligations.

possibility that Jane Doe C was being groomed to become Cross' next victim. Like the YPD, Della Rocca failed to warn or take any steps to protect Jane Doe C and actively pressured Dr. Lockwood to remain silent.

151.    In the following months, Della Rocca was frequently agitated and called Dr. Lockwood at least a dozen times, sometimes late at night, or pulled her out of seminar meetings to harangue her about not talking to anyone about the Cross case. Della Rocca mentioned on several occasions that he had spoken with then-Dean (soon-to-be Provost) Peter Salovey. Dr. Lockwood was shocked to learn that Salovey's primary concern, like Della Rocca's, was not the safety of the students in Cross' classes, but rather making sure that Dr. Lockwood did not disclose Cross' misconduct to anyone. Salovey wanted to make sure that Dr. Lockwood was aware of the importance of "protecting the privacy" of Jane Doe B, a strange request in light of the very visible 24/7 bodyguard stationed in the hallway outside Jane Doe B's room. It was an open secret among the undergraduates, who had formed a group to protect Jane Doe B, that her bodyguard was in place because there were serious allegations involving Cross.

152.    Dr. Lockwood was originally scheduled to defend her dissertation in the spring of 2008, with Cross as a committee member. She realized that the defense would need to be postponed, despite the fact that she was applying for an Assistant Professor position at SCSU, which would be contingent on receiving the PhD. Della Rocca barred her from the customary practice "job talk" faculty candidates are required to present to the department; refused her requests for a substitute external committee member; and jeopardized her SCSU application by permitting a damaging half-page letter to be included in her dossier, written by a female faculty friend of Cross who was angered by

Dr. Lockwood's remarks about Cross at the fall 2007 meeting of women faculty and graduate students.

153.    In March 2008, the YPD turned over their file on Cross to the Connecticut State Attorney's office, and Cross was finally informed that he was being investigated for first degree sexual assault. Cross was co-instructing a "Works-in-Progress" seminar that Dr. Lockwood was taking as a dissertation student and refused to allow her to present her work. He offered no reason for the refusal at the time, but later admitted that it was because he assumed that she knew about the complaint that had been filed. It was professionally humiliating for her to be denied the opportunity to present. Dr. Lockwood met with Della Rocca to discuss the problem, but he failed to intervene to stop the retaliation.

154.    On April 10, 2008, after refusing to speak with Dr. Lockwood for three weeks, Cross agreed to meet. During the four-hour-long conversation, he was often shaking uncontrollably. He revealed that the YPD had discovered that he had sex with four different undergraduates at Yale; that he had given Jane Doe B a copy of the erotic novel *Lolita* with his signature and an "inappropriate message"; that the YPD had "bugged" his office; and that he "wasn't sure if the sex [with Jane Doe B] was consensual" because it involved some form of bondage. He expressed anger that Dr. Lockwood had known an investigation was occurring since December and did not inform him.

155.    In June, Cross contacted Dr. Lockwood to thank her for providing information about the start date of the investigation and explained that his attorney had been able to use the information to negotiate a voluntary severance agreement because

Yale failed to notify him until mid-March, a violation of Yale policy. He took the "golden parachute" Yale offered and used it to self-fund a visiting scholar position at Oxford for two years, which he obtained with the help of Tamar Gendler, the wife of Dr. Lockwood's adviser.

156.    Just before Dr. Lockwood successfully defended her dissertation and left Yale in May 2009, Dr. Lockwood was offered an unsolicited non-disclosure agreement ("NDA") by Peter Salovey, then-Provost of Yale, who proposed silence on the Cross case in exchange for $2,000. Dr. Lockwood declined, but said it would be helpful to have extended online library privileges.[148] The privileges, including ongoing access to her Yale email account, were granted automatically each year after 2009 until Dr. Lockwood was photographed by the *Yale Daily News* in 2013 while participating in a Title IX protest on campus during Salovey's inauguration as President of Yale.

157.    Even after she joined the faculty at SCSU, Dr. Lockwood continued to receive requests from Yale students and alumnae who were aware of serious faculty sexual misconduct in the Philosophy Department at Yale, but were afraid that if they reported, they would endure the retaliation she experienced. Between 2010 and 2013, Dr. Lockwood spoke with Philosophy Department Chair Della Rocca on four different occasions about the new Title IX violations being perpetrated by faculty in his department: (1) Professor George Bealer, who was given an early retirement package with a mutual NDA in 2013 after sexually assaulting one—possibly two—male undergrads; (2) Professor Jules Coleman, who was given a golden parachute to NYU in

---

[148] Dr. Lockwood knows of no other alumni who were granted similar privileges.

