**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SUSAN DARIA LANDINO, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No.: 1:22-cv-00675-APM |
| v. | ) | |
| | ) | |
| YALE UNIVERSITY | ) | ORAL HEARING REQUESTED |
| | ) | |
| Defendant | ) | |
| | ) | |

**DEFENDANT YALE UNIVERSITY'S
<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISMISSAL</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND .............................................................................................................................. 3

   A.  Legal Background ................................................................................................................ 3

     1.  The False Claims Act ..................................................................................................... 3

   B.  Legal Standard .................................................................................................................... 5

   C.  Statement of Facts .............................................................................................................. 5

     1.  Allegations Regarding Individual Instances of Sexual Harassment or Assault .......... 7

       a. Relator Maihle's Allegations ...................................................................................... 7

       b. Relator Landino's Allegations .................................................................................... 9

       c. Relator Lockwood's Allegations ................................................................................. 9

     2.  Allegations From Public Filings or Reports ............................................................... 10

     3.  Jane Doe Declarations ................................................................................................ 14

     4.  Relators' Allegations as to Yale's Leadership and Culture........................................ 14

     5.  Yale's 2012 VRA ....................................................................................................... 15

PROCEDURAL HISTORY............................................................................................................ 15

ARGUMENT .................................................................................................................................. 16

   A.  Relators' Pre-2012 Allegations of False Claims Are Time-Barred Under the Statute of Limitations ....................................................................................................................... 16

   B.  Relators' FCA Claim Should be Dismissed..................................................................... 17

     1.  Relators Fail to Allege False Claims with Sufficient Particularity to Satisfy Rule 9(b). ................................................................................................................... 17

       a. The Complaint Fails to Identify a Single False Claim, Let Alone With Particularity.18

         i.  The Complaint Does Not Identify Any Claim at All. .............................................. 18

         ii.  Relators Also Fail to Adequately Allege Falsity. ................................................... 20

       b. Relators Fail to Allege that Yale Knowingly Made False Statements and Claims..... 21

       c. Relators Fail to Sufficiently Allege Materiality. ....................................................... 24

     2.  Relators Fail to State a Claim Under Rule 12(b)(6). .................................................. 29

     3.  Relators' Claims Are Based on Publicly Disclosed Information................................. 30

       a. The Allegations Raised by Relators Were Publicly Raised in Government Investigations and Documents, Third Party Press Reports, Yale's Own Publications, and Prior Lawsuits. ................................................................................. 31

b.  Relators Are Not an Original Source ........................................................ 38

4.  The Qui Tam Provisions of the False Claims Act are Unconstitutional. ...................... 39

a.  The Qui Tam Provisions Violate the Appointments Clause ....................................... 40

b.  The Qui Tam Provisions Violate the Vesting Clause ................................................ 42

c.  The Qui Tam Provisions Violate the Take Care Clause ............................................. 43

C.  Relators' Unjust Enrichment Claim Must Be Dismissed. ................................................. 44

CONCLUSION ........................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Yale*,
    631 F.2d 178 (2d Cir. 1980) .......................................................................................... 10, 37

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................ 5

*Bagley v. Yale Univ.*,
    42 F. Supp.3d 332 (D. Conn. 2014) ........................................................................... 10, 35

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 5

*Brink v. Cont'l Ins. Co.*,
    787 F.3d 1120 (D.C. Cir. 2015) ......................................................................................... 4

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................................................... 40, 41, 42

*Cannon v. District of Columbia*,
    717 F.3d 200 (D.C. Cir. 2013) ......................................................................................... 25

*The Confiscation Cases*,
    74 U.S. 454 (1868) ........................................................................................................... 42

*Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*,
    587 U.S. 262 (2019) ......................................................................................................... 16

*Decision and Findings of Fact For the Proposed Debarments of Robert Edward
    Mccaa, Ph.d.*, 1987 WL 419231, DAB 823 (H.H.S. Jan. 12, 1987) ............................. 25

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ................................................................................... 11

*Dop Consol. Hum. Servs. Agency, Inc.*,
    1999 WL 985369, DAB 1689 (H.H.S. May 6, 1999) ...................................................... 26

*Dr. Paul F. Langlois*,
    1993 WL 742594, DAB 1409 (H.H.S. May 6, 1993) ...................................................... 26

*Falconi-Sachs v. LPF Senate Square, LLC*,
    142 A.3d 550 (D.C. 2016) ............................................................................................... 44

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................................... 29, 43

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...........................................................................42

*Jefferson Comprehensive Care Sys., Inc.*,
    2011 WL 2110682, DAB 2377 (H.H.S. Apr. 4, 2011) ...........................26

*John C. Hiserodt, M.D., Ph.d.*,
    1994 WL 321797, DAB 1466 (H.H.S. Feb. 25, 1994) ...........................26

*Kelly v. Yale Univ.*,
    No. CIV.A. 3:01-CV-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003) ...........................37

*Langeman v. Garland*,
    88 F.4th 289 (D.C. Cir. 2023) ...........................................................11

*Lucia v. SEC*,
    585 U.S. 237-38 (2018) ..............................................................40, 41

*Martin v. Arc of D.C.*,
    541 F. Supp. 2d 77 (D.D.C. 2008) .....................................................19

*Morrison v. Olson*,
    487 U.S. 654 (1988) ..........................................................................41

*Nevada Dep't of Hum. Res.*,
    2005 WL 2834999, DAB 1995 (H.H.S. Sept. 23, 2005) ........................26

*Newman v. U.S.*,
    382 F.2d 479 (D.C. Cir. 1967) ..........................................................42

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ..........................................................................44

*Ohio Dep't of Hum. Servs.*,
    1990 WL 600235, DAB 1202 (H.H.S. Nov. 1, 1990) ...........................26

*\*Pencheng Si v. Laogai Rsch. Found.*,
    71 F. Supp. 3d 73 (D.D.C. 2014) .................................................. *passim*

*Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*,
    43 F. Supp. 3d 28 (D.D.C. 2014) .......................................................25

*Pinebelt Ass'n for Cmty. Enhancement*,
    2014 WL 8144941, DAB 2611 (H.H.S. Dec. 22, 2014) ........................26

*Printz v. U.S.*,
    521 U.S. 898 (1997) ..........................................................................43

*Puerto Rico Dep't of the Fam.*,
   2005 WL 2323194, DAB 1993 (H.H.S. Sept. 9, 2005) ..........................................26

*Rhode Island Dep't of Human Services*,
   2013 HHSDAB LEXIS 374, DAB 2552 (H.H.S. Dec. 20, 2013) ...........................26

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) ..............................................................................43

*Rockefeller ex rel. U.S. v. Washington TRU Sols. LLC*,
   No. 03-7120, 2004 WL 180264 (D.C. Cir. Jan. 21, 2004) .....................................45

*Rosell v. VMSB LLC*,
   67 F.4th 1141 (11th Cir. 2023) ............................................................................44

*Rural Day Care Ass'n of Ne. N. Carolina*,
   1994 WL 618572, DAB 1489 (H.H.S. Aug. 8, 1994) .............................................26

*\*Selia L. LLC v. CFPB*,
   591 U.S. 197 (2020) ...........................................................................41, 42, 43

*Simons v. Yale Univ.*,
   No. 3:19-cv-01547-OAW (D. Conn. Oct. 1, 2019) ..........................................34, 38

*Smith v. Athena Constr. Grp., Inc.*,
   No. 18-CV-2080, 2023 WL 11914900 (D.D.C. Jan. 20, 2023)................................39

*\*Smith v. Athena Constr. Grp., Inc.*,
   No. 18-CV-2080 (Mehta, J.), 2022 WL 888188 (D.D.C. Mar. 25, 2022) ..........................5, 38

*Southwest Arkansas Development Council, Inc.*,
   2012 HHSDAB LEXIS 197, DAB 2489 (H.H.S. Dec. 12, 2012) ...........................26

*Springer v. Philippine Island*s,
   277 U.S. 189 (1928).............................................................................................42

*Subject: Kimon J. Angelides, Ph.d.*,
   1999 WL 88783, DAB 1677 (H.H.S. Feb. 5, 1999) ...............................................26

*Subject: Wyoming Dep't of Fam. Servs.*,
   2007 WL 1354322, DAB 2074 (H.H.S. Apr. 6, 2007)............................................26

*UCLA Sch. of Med.*,
   1982 WL 189611, DAB 340 (H.H.S. Aug. 30, 1982) .............................................25

*Union Twp. Cmty. Action Org., Inc.*,
   2005 WL 1164061, DAB 1976 (H.H.S. Apr. 29, 2005)..........................................26

*Universal Health Servs. v. U.S. ex rel. Escobar,
   579 U.S. 176 (2016)..................................................................4, 5, 22, 28

Utica Head Start Child. & Fams., Inc.,
   2000 WL 1479326, DAB 1749 (H.H.S. Sept. 27, 2000) ........................................26

U.S. v. Halifax Hosp. Med. Ctr.,
   997 F. Supp.2d 1272 (M.D. Fla. 2014)..................................................................40

U.S. v. Lozano,
   No. CV 17-2433 (RJL), 2023 WL 6065161 (D.D.C. Sept. 18, 2023)....................39

U.S. v. Nixon,
   418 U.S. 683 (1974)..................................................................42

U.S. v. Riverside Med. Grp., P.C.,
   22-04165 (SDW) (LDW), 2024 WL 4100372 (D.N.J. Sept. 6, 2024)....................40

*U.S. v. Sci. Applications Int'l Corp.,
   626 F.3d 1257 (D.C. Cir. 2010) ..................................................................23, 24

U.S. and State of Tenn. Ex rel. Adams v. Chattanooga Hamilton Cnty. Hosp. Auth.,
   1:21-cv-84, 2024 WL 4784372 (E.D. Tenn., Nov. 7, 2024)....................40

U.S. ex rel. Adams v. Dell Computer Corp.,
   496 F. Supp. 3d 91 (D.D.C. 2020)..................................................................22, 23

U.S. ex rel. Bailey v. Veterans Med. Transcription Servs., Inc.,
   No. CV 20-2312 (BAH), 2023 WL 7536185 (D.D.C. Nov. 13, 2023), aff'd,
   2024 WL 4864480 (D.C. Cir. Nov. 22, 2024) ........................................16

U.S. ex rel. Bender v. N. Am. Telecomm., Inc.,
   750 F. Supp. 2d 1 (D.D.C. 2010), aff'd, 499 F. App'x 44 (D.C. Cir. 2013)............18

U.S. ex rel. Bender v. N. Am. Telecommunications, Inc.,
   686 F. Supp. 2d 46 (D.D.C. 2010) ..................................................................4, 17

U.S. ex rel. Butler v. Shikara,
   20-80483-cv, 2024 WL 4354807 (S.D. Fla. Sept. 6, 2024)....................40

U.S. ex rel. Clark v. UnitedHealth Grp., Inc.,
   cv-13-00372 (MV) (CG), 2016 WL 9777207 (D.N.M. Sept. 22, 2016) ................20

*U.S. ex rel. Conteh v. IKON Off. Sols., Inc.,
   103 F. Supp. 3d 59 (D.D.C. 2015)..................................................17, 18, 22, 24

U.S. ex rel. Davis v. D.C.,
   413 F. App'x 308 (D.C. Cir. 2011)..................................................................39

*U.S. ex rel. Davis v. District of Columbia*,
   679 F.3d 832 (D.C. Cir. 2012) ...................................................................................30, 31

*U.S. ex rel. Doe v. Staples, Inc.*,
   773 F.3d 83 (D.C. Cir. 2014) .............................................................................................31

*U.S. ex rel. Eisenstein v. City of New York*,
   556 U.S. 928 (2009) ...........................................................................................................43

*U.S. ex rel. Findley v. FPC-Boron Emps.' Club*,
   105 F.3d 675 (D.C. Cir. 1997) ...........................................................................................30

*U.S. ex rel. Groat v. Bos. Heart Diagnostics Corp.*,
   255 F. Supp. 3d 13 (D.D.C. 2017), *amended on reconsideration in part*, 296
   F. Supp. 3d 155 (D.D.C. 2017) ..........................................................................................25