2012 despite known sexual misconduct;[149] and (3) Professor Thomas Pogge, who is still teaching at Yale, despite irrefutable evidence that Pogge had engaged in and is likely continuing to engage in systemic grooming and both hostile environment and *quid pro quo* sexual harassment, including writing a letter of recommendation for a student he never taught. During each conversation, Dr. Lockwood urged Della Rocca, then Chair of the UWC, to institute training for the Philosophy faculty and graduate students on sexual and related harassment. Della Rocca insisted on the importance of silence and failed to provide training.

158.    From 2014 through 2015, Dr. Lockwood escalated the warnings she had alerted Department Chair Della Rocca to regarding Yale's Title IX noncompliance to the Yale administration. Dr. Lockwood met with Title IX Coordinator Stephanie Spangler on multiple occasions and emailed both Spangler and President Salovey. Dr. Lockwood's emails to Spangler and Salovey notifying them of violations of Yale's VRA and Title IX were met with silence or terse replies despite the fact that the emails pinpointed multiple specific, substantiated violations of Title IX and Yale's Voluntary Resolution Agreement. Such violations included failure to pursue steps to prevent the recurrence of sexual harassment, failure to permit third-party complainants to go through informal or formal processes, and failure to do a climate assessment and/or provide training for a specific population.

159.    After a disturbing phone call she received from YPD Detective Brian Donnelly (since promoted to sergeant despite numerous gender-based complaints to leadership, including from Natasa Mateljevic), Dr. Lockwood documented the Title IX

---

[149] Coleman was quietly persuaded to resign from NYU in 2014 after additional allegations of sexual misconduct at NYU emerged.

violations in an email sent to Spangler on June 11, 2014 (re-sent on September 18th and 23rd, and finally re-sent to both Spangler and Salovey November 16th after she received no response). Detective Donnelly called in response to Dr. Lockwood's report to Spangler that an alumna had provided information about the location of possible child pornography on one of Pogge's Yale computers. Instead of asking about the details of the child pornography allegation, Donnelly tried to elicit a "confession" by insisting that the only possible motive Dr. Lockwood could have was that she herself had been involved in some kind of sexual liaison with Pogge and was "seeking revenge."

160.    In late August 2014, Dr. Lockwood spoke with Department Chair Della Rocca to request his assistance in getting a fact finder assigned to the case of Jane Doe 3. Della Rocca admitted that Jane Doe 3 had met with him in April 2014, and filed a formal complaint with the UWC shortly after, and that the UWC had done nothing to address her complaint. Further, Della Rocca admitted that Yale's post-VRA UWC policies required that a fact finder be assigned within seven days. His only explanation that the required assignment had not been made after more than three months was that "the fact finders are busy." Dr. Lockwood informed Della Rocca that the overall delay and his personal failure to respond to Jane Doe 3's emails had caused Jane Doe 3 extreme anxiety. Despite this call, a fact finder was not appointed for at least an additional two weeks.

161.    Between 2015 and 2017, Dr. Lockwood learned of multiple additional cases of faculty sexual misconduct in other departments at Yale and documented a pattern of discouraging complainants from filing reports with the UWC; intentional enforcement of silence through non-disclosure agreements and retaliation; and harboring faculty predators whose cases would cause public embarrassment and potential loss of

significant federal grant money. In addition to Jane Does B, C, 3, and 6, Dr. Lockwood was contacted by and tried to help Graduate Schools of Arts and Sciences Jane Does 5 and 7-10 since leaving Yale, as well as several other survivors of faculty sexual misconduct who have chosen to remain silent due to fear of retaliation.

**B. Witness Declarations of Title IX Violations.**

162.    The following nine summaries of Jane Doe Declarations involve sexual assault and harassment Title IX Claims. In all these cases, Yale took steps to protect the named faculty or student harasser, rather than the student victim, through various methods that sought to silence the victim entirely, prevent any investigation of the student's complaints, or keep the victim from accessing their rights. Each account is an example of Yale's systemic violations and noncompliance with HHS and NIH requirements.

**a. Jane Doe 1 (Statement by Mary Doe 1).**

163.    Mary Doe 1's daughter, Jane Doe 1 (Yale College '08), was raped on August 27, 2005 by fellow Calhoun College student Gregory Korb in his dorm room on campus—dubbed the "Party Suite" because Yale supplied the suite's underage student residents with money to buy alcohol that they served to other underage students. During the attack, Korb bit Jane Doe 1 and ripped her clothing, causing Jane Doe 1 to fear for her life. When she eventually escaped and ran across the courtyard to the home of Calhoun College Dean Stephen Lassonde, Korb chased her. Lassonde let Jane Doe 1 inside and locked his door, while Korb screamed and pounded on the door.