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*,
   No. CV 15-2105 (ABJ), 2020 WL 435490 (D.D.C. Jan. 28, 2020) .................................22, 25

*U.S. ex rel. Kelly v. Boeing Co.*,
   9 F.3d 743 (9th Cir. 1993) ..................................................................................................43

*U.S. & State of Ill. Ex rel. Lagatta v. Reditus Labs., LLC*,
   1:22-cv-01203-SLD-JEH, 2024 WL 4351862 (C.D. Ill. Sept. 30, 2024)...........................40

*U.S. ex rel. Landis v. Tailwind Sports Corporation*,
   51 F. Supp. 3d 9 (D.D.C. 2014) .....................................................................................23, 24

*\*U.S. ex rel. Landis v. Tailwind Sports Corporation*,
   No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016) .............................23

*U.S. ex rel. McLain v. KBR, Inc.*, No. 1:08-CV-499 GBL/TCB,
   No. 1:08-CV-499, 2013 WL 710900 (E.D. Va. Feb. 27, 2013) ...........................................19

*U.S. ex rel. McLamore v. Winn Companies*,
   No. 16-CV-1274 (TSC), 2022 WL 18024623 (D.D.C. Dec. 30, 2022)................................16

*U.S. ex rel. Miller v. Manpow, LLC*,
   2:21-cv-05418-VAP-ADSx, 2023 WL 8290402 (C.D. Cal. Aug. 30, 2023) ........................40

*U.S. ex rel. Mossey v. PaL-Tech, Inc.*,
   1:99-cv-1406, 2006 WL 8460541 (D.D.C. Apr. 3, 2006) ....................................................21

*U.S. ex rel. O'Connor v. U.S. Cellular Corp.*,
   No. 20-CV-2071 (TSC), 2023 WL 2598678 (D.D.C. Mar. 22, 2023) ..................................37

*U.S. ex rel. Oliver v. Philip Morris USA Inc.*,
   826 F.3d 466 (D.C. Cir. 2016) ...........................................................................................39

*U.S. ex rel. Pepe M.D. et al. v. Fresenius Medical Care Holdings*,
  1:14-cv-03505-LDH-ST, 2024 U.S. Dist. LEXIS 198407 (E.D.N.Y. Oct. 31,
  2024) ........................................................................................................................... 19

*\*U.S. ex rel. Polansky* v. *Executive Health Resources, Inc.*,
  599 U.S. 419 (2023) ........................................................................................... 39, 40, 44

*U.S. ex rel. Rockefeller v. Westinghouse Elec. Co.*,
  274 F. Supp. 2d 10 (D.D.C. 2003) ......................................................................... 44

*U.S. ex rel. Scutellaro v. Capitol Supply, Inc.*,
  No. 10-cv-1094 (BAH), 2017 WL 1422364 (D.D.C. Apr. 19, 2017) .................... 30

*U.S. ex rel. Settlemire v. District of Columbia*,
  198 F.3d 913 (D.C. Cir. 1999) ................................................................................ 31

*U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
  214 F.3d 1372 (D.C. Cir. 2000) .............................................................................. 20

*U.S. ex rel. Smith v. Yale Univ.*,
  415 F. Supp. 2d 58 (D. Conn. 2006) ....................................................................... 17

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) .................................................................................. 30

*U.S. ex rel. Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002) ................................................................................ 43

*U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
  41 F.3d 1032 (6th Cir. 1994) .................................................................................. 43

*U.S. ex rel. Thomas v. Mercy Care*,
  CV-22-00512-PHX-JAT, 2023 WL 7413669 (D. Ariz. Nov. 9, 2023) .................. 40

*\*U.S. ex. rel. Totten v. Bombardier Corp.*,
  286 F.3d 542 (D.C. Cir. 2002) ............................................................................ 4, 17

*U.S. ex rel. Wallace v. Exactech, Inc.*,
  703 F. Supp.3d 1356 (N.D. Ala. 2023) ................................................................... 40

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
  389 F.3d 1251 (D.C. Cir. 2004) ................................................................................ 5

*U.S. ex rel. Winkelman v. CVS Caremark Corp.*,
  827 F.3d 201 (1st Cir. 2016) .................................................................................. 31

*U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*,
  No. 8:19-cv-01236-KKM-SPF, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024) ......... 40, 41, 42

*U.S. Virgin Islands*,
    2019 WL 2499582, DAB 2943 (H.H.S. May 23, 2019) ........................................................ 26

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000) ................................................................................................................ 43

**Statutes**

20 U.S.C. § 1092(f) (Clery Act) ..................................................................................................... 32

31 U.S.C. §§ 3729 – 3733 (False Claims Act) ................................................................... *passim*

    31 U.S.C. § 3729 ............................................................................................... 3, 21, 24, 29

    31 U.S.C. § 3730 .................................................................................................. 30, 31, 38

    31 U.S.C. § 3731 ............................................................................................................... 16

42 U.S.C. Ch. 7 (Social Security Act) ........................................................................................... 26

**Other Authorities**

Fed. R. Civ. P. 9(b) ........................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) .................................................................................................................. 44

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 5, 17, 29, 31

U.S. Const. art. II ................................................................................... 17, 39, 40, 41, 42, 44

U.S. Const. art. II, § 2, cl. 2, Appointments Clause ............................................................... 40, 41, 44

U.S. Const. art. II, § 3, Take Care Clause ................................................................................. 43, 44

U.S. Const. art. II, cl. 1, Vestings Clause .......................................................................................... 44

## INTRODUCTION

This case alleges a vast, implausible scheme: for decades, the Relators claim, Yale University systematically failed to comply with Title IX, the landmark civil rights law prohibiting sex discrimination by educational programs that receive federal funding. Across these decades, Relators allege, Yale also consistently lied to the federal government, certifying that it complied with Title IX in an uncounted number of grant applications for medical and scientific research made to the National Institutes of Health (NIH) and the Department of Health and Human Services (HHS). This combination of purported systematic Title IX violations and false certifications of compliance in unspecified applications, they say, constitutes a long series of false claims made to the federal government. Every one of those certifications, they say, represents a violation of the False Claims Act (FCA), which combats fraudulent claims made against the federal government. While the Relators' allegations are sweeping in their scope— stretching across over a hundred pages and covering nearly half a century—they fail to identify even one false claim that Yale submitted to the federal government. Instead of doing what the FCA requires—identifying particular grant applications or payments—they refer to the set of grant applications as a whole, hoping to link generations of federal grant applications and payments to the kinds of isolated allegations of sex discrimination any large organization would face over a period of decades. The Complaint does not allege any court or administrative body ever found that Yale was out of compliance with Title IX when a particular grant application was made or payment received. Nor does it allege that any Yale official with authority to certify Title IX compliance ever knew (or even believed) that Yale was not complying with Title IX when the certification was made. Instead, the Complaint plays a blind game of connect-the-dots: on one side is an undifferentiated mass of federal research funding received over the course of decades,

1

without a single, specific grant or accompanying certification identified; on the other side are isolated claims of sex discrimination during those decades (many already widely publicized or disclosed directly to the government). The insinuation is that they *must* be connected.

This is not enough. The Complaint offers a blunderbuss approach to pleading FCA violations, but the FCA requires a scalpel. FCA claims are fraud claims that must be pleaded with particularity, not by insinuation. A disjointed set of vague accusations of sex discrimination spread across decades cannot support the assertion that every grant that the federal government awarded and paid to Yale across those decades—grants that the government awarded because it judged the medical and scientific research worthy of federal support—constituted a false claim.

The Complaint fails to plead several essential elements of FCA claims: falsity, scienter, and materiality. Any of those failures alone would require dismissal. First, the Complaint does not identify any specific false statement that Yale made, let alone one that misrepresented objective fact. Second, the Complaint lacks any factual allegations that, even if true, would establish the necessary scienter: that Yale's certifications of legal compliance with Title IX were knowingly or recklessly false. Third, even if the Complaint adequately alleged that the scattered harassment allegations it describes amounted to a Title IX violation, Relators have not alleged that this would have been material to the agency's decision to approve any grants: after all, despite the alleged violations being investigated and reported on by the press, the United States continued to award grants to Yale throughout the relevant time period.

Aside from these three fundamental flaws, the action is barred under the FCA because its allegations were publicly disclosed. Relators are not original sources bringing meaningfully new information to the attention of the United States. To the contrary, the Complaint relies heavily on already-public information, including Yale's own public reports, published legal cases, media

reporting, and other third-party sources. The snippets of new information they offer do not derive from their own experiences or observations, but from the unsworn information of anonymous third parties whom they refuse to name.

Even if the Complaint did not suffer from the three fatal pleading flaws and its failure to meet the original source requirement, it would face additional hurdles. First, recent case law supports the conclusion that relators are constitutionally barred from bringing FCA claims. Second, the FCA's statute of repose bars any claims before 2012, and while the Complaint does not identify any specific grant payments that Relators contend were false claims, it broadly asserts that "the University has received more than $6 billion in HHS funding *since 2008*" while describing alleged discrimination going back decades. Relators commenced this action in 2022, more than ten years after much of the conduct they believe supports their claims. Third, Relators lack standing to bring common law unjust enrichment claims on behalf of the United States.

Relators may believe that stringing together old reports of allegations against individual faculty over the course of almost half a century amounts to an actionable claim for a university-wide scheme of billions of dollars in false claims against the federal government. It does not. The FCA requires specific allegations of falsity, scienter, materiality and Relators' status as original sources of the information underlying those allegations. The Complaint fails on all those fronts and should be dismissed.

## BACKGROUND

### A. Legal Background

#### 1. The False Claims Act

The False Claims Act (FCA) prohibits any person from presenting a "false or fraudulent claim" for payment by the federal government. 31 U.S.C. §§ 3729(a)(1)(A), (b)(2). Because claims alleging violations of the FCA sound in fraud, they must be alleged with particularity

under Rule 9(b). *U.S. ex. rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002). Relators are required to set forth with particularity the who, what, when, where, and how of the alleged fraud by "referenc[ing] . . . specific fraudulent statements, who made the statements, what was said, when or where these statements were made, and how or why the alleged statements were fraudulent." *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015). Allegation of a false claim is the "*sine qua non*" of a violation of the FCA. *U.S. ex rel. Bender v. N. Am. Telecommunications, Inc.*, 686 F. Supp. 2d 46, 52 (D.D.C. 2010). A complaint alleging a FCA violation must sufficiently establish that false claims were submitted for government payment as a result of the defendant's misconduct. *Id.*

While FCA liability can attach to claims rendered false by a contractor's knowing failure to comply with a legal obligation (statutory, regulatory, or contractual), the legal obligation must be material to the government's decision to pay. *Universal Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 190 (2016). This materiality requirement is "rigorous" and "demanding," *id.* at 192-94, and plaintiffs must plead it with particularity under Rule 9(b), *id*. at 195 n.6.

Pleading materiality under the FCA is rigorous and demanding because the FCA "is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194.[1] As a result, a "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* Moreover, materiality "cannot be found where noncompliance is minor or

---

[1] Throughout this brief, unless otherwise noted citations and internal quotations and marks are omitted; any emphasis is added.

insubstantial." *Id.* Liability under the FCA attaches *only* when the alleged statutory, regulatory, or contractual non-compliance would affect the payor's payment behavior. *Id.*

### B.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), Relators must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations, generally assumed as true, must still "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. But the pleading of bare legal conclusions is insufficient to survive a motion to dismiss and "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678-79. A complaint must provide Defendants fair notice of what a claim is, "the grounds upon which it rests," and claims must support recovery under a viable legal theory. *Twombly*, 550 U.S. at 555.

Because FCA claims sound in fraud, they must meet the heightened pleading standard of Rule 9(b), which requires parties to "state with particularity the circumstances constituting fraud or mistake." A complaint must also identify "the fact misrepresented and what was retained or given up as a consequence of the fraud." *Smith v. Athena Constr. Grp., Inc.*, No. 18-CV-2080 (Mehta, J.), 2022 WL 888188, at *5 (D.D.C. Mar. 25, 2022) (citing *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). The particularity requirement "safeguards potential defendants from frivolous accusations of moral turpitude ... [and] guarantee[s] all defendants sufficient information to allow for preparation of a response." *Id.*

### C.  Statement of Facts

The Complaint asserts that Yale violated the FCA by falsely certifying, in unspecified applications for federal grant funding, that it complied with Title IX and other applicable laws. The Complaint does not allege that any court or administrative agency has ever found that Yale failed to comply with Title IX. Nor does it allege that any individual at Yale with responsibility

for a grant application to the federal government believed Yale was not complying with Title IX. Nor does it allege that any particular grant application Yale submitted was false.