164.    Jane Doe 1, bleeding from the bite wounds on her face and breast, told Lassonde to call the police and that she needed to go to the hospital. Dean Lassonde

repeatedly refused Jane Doe 1's requests, but ultimately drove her to Yale campus health services, who called an ambulance and permitted Jane Doe 1 to call her parents. Mary Doe 1 and her husband came immediately to meet Jane Doe 1 at Yale New Haven Hospital where they encountered Yale Police Detective Peter Brano who tried to get Mary Doe 1 and her husband to speak to the perpetrator's parents. Yale Detective Brano attempted to persuade Mary Doe 1 to "figure this out" with Korb's mother, who is a lawyer. Mary Doe 1 refused.

165.    At no point did any Yale official mention Jane Doe 1's rights under Title IX or refer Mary Doe 1 to Yale's Title IX Coordinator. Shortly after the rape, Dean Lassonde held a Calhoun College meeting in which he revealed Jane Doe 1's name and described the violence as "bizarre." He then permitted Korb and his lawyer mother to provide their version of what occurred, leaving Jane Doe 1 to face intense hostility upon her return to campus—to be called a slut and to be spit on.

166.    In the months and years that followed, Jane Doe 1's parents were in frequent contact with the Dean of Yale College, Peter Salovey, seeking support and justice for their daughter who suffered retaliation and hostility from her peers and Yale officials for reporting her assault. At one point, Jane Doe 1's parents were offered $1,000,000 by the Korb family, who appeared in the lobby of Mary Doe 1's apartment building without notice. Yale College Assistant Dean Jill Cutler told Mary Doe 1 that a disciplinary committee would convene to decide what would happen to Korb, but to Mary Doe 1's knowledge, a committee was never convened. Instead, Jane Doe 1 was summoned to Cutler's office where Dean Cutler had Korb on the phone. Cutler asked Korb if he committed the acts. Korb admitted to the facts and apologized to Jane Doe 1.

167.    Despite his acts and confession, Yale had no punishment for Korb. Cutler told Jane Doe 1 that Korb was placed on academic probation and would not be allowed on campus. However, Yale College Dean Peter Salovey allowed Korb to enroll in and continue to make progress toward his degree in a Yale-sponsored program in Germany and South Africa.[150] Further, though Jane Doe 1 had pursued prosecution of the attack outside of Yale with the local district attorney's office, Yale attorney Susan Sawyer and Dean Cutler contacted Mary Doe 1 and Jane Doe 1's attorney to ask if they "could come to some sort of agreement on the criminal charges against Korb so that there would be no trial." Even worse, when the criminal case progressed, the assistant district attorney assigned to the case refused to go to trial and pressured Jane Doe 1 into accepting a plea deal that resulted in zero jail time for Korb. Based on these events, Mary Doe 1 believes Yale exerted improper influence on the District Attorney to accept a plea deal, especially since Detective Brano told Mary Doe 1 that District Attorney for New Haven County Michael Dearington "works for Yale."[151]

**b. Jane Doe 2 (Statement by John Doe 1).**

168.    Jane Doe 2, daughter of John Doe 1 and Mary Doe 2, began Yale in September 2007. That December, she attended an annual Yale event, known as the "Freshman Screw," where she was raped by a male first-year student (Assailant E). Prior to that night, Jane Doe 2 had never met Assailant E. That morning, Jane Doe 2 called her

---

[150] This is in contrast to Jane Doe 2's case in 2008 when Dean Salovey denied Jane Doe 2, the rape survivor, the right to study abroad.

[151] Mary Doe 1 testified under oath that she learned that Detective Brano had made similar comments to other Yale rape survivors. Further, Relator Landino was also informed by YPD and NHPD staff that Dearington appeared to have a conflict of interest based on his relationship with Yale's General Counsel's Office, including but not limited to former Yale Vice President and General Counsel Dorothy Robinson.

parents for help, and Jane Doe 2's parents called Associate Dean of Yale College Marichal Gentry who told them that Yale did not offer Title IX support services.

169.   On December 6, 2007, John Doe 1, Mary Doe 2, and Jane Doe 2 met with Associate Dean Gentry, Dr. Carole Goldberg, a Yale psychologist specializing in sexual assault cases, and Dean Jasmina Besirevic-Regan, who told the family that Yale would not protect Jane Doe 2 if she decided to report the rape to the police, as her anonymity would be compromised. However, Yale would protect and support Jane Doe 2 if she chose to go through the Yale Executive Committee ("ExComm") process.