The factual allegations that purport to establish Yale's knowing non-compliance with Title IX are limited to: (1) individual instances of alleged sexual harassment, spanning many years and taking place in different parts of the University, which Relators allege were not handled consistently with Title IX; (2) a "distinct pattern" of silencing and retaliating against victims by "a consistent core group of Yale senior leadership" responsible for handling those allegations; and (3) a 2012 Voluntary Resolution Agreement (VRA) entered into between Yale and the U.S. Department of Education's Office for Civil Rights (OCR) resolving a March 2011 complaint that had alleged there was a "sexually hostile environment" on campus to which the university had not adequately responded. (Compl. ¶ 8.) As explained below, OCR did not issue a finding that Yale had violated Title IX. In OCR's Press Release announcing the VRA, the assistant secretary for civil rights stated, "I applaud the steps Yale has taken and has agreed to take to address immediate concerns and to put systems in place to help prevent future Title IX discrimination." Freiman Decl. Ex. 1, 06.15.2012 OCR Press Release. The Press Release noted that Yale had "worked closely with OCR throughout its investigation, voluntarily and proactively made changes to its procedures and practices related to Title IX compliance, and notified the university-wide community of these changes. The university has further agreed to continue this commitment by entering into a voluntary resolution agreement." *Id.*

Many parts of the Complaint allege conduct before March 11, 2012, when Yale adopted the additional Title IX compliance measures described in the VRA. As alleged in the Complaint, Yale established a University-Wide Committee on Sexual Misconduct (UWC) in 2011 to respond to complaints of sexual harassment under Title IX. (Compl. ¶ 94.) All Relators had left

Yale by 2013. Relator Lockwood graduated with a Ph.D. in Philosophy in 2009. (*Id*. ¶ 19.)

Relator Landino worked as administrative staff from 1999-2010, developing public safety

educational programming, and as a project manager at Yale School of Medicine (YSM) from

2010 to November 2012. (*Id*. ¶ 17.) Relator Maihle left her YSM faculty position in 2013. (*Id*. ¶

22.)

### 1.    Allegations Regarding Individual Instances of Sexual Harassment or Assault

These allegations fall into three further subcategories: (1) personal observations and

experiences of Relators; (2) publicly available information; and (3) allegations purportedly based

on declarations by unidentified declarants.

### a.    *Relator Maihle's Allegations*

Maihle alleges witnessing sexual harassment at YSM and abuses of federal grants. (*See

generally* Compl. ¶¶ 21-22, 114-130.) She alleges acts or omissions by male colleagues:

- Alleged conduct by a faculty member who died in 2008, and which therefore must have
  occurred at least 14 years before the filing of the Complaint. (Compl. ¶ 130(a).)

- Alleged conduct by a faculty member who resigned in 2010, and which therefore must have
  occurred at least 12 years before the filing of the Complaint. (Compl. ¶ 130(f).)

- In an unspecified period before 2013, when Maihle left Yale, the Chair of the Department of
  Obstetrics and Gynecology allegedly did not stop on-campus parties that included alcohol.
  (Compl. ¶¶ 22, 130(h).)

- On an unspecified date, a sexual harassment complaint was allegedly read at a meeting
  considering a YSM faculty member's reappointment, and those present (except Maihle)
  laughed. A faculty member present at the meeting allegedly reported he had had a "come to

Jesus" talk with the faculty member under consideration, leading to more laughter, and the faculty member was later reappointed by committee vote. (Compl. ¶¶ 130(b), 130(j).)

- On an unspecified date, when a Promotion and Tenure Committee meeting discussed sexual harassment complaints against a faculty member, a faculty member allegedly noted that Yale's settlement of a sexual harassment case against another faculty member "didn't hurt him." After Maihle voted against a faculty member's promotion, a faculty member told Maihle that Yale did not "like it" when promotion votes were not unanimous. (Compl. ¶ 130(l).)

- On an unspecified date, a YSM faculty member allegedly showed slides of he and another faculty member (who died in 2008) with female staff sitting on their laps. This faculty member also allegedly told Maihle that sexual harassment lawsuits did not do much harm even to chairs. In Fall 2011, after Maihle objected to a derogatory comment this faculty member made while reviewing a female faculty member, the faculty member allegedly told Maihle to "shut up." (Compl. ¶ 130(e).) Maihle supported "Jane Doe A" in reporting this faculty member to the UWC for his sexual advances, which led to the UWC later demoting him. (Compl. ¶ 122.) Maihle alleges that in 2012 she was retaliated against for supporting "Jane Doe A" in filing the complaint against the faculty member. (Compl. ¶ 123.)

- The day after that Fall 2011 exchange, the then Interim Chair of the Promotions and Tenure Committee told Maihle that YSM had recently reviewed her performance, but he did not provide details of that review. The Interim Chair later wrote her telling her to anticipate salary reductions if she did not significantly improve, and accused her of misrepresenting her productivity. (Compl. ¶ 130(l).)

   *b. Relator Landino's Allegations*

At some point during Landino's employment at Yale from August 1999 to November 2012, she raised concerns with an Associate Vice President that survivors were not being provided Title IX services, and was allegedly told that Title IX compliance was not her job. (Compl. ¶ 132.) Landino does not allege that Title IX compliance *was* her job. She alleges her job was to develop programming to educate people on public safety. (*Id*. ¶ 131.) Landino alleges, without further detail, that she "became aware" that Yale leadership talked students out of reporting sexual harassment or misconduct to the police and did not provide students with appropriate assistance. (*Id*. ¶ 132.) She alleges she reported what she believed to be Title IX violations to the Yale President in 2014 (after she had left Yale), without specifying what the alleged violations were. (*Id.* ¶ 135.) Landino also alleges earlier incidents in 2004, 2006, 2009, and 2010, (*id.* at ¶¶ 137-44), all predating the Complaint by more than a decade.

   *c. Relator Lockwood's Allegations*

Lockwood received her Ph.D. from Yale in 2009 and alleges she learned of sexual misconduct by faculty that occurred in late 2007 and 2008. (Compl. ¶¶ 145, 147-55.)

She alleges that in 2010-13, after leaving Yale, she received reports from Yale students and alumni about faculty sexual misconduct in the Philosophy Department. On four occasions, she allegedly shared with the Chair of the Philosophy Department that in her view Title IX violations were occurring in that department. (*Id.* ¶ 157.) Lockwood, a philosopher, does not allege that she is a legal expert or an expert in Title IX compliance. She alleges three instances of what she characterizes as Title IX violations: (1) she claims that in 2013 a professor received an early retirement package with a mutual non-disclosure agreement after allegedly sexually assaulting "one—possibly two—male undergrads"; (2) she claims that in 2012 another professor

"was given a golden parachute to NYU" despite "known sexual misconduct"; and (3) she claims

that a third professor was not terminated despite unspecified "irrefutable evidence" that he

engaged in sexual harassment. Relator Lockwood alleges that the then Chair of the Philosophy

Department, who at the time was also the UWC chair, failed to provide training "on sexual and

related harassment" to Philosophy Department faculty and graduate students. (*Id.* ¶ 157.)

Even if these incidents had occurred as these Relators allege, there is no allegation that

anyone responsible for or with knowledge of any of the acts or omissions recited above and set

forth in the Complaint certified compliance with Title IX on federal grant applications.

### 2. Allegations From Public Filings or Reports

The Complaint cites lawsuits, public news, and Yale's own Title IX website as supposed

support for alleged inappropriate conduct by Yale employees.[2]

- The Complaint references *Alexander v. Yale*, 631 F.2d 178 (2d Cir. 1980). (*See* Compl. ¶ 89

  n.49.) In that case, five students alleging violations of Title IX sued Yale in 1977; all of their

  claims were dismissed.

- The Complaint also refers to HHS administrative decisions, (*see* Compl. nn.35-36, 38-40),

  but none pertain to Title IX, let alone Yale.

- Relators allege that in 2013 a Yale School of Management professor sued, alleging gender

  and age discrimination and retaliation. (Compl. ¶ 99.) The Complaint cites heavily from a

  motion to dismiss decision that necessarily assumed the facts alleged to be true. *See Bagley v.*

  *Yale Univ.*, 42 F. Supp.3d 332 (D. Conn. 2014). The Complaint acknowledges that the case

  was resolved without a finding of liability. (Compl. ¶ 99 n.64 (citing Ryan Gittler, *Bagley*

---

[2] This includes an allegation that in 2015, a complaint was filed with OCR about sexual misconduct
by a philosophy professor. (Compl. ¶ 98.) The conduct described in that OCR complaint allegedly
occurred in 2010 or before. (*Id.*)

*Discrimination Lawsuit Dismissed*, YALE DAILY NEWS (Feb. 22, 2017),

https://yaledailynews.com/blog/2017/02/22/bagley-discrimination-lawsuit-dismissed/.))

- The Complaint relies on articles from the student-run Yale Daily News from 2014, 2017, and 2018 about the topic of sexual misconduct or sexual harassment at Yale. (Compl. ¶ 105.)

- The Complaint relies heavily on semi-annual Provost Reports of Sexual Misconduct Complaints, which Yale began publishing in 2012. (*Id.* ¶ 108.) But it does not disclose that Yale publishes those reports on its publicly available Title IX website "to provide greater transparency and to raise community awareness about the prevalence and nature of incidences disclosed." *See* Freiman Decl. Ex. 2, "Title IX at Yale" (containing dozens of reports involving Title IX published by Yale from 2008 to the present, cataloging complaints and responsive investigations, regardless of whether they result in any finding of misconduct).[3]

- In 2015 and 2019, Yale voluntarily participated in campus sexual climate surveys with the Association of American Universities (AAU). (Compl. ¶ 107.)

- The Complaint characterizes the June 2020 Yale Provost Report on Sexual Misconduct as identifying 59 sexual harassment complaints made to its Title IX Coordinator in the second half of 2019, none of which were reviewed by the UWC, and "38 reported sexual assault complaints, only one [of which] was reviewed by the UWC." (*Id.* ¶ 109.) Again, the Complaint neglects to disclose that the report (incorporated by reference into the Complaint) states that every sexual harassment or sexual assault complaint was addressed by either the

---

[3] On this motion to dismiss, the Court can consider "facts alleged in the complaint, *any documents* attached to or *incorporated in the complaint*, matters about which the court may take judicial notice, and matters of public record." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 70 (D.D.C. 2016); *see also Langeman v. Garland*, 88 F.4th 289, 291–92 (D.C. Cir. 2023).

UWC, the Title IX Coordinator, or the Yale Police. *See* Freiman Decl. Ex. 3, "Report of

Complaints of Sexual Misconduct" from July 1, 2019 through December 31, 2019 at 10,

Table 3. A complainant at Yale nearly always chooses whether and how to report an assault:

> In providing a range of formal and informal options for pursuing complaints, the
> University seeks to meet the varied needs of potential complainants. Whenever possible,
> it is the complainant who decides whether or not to pursue a complaint, and in what
> venue. In certain unusual circumstances, such as those involving risks to the safety of
> individuals and/or the community, the University will bring matters to a formal hearing
> independently of the wishes of an individual complainant. The choice of an informal
> process does not imply the matter is less serious than those matters pursued through
> formal processes, nor does it preclude the complainant from choosing to bring a formal
> complaint at a later date.

Freiman Decl. Ex. 4, "Reports of Complaints of Sexual Misconduct Brought forward from

January 1, 2019 through June 30, 2019" at 7.

- The Complaint refers to an Academic Sexual Misconduct Database, Individual Institution

  Title IX Reports, and the 2015 and 2019 AAU Campus Climate Surveys as supposed support

  for the assertion that since the 2012 VRA, Yale has had lower compliance with Title IX than

  universities of its size or larger. (*Id.* ¶ 111.) All of these are publicly available documents.