170.   In January 2008, John Doe 1 received a call from the Assistant Dean of Academic Affairs, Jill Cutler, who acknowledged that neither the YPD nor New Haven Police Department were aware of Jane Doe 2's case because then they would file a report that would become a matter of public record. She explained that Yale was "holding" Jane Doe 2's case back, out of "respect" for her privacy. John Doe 1 had several meetings in January and February 2008 with Associate Vice President Martha Highsmith, Dean Cutler, Dean Gentry, Dr. Goldberg, Dean Besirevic-Regan, and Pamela George to communicate his family's concerns. George told Relator Landino that Dean Gentry had made "troubling" remarks about Jane Doe 2's case and called John Doe 1 a "nuisance."[152]

171.   At Yale's insistence, Jane Doe 2 decided to proceed with the ExComm process that took place in February 2008 and found Assailant E, accompanied by an attorney, not guilty. When pressed, Dean Cutler told Jane Doe 2 that ExComm did not

---

[152] Pamela Geoge is a former Assistant Dean of Academic Affairs at Yale College, Director of the Yale Afro-American Cultural Center, and Assistant Dean of Student Affairs. Her last role at Yale College's Dean's Office was a position that should have included handling Title IX issues, but those responsibilities were removed from George's job portfolio when she took the postion.

write reports on the cases it hears, and that the minutes reflecting testimony and committee discussion and decisions were confidential. In August, Jane Doe 2 and her parents met with then Yale President Richard Levin to tell him how the rape and Yale's handling of it had harmed Jane Doe 2. Yale attorney Susan Sawyer was present and tightly controlled President Levin's responses. A month later, Levin refused to apologize or to reimburse Jane Doe 2's therapy expenses. Then Yale Provost Peter Salovey also denied Jane Doe 2 Title IX accomodations to participate in a study aborad program. Assailant E remained on campus and received no apparent disciplinary action or academic consequences. He went on to hold leadership positions at Yale and received his degree from Yale. Despite continuing to earn straight As, Jane Doe 2 decided that she could not continue to attend Yale, especially since Assailant E would continue to be present on campus with no limitations whatsoever. She left Yale for a different prestigious university, where she completed her degree with top academic marks.

    **c.   Jane Doe 3.**

172.    Jane Doe 3 attended Yale as an undergraduate and was the victim of an acquaintance rape by her ex-boyfriend, Alexander Michaud, on March 22, 2013. Notably, this is post-VRA and is precisely the type of case that caused OCR to investigate Yale and that the VRA was supposed to solve. Michaud alerted Berkeley Residential Dean Mia Reinoso Genoni to the rape allegations that same month, but Dean Genoni did not inform Jane Doe 3 of her right to report and to request Title IX accommodations. Instead, the Dean encouraged her to take a year off when Jane Doe made the request at the end of Spring 2013.

173.    In April 2014, Jane Doe 3 returned to campus to visit friends and became aware that Michaud, who had been forced to take a leave of absence in Fall 2013 on a separate matter, might also be returning to campus for Fall 2014. Jane Doe 3 was concerned about being re-traumatized by encountering him when she returned in the fall and decided to meet with UWC Chair Michael Della Rocca and Aly Menon to file a Title IX complaint and request reasonable accommodations.

174.    Jane Doe 3 filed a complaint at the end of April. Despite repeated attempts to check on the complaint through the summer, she received only one communication that showed Michaud had been given her complaint and permission to respond. Eventually, Jane Doe 3 was informed that David Post was the new UWC Chair, and Angela Gleason was the Title IX Coordinator. Although Gleason initially responded positively to Jane Doe 3's requests for interim measures, Gleason never followed through, and none were provided.

175.    Five months after the complaint was filed, Yale appointed a fact finder to Jane Doe 3's complaint, who interviewed Jane Doe 3. Statements from four of Jane Doe 3's witnesses about the night in question were inappropriately discounted, thereby allowing the UWC to dismiss Jane Doe 3's complaint based on her purported ability to give consent. The day after Jane Doe 3 received the UWC result, Jane Doe 3 wrote an email to Yale President Peter Salovey pointing out that the University "is actively harming and silencing its students in favor of maintaining a reputation. (…) I don't know where you stand on issues of sexual assault," she wrote, "but the branch of the administration responsible for dealing with them has clearly indicated that it doesn't care. I should hope you think differently." Salovey never responded to Jane Doe 3's email.

Michaud remained at Yale, and later that year, he was a party to another violent incident in which another Yale College student, Tyler Carlisle, stabbed Michaud and then jumped to his death.

### d.  Jane Doe 6.

176.    Jane Doe 6 is a doctoral student in London. In 2013, she was a Master of Philosophy student working on a thesis that focused on Yale Professor Thomas Pogge's work and attended a conference in London where Pogge spoke in his capacity as a Yale Philosophy Professor. Following a brief group conversation, Pogge somehow obtained Jane Doe 6's private email address and began an academic mentor relationship that turned into a sexual relationship, using his Yale email account.

177.    Jane Doe 6 was manipulated and sexually exploited by Pogge, who offered jobs, money, contacts, and help on her thesis and research in exchange for sex. Pogge confessed to her that he had engaged in similar relationships with other women. One of the women was a young Chinese student who audited a Yale summer school course with him in Beijing, and for whom he wrote a recommendation despite the fact that he was not familiar with her work. Another was a Yale undergraduate student.