  *See, e.g.*, Freiman Decl. Ex. 5, "Academic Sexual Misconduct Database." Other institutions'

  Title IX reports are, like Yale's, available publicly. *See, e.g.*, Freiman Decl. Ex. 6, "Sexual

  Misconduct & Title IX" (Princeton); Freiman Decl. Ex. 7, Institute Discrimination &

  Harassment Response Office, "Annual Reports" (MIT); Freiman Decl. Ex. 8, Harvard Office

  of Dispute Resolution, "Annual Data"; Freiman Decl. Ex. 9, Stanford Office of the Vice

  Provost for Institutional Equity, Access & Community, "Reports." The AAU Campus

Climate Surveys are also available online. *See, e.g.*, Freiman Decl. Ex. 10, 2019 Campus Climate Survey; Freiman Decl. Ex. 11, 2015 Campus Climate Survey.[4]

- The Complaint alleges that a former secretary at YSM filed suit in 2006, alleging that a faculty member sexually harassed her. (Compl. ¶ 130(k).) (The Complaint does not allege any finding of liability against the faculty member or Yale.)

- The Complaint describes the published report of an independent investigation into a former professor (Daly Report). (Compl. ¶ 110.) It does not disclose that Yale itself commissioned a former United States Attorney to conduct the independent investigation, and then published the 50+ page single-spaced Daly Report, referenced in the Complaint, in its entirety. *See* Freiman Decl. Ex. 12, 08.14.2019 Daly Report.

The Complaint also alleges facts from other public sources pertaining in some tangential way to Yale. For example, it alleges that in 2020 a YSM faculty member was "acquitted after a jury trial of allegations of medical battery, negligent infliction of emotional distress, and failure to disclose the nature of the procedure." The description of the causes of action indicates this was a civil action brought by a patient (not employee or student) whom the doctor treated while at Yale. (Compl. ¶ 130(j).) The Complaint alleges a separate lawsuit filed against this faculty member by a nurse alleging operating room misconduct. (*Id.*) It does not explain how either matter relates to grant fraud or Title IX. Likewise, the Complaint alleges that a different YSM faculty member was found liable for medical malpractice in 2010 relating to misreading a

---

[4] Paragraph 111 of the Complaint refers to an exhibit which is "a report prepared by Relators" that purportedly "aggregates data" from the sources referenced in text. In other words, it purportedly aggregates the publicly available information cited above. This exhibit, along with another exhibit purportedly containing a Relator-constructed timeline of pre-VRA Title IX infractions, (*see* Compl. ¶ 90), were not attached to the unsealed filed Complaint. Yale responds to the allegations in the paragraphs of the complaint, rather than the unattached exhibit, but both paragraphs and exhibit were based on the publicly disclosed sources.

pathology report, (Compl. ¶ 130(l)), again with no explanation of the pertinence to the FCA claims at issue.

### 3. Jane Doe Declarations

The Complaint purports to provide summaries of nine Jane Doe declarants with secondhand information of Title IX claims. Allegations regarding Jane Does 1 and 2 involve sexual misconduct that allegedly occurred in 2005 and 2007 (Compl. ¶¶ 163, 168), before the relevant time period, *see* below at 16. The Complaint alleges that Jane Doe 3 was raped by her ex-boyfriend and that afterwards she was not advised of her Title IX rights, that the UWC moved too slowly, and that it reached the wrong result. (Compl. ¶¶ 172-75.) The Complaint alleges that Jane Doe 5 filed a Title IX complaint after witnessing a professor harass a visiting professor, and that a third professor made a Title IX complaint after witnessing the first professor grab Doe 5's hand, but that neither complaint was properly investigated. (Compl. ¶¶ 205-207.) Jane Does 6-10 are former graduate students who allege they received inappropriate and unwanted advances by Yale faculty. (Compl. ¶ 176-202.) Jane Does 8-10 claim they were denied reasonable accommodations by the Title IX office. (Compl. ¶¶ 194, 200.)

### 4. Relators' Allegations as to Yale's Leadership and Culture

Relators allege that Yale knew or should have known it was out of compliance with Title IX because high-level officials allegedly suppressed reports of sexual harassment and assault by its professors and on its campus. (Compl. ¶ 112.) The only allegations related to "high-level" Yale personnel from 2012 or later come from Relator Lockwood and her account of what she learned secondhand from Jane Does 3 and 5-10. (Compl. ¶¶ 158-59, 161.) She alleges she met with Title IX Coordinator Stephanie Spangler in 2014-15, and emailed Spangler and former Yale President Peter Salovey, "notifying them of violations of Yale's VRA and Title IX," but that her emails were met with either no reply or "terse replies." (*Id.* ¶ 158.) She alleges the VRA and

Title IX violations about which she notified them "included failure to pursue steps to prevent the recurrence of sexual harassment, failure to permit third-party complainants to go through informal or formal processes, and failure to do a climate assessment and/or provide training for a specific population." (*Id.*) Lockwood alleges she sent an email documenting these violations in June 2014 and sent it again three times in Fall 2014. (*Id.* ¶ 159.) Lockwood had finished her Ph.D. and left Yale five years before the emails. (*Id.* ¶ 156.)

### 5.  Yale's 2012 VRA

The conduct that was investigated and resolved in the June 11, 2012 VRA occurred before 2011. The Complaint alleges that OCR "investigated and concluded that Yale violated Title IX, resulting in the heightened [VRA] contractual requirements." (Compl. ¶ 111.) The VRA is repeatedly referenced in the Complaint and is available on a government website. Freiman Decl. Ex. 13, 06.11.2012 Voluntary Resolution Agreement. It says:

> Prior to and during the course of the investigation, the University implemented a number of policies, procedures and practices to improve its response to sexual misconduct complaints, ensure compliance with Title IX and its implementing regulation and to resolve the issues of the complaint. ***OCR has not made a finding of noncompliance*** **and this Resolution Agreement has been entered into voluntarily by the University and does not constitute an admission that the University is not in compliance with Title IX and/or its implementing regulation.**

*Id.* at 1. The Complaint does not explain why the Relators assert that OCR "concluded that Yale violated Title IX" when the VRA states that "OCR has *not* made a finding of noncompliance."

### PROCEDURAL HISTORY

Relators' complaint was filed under seal on March 11, 2022. ECF. No. 1. The government declined to intervene on September 16, 2024. ECF No. 16.

**ARGUMENT**

### A. Relators' Pre-2012 Allegations of False Claims Are Time-Barred Under the Statute of Limitations

As a threshold matter, the FCA bars claims in *qui tam* suits in which the federal government declines to intervene filed more than (1) six years from the date of the violation, or (2) three years from the date the U.S. official responsible for acting knew or should have known of the violation, "*but in no event more than 10 years from the date on which the violation is committed.*" 31 U.S.C. § 3731(b); *see also Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 587 U.S. 262, 268–271 (2019) (clarifying that (b)(2) applies to *qui tam* suits in which the government has declined to intervene). As explained below, the Complaint fails to identify any individual false claim submitted to the government, making it impossible to determine the appropriate statute of limitations. *See U.S. ex rel. Bailey v. Veterans Med. Transcription Servs., Inc.*, No. CV 20-2312 (BAH), 2023 WL 7536185, at *5 n.5 (D.D.C. Nov. 13, 2023), *aff'd*, 2024 WL 4864480 (D.C. Cir. Nov. 22, 2024) ("As further evidence of the inadequacy of relator's allegations, defendants, based on the information available, cannot know whether to prepare a defense based on the FCA's statute of limitations"). But even if that were not true, the FCA's longer limitations period in subsection (b)(2) bars any claims based on conduct occurring more than ten years before the Complaint was filed on March 11, 2022. That means that any violations allegedly committed before March 11, 2012 are time-barred and irrelevant to the analysis of whether the Complaint should be dismissed.[5] *See U.S. ex rel. McLamore v. Winn Companies*, No. 16-CV-1274 (TSC), 2022 WL 18024623, at *4 (D.D.C. Dec. 30, 2022) (barring Plaintiff from amending

---

[5] The relevant federal officials likely knew or should have known of any alleged false claims at the time of the grant applications given the public nature of the sexual misconduct allegations. But the Complaint does not note the dates of the grant applications, making it impossible to determine the application of the three-year or six-year rules on a motion to dismiss.

2016 complaint to allege an FCA violation based on a contract executed in 2004). For the reasons below, the Complaint should be dismissed entirely, but at the very least its allegations of conduct before March 11, 2012 must be disregarded.

### B. Relators' FCA Claim Should be Dismissed

Relators' FCA claim should be dismissed for each of six independent reasons: the Complaint fails to satisfy Rule 9(b) pleading requirements; it fails to plausibly allege the essential elements of falsity, knowledge, and materiality required by Rule 12(b)(6); it violates Article II of the U.S. Constitution; and it is based on publicly disclosed information.

#### 1. Relators Fail to Allege False Claims with Sufficient Particularity to Satisfy Rule 9(b).

It is well established that "because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." To "provide fair notice to the defendants of the claims against them," *United States ex rel. Conteh v. IKON Off. Sols., Inc.*, 103 F. Supp. 3d 59, 64 (D.D.C. 2015), "Rule 9(b) requires a relator to plead the who, what, when, where, and how with respect to the circumstances of a fraudulent certification," *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 94 (D.D.C. 2014). In particular, a false claim is the "*sine qua non*" of a False Claims Act violation. *U.S. ex rel. Bender v. N. Am. Telecommunications, Inc.*, 686 F. Supp. 2d 46, 52 (D.D.C. 2010); *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 85 (D. Conn. 2006). "Standing alone, allegations of violations of federal regulations or laws are insufficient if a relator cannot identify with particularity any actual false claim submitted by defendant to the government." *Smith*, 415 F. Supp. 2d at 85.

*a. The Complaint Fails to Identify a Single False Claim, Let Alone With Particularity.*
*i.    The Complaint Does Not Identify Any Claim at All.*

The Complaint fails to identify a single alleged claim or statement—false or otherwise—made or caused to be made by Yale. Nor does it allege who made that claim, when they made it, the amount of the claim, whether anyone knew it was false, or whether the claim was paid. Relators merely assert generally that Yale receives federal grant money and that it has a "system to assist in the application process and maintenance of federal grants," (Compl. ¶¶ 24-25, 29), but they do not specify any particular grant application submitted to the government that they contend comprises a false claim. The Complaint provides no actual or representative claims, making it impossible to determine whether certifications for any particular claim were false. Further, while Relators allege incidents of sexual misconduct by a handful of Yale professors and students over the past 40+ years, the 106-page complaint is devoid of any facts connecting the alleged misconduct to any specific claims that were submitted to the government. The Complaint fails because it lacks the necessary "who, what, when, where, and how" details: It "does not provide any details as to the specific contents of the certification, the timing of the certification, how many times this certification was made . . . or, indeed, who made the certification . . . ." *Pencheng Si*, 71 F. Supp. 3d at 94 (dismissing FCA complaint under Rule 9(b)); *see also, e.g.. Conteh*, 27 F. Supp. 3d at 89 (dismissing FCA complaint under Rule 9(b) because it "fail[s] to identify a single individual responsible for submitting false claims, [and] fails to identify a single false claim or statement that [Defendant] submitted to the federal government"); *U.S. ex rel. Bender v. N. Am. Telecomm., Inc.*, 750 F. Supp. 2d 1, 7–8 (D.D.C. 2010), *aff'd*, 499 F. App'x 44 (D.C. Cir. 2013) (dismissing FCA claim under Rule 9(b) because plaintiff failed to allege "the content of the false claims, identify the employees who made them,

state how many times or when the false claims were submitted, or describe any specific false []
claims submitted.").