178.    Pogge had often asked Jane Doe 6 to be more childlike, and he had shown her photos of a young girl whom he claimed he knew had been sexually abused decades earlier. She became concerned that the scope of Pogge's harassment might include sexual abuse of children, and worried about the fact that Pogge had recently launched a "Forced Labor and Human Trafficking Project" program that would give him access to child sex abuse victims.[153] Jane Doe 6 asked Dr. Lockwood to intercede and speak with the young

---

[153] Fernanda Lopez Aguilar, another Pogge harassment complainant, told Dr. Lockwood that while she was working as Professor Pogge's research assistant during the summer of 2010, she accidentally opened a

girl who was in the photo. When Dr. Lockwood did, Jane Doe 6's worst fears were confirmed; the woman explained that Professor Pogge had sexually abused her for years as a child. She told Dr. Lockwood that she had stopped speaking with Pogge decades ago because she suspected that he was sexually abusing the "very young" students he brought home to Germany.

179.    Dr. Lockwood reported to Philosophy Department Chair Della Rocca, Yale Chief of Police, and YPD Assistant Chief the information leading to the belief that (a) Professor Pogge had sexually abused a young girl and exhibited pedophilic or ephebophilic tendencies, (b) a current victim had emails and Skype messages showing that Professor Pogge either had inappropriate sexual relations with and/or sexually harassed at least eight students across three continents between 2009 and 2014, and (c) according to recent victims, Professor Pogge may have had child pornography on his Yale laptop. Dr. Lockwood also met with Title IX Coordinator Spangler, Assistant Provost for Academic Integrity Killheffer, and additional members of the YPD to report this information. Notably, Kilheffer served as Deputy Title IX Coordinator and reported to Spangler.

180.    In May through November 2014, Dr. Lockwood met again on several occasions with Spangler and emailed Spangler and Yale President Peter Salovey in an attempt to persuade them to respond to the problem of sexual harassment in the Philosophy Department, including Professor Pogge's harassment.[154] Despite the seriousness of the allegations, Dr. Lockwood and Jane Doe 6's complaints were not

---

subfolder on Professor Pogge's Yale University laptop and discovered about twenty pornographic images of young women and girls. Jane Doe 6 reported that she believed there might be child pornography on an additional Yale laptop.
[154] Relator Landino attended the May meeting.

investigated. Yale senior leadership and the Title IX Office disclaimed any responsibility to investigate because the victims were not Yale students at the time, despite the fact that the VRA and applicable federal laws required Yale, as a fiduciary of federal funds, to fully investigate any information of violations originating from third-party complaints.

181.    Between May and October 2014, Jane Doe 6 was in contact with Title IX Coordinator Spangler and UWC Chair David Post regarding her concerns about Professor Pogge. On October 30, 2014, Jane Doe 6 officially was informed that her complaint would not be considered by the UWC. Title IX Coordinator Spangler advised her that her relationship with Professor Pogge was assumed to be an intimate partner relationship for purposes of UWC procedures, and that, although intimate partner violence is prohibited under Yale policies, the policy did not apply because she was not a Yale student. Professor Pogge continues to teach and mentor students, and to enjoy the privileges of an appointment as the Leitner Professor of Philosophy and Professor of Political Science.

182.    Professor Pogge still teaches in the Philosophy Department at Yale.

**e.   Jane Doe 7.**

183.    Jane Doe 7 began her PhD in Yale's Philosophy program in 2016, after confirming with Professor Michael Della Rocca that sexual harassment rumors regarding Professor Jason Stanley, who would be her primary advisor, allegedly were unfounded. Della Rocca assured her that it would be safe to study with Stanley. When this turned out to be false, she accelerated her rate of progress through the program and finished in three years, despite the fact that the program provides five years of funding.

184.    Shortly after matriculation, Professor Stanley subjected Jane Doe 7 to (i) excessive texts and emails (some sent in the middle of the night), (ii) graphic

pornographic material in a seminar that Professor Stanley announced he was teaching solely for Jane Doe 7's benefit, (iii) comments from Stanley to Jane Doe 7 that "they were perfect for each other," and (iv) threats and outbursts of anger once Jane Doe 7 had made her disinterest in any personal relationship with Stanley known.

185.    Jane Doe 7 reported Professor Stanley to former UWC Chair Della Rocca, who repeatedly discouraged Jane Doe 7 from filing a complaint. Della Rocca told Jane Doe 7 that her career would be negatively impacted if she reported Professor Stanley to University or law enforcement officials.