Courts in this district and elsewhere have routinely dismissed FCA complaints where,
like this Complaint, they omitted critical details about the alleged false claims and those
responsible for submitting them. In *Pencheng Si*, for example, a relator claimed that the
defendant violated the FCA by falsely certifying that grant funds would not be spent on lobbying
activities. *Pencheng Si*, 71 F. Supp. 3d at 94. The court found that relator's false certification
theory failed to satisfy Rule 9(b) because the complaint "merely offers the vague allegation that
the Grant recipients had to certify that no [federal] funds would be used for lobbying," without
any details about the contents of the certification, its timing, or even who made it. *Id.* It was not
enough to "provide[] numerous examples of allegedly barred lobbying activity" and to "point[]
to a statute that sets forth limitations on use of grant funding," because "the details of any
certification" were "entirely absent." *Id. See also Martin v. Arc of D.C.*, 541 F. Supp. 2d 77, 83
(D.D.C. 2008) ("plaintiff fails to plead with particularity a viable claim under the FCA because
the complaint fails to identify who, if anyone, made a false representation to the government and
fails to provide any of the purported details such as the time, place, and contents of the alleged
false representation"); *U.S. ex rel. Pepe M.D. et al. v. Fresenius Medical Care Holdings*, 1:14-
cv-03505-LDH-ST, 2024 U.S. Dist. LEXIS 198407, at *14–*15 (E.D.N.Y. Oct. 31, 2024)
(dismissing FCA claim under Rule 9(b) because 105-page complaint failed to present "any facts
connecting the alleged conduct to specific claims that were indeed submitted to the
government"); *U.S. ex rel. McLain v. KBR, Inc.*, No. 1:08-CV-499 GBL/TCB, 2013 WL 710900,
at *8–*9 (E.D. Va. Feb. 27, 2013) (finding "a fatal flaw in the Complaint because Relator does
not allege the existence of a false claim or a connection between false reports and the submission

of a claim" and "fails to allege any specific transaction between Defendant and the Government"); *U.S. ex rel. Clark v. UnitedHealth Grp., Inc.*, cv-13-00372 (MV) (CG), 2016 WL 9777207, at *7 (D.N.M. Sept. 22, 2016) (dismissing relator's FCA claim under Rule 9(b) because relator failed to specifically allege "which Defendant made certifications, to whom they were made, when they were made, or how often they were made").

Here too, Relators do little more than assert that laws were violated without including "details of any certification." *Pencheng Si*, 71 F. Supp. 3d at 94. They do not identify any individuals who made claims to the government, the specific claims (*i.e.*, the grant applications or their certifications) that were allegedly false, the time when such claims were submitted, or the details of how any fraudulent scheme was structured. In other words, Relators have not pleaded the who, what, when, where, and how of the alleged fraud.

## ii.    *Relators Also Fail to Adequately Allege Falsity.*

Even if the Complaint did describe specific claims to the government, which it does not, it does not explain how any such claim was false based on the alleged conduct. Relators argue that Yale violated the FCA by falsely certifying that it was in compliance with Title IX when it submitted unspecified grant applications. But while Relators point to incidents of alleged sexual misconduct over more than 40 years, the Complaint lacks any non-conclusory allegations showing that Yale was *not in compliance* with Title IX at the time of any particular grant application. Whether Yale was in compliance with Title IX is a legal question. To be sure, while "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA," a "false certification of compliance . . . creates liability when certification is a prerequisite to obtaining a government benefit." *U.S. ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc*., 214 F.3d 1372, 1376 (D.C. Cir. 2000). But pleading a claim of false certification requires specific factual

allegations that "(1) a government contract required compliance with certain conditions as a prerequisite to government payment; (2) the defendant failed to comply with those conditions; and (3) the defendant falsely certified that it did, in fact, comply with the conditions in order to induce the government to make a payment." *U.S. ex rel. Mossey v. PaL-Tech, Inc.*, 1:99-cv-1406 (PLF), 2006 WL 8460541, at *5 (D.D.C. Apr. 3, 2006).[6]

Relators allege incidents of sexual misconduct over several decades and then assert that such occurrences necessarily mean that Yale was not in compliance with Title IX across those decades. But they cite no court or administrative agency ever finding Yale out of compliance with Title IX. The Complaint asserts that OCR's 2012 Title IX investigation "revealed Yale's systemic noncompliance" with Title IX (Compl. ¶ 93, n.55), but as noted above, that characterization of the government report flatly contradicts the report itself, which stated that "OCR has *not* made a finding of noncompliance." Broad assertions that a government document means the opposite of what it says do not satisfy Rule 9(b)'s requirement of pleading with specificity.

     *b. Relators Fail to Allege that Yale Knowingly Made False Statements and Claims.*

Relators also fail to allege that Yale knowingly made false statements and claims about its Title IX compliance. The FCA imposes liability on those who *knowingly* present or make false claims or statements to the federal government. 31 U.S.C. § 3729(a)(1)(A), (B). Under the FCA, that requires either (1) actual knowledge, (2) deliberate ignorance of the truth of information, or (3) reckless disregard of the truth of information. 31 U.S.C. § 3729(b)(1). A relator can prove an entity's scienter by demonstrating "actual knowledge possessed by

---

[6] Relators also do not allege—let alone with specificity—that any false certifications were "material to the government's payment decision." *Id*. *See* below at 24-29.

individual company employees" or that "the company acted recklessly based on the actions of employees or [the company's] systems and structure." *U.S. ex rel. Adams v. Dell Computer Corp.*, 496 F. Supp. 3d 91, 101 (D.D.C. 2020). The knowledge requirement of the FCA is "rigorous" and "strict[ly] enforce[d]" in order to address "concerns about fair notice and open-ended liability." *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2020 WL 435490, at *7 (D.D.C. Jan. 28, 2020) (citing *Universal Health Servs., Inc. v. U.S.*, 579 U.S. 176, 192 (2016)); *see also Adams*, 496 F. Supp. 3d at 100 (D.D.C. 2020) ("Strict enforcement of the FCA's scienter requirement will also help to ensure that ordinary breaches of contract are not converted into FCA liability.").

Nowhere in Relators' lengthy Complaint do they allege that anyone at Yale actually knew they were falsely certifying compliance with Title IX, or that anyone at Yale certifying compliance with Title IX deliberately ignored or recklessly disregarded the truth. While Relator Lockwood alleges that she warned the Yale administration about what she believed to be "Title IX noncompliance" (Compl. ¶ 158), the Complaint does not allege that anyone at Yale made false certifications to the government intentionally or with reckless disregard. Simply identifying employees that a relator told of alleged non-compliance with federal requirements, "without . . . connecting these individuals to the allegedly fraudulent submissions, is inadequate" under Rule 9(b). *Conteh, Inc.*, 27 F. Supp. 3d at 88. Instead, the Complaint includes a list of historical and anecdotal instances of alleged misconduct over decades, presumably implying that officials certifying Title IX compliance on grant applications must have known about those alleged instances, and must have known that the existence of the incidents necessarily meant Yale was

22

not in compliance with Title IX.[7] That is insinuated, not alleged, but even if it were pleaded, it would not establish knowledge under the FCA. Put plainly: Relators "may not use collective knowledge of multiple individuals within a company to impute knowledge on the company as a whole." *Adams,* 496 F. Supp. 3d at 10. As the D.C. Circuit has explained, "under the FCA, collective knowledge provides an inappropriate basis for proof of scienter because it effectively imposes liability, complete with treble damages and substantial civil penalties, for a type of loose constructive knowledge that is inconsistent with the Act's language, structure, and purpose." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010).

A complaint likewise does not adequately plead FCA scienter by alleging that high-ranking officials of an entity failed to stop allegedly false certifications. In *U.S. ex rel. Landis v. Tailwind Sports Corporation*, this Court rejected a relator's attempt to state an FCA claim against a high-ranking official by merely pleading that the official failed to take preventative action to prevent alleged doping. 51 F. Supp. 3d 9, 51-52 (D.D.C. 2014), clarified on denial of reconsideration, No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016). The Court held that the relator's failure to identify acts specifically taken by the official to facilitate the alleged doping activities and failure to show he knew about the doping meant the relator failed to satisfy Rule 9(b). *Id*. Further, the fact that the official was high ranking was also insufficient. Noting that the D.C. Circuit had "rejected the theory that the 'collective knowledge' of a corporation's officers can support the argument that the corporation knowingly submitted a false claim," this Court also "decline[d] to accept the theory that the FCA's scienter requirement can be established solely because an individual had a high-ranking position within the

---

[7] Relators attempt to paint sexual misconduct as widespread at Yale but point to only a few professors in isolated departments. It is not contested that Yale has thousands of faculty members and nearly a hundred programs and departments. Freiman Decl. Ex. 14, "Yale Facts."

corporation that submitted an allegedly false claim." *Id.* at 52. (*citing Sci. Applications Int'l Corp.*, 626 F.3d at 1274-1275). In this case, Relators fail to allege that anyone at Yale made knowingly false certifications of compliance with Title IX.

While the Complaint identifies employees that allegedly knew of incidents of sexual harassment, it does not allege noncompliance by Yale's Title IX office or that Yale certified compliance with Title IX despite a legal determination that it was not in compliance with Title IX. But even if the Complaint had alleged an employee who knew of Yale's alleged non-compliance with Title IX, it would not have been enough: alleging that individuals knew a federal requirement was not being met, "without also connecting these individuals to the allegedly fraudulent submissions, is inadequate." *Conteh*, 27 F. Supp. 3d at 88. While Relators allege some Yale employees knew of incidents of sexual harassment, they would have to allege that some Yale employees knew both that Yale was not in compliance with Title IX *and* that Yale was falsely certifying compliance with Title IX to fraudulently induce the federal government to award Yale funding. Relators make no such allegations.

### c. Relators Fail to Sufficiently Allege Materiality.

The Relators also fail to sufficiently allege materiality because they cannot show that the conduct they claim violated Title IX was material to the government's payment decisions on any particular award. Liability for an FCA violation arises under a false certification theory only when "compliance with the condition is material to the government's decision to pay." *Pencheng Si*, 71 F. Supp. 3d at 93. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality is a central element in proving a false certification, and courts must "rigorously" enforce this element. *Sci. Applications Int'l Corp.*, 626 F.3d at 1271. Like the

scienter requirement, the materiality requirement is "strict[ly] enforce[d]" in order to address

"concerns about fair notice and open-ended liability." *U.S. ex rel. Hawkins*, 2020 WL 435490, at

*7. Under a false certification theory of FCA liability, "the plaintiff must plead that the

defendant knowingly violated a requirement that the defendant knows is material to the

Government's payment decision." *U.S. ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 255 F.

Supp. 3d 13, 23 (D.D.C. 2017), *amended on reconsideration in part*, 296 F. Supp. 3d 155

(D.D.C. 2017). The Complaint does not plausibly plead materiality, requiring dismissal.