186.    In June 2017, Jane Doe 7 met with Jason Killheffer, an Assistant Provost for Academic Integrity who worked with Title IX Coordinator Spangler. In this meeting, and in another meeting in mid-July, Jane Doe 7 fully disclosed to Killheffer and Spangler the sexual harassment by Stanley. When Jane Doe 7 explained that she was afraid Professor Stanley might attack her, Killheffer told her that he would contact the YPD to set up a meeting. The YPD never contacted her as promised.

187.    In September 2017, Jane Doe 7 met with Killheffer, Della Rocca and Shelly Kagan, Interim Acting Chair of Philosophy. Killheffer informed her that unless she filed a formal complaint with the UWC, his office could not perform any investigation. Killheffer told her that reporting Stanley's conduct would likely lead to retaliation by Stanley and Yale could do nothing to prevent it—a statement that directly violates Yale's obligations under the VRA and Title IX.

188.    In June 2018, Jane Doe 7 again met with the Chair of the UWC, David Post, who told her that the maximum penalty for Stanley, should she file a complaint with the UWC and should the UWC find him responsible, would be a one-year suspension

with pay. He also indicated that Yale could not protect her against retaliation if she were to file and agreed that she would be extremely vulnerable.

189.    Jane Doe 7's experience demonstrates, among other violations, a coordinated pattern by senior Yale leadership including those charged with Title IX compliance to discourage Jane Doe 7 from filing a Title IX report.

190.    Professor Stanley still teaches in the Philosophy Department at Yale.

### f.    Jane Doe 10.

191.    From 2014 to 2018, Jane Doe 10 attended the Yale University School of Music to study viola, earned a master's degree in music, and completed her coursework for a Doctor of Music Arts (DMA) degree. She is currently in the dissertation stage for her DMA and is expected to graduate from Yale in 2022. Jane Doe 10's primary adviser, Ettore Causa, with whom the program requires her to spend several hours per day, sexually harassed her and ultimately had a brief sexual encounter with her in violation of Yale's prohibition on faculty-student consensual relationships. Thereafter, Professor Causa retailed against Jane Doe 10.

192.    In 2015, Professor Causa began to groom Jane Doe 10 publicly and privately. He made it clear to all 10-12 students in his viola studio class that Jane Doe 10 was his target. Professor Causa talked about what he considered sexy, and how beautiful he found Jane Doe 10, isolating Jane Doe 10 from the other students. During the spring and summer of 2016, Professor Causa and Jane Doe 10 had a short-lived sexual encounter. In January 2017, he began retaliating against Jane Doe 10, leading Jane Doe 10 to become distressed, her performances to falter, and Professor Causa to become increasingly irritable with her.

193.    Professor Causa's retaliation against Jane Doe 10 included denying her the right to perform in the annual master class. Jane Doe 10 appropriately reported Causa's harassment and retaliation to Assistant Provost for Academic Integrity Killheffer in Yale's Title IX Office. In a subsequent meeting with Killheffer, he inappropriately included the Dean of Yale School of Music in the discussions without first disclosing to Jane Doe 10 the intention to inform senior Yale leadership of the facts.

194.    Jane Doe 10 requested reasonable accommodations from the Title IX office, such as being permitted to study with another teacher. These reasonable requests were denied until they were no longer helpful to Jane Doe 10's studies. Her access to educational opportunities has been hampered by the harassment and retaliation.

195.    Yale's Title IX officials' complete failure to provide her with accommodations and failure to respond to retaliation were so egregious that Jane Doe 10 was left with no option but to elevate her concerns. She contacted David Post, Chair of Yale's UWC, President Peter Salovey, and Provost Benjamin Polak and informed them that she wanted to file a Title IX complaint *against* Yale and the Title IX leadership. UWC Chair David Post responded that violations of Title IX by Yale's Title IX office "do not fall within the jurisdiction of the UWC."

196.    Professor Causa still teaches in the School of Music at Yale.

### g.  Jane Does 8 & 9.

197.    Professor Roberto Gonzalez Echevarria, Yale faculty in the Department of Spanish and Portuguese ("S&P"), has a long history of sexual harassment and misconduct known by senior Yale administrators, including Provost Benjamin Polak and President Peter Salovey. The S&P Department was known to have a hostile environment.

S&P doctoral students, Jane Does 8 and 9, were warned by other women at Yale not to meet with Professor Echevarria in his office with the door closed and to be on their guard constantly around him.

198.    At the 2014 and 2015 Annual S&P Department Fall Receptions, Professor Echevarria made unwanted and repeated sexual advances toward Jane Does 8 and 9, respectively. Jane Does 8 and 9 reported to an associate dean of the Graduate School Professor Echevarria's unwanted touching and his habit of making sexually charged comments in class. The associate dean was aware of Echevarria's decades of abusive conduct, which was well-known to the Graduate School and University administration, and encouraged both Jane Does to meet with Carl Hashimoto, the Deputy Title IX Coordinator for the Graduate School, to initiate a formal complaint.