      The Complaint's theory of materiality appears to be based on the implausible premise

that any Title IX violation at an institution, no matter how remote its connection to a federal

award, would be material to federal sponsors' payment decisions across all awards to the

institution.[8] As support, Relators assert that a grant applicant's certification of compliance with

Title IX is material to the government's decision to award funds because HHS and NIH

emphasize Title IX compliance, including through enforcement actions. *See* Compl. ¶¶ 70-73,

nn.35, 36, 38, 39 & 40.) But none of the enforcement actions alleged in the Complaint involved

Title IX. Some involved violations of federal rules specific to scientific research[9], others

_____

[8] The Complaint appears to presume, without actually alleging, that the government withdraws funding from schools merely because they are subject to Title IX *investigations*. If the government withdrew funding from schools under Title IX investigations, few schools would receive federal funding. According to the Department of Education website, there are currently 1,292 ongoing Title IX investigations into post-secondary academic institutions. Freiman Decl. Ex. 15, "Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools." "Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." *Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013)).
[9] *See, e.g., UCLA Sch. of Med.*, 1982 WL 189611, DAB 340 (H.H.S. Aug. 30, 1982) (research grant funding withheld after principal investigator performed experiments on human subjects using recombinant DNA genes without permission); *Decision and Findings of Fact For the Proposed Debarments of Robert Edward Mccaa, Ph.d.*, 1987 WL 419231, DAB 823 (H.H.S. Jan. 12, 1987) (debarment of principal investigator who fabricated and falsified data, and

involved termination of Head Start preschool programs for noncompliance with regulations

setting forth program performance standards and governing financial reporting, procurement, and

fiscal management of Head Start grants[10], and others concerned compliance with federal

regulations relevant to funding for the Temporary Assistance for Needy Families (TANF)

program under a system set up by Title IV-A and IV-D of the Social Security Act.[11]

It is true that federal sponsors have policies and processes for helping to assure that

federal research is conducted in a safe and appropriate environment free from harassment. But

the guidance documents describing these processes contradict the Complaint's sweeping theory

of materiality, and show that even allegations affecting specific federal awards do not necessarily

or even customarily cause agencies to terminate funding for that award, much less funding across

---

published that data in scientific journals); *Dr. Paul F. Langlois*, 1993 WL 742594, DAB 1409
(H.H.S. May 6, 1993) (debarment of research fellow who fabricated data and falsified
experimental results); *John C. Hiserodt, M.D., Ph.d.*, 1994 WL 321797, DAB 1466 (H.H.S. Feb.
25, 1994) (debarment of researcher who presented falsified data and fabricated experimental
results to NIH in applications for funding for research); *Subject: Kimon J. Angelides, Ph.d.*, 1999
WL 88783, DAB 1677 (H.H.S. Feb. 5, 1999) (debarment of principal investigator who falsely
reported experimental data, in many cases where the experiments had not even been attempted).
[10] *See, e.g., Pinebelt Ass'n for Cmty. Enhancement*, 2014 WL 8144941, DAB 2611 (H.H.S. Dec.
22, 2014); *Rural Day Care Ass'n of Ne. N. Carolina*, 1994 WL 618572, DAB 1489 (H.H.S. Aug.
8, 1994); *Dop Consol. Hum. Servs. Agency, Inc.*, 1999 WL 985369, DAB 1689 (H.H.S. May 6,
1999); *Utica Head Start Child. & Fams., Inc.*, 2000 WL 1479326, DAB 1749 (H.H.S. Sept. 27,
2000); *Union Twp. Cmty. Action Org., Inc.*, 2005 WL 1164061, DAB 1976 (H.H.S. Apr. 29,
2005); *Jefferson Comprehensive Care Sys., Inc.*, 2011 WL 2110682, DAB 2377 (H.H.S. Apr. 4,
2011); *Southwest Arkansas Development Council, Inc.*, 2012 HHSDAB LEXIS 197, DAB 2489
(H.H.S. Dec. 12, 2012); *Gulf Coast Community Action Agency, Inc.*, DAB A-15-33 (H.H.S. Dec.
16, 2015), https://www.hhs.gov/sites/default/files/static/dab/decisions/board-
decisions/2015/dab2670.pdf; *Cmty. Action Agency of Cent. Alabama*, 2011 WL 2110682, DAB
2797 (H.H.S. June 16, 2017).
[11] *See, e.g., Ohio Dep't of Hum. Servs.*, 1990 WL 600235, DAB 1202 (H.H.S. Nov. 1, 1990);
*Nevada Dep't of Hum. Res.*, 2005 WL 2834999, DAB 1995 (H.H.S. Sept. 23, 2005); *Puerto Rico
Dep't of the Fam.*, 2005 WL 2323194, DAB 1993 (H.H.S. Sept. 9, 2005); *Subject: Wyoming
Dep't of Fam. Servs.*, 2007 WL 1354322, DAB 2074 (H.H.S. Apr. 6, 2007); *Rhode Island Dep't
of Human Services*, 2013 HHSDAB LEXIS 374, DAB 2552 (H.H.S. Dec. 20, 2013); *U.S. Virgin
Islands*, 2019 WL 2499582, DAB 2943 (H.H.S. May 23, 2019).

all awards. For example, "NIH's standard procedures for handling allegations involving [its]

recipient community" describes the actions NIH might take after receiving "[a]llegations of

harassment, including sexual harassment, discrimination, and other forms of inappropriate

conduct that can result in a hostile work environment." Freiman Decl. Ex. 46, "NIH Process for

Handling Allegations of Harassment on an NIH-Funded Project at a Recipient Institution." After

determining whether "NIH-funded grants are involved," NIH sends a letter to the recipient

institution seeking information about the incident, including "[w]hether the alleged events were

linked to any NIH-funded activities." *Id*. The document lists the "appropriate actions" NIH may

take after receiving the recipient institution's response, including the following "grant

management actions": "Requesting the recipient institution to identify a replacement principal

investigator on an NIH award"; "Holding pending awards associated with the PI [Principal

Investigator] of concern while compliance issues are resolved"; "Declining to approve requests

to transfer grants involving the PI [Principal Investigator] to another institution"; and "Requiring

special reporting requirements from the institution." *Id*.

      This guidance confirms that NIH takes a grant-specific approach to allegations of sexual

misconduct. Even when it learns of allegations affecting specific NIH-funded projects,

something that is not alleged anywhere in the Complaint, NIH finds it appropriate to request that

the recipient institution simply replace the principal investigator who is the subject of the

award—thereby allowing continued funding on even the specific award(s) impacted by the

sexual misconduct. The Complaint includes no allegations that any federal awards were

impacted by the alleged events they describe. And even if it had alleged such an impact, the

Complaint offers no explanation of why NIH or any other federal funder would have considered

27

it material to all awards, instead of taking their ordinary pragmatic and highly grant-specific approach to addressing allegations of sexual misconduct.

This is borne out in federal agencies' actual responses to past Title IX violations. Documents of which this court may take judicial notice show that even when OCR has determined that Title IX violations in fact occurred—which it did *not* do with Yale—the institutions where the violations occurred continued to receive federal funding. For example, in 2018, OCR found after a five-year investigation that the University of North Carolina Chapel Hill violated Title IX. Freiman Decl. Ex. 16, 06.28.2018 Letter from OCR to UNC. But the NIH reports that the University of North Carolina Chapel Hill received over 900 NIH awards totaling approximately half a billion dollars in 2018 and 2019. Freiman Decl. Ex. 17, NIH Data UNC 2018; Freiman Decl. Ex. 18, NIH Data UNC 2019. Likewise, in 2015, OCR found that the University of Virginia had not fully complied with Title IX requirements (Freiman Decl. Ex. 19, 09.21.2015 Letter from OCR to UVA), but the NIH awarded that university over 300 grants in 2015 and 2016 for a total of over a quarter billion dollars. Freiman Decl. Ex. 20, NIH Data UVA 2015; Freiman Decl. Ex. 21, NIH Data UVA 2016. This strongly suggests that even an actual finding that an institution did not comply with Title IX would not be material to HHS's payment decisions, particularly not in the sweeping way the Complaint implies. As the Supreme Court has observed, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Universal Health Servs., Inc. v. U.S.*, 579 U.S. 176, 195 (2016).

Relators do not (and cannot) plausibly allege that if the federal government had known about what Relators believe to be Title IX violations at Yale, the government would have halted grant funding to Yale—or would have rejected or withdrawn particular grants. The Complaint

28

itself makes that clear. It includes a 10-page recitation of *public* alleged Title IX violations at Yale after 2012. (Compl. ¶¶ 89-91, 98-111.) Because those alleged violations were public, the government either knew or could have known about them when evaluating any claims Yale submitted. Indeed, the Complaint asserts that the federal government investigated Yale's "required reporting of data on sex offenses" and fined Yale for not reporting certain sex offenses. (*Id.* ¶ 91.) The Complaint alleges that the 2012 Voluntary Resolution Agreement (VRA) required Yale to report annually to OCR on Title IX compliance. (*Id.* ¶ 95.) The VRA, incorporated in the Complaint, itself describes reporting requirements for Yale and ongoing OCR monitoring of the VRA "until OCR determines that the University has fulfilled the terms of this [VRA] and is in compliance with the regulation implementing Title IX." Freiman Decl. Ex. 13, 06.11.2012 Voluntary Resolution Agreement at 6. A letter from OCR to Yale several days later, publicly available on the OCR website, likewise describes detailed reporting requirements by Yale and notes that OCR would, "[c]onsistent with its usual practices . . . monitor the University's implementation of the [VRA] and the University's compliance with Title IX concerning sexual misconduct." Freiman Decl. Ex. 22, 06.15.2012 Letter from OCR to Yale at 11-12.

Thus, the Complaint fails under Rule 9(b).

### 2.   Relators Fail to State a Claim Under Rule 12(b)(6).

While the heightened pleading standard of Rule 9(b) applies to this case, the Complaint fails to even state a claim under Rule 12(b)(6). For the reasons above, the Complaint does plausibly allege that Defendant "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval," or "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim" to the federal government. 31 U.S.C. § 3729(a)(1)(A) and (B).

### 3. Relators' Claims Are Based on Publicly Disclosed Information

The FCA's public disclosure bar forecloses claims based on public information, such as news articles, Yale's own Title IX website, prior litigation, and the OCR investigation. Congress enacted the public-disclosure bar "to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994). The public disclosure bar requires courts to dismiss a suit if the core "allegations or transactions ... were publicly disclosed." 31 U.S.C. § 3730(e)(4)(A)(i). Where a relator brings suit rather than the federal government, and the core allegations were publicly disclosed, the suit cannot continue unless the relator "is an original source of the information." *Id.* § 3730(e)(4)(A).

"The FCA sets up a two-part test for determining" whether the public disclosure bar applies. *U.S. ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997). The court first determines "whether the information underlying the allegations and transactions has been publicly disclosed." *U.S. ex rel. Scutellaro v. Capitol Supply, Inc*., No. 10-cv-1094 (BAH), 2017 WL 1422364, at \*12 (D.D.C. Apr. 19, 2017). If the information underlying the allegations was publicly disclosed, then the court determines whether the relator is the original source of the publicly disclosed information. *Id.* But to survive the public disclosure bar, relators who are original sources must have offered "information [that] adds value." *U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 839 n.4 (D.C. Cir. 2012).

The public-disclosure "inquiry focuses not on the additional incriminating information a relator supplies, but instead on whether the quantum of information already in the public sphere was sufficient to set government investigators on the trail of fraud." *U.S. ex rel. Doe v. Staples, Inc*., 773 F.3d 83, 87 (D.C. Cir. 2014). The critical question is "whether the publicly disclosed

information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *U.S. ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999); *see also U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 838 (D.C. Cir. 2012) (holding that original source whistleblower can maintain FCA suit despite public disclosure bar only if she provided the key information to the government).

Here, even if the Complaint's allegations amounted to Title IX violations, so many of those allegations were public that the government could have been alerted to the likelihood of the alleged wrongdoing (if any) and could have evaluated whether to pursue enforcement. The Complaint's allegations of sexual misconduct after 2012 were publicly disclosed in the VRA, Yale's Title IX website, news sources, and prior litigation[12]. *See generally* Declaration of Jonathan Freiman, attaching sources. Relators' allegations are substantially the same as these prior disclosures.

a. **The Allegations Raised by Relators Were Publicly Raised in Government Investigations and Documents, Third Party Press Reports, Yale's Own Publications, and Prior Lawsuits.**

*Government investigations.*

A government investigation constitutes public disclosure. 31 U.S.C. § 3730(e)(4)(A)(ii). Relators point to multiple government investigations in support of their theory of sexual misconduct at Yale.

---

[12] The Court may take judicial notice of news articles to assess whether the Complaint survives the public disclosure bar. *See U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (noting that circuit courts "routinely have considered undisputed documents provided by the parties in connection with Rule 12(b)(6) motions based on the public disclosure bar" because "a court may consider matters of public record and facts susceptible to judicial notice") (collecting cases)).

Relators cite to an investigation by the Department of Education ("ED") that allegedly "confirmed three Clery Act reporting violations, indicating overt and active suppression by Yale and its senior leadership of the required reporting of data on sex offenses." (Compl. ¶¶ 91-93, nn.50-55.) Relators allege that as a result of this investigation, "ED fined Yale [in May 2013] for not reporting four sex offenses in its Annual Campus Security Report in 2001 and 2002, and for improperly and intentionally excluding Yale New Haven Hospital from the reporting on crime statistics in order to falsely underreport the crime data. . . . Yale was initially informed by ED that they would be fined $165,000 but ultimately, the school was fined $155,000." (*Id.* ¶ 91, n.52.) The findings of these investigations were publicly available and reported by the Yale Daily News. Freiman Decl. Ex. 23, 05.17.2013 Yale Daily News article titled "Yale fined $165,000 for Clery Act violations" (reporting on the allegations of sex offenses, underreporting of crime data, and fines imposed two years after the conclusion of the seven-year investigation); *see also* Freiman Decl. Ex. 24, 07.17.2013 Campus Safety Magazine article titled "Dept. of Ed Reduces Clery Fine for Yale."