199.    In Fall 2015, Jane Does 8 and 9 met with Deputy Title IX Coordinator Hashimoto, and then met in February 2016 with Hashimoto and Assistant Provost for Academic Integrity Killheffer. They were informed of the basics of the Title IX complaint process and told that Hashimoto would serve as the "official" complainant in the case instead of Jane Doe 8 or 9. They were told that making Hashimoto (the Deputy Title IX Coordinator) the complainant was in their best interest because it would protect them from "the turbulence of the Title IX process" and give them "safety and peace of mind."

200.    Jane Does 8 and 9 were not given an option to file the complaint themselves by the Deputy Title IX Coordinator. Because Hashimoto was the official complainant, Jane Does 8 and 9 were denied access to accommodations, such as transferring advisors from Professor Echevarria. Even more remarkably, Hashimoto told

Jane Does 8 and 9 that they had no right to access basic information about the complaint process and the resolution of the case because they were not the complainants.

201.   After further pressing, on November 2, 2016, David Post, Chair of the UWC, notified Jane Does 8 and 9 in a joint email of the outcome of the case. Professor Echevarria was found to have created a hostile environment for women in his departments and an "appropriate" penalty was imposed. Post, who had served as Chair of the UWC for more than two years at that point, told them that they were required to keep information connected to UWC proceedings confidential, an instruction in direct contradiction with Title IX requirements. After the one-semester leave for Fall 2016, Professor Echevarria resumed teaching, while both Jane Does 8 and 9 left Yale to pursue their PhDs elsewhere.

202.   Professor Echeverria continues to teach and mentor students, and to enjoy the privileges of an appointment as a Yale Sterling Professor of Hispanic and Comparative Literatures.

**h.  Jane Doe 5.**

203.   Jane Doe 5 was accepted to the Yale Spanish & Portuguese ("S&P") Ph.D. program in 2016, and visited the department, meeting various faculty members in April 2016. She purposefully excluded Professor Echevarria from her meeting list due to his reputation as a sexual predator, though she was forced to meet with Professor Echevarria by the Chair of S&P, Rolena Adorno, who "marched" her to Echevarria's office, insisting that Jane Doe 5 meet with him. She then left Jane Doe 5 in Echevarria's office, where Professor Echevarria ogled Jane Doe 5 and "fondled a baseball suggestively as he stared"

at her. Due to the Chair's bullying and Echevarria's oddly sexual behavior, Jane Doe 5 declined Yale's offer of admission.

204.    In September 2016, Jane Doe 5 learned that Professor Echevarria was suspended, and that there would be a full departmental overhaul. She accepted S&P's offer and matriculated in January 2017. At the start of her studies in January, she discovered Professor Echevarria's suspension was only for one semester, and that Echevarria had resumed teaching on campus. Jane Doe 5 managed to avoid Professor Echevarria for three months, but encountered him in March 2017 and witnessed him sexually harass a visiting professor. Fearing retaliation by Professor Echevarria, and his friends in S&P (including the Chair) who could fail her for her oral exams, Jane Doe 5 did not report the incident immediately.[155]

205.    Not wanting to be in proximity to Professor Echevarria and S&P's toxic environment, Jane Doe 5 explored transferring to the Comparative Literature Department in early June 2017. She met with Professor Ayesha Ramachandran and disclosed what happened with the visiting professor. Ramachandran opened the transfer application and said she was obligated to file a formal complaint with Yale's Title IX office about what Jane Doe 5 reported to her, which Ramachandran subsequently did. Despite Jane Doe 5's 4.0 grade point average, her transfer application was rejected due to the large number of students seeking transfers out of S&P.

206.    Although Jane Doe 5 attempted to follow up on the Title IX complaint through emails and meetings with the Associate Dean, Assistant Provost of Academic Integrity Killheffer, and Title IX Coordinator Spangler, no investigator ever reached out

---

[155] This fear was partly based on former S&P Professor Susan Byrne's lawsuit against Yale alleging that she was denied tenure because she reported Professor Echevarria's sexual harassment. *See* Section VI.C.3. for further details on Byrne's lawsuit.

to her about Ramachandran's Title IX complaint. Yale's 2017 sexual assault report falsely stated that the events Jane Doe 5 witnessed were not investigated because the S&P student "declined to pursue a formal complaint at this time."

207.    In January 2018, Jane Doe 5 was in the S&P communal area chatting with students and faculty when Professor Echevarria confronted her, yelled that he had never seen her before in his life, denied that she was a student in S&P, and aggressively grabbed and held her hand. A faculty member witnessed the retaliation and filed a Title IX complaint, which was referred to the UWC. Jane Doe 5 was never contacted by anyone about the Title IX retaliation complaint, nor was she ever offered protection from Professor Echevarria, who clearly knew that she had complained. Like Jane Does 8 and 9, Jane Doe 5 ultimately decided to leave Yale.