Using another government investigation to support their allegations, Relators detail the 2012 OCR Investigation and its resolution through the VRA. (Compl. ¶ 95, n.58; ¶ 96; ¶ 97, nn.59-60.) The government conducted—and therefore knew of—OCR's 2012 investigation (*Id.* ¶ 92.) By its nature this investigation and the VRA are public disclosures. The government knew all of the information regarding Yale's voluntary agreement and the contents of the VRA. So did others: The VRA was available from multiple public sources. *See* Freiman Decl. Ex. 13, 06.11.2012 Voluntary Resolution Agreement. Federal websites and other public sources also maintained copies of the investigation and related documents. Freiman Decl. Ex. 25, The Chronicle of Higher Education Title IX Sexual Assault Investigation Tracker; Freiman Decl. Ex.

28, Jul./Aug. 2012 Yale Alumni Magazine article titled "Federal government ends Title IX investigation"; Freiman Decl. Ex. 27, 06.15.2012 Yale Daily News article titled "Department of Education ends Title IX investigation." The ED issued public statements about the investigation and the VRA, which was further publicized by the complainants and reported on by third party news sources. Freiman Decl. Ex. 28, 06.15.2012 NBC CT article titled "Yale Sex Discrimination Complaint Resolved"; Freiman Decl. Ex. 29, 06.19.2012 CNN article titled "Yale settles sexual harassment complaint"; Freiman Decl. Ex. 30, 06.15.2012 Christian Science Monitor article titled "Yale settles Title IX complaint, launches new sexual misconduct policies"; Freiman Decl. Ex. 31, 06.15.2012 TIME article titled "Yale Settles Charges of Sexual Discrimination." Relators nevertheless allege, "Based on a March 2011 formal complaint filed by sixteen Yale students and alumni reporting the sexually hostile environment at Yale for which Yale did nothing to curb, ED began another investigation into Yale." (Compl ¶ 92, n.53). These allegations also come directly from the Yale Daily News. Freiman Decl. Ex. 32, 03.31.2011 Yale Daily News article titled "BREAKING: DOE's Office for Civil Rights to investigate Yale for 'hostile sexual environment.'"

### *Allegations Concerning Professors*

Relators allege that a professor in the Department of Philosophy assaulted a Yale graduate and made unwelcome advances when she worked for him on a Yale-sponsored trip to Chile. (Compl. ¶ 98, nn.61-63.) This allegation was reported in a 2016 Buzzfeed article, the *Yale Daily News*, and the *New York Times*. Freiman Decl. Ex. 33, 12.16.2017 Yale Daily News article titled "Students revive sexual misconduct allegations against three Yale professors"; Freiman Decl. Ex. 34, 07.08.2016 New York Times article titled "After a Professor is Cleared of Sexual

33

Harassment, Critics Fear 'Cultural Silence' at Yale." The Complaint's allegations related to this incident derive from these public sources.

Relators concede that allegations regarding a YSM faculty member come from an "article [in which] the Yale Daily News detailed sexual harassment in the Yale School of Medicine" (Compl. ¶ 106.) All of the Complaint's allegations about this professor have been described extensively in media reporting (*see, e.g.*, Freiman Decl. Ex. 35, 11.05.2018 Yale Daily News article titled "Open Secrets: #MeToo in the Med School"); Compare Compl. ¶ 106, n.90, with Freiman Decl. Ex. 36, 11.14.2014 New York Times article titled "Yale Medical School Removes Doctor After Sexual Harassment Finding"; Compare Compl. 106 n.93, with Freiman Decl. Ex. 37, 10.22.2018 Yale Daily News article titled "Stripped of endowed chair, Simons files lawsuit against Yale." The allegations are also related in a lawsuit filed against Yale in 2019. Compl., *Simons v. Yale Univ.*, No. 3:19-cv-01547-OAW (D. Conn. Oct. 1, 2019), ECF No. 1.

The allegations against a former professor involve misconduct from the 1990s that Relators also acknowledge came from a 2019 report (the Daly Report) published on Yale's website following an investigation performed by the former U.S. Attorney for the District of Connecticut. *See* Freiman Decl. Ex. 12, 08.14.2019 Daly Report. The Complaint states, "The report found that the YSM Professor and former Morse College advisor sexually assaulted five students affiliated with his University research in St. Kitts and engaged in sexual misconduct with at least other undergraduate, graduate, and high school students even after the 1994 investigation." (Compl. ¶ 110, n.99-102.) CNN also reported on the Daly report. Freiman Decl. Ex. 38, 08.21.2019 CNN article titled "Former Yale professor sexually assaulted five students, report says."

Relators also allege that "in December 2013, [a professor in the Yale School of Management (SOM)] sued Yale alleging a pattern of gender and age discrimination, as well as retaliation." (Compl. ¶ 99, nn.64-66; ¶ 101, nn.67-69; ¶ 102, nn.70-74; ¶ 103, nn.75-82; ¶ 104, nn.83-84.) Each of these allegations were described in *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 337-38 (D. Conn. 2014) (dismissed), and were later reported on by the Yale Daily News, which stated: "In her December 2013 suit, Bagley claimed she had not been reappointed to a professorship in May 2012 because of her gender and age." Freiman Decl. Ex. 39, 02.22.2017 Yale Daily News article titled "Bagley discrimination lawsuit dismissed."

Relators also rely on articles from the Yale Daily News to allege misconduct in the Spanish and Portuguese Departments. (Compl. ¶ 105, n.85.) Specifically, Relators allege that "[i]n 2014, the S&P department faced budget-related problems, which made it difficult for them to compete with peer institutions. These financial issues were enhanced by the secretive nature of the department chairs who controlled the budget. A graduate student *quoted in the article* asked to remain anonymous for fear of retaliation from the department and stated that the department chair can ruin a person's career with a recommendation letter." (*Id.*) Relators recognize "[i]n 2017, the *Yale Daily News* detailed how . . . a former S&P professor[] filed a lawsuit claiming that she faced sexual harassment and bullying from professors in the S&P department." (*Id.* at ¶ 105.) As Relators concede, these allegations had all been reported by the Yale Daily News. Freiman Decl. Ex. 40, 11.20.2014 Yale Daily News article titled "Spanish, Portuguese department faces budget woes, chilly environment"; Freiman Decl. Ex. 41, 07.07.2017 Yale Daily News article titled "Former Spanish prof alleges sexual harassment, retaliatory firing in lawsuit."

### *2015 and 2019 AAU Campus Climate Surveys on Sexual Misconduct*

The Complaint also uses the results of two campus climate surveys on sexual misconduct in support of the alleged prevalence of misconduct at Yale (Compl. ¶ 107, nn.94-95.) Specifically, Relators state that "Yale participated in two [] campus sexual climate surveys, which compiled data from students at 27 universities in 2015 and in 2019. The results of the 2015 survey — which were described as 'extremely disturbing' by Yale President Peter Salovey — showed that 16.1% of survey respondents had been victims of sexual misconduct while at Yale." (Compl. ¶ 107.) These survey results, however, are publicly available. *See* Freiman Decl. Ex. 11, 2015 Campus Climate Survey; Freiman Decl. Ex. 10, 2019 Campus Climate Survey. The surveys accumulate information previously reported on Yale's public Title IX website. *See* Freiman Decl. Ex. 2, "Title IX at Yale." And the results were also reported by the Yale Daily News, which stated, nearly identically to Relators, that "Yale, along with 26 other universities, participated in the first iteration of the survey in 2015. The survey results, which Salovey called 'extremely disturbing,' showed that Yale students experience sexual harassment and assault at a higher rate than the national average among universities." Freiman Decl. Ex. 42, 02.05.2019 Yale Daily News article titled "Yale participates in national sexual climate survey"; *see also* Freiman Decl. Ex. 43, 10.15.2019 New Haven Register article titled "Yale above average in nationwide survey of sexual assault reports."

### *Provost Reports of Sexual Misconduct Complaints 2012-2019*

Relators further point to statistics from Yale's own Provost Reports (Compl. ¶ 108, n.98, ¶ 109) that provide the number of sexual misconduct complaints at Yale. Yale published these reports on its Title IX website. Freiman Decl. Ex. 2, "Title IX at Yale"; Freiman Decl. Ex. 3, "Reports of Complaints of Sexual Misconduct" from July 1, 2019 through December 31, 2019;

Freiman Decl. Ex. 4, "Reports of Complaints of Sexual Misconduct Brought forward from January 1, 2019 through June 30, 2019."

### Prior Litigation

Relators also point to two lawsuits as evidence of Yale's alleged history of Title IX violations—*Kelly v. Yale Univ.*, No. CIV.A. 3:01-CV-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003) and *Alexander v. Yale*, 631 F.2d 178 (2d Cir. 1980). Relators allege that "[i]n the seminal 2003 *Kelly v. Yale* case, a federal court found sufficient evidence of Yale's 'deliberate indifference' to sexual harassment and denied Yale's motion for summary judgment, ultimately leading to a settlement." (Compl. ¶ 8.) Likewise, with respect to *Alexander*, Relators allege that "five students sued the University after it refused to establish a centralized grievance mechanism for addressing incidents of sexual misconduct." (Compl. ¶ 89.) These allegations merely parrot the public lawsuits, demonstrating public disclosure well before the filing of this Complaint. *See U.S. ex rel. O'Connor v. U.S. Cellular Corp.*, No. 20-CV-2071 (TSC), 2023 WL 2598678, at *5 (D.D.C. Mar. 22, 2023) (finding public disclosure bar triggered because prior suit had "the same core allegations—against the same defendants" even though FCA suit alleged additional fraudulent conduct and FCA violations).

In addition, the allegations concerning Jane Doe 1—that she "was raped on August 27, 2005 by [a] fellow Calhoun College student … in his dorm room on campus" and suffered from specific assault-related wounds (Compl. ¶¶163-67) were made public in the civil case against the student, *see Gerena v. Korb*, No. 1:07-cv-03976-LBS (S.D.N.Y. May 22, 2007), ECF No. 1 (Notice of Removal) at 7-17, and in newspapers. *See* Freiman Decl. Ex. 44, 11.03.2006 New Haven Register article titled "Yale student gets probation in assault"; Freiman Decl. Ex. 45;

05.01.2007 New York Post article titled "YALE SEX SUIT" (detailing the incident, including the alleged sexual assault and specific assault-related wounds).

**b. Relators Are Not an Original Source**

Against this mountain of public information, Relators can avoid the public disclosure bar only if they qualify as an "original source." 31 U.S.C. § 3730(e)(4). A relator bears the burden of proving original source status. *See Smith v. Athena Constr. Grp., Inc*., No. 18-CV-2080, 2022 WL 888188, at **9, 10 (D.D.C. Mar. 25, 2022) (Mehta, J.) ("The original-source inquiry therefore is framed as an exception to the public-disclosure affirmative defense. . . . Placing the burden on the relator, who uniquely knows whether he is an original source, is therefore appropriate." To do so, a relator must have either (1) "prior to [the] public disclosure . . . voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" or (2) "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, *and* who has voluntarily provided the information to the Government before filing" their suit.[13] 31 U.S.C. § 3730(e)(4)(B) (emphasis added); *id*. Both alternatives require disclosures that are made voluntarily.

Relators did neither of those. They do not allege that they are the original sources of the publicly disclosed information and that they gave this information to the government before the public disclosures or before suing Yale. They do not allege they "voluntarily provided" any information to the government before the government investigation in 2012 or the news articles published before and after the investigation. Nor do they allege providing any information to the government before filing their lawsuit. *See* 31 U.S.C. § 3730(e)(4)(B).

---

[13] The Complaint erroneously paraphrases a superseded version of the FCA in Paragraph 23 and then conclusorily assert that they met the requirements of that superseded statutory language.