208.    Professor Echevarria still teaches in the Spanish & Portuguese Department at Yale.

## VII.    DAMAGES.

209.    The United States has suffered damages as a result of the acts and practices of Defendant, as described herein, in presenting, causing to be presented, and conspiring to present false and fraudulent claims, statements, and records to the United States for Federal Higher Education and Research Grant Funding through Defendant's research grant fraud and related Title IX violations.

210.    Defendant's false statements were material to the decision of the United States to grant funds to Defendant based on Defendant's false statements and certifications to obtain Federal Higher Education and Research Grant Funding, as challenged herein.

211.    Defendant profited unlawfully from the payment of the false and fraudulent claims by the United States.

212.    Damages to the United States are substantial.

## COUNT I
### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

213.    Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

214.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

215.    By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent statements and certifications regarding Federal Higher Education and Research Grant Funding. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

216.    Each claim presented or caused to be presented for Federal Higher Education and Research Grant Funding challenged herein represents a false or fraudulent claim for payment under the FCA.

217.    Unaware that Defendant submitted false statements to conceal its misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial noncompliance, the United States paid and continues to pay the false claims submitted for Defendant's Federal Higher Education and Research Grant Funding. These claims would not have been paid but for Defendant's fraud and false statements.

218.    In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

## COUNT II
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

219.    The Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

220.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

221.   By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims for Federal Higher Education and Research Grant Funding to which it was not entitled. Defendant knew that the records and statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the records and statements, or acted in reckless disregard for whether the records and statements were true or false.

222.   Each false or fraudulent record or statement material to a false or fraudulent claim for Federal Higher Education and Research Grant Funding challenged herein represents a false or fraudulent claim for payment under the FCA.

223.   Unaware that Defendant submitted false records or statements to conceal its misconduct and falsely certified compliance with laws and regulations despite pervasive and substantial noncompliance, the United States paid and continues to pay the false claims submitted for Defendant's Federal Higher Education and Research Grant Funding. These claims would not have been paid but for Defendant's fraud and false statements.

224.   In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

## **PRAYER AS TO COUNTS I-II**

WHEREFORE, Relators pray that this District Court enter judgment on behalf of Relators and against Defendant in Counts I-II, respectively, as follows:

a.      Damages in the amount of three times the actual damages suffered by the United States Government as a result of Defendant's conduct;

b.      Civil penalties against the Defendant, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.      The fair and reasonable sum to which Relators are entitled under 31 U.S.C. § 3730(b); additionally, Relators are entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendant;

d.      All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.      Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.      Relators' individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

## COUNT III
## UNJUST ENRICHMENT

225.    Relators restate and reallege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

226.    Relators, on behalf of the United States, claim the recovery of all monies by which Defendant has been unjustly enriched, including profits earned by Defendant because of false certifications, including but not limited to Program Participation Agreements, Assurances of Compliance, Federal Higher Education and Research Grant Funding applications and reporting, and ongoing reports made to Federal Payers.

227.    By obtaining monies as a result of its violations of federal law, Defendant was unjustly enriched and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

## PRAYER AS TO COUNT III

WHEREFORE, Relators pray that this District Court enter judgment on behalf of Relators and against Defendant in Count IV as follows:

a.    Damages sustained by the United States, including the amounts Defendant unlawfully obtained;

b.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

c.    Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

d.    Relators' individual damages, if any, which may be alleged; and

e.   All other relief on behalf of Relators or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

### DEMAND FOR JURY TRIAL

Relators demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

Andrew M. Beato (DC Bar 469097)
ABeato@steinmitchell.com
Melissa Sussman Fox (NY Bar 4507729)
*Admitted to practice in the United States District Court for the Southern District of New York*
MFox@steinmitchell.com
STEIN MITCHELL BEATO & MISSNER LLP
901 15th Street, N.W.
Suite 700
Washington, D.C. 20005
(202) 737-7777 (telephone)
(202) 296-8312 (fax)

*Counsel for Relators*

March 11, 2022

106

## CERTIFICATE OF SERVICE

I certify that on this 11th day of March a true and correct copy of the foregoing Complaint was filed under seal with the Clerk of Court. Service of this Complaint shall be made to the following parties listed below by U.S. Certified Mail, Return Receipt Requested:

| The Honorable Merrick B. Garland<br>United States Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 | Matthew M. Graves<br>Assistant United States Attorneys<br>United States Attorney's Office<br>Civil Process Clerk<br>555 4th Street, NW<br>Washington, DC 20530 |
| --- | --- |

Andrew M. Beato
Melissa Sussman Fox