This forecloses any original source argument. *See U.S. ex rel. Davis v. D.C.*, 413 F. App'x 308, 310 (D.C. Cir. 2011) (affirming dismissal because relator failed to satisfy disclosure requirement; finding disclosure of the complaint to the federal government insufficient); *Smith v. Athena Constr. Grp., Inc.*, No. 18-CV-2080, 2023 WL 11914900, at *1 (D.D.C. Jan. 20, 2023) (dismissing case where plaintiff did not allege that he provided information to government before filing action); *U.S. v. Lozano*, No. CV 17-2433 (RJL), 2023 WL 6065161, at *6 (D.D.C. Sept. 18, 2023) ("The Relator fails to qualify as an original source in two respects: first, the nonpublic information she allegedly disclosed does not materially add to the publicly disclosed information; and second, she fails to adequately allege that she voluntarily provided the information to the Government prior either to the public disclosure or before initiating this suit"). A relator can be an original source only if she has "first-hand knowledge of th[e] information" supporting the allegations. *U.S. ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 478 (D.C. Cir. 2016). "Courts must be mindful of suits based only on secondhand information, speculation, background information or collateral research." *Id*. at 479.

### 4. The Qui Tam Provisions of the False Claims Act are Unconstitutional.

This Court should dismiss the case for any or all of the statutory defects in the Complaint discussed above. If, however, this Court concluded that the case had no such defects, the case would nevertheless have to be dismissed because the maintenance of this *qui tam* FCA case violates Article II of the U.S. Constitution.

Neither the Supreme Court nor the D.C. Circuit has addressed the constitutionality of the FCA's *qui tam* provisions. But three Supreme Court justices have recently questioned their constitutionality. In his dissenting opinion in *U.S. ex rel. Polansky* v. *Executive Health Resources, Inc.*, 599 U.S. 419 (2023), Justice Thomas wrote that the "FCA's *qui tam* provisions have long inhabited something of a constitutional twilight zone. There are substantial arguments

that the *qui tam* device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation." *Id.* at 449 (dissenting op.). Justices Kavanaugh and Barrett noted in a separate concurrence that they agreed with Justice Thomas and suggested that "the Court should consider the competing arguments on the Article II issue in an appropriate case." *Id.* at 442 (concurring op.). The separate opinions in *Polansky* led to several constitutional challenges to the *qui tam* provisions, in turn generating several recent district court decisions on their constitutionality.[14] One such decision, *U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*, No. 8:19-cv-01236-KKM-SPF, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024), currently on appeal to the Eleventh Circuit, held that the FCA's *qui tam* provisions violate the Appointments Clause.

    *a.*    *The Qui Tam Provisions Violate the Appointments Clause*

The Appointments Clause applies to "Officers of the United States," who must be appointed by the President. U.S. Const. Art. II § 2 cl. 2. An "Officer of the United States" is someone who "exercise[es] significant authority pursuant to the laws of the United States" and "occup[ies] a 'continuing' position established by law. *Lucia v. SEC*, 585 U.S. 237-38, 245 (2018).

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Court held that members of the Federal Election Commission were "Officers of the United States" because they had the "primary responsibility for conducting civil litigation in the courts of the United States for vindicating

---

[14] *See U.S. and State of Tenn. Ex rel. Adams v. Chattanooga Hamilton Cnty. Hosp. Auth.*, 1:21-cv-84, 2024 WL 4784372 (E.D. Tenn., Nov. 7, 2024); *U.S. ex rel. Butler v. Shikara*, 20-80483-cv, 2024 WL 4354807 (S.D. Fla. Sept. 6, 2024); *U.S. ex rel. Miller v. Manpow, LLC*, 2:21-cv-05418-VAP-ADSx, 2023 WL 8290402 (C.D. Cal. Aug. 30, 2023); *U.S. & State of Ill. Ex rel. Lagatta v. Reditus Labs., LLC*, 1:22-cv-01203-SLD-JEH, 2024 WL 4351862 (C.D. Ill. Sept. 30, 2024); *U.S. ex rel. Thomas v. Mercy Care*, CV-22-00512-PHX-JAT, 2023 WL 7413669 (D. Ariz. Nov. 9, 2023); *U.S. v. Riverside Med. Grp., P.C.*, 22-04165 (SDW) (LDW), 2024 WL 4100372 (D.N.J. Sept. 6, 2024); *U.S. v. Halifax Hosp. Med. Ctr.*, 997 F. Supp.2d 1272 (M.D. Fla. 2014); *U.S. ex rel. Wallace v. Exactech, Inc.*, 703 F. Supp.3d 1356 (N.D. Ala. 2023).

public rights." *Id.* at 140. Similarly, in *Morrison v. Olson*, the Supreme Court held that an independent counsel became an Officer when assuming the government's prosecutorial responsibilities in a single action. 487 U.S. 654, 671 n.12 (1988). In *Selia L. LLC v. CFPB*, 591 U.S. 197, 219 (2020), the Supreme Court held that the director of the Consumer Financial Protection Bureau ("CFPB") has the "power to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power" and was therefore an executive officer who could be removed by the President at will.

Relying on these precedents, *Zafirov* held that an FCA relator wields "textbook" significant authority because she "conduct[s] civil litigation in the courts of the United States for vindicating public rights." 2024 WL 4349242 at *7 (quoting *Buckley*, 424 U.S. at 140). The FCA authorizes a relator "not only to direct litigation, but also to bind the federal government without direct accountability to anyone in the Executive Branch." *Zafirov*, 2024 WL 439242 at *2. The relator "enjoys unfettered discretion to decide whom to investigate, whom to charge in the complaint, which claims to pursue and which legal authorities to employ." *Id.* The relator determines "whether to appeal and what arguments to preserve, thereby shaping the broader legal landscape for the federal government." *Id.* (citing U.S. Dep't of Just., Just. Manual § 2-2.121 (2024)).

As to the requirement that an Officer of the United States operate a "continuing position established by law," this inquiry "stress[es] 'ideas of tenure [and] duration' and asks whether the individual's statutory duties are 'occasional or temporary' rather than 'continuing and permanent.'" *Zafirov*, 2024 WL 4349242 at *11 (quoting *Lucia*, 585 U.S. at 245). While a relator's term concludes at the end of a single matter, that is also true of an "Independent Counsel []—authorized 'to exercise all investigative and prosecutorial functions and powers of

the Department of Justice' for purposes of a single investigation." *Id.* at 12. And just as the

Independent Counsel in *Morrison* was an Officer, so too is a FCA relator. *Id.*

Though it is the minority view, the *Zafirov* opinion is thorough, persuasive, and

consistent with binding Supreme Court precedent. 2024 WL 4349242 at *7-*13. This Court

should adopt its reasoning and dismiss this case, where Relators wield significant authority on

behalf of the federal government without the President appointing them as Officers of the United

States. *Id.* at *19.

       *b.*    *The Qui Tam Provisions Violate the Vesting Clause*

The Supreme Court has been clear that "the 'executive Power'—all of it—is 'vested in a

President,' who must 'take Care that the Laws be faithfully executed.'" *Selia L. LLC*, 591 U.S. at

203 (quoting U.S. Const. art. II, § 1, cl. 1 & art. II, § 3). Central to the executive power is the

authority to "enforce" laws "or appoint the agents charged with the duty of such enforcement."

*Springer v. Philippine Island*s, 277 U.S. 189, 202 (1928). Bringing enforcement actions in court

is fundamental to the executive power because "a lawsuit is the ultimate remedy for a breach of

the law." *Buckley*, 424 U.S. at 138. Accordingly, it has long been true that "civil suits, in the

name and for the benefit of the United States" are initiated by a U.S. attorney "and, in the

absence of any directions from the Attorney-General, he controls the prosecution of the same in

the district and circuit courts." *The Confiscation Cases*, 74 U.S. 454, 457 (1868). The executive

power to enforce the law includes the discretion not to bring an action at all. *See United States v.

Nixon*, 418 U.S. 683, 693 (1974); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Such

discretion also encompasses decisions on "what precise charge" to bring and "whether to dismiss

a proceeding once brought." *Newman v. U.S.*, 382 F.2d 479, 480 (D.C. Cir. 1967).

42

The FCA's *qui tam* provisions impermissibly vest the executive power in relators. The U.S. is a "real party in interest" and "bound by the judgment in all FCA actions regardless of its participation in the case." *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934-36 (2009). The relator decides whether to sue, which claims to assert, and the scope of the claims—that is, she exercises prosecutorial discretion, including the attempt to "impose[] damages that are essentially punitive in nature." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 784 (2000). A relator thus conducts civil litigation with potentially punitive consequences on behalf of the United States: litigation that should be conducted by the Executive, if at all. The Constitution commands that executive power be wielded only by the President, "personally and through officers whom he appoints." *Printz v. U.S.*, 521 U.S. 898, 922 (1997).

c.   *The Qui Tam Provisions Violate the Take Care Clause*[15]

The President must retain "the ability to supervise and remove the agents who wield executive power in his stead." *Selia L.*, 591 U.S. at 238. The removal power is essential: "The President cannot 'take care that the laws be faithfully executed' if he can not oversee the faithfulness of the officers who execute them" and remove "those for whom he cannot continue to be responsible." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 484, 493 (2010). Under the FCA, however, "[T]he Executive has no power to remove the relator from the litigation under any circumstances." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 763 & n.19 (5th Cir. 2001) (en banc) (Smith, J., dissenting). The United States can stop a relator from

---

[15] While the D.C. Circuit has not addressed the question, four circuit courts have held that the FCA does not violate the Take Care clause. *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749-55 (9th Cir. 1993); *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 752-57 (5th Cir. 2001); *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805-07 (10th Cir. 2002). But these cases all predate the dissenting and concurring opinions in *Polansky*, as well as the other Supreme Court decisions on which Defendant relies, such as *Free Enterprise Fund* and *Selia L.*

pursuing a FCA suit only by seeking court approval to dismiss the entire action. To do so, the Executive must demonstrate that "the burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 438. If the motion is granted—after expending prosecutorial resources and subjecting the executive power to judicial oversight—dismissal terminates the "entire action, and not an individual claim." *Rosell v. VMSB LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023). Forcing the President to decide between allowing a relator to remain in her position or dismissing the action impedes the Executive from "accomplishing its constitutionally assigned functions," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).

Because the *qui tam* provisions violate the Appointments Clause, the Vesting Clause, and the Take Care Clause of Article II of the Constitution, this Court should hold that Relators cannot bring the suit on behalf of the United States. Because the Executive, exercising its discretion, has chosen to intervene, the case lacks a plaintiff and must be dismissed.

### C. Relators' Unjust Enrichment Claim Must Be Dismissed.

Relators lack standing to bring a common law unjust enrichment claim (Compl. ¶ 226; Count III) on behalf of the United States. Rule 12(b)(1) requires dismissal of that claim. A plaintiff bringing an unjust enrichment claim must show "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016). Here, it is the United States, not any relator, that conferred the benefit on defendant and who would suffer from the alleged injustice of the defendant retaining the benefit. Because a "relator in a *qui tam* FCA action does not have standing to assert common law claims based upon injury sustained by the United States," unjust enrichment claims brought by FCA relators must be dismissed. *U.S. ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F.

Supp. 2d 10, 14 (D.D.C. 2003), aff'd sub nom. *Rockefeller ex rel. U.S. v. Washington TRU Sols.*

*LLC*, No. 03-7120, 2004 WL 180264 (D.C. Cir. Jan. 21, 2004) (collecting cases).

## CONCLUSION

The Court should dismiss the Complaint in its entirety.

Dated March 7, 2025                              Respectfully Submitted,

By:    */s/ Jonathan M. Freiman*
        Jonathan M. Freiman (#D00322)
        WIGGIN AND DANA LLP
        One Century Tower
        265 Church Street
        P.O. Box 1832
        New Haven, Connecticut 06508
        Tel.: (203) 498-4584
        Fax: (203) 782-2899
        jfreiman@wiggin.com

        Jolie Apicella (# NY0614)
        WIGGIN AND DANA LLP
        437 Madison Avenue
        New York, NY 10022
        Tel.: (212) 551-2844
        Fax.: (212) 551-2888
        japicella@wiggin.com

        *Counsel to Defendant*