# EXHIBIT 12

# REPORT OF INDEPENDENT INVESTIGATION

# SEXUAL MISCONDUCT BY YALE PROFESSOR D. EUGENE REDMOND

**August 14, 2019**

**Deirdre M. Daly**
**Finn Dixon & Herling LLP**
**Stamford, Connecticut**

## Table of Contents

I.  Summary of Investigation and Findings ................................................................ 1

II.  Background on the Investigation ....................................................................... 3

    A.  The Genesis of the Independent Investigation........................................... 3

    B.  Independence and Scope of the Investigation .......................................... 4

    C.  Our Methodology.................................................................................... 4

III.  Background on Redmond and the St. Kitts Facility ............................................ 6

    A.  Redmond ............................................................................................... 6

        1.  Professional Background .................................................................. 6

        2.  Scientific Work ............................................................................... 6

        3.  Roles at Morse College and in the Yale Community........................... 7

        4.  Sponsorship of Kittitians................................................................ 7

    B.  Yale's Links to the St. Kitts Facility ....................................................... 7

        1.  SKBRF, Axion, and Company 1 ....................................................... 8

        2.  Grants Used to Fund Research at SKBRF .......................................... 8

        3.  Student Work at SKBRF .................................................................. 9

IV.  Redmond's Sexual Misconduct ...................................................................... 10

    A.  Students' Accounts of Abuse ............................................................... 10

    B.  Yale's Sexual Misconduct Policies ....................................................... 12

    C.  Specific Incidents of Abuse ................................................................. 13

        1.  The Bedroom Assaults .................................................................. 13

        2.  The Medical Exams ...................................................................... 17

        3.  Other Sexual Misconduct .............................................................. 19

V.  The 1994 Investigation .................................................................................. 23

    A.  The Inquiry Committee's Findings and the Settlement Agreement ........... 23

    B.  The YSM Dean's Decision and the Failure to Monitor Redmond ........... 25

    C.  Procedural Observations about the 1994 Investigation ........................... 27

VI.  Other Missed Opportunities .......................................................................... 28

    A.  Professor 1 ......................................................................................... 28

    B.  Scientist 1.......................................................................................... 29

    C.  Morse College Administrators.............................................................. 30

VII.  Redmond's Retirement from Yale .................................................................. 32

VIII. Redmond's Response to the Investigation ........................................................................ 33

IX.    Yale's Efforts to Address Sexual Misconduct ................................................................ 34

X.     Recommendations ............................................................................................................ 35

       A.    Yale's Actions ........................................................................................................ 36

             1.    Record-Keeping for Faculty Disciplinary Action ....................................... 36

             2.    Monitoring of Off-Campus Programs ......................................................... 36

             3.    Report to Connecticut Department of Public Health .................................. 36

       B.    Recommendations ................................................................................................... 37

             1.    Implementation and Monitoring of Faculty Discipline ............................... 37

             2.    Bystander Intervention Training ................................................................ 37

             3.    Faculty Reference Checks ........................................................................... 37

             4.    Discipline .................................................................................................... 39

XI.    Final Thoughts ................................................................................................................. 39

I.    <u>Summary of Investigation and Findings</u>

On January 28, 2019, Yale University ("Yale" or the "University") announced that it had retained the law firm of Finn Dixon & Herling LLP ("Finn Dixon & Herling") to conduct an independent investigation of complaints of sexual misconduct against former Yale School of Medicine ("YSM") professor Dr. D. Eugene Redmond ("Redmond"). Redmond was on the faculty of YSM in the Psychiatry and Neurosurgery departments for forty-four years from 1974 until his retirement in July 2018.

In March 2018, a Yale undergraduate filed a formal complaint against Redmond alleging sexual misconduct at Redmond's research facility in the Caribbean Island of St. Kitts. During Yale's internal investigation of that complaint, the current Yale administration learned that a group of Yale students made similar complaints against Redmond in 1994. On July 27, 2018, knowing that disciplinary proceedings in connection with the 2018 complaint were imminent and that the 1994 complaints had surfaced, Redmond retired. Five months later, in January 2019, a third complainant came forward and reported that Redmond had sexually abused him when he was a Yale undergraduate working in St. Kitts.

It was the combination of these three complaints that prompted Yale to request that Finn Dixon & Herling conduct an independent investigation of (i) any sexual misconduct by Redmond while he was a member of the YSM faculty, and (ii) what, if anything, Yale knew about any sexual misconduct by Redmond. Yale asked that our investigative team make every effort to identify any potential victims of sexual misconduct by Redmond, to assess the credibility of their accounts, to determine if anyone at Yale became aware of any sexual misconduct by Redmond and what they did with that information, to explore Redmond's retirement from Yale, and to provide relevant recommendations. From the outset, Yale publicly stated that the results of our investigation would be shared with the Yale community. This Report reflects the evidence and information that we were able to collect and our findings based on the available evidence.

Our investigation took approximately six months. We attempted to contact all current or former students who worked with Redmond at the St. Kitts facility or who were his freshman advisees. We notified them of our investigation and requested that they contact us if they believed they had relevant information. As a result of this outreach and other investigative efforts, we interviewed 110 witnesses, including 38 current and former students, most of whom were Yale undergraduates at the relevant time. For brevity's sake, we will refer to current and former students simply as students. We also interviewed 34 Yale professors and administrators, and reviewed any relevant documents that were available to us.

Redmond declined our request for an interview. His counsel informed us that, in order to interview Redmond, we would need to disclose to him in advance of the interview the names of students who had made allegations against him and all notes and memoranda relating to our interviews of those students. As discussed below, we did not agree to these preconditions. Based on other information available to us, we understand that Redmond has generally denied any complaints of sexual misconduct.

Based on our investigation, we have concluded that Redmond sexually assaulted five students in St. Kitts while he was a Yale professor. These assaults occurred on five separate

occasions, when he initiated and engaged in nonconsensual sexual contact with each student. Each of these incidents occurred in a bedroom that Redmond required each student to share with him and after each of the students had been drinking with Redmond. We have also determined that Redmond conducted, in St. Kitts, three purported medical exams of students that included inappropriate genital and/or rectal exams. Further, Redmond committed other acts of sexual misconduct involving at least eight other undergraduates or recent graduates and one high school student in St. Kitts, New Haven, and other locations. Two of the assaults and two of the exams occurred in the early 1990s; the remaining three assaults and the third exam occurred between 2010 and 2017. Most of the other misconduct occurred after 2005.

We found the students' accounts to be highly credible. When interviewed, the students were candid and straightforward; they neither embellished facts nor appeared vindictive. There were no eye-witnesses to the assaults, and each of the students acknowledged that they were intoxicated at the time of the assaults. Some also stated they had blocked out memories so that they do not recall the full details of what happened. But each incident is corroborated, at least in part, by written communications and interviews with family members, friends, or therapists to whom the students reported the incidents. The strongest corroboration for the assaults is the striking similarity between the students' accounts of what happened, despite the fact that the incidents occurred years, and, in some cases, decades apart, and the students do not know one another or the nature of their individual accounts. It is also relevant to our findings, as discussed later in this Report, that Redmond tried to obstruct our investigation by encouraging some witnesses not to cooperate with us, to provide false information, or to withhold relevant information.

We also investigated what knowledge, if any, Yale had of Redmond's misconduct. The first complaints of sexual misconduct by Redmond were those raised by a group of students in 1994. While YSM conducted an investigation in response to the complaints, issued findings, and made recommendations, we find that there were flaws in the investigation. More concerning, however, was YSM's failure to implement any meaningful monitoring mechanisms to ensure ongoing oversight of Redmond and student activity at the St. Kitts facility. Redmond's false representations to YSM that he had terminated the program created a false sense of confidence that his misconduct had stopped. In fact, at least by 2001, Redmond returned to recruiting students to work with him in St. Kitts, and required some of them to share a bedroom with him. We know of 20 students who worked with Redmond from 2001 to 2017 in St. Kitts. Three of those students were assaulted by Redmond, and several others experienced sexual harassment by him. Redmond failed to honor his representations to Yale after the 1994 complaints; breached a policy the St. Kitts facility put in place after the 1994 investigation, which required separate housing for students and faculty; and violated a Settlement Agreement he entered into with a student that required Redmond to eliminate the program, to cease all recruiting and supervision of students in St. Kitts, and to abide by the separate housing policy.

We found no evidence that any faculty, staff, or administrators at Yale had actual knowledge of Redmond's sexual misconduct before it was reported. Nevertheless, it is equally clear that if Yale had implemented a longstanding monitoring program after the 1994 investigation, Redmond's ongoing misconduct might well have been detected and stopped. In addition, at various points after 1994, several members of the Yale community had concerns about Redmond's

subsequent interactions with certain students, which, if they had pursued, might have prompted Yale to further scrutinize Redmond's conduct and potentially uncover his misconduct.

This Report first describes the scope and independence of the investigation and our methodology. It then provides background information regarding Redmond, the St. Kitts facility, and its links to Yale; summarizes the experiences of students; describes the 1994 investigation and its aftermath; explains how Redmond was able to continue his pattern of misconduct; identifies missed opportunities for members of the Yale community to intervene and potentially detect and report Redmond's predatory behavior; and recounts Redmond's departure from Yale and his response to this investigation. It also outlines Yale's efforts to address sexual misconduct and concludes with suggested recommendations.

We are grateful to everyone who cooperated in this investigation, and particularly to the students who spoke with us despite their understandable reluctance to relive and share what were painful experiences. Some witnesses discussed personal and sensitive experiences, all the details of which could not be reflected here. We want to emphasize that every interview contributed in a meaningful way to our investigation and was critical to informing our understanding of what happened.

II.    Background on the Investigation

A.    The Genesis of the Independent Investigation

Yale announced this investigation on January 28, 2019.[1] At that point, Yale was aware of three separate complaints of sexual misconduct against Redmond. First, a Yale undergraduate had filed a formal complaint alleging recent sexual misconduct in St. Kitts, which was later confirmed in a confidential university investigation. Second, during that investigation, the current Yale administration learned that YSM had investigated similar complaints raised by St. Kitts interns from Yale in 1994. Third, in early January 2019, a former Yale undergraduate attempted to submit a formal sexual misconduct complaint to a Yale investigative body concerning Redmond's conduct in St. Kitts in the 2010s. But by that point, Yale no longer had jurisdiction over Redmond because he had retired. These three sets of complainants do not know each other and were unaware of one another's allegations.

A combination of factors prompted Yale to initiate an independent investigation. First, there were three complaints across almost twenty-five years against a single professor. Further, the records of the 1994 investigation revealed that (i) Redmond had represented to a YSM investigatory committee and the then-Dean of YSM that the St. Kitts student internship program had been terminated, but that students might accompany individual researchers to St. Kitts on an *ad hoc* basis, and (ii) the Dean had required on-going monitoring of student participation in research, if any, at the St. Kitts facility. Yale wanted to determine not only the full extent of Redmond's misconduct, but also what university employees may previously have known about his conduct, whether they failed to take appropriate steps to oversee his activities in St. Kitts, and whether they failed to respond appropriately to any allegations or reports of sexual misconduct.

B.    Independence and Scope of the Investigation

Yale engaged Deirdre Daly, a partner at Finn Dixon & Herling and the former United States Attorney for the District of Connecticut, to lead the investigation. Yale's January 28 statement advised the Yale community that Ms. Daly would be reaching out to students, alumni, and others who may have relevant information and that anyone wishing to contact her could do so confidentially by calling a designated hotline or sending an email to a dedicated email address.

From the outset, we recognized the need to ensure our ability to conduct an investigation free from any interference or influence from Yale or any other potentially interested party. Our investigative team functioned entirely independently in pursuing the investigation and preparing this Report. We had full authority, in our sole discretion, to determine what information and material was relevant to the investigation. No one at Yale, including within the Office of the General Counsel ("OGC"), directed or influenced our fact-finding. We developed our investigative process and plan independently, and Yale placed no restrictions on our pursuit of investigative leads. No changes or edits were made to this Report by anyone outside the investigative team, nor was a draft of the Report shared with anyone outside of Finn Dixon & Herling. Our findings and recommendations are exclusively those of our team.

In conducting our investigation, we received full cooperation from Yale, including the OGC; deans and professors from YSM and Yale College; the Title IX Office; administrators from Morse College, a residential college; YSM operations managers; and other university administrators. The University provided us full access to all available relevant documents and witnesses within its control, and guided us to witnesses who might have relevant information. Further, in order to facilitate our ability to identify all potential victims of Redmond's misconduct, Yale provided available contact information for any Yale students believed to have worked at the St. Kitts facility or who were Redmond's freshman advisees.

With respect to the scope of our assignment, we were engaged to investigate and make factual findings regarding: (1) any sexual misconduct or related inappropriate behavior by Redmond during his tenure as a professor on the YSM faculty, including any misconduct that may have occurred on or in the vicinity of Yale's campus or at the St. Kitts facility; (2) any individuals within the Yale administration who may have become aware of any allegations or reports of sexual misconduct or related inappropriate behavior by Redmond during his tenure at Yale, what information they received, and what, if anything, they did in response; (3) the facts and circumstances surrounding Redmond's departure from Yale; and (4) any other issues that may be identified by Yale depending on information received during the investigation. We were also asked to recommend any remedial measures warranted by our findings.

C.    Our Methodology

In an effort to identify potential victims, we contacted 35 students who worked with Redmond at the St. Kitts facility by email or mail to advise them of our investigation and to request an interview. These students were identified by Yale, other witnesses, Axion Research Foundation ("Axion"), a non-profit organization founded by Redmond that funded some of the students' work in St. Kitts, or from messages to our hotline or dedicated email address.[2] Additionally, Yale's Title IX Coordinator contacted the 68 Morse College students who were assigned as Redmond's

4

advisees from 1998 through 2018, for whom Yale had email addresses, and advised them of our investigation.[3]  As a result of these contacts, we interviewed 28 individuals who worked at the St. Kitts facility as undergraduates or recent graduates (two of whom were Redmond's advisees) and interviewed three advisees who did not work in St. Kitts.

At our request, a Yale administrator and New Haven community member with ties to the local Kittitian community circulated Yale's announcement of the investigation to members of this community so that they had our contact information if anyone wished to speak with us.  No witnesses came to us through that channel.

In total, we interviewed 110 people.[4]  We interviewed 38 current or former students, including 28 from Yale, 9 from other universities, and 1 who was in high school at the time of his work in St. Kitts.  We also interviewed 13 corroborating witnesses (family, friends, psychiatrists, and psychologists); 6 current or former Yale professors;[5] 28 current or former Yale administrators;[6] 12 of Redmond's business associates, including employees of the St. Kitts facility; and 11 researchers who worked with Redmond, some of whom are current or former Yale employees.[7]  Additionally, we interviewed two medical experts about exams that Redmond performed on three students in St. Kitts, and consulted with Yale's Title IX Office about the University's sexual harassment policies and remedial measures being put in place at Yale.

At the outset of each witness interview, we stated that Yale had hired us to conduct the investigation and explained the scope of our investigative mandate.  We advised that we are attorneys who have been engaged by Yale and we do not represent the witness or any other individual.  We never objected when a witness wanted to have his or her personal attorney present for the interview.  As background, we explained that the team leader, Deirdre Daly, had investigative and prosecutorial experience and formerly served as the United States Attorney in Connecticut.  We also advised witnesses that Yale had stated that the results of our investigation would be made public.  We agreed not to reveal in our Report the names or any other specific identifying information relating to students or other witnesses who requested confidentiality.  We explained there are some exceptions to our ability to keep witness names confidential, such as an obligation to report to the state or law enforcement information of a crime where the victim is a minor or a circumstance in which someone is at risk of imminent harm.  In addition, we cautioned that should we be compelled by court order to disclose the names of witnesses and/or our interview notes, we would be obligated to comply with such an order.  All witnesses indicated their understanding and agreement with these conditions.

We also reviewed approximately 1,450 documents, including the files relating to the 1994 and 2018 Yale investigations concerning Redmond, emails to/from Redmond, emails and other documents provided by witnesses, files concerning grant applications and awards to Redmond and colleagues, Yale correspondence, policies and procedures, certain of Redmond's scientific publications, relevant media reports, other similar investigative reports on sexual misconduct, and other miscellaneous documents.

Certain documents were unavailable to us.  While Yale provided us full access to Redmond's Yale email account, there was only one email in the inbox compared to approximately 800 messages in the sent folder, which suggests that the messages in the inbox were deleted.  We could not determine the deletion date.  In addition, not all historical versions of Yale's handbooks,

5

regulations, policies and procedures were available. Finally, Axion's legal counsel denied our request for meeting minutes of the Axion Board of Directors, but represented some facts about the contents of available minutes.

Throughout the Report, we provide citations to our factual findings to make clear the source of our information, whether it is an interview or a particular document. Since students and a number of other witnesses requested confidentiality, we refer to all witnesses by a general descriptor of their status (*e.g.*, Professor 1) and/or a random witness number (*e.g.*, W1).

III.    Background on Redmond and the St. Kitts Facility

    A.    Redmond

        1.    Professional Background

Redmond was born in 1939.[8] He graduated from Southern Methodist University in 1961 and Baylor College of Medicine in 1968, and completed a psychiatry research residency at the Illinois State Psychiatric Institute in 1972.[9] From 1972 to 1974, he worked as a clinical associate at the Laboratory of Clinical Science at the National Institute of Mental Health.[10] Redmond was Board Certified in Psychiatry in April 1977,[11] and, like all psychiatrists certified prior to October 1994, he has a lifetime certificate.[12] He obtained a Connecticut physician's license in November 1987; his license is currently active and expires in June 2020.[13] He has no recorded licensure actions or pending charges.[14] Other than early in his career, Redmond has not been a practicing physician.

Redmond was a faculty member at YSM for forty-four years. He joined the school in 1974 as an assistant professor of psychiatry, was promoted to professor with tenure in 1987, and held positions in the Psychiatry and Neurosurgery departments until retiring in July 2018.[15]

        2.    Scientific Work

Early in his career, Redmond studied neurotransmitter systems in the brain using animal models, which contributed to understanding the mechanisms of anxiety and drug withdrawal.[16] This work led to a patent for using the drug clonidine as a treatment for opiate withdrawal.[17] He has largely devoted the rest of his career to developing non-human primate models of Parkinson's disease and analyzing the outcome of gene and cell therapies using these models.[18] A substantial part of his work is conducted in St. Kitts at the St. Kitts Biomedical Research Foundation ("SKBRF"), a non-profit he founded in 1982 that operates a primate research and laboratory facility on the island.[19]

St. Kitts has a large population of vervet monkeys, which provided a unique research opportunity for Redmond.[20] Some current or former co-investigators at Yale and other institutions confirmed that Redmond's study of vervet monkeys exposed to MPTP, a drug which induces Parkinsonian features, contributed to the development of a model that was the "gold standard" for Parkinson's disease research in the 1980s and 1990s.[21] In the late 1980s to early 1990s, Redmond led a pioneering clinical study with collaborators from seven YSM departments on fetal tissue transplantation in patients suffering from advanced Parkinson's disease.[22] Although the initial studies showed some promising behavioral effects, there were technical and ethical issues with the

use of fetal tissue and the transplants did not integrate correctly.[23]  Since then, Redmond has studied the effect of delivering genes or stem cells into non-human primates with MPTP-induced Parkinsonian symptoms.[24]

Some witnesses, especially those in the YSM Psychiatry Department or who collaborated with Redmond, noted his important scientific achievements.[25]  Others were unfamiliar with him or knew of him, but not the details of his work.[26]

### 3. Roles at Morse College and in the Yale Community

From 1976 until his retirement, Redmond was a Fellow at Morse College, an elected University member who engages in Morse College life.[27]  From 1998 to 2018, he was assigned to advise approximately 73 Morse students,[28] and was known as an active Fellow, attending Fellows Dinners, always volunteering to serve as an advisor, and inviting advisees to dinners at his house and at off-campus restaurants.[29]

He was also known as a frequent entertainer at his house and Axion's headquarters, both of which are near Yale's campus.[30]  His entertaining included hosting annual "winter gatherings" attended by faculty, administrators, students, and neighbors.[31]  Redmond also hosted smaller parties for students and former students, usually at his own house.[32]  Witnesses who attended the parties were encouraged to bring friends, and alcohol was served, including to underage students.[33] Witnesses reported that the attendees were overwhelmingly male, and often young, attractive, and athletic.[34]  Through these parties, Redmond cultivated a circle of young, male acquaintances.[35]

### 4. Sponsorship of Kittitians

Over the years, Redmond has come to know many Kittitians, in part because SKBRF employs Kittitians at the facility.[36]  He encouraged several young male Kittitians to come to the United States for further education and helped them to navigate the school admissions process.[37] We learned of at least six Kittitians who attended Yale, Southern Connecticut State University, or Quinnipiac University, and at various times, lived at Redmond's house rent-free while they were in school.[38]  In addition, Redmond adopted a young Kittitian man who later graduated from a U.S. university and became a successful doctor.[39]  A number of these witnesses praised the positive impact Redmond has had on their lives.[40]  None of the Kittitians we interviewed who lived with Redmond in New Haven or worked with him in St. Kitts reported any sexual misconduct.

### B. Yale's Links to the St. Kitts Facility

Although Yale did not directly sponsor or have actual authority over students working at the St. Kitts facility, Yale had multiple direct links to the internship program.  Redmond, a Yale professor, recruited Yale students to intern at the facility, and supervised them on site.  For many years, other Yale professors also conducted research there.  Moreover, Yale received funding from federal and state agencies for indirect costs (overhead costs not identified with a particular project function) in connection with research grants that supported Redmond's work in St. Kitts.  We agree with one former Yale administrator's assessment that Yale had a "legitimate interest" in the SKBRF work because the organization was run by a Yale professor, his Yale research colleagues worked there,[41] and SKBRF and Axion are "de facto creatures" of Redmond so, at least in that sense, the SKBRF internship was a "Yale program."[42]

1.    SKBRF, Axion, and Company 1

In the late 1970s, Redmond worked at a St. Kitts facility run by other scientists before purchasing his own property located at the Lower Bourryeau Estate Yard.[43]  In 1982, he and another YSM faculty member ("Professor 1") founded SKBRF, a charitable foundation organized under the laws of St. Kitts.[44]  Redmond leases his St. Kitts property to SKBRF.[45]  Because of the large population, in St. Kitts, of  vervet monkeys, which are considered an agricultural pest, SKBRF is able to obtain the monkeys at a lower cost than U.S. primate facilities.[46]  Redmond served as the president and a Board member of SKBRF, along with Professor 1 and citizens of St. Kitts, until late 2018.[47]

In addition to SKBRF, two other entities, Axion, a tax-exempt 501(c)(3) Connecticut organization, and a for-profit translational research company ("Company 1"), also use the SKBRF resources and facilities.[48]  Redmond held leadership roles at all three entities until resigning when the sexual misconduct allegations against him came to light.[49]  Axion was founded in 1985 by Redmond and Professor 1, with Redmond serving as president and director until February 12, 2019.[50]  Currently, Professor 1 is acting president and continues to serve on the Board with two other directors.[51]  Redmond, Professor 1, and two others initially formed Company 1, which was later bought by a Yale employee ("Scientist 1") and his business partner in the 2000s.[52]  Scientist 1 serves as the president and two other Yale employees ("Scientist 2" and "Scientist 3"), among others, work there.[53]  Redmond was on the Board of Directors of Company 1 until the current allegations surfaced.[54]

Since the 1980s, Redmond has typically been on-site at SKBRF for much of the summer and for other shorter trips during the rest of the year.[55]  Professor 1 worked at the SKBRF facilities at least once per year for a few days at a time from inception through 2011.[56]  He reported that he was last on-site in October 2011.[57]  Scientist 1 is a Yale adjunct professor with no teaching responsibility, who has taken hundreds of research trips to St. Kitts since 1989.[58]  Scientist 2 is a senior research scientist at Yale who first went to St. Kitts in 1980 and on average has visited the facility one to two times per year for approximately two to seven days at a time.[59]  Scientist 3 is an adjunct professor with no teaching responsibility, who does not receive a salary from Yale.[60]  He went to St. Kitts three to four times as a graduate student in the 2000s and seven times from 2016-2018.[61]

2.    Grants Used to Fund Research at SKBRF

Redmond funded much of his research with grant awards that he applied for through Yale.[62]  From 1985, the first year data is available, through 2008, the National Institutes of Health ("NIH") awarded Redmond approximately $31 million for projects on which he was the principal investigator.[63]  This funding was used in part to conduct research at the St. Kitts facility.[64]  Throughout the years, Redmond supplemented this funding with state grants[65] and private philanthropy.[66]  Professor 1 and Scientist 2 also received government funding as principal investigators for studies with an SKBRF component.[67]  While some of their work supports Redmond's Parkinson's disease research, they also conduct their own research in other areas.[68]  From 1985 to the present, NIH awarded Professor 1 approximately $12.5 million and Scientist 2 $8.4 million for projects with an SKBRF component.[69]  Based on available data from 2000 to the present, Yale has received approximately $7.3 million from NIH and the Connecticut Stem Cell

Research Grants-in-Aid Program for indirect, overhead costs for grants with an SKBRF component awarded to Redmond, Professor 1, and Scientist 2.[70]

For many of these research projects, Yale entered into agreements with Axion for Axion to provide animals and research services at SKBRF.[71] Typically, Yale would receive funding from NIH, for example, and then pay Axion, which would then pay SKBRF.[72] From 1999 to February 2018, Yale has paid Axion approximately $7 million for research projects done by Redmond, Professor 1, Scientist 2, or another of Redmond's collaborators.[73]

### 3.    Student Work at SKBRF

Starting in the late 1970s and through 2017, Redmond recruited Yale undergraduates and other students to work at SKBRF during school breaks, primarily during the summer. The earliest confirmed Yale intern worked in St. Kitts in 1978.[74] Our investigation confirmed that Yale undergraduates worked in St. Kitts at least in the years 1978-82, 1990-94, 2001, 2004-2007, 2009, 2011-2012, 2014, and 2016-2017. Two individuals who had recently graduated from Yale and another university worked in Redmond's New Haven lab and at SKBRF in 1991-92 and 2011-2013; and undergraduates from other universities and high school students worked at SKBRF in 1988, 1989, 1990, 1993, 1994, and 2015.

From 1978 through 1994, at least 41 student or post-grad researchers worked with Redmond in St. Kitts; and 27 of the 41 are male. As noted above, in 1995, Redmond represented to Yale that the student internship program had been terminated, and that only on occasion would a student accompany an individual researcher to work at the facility.[75] Based on our investigation, we found that at least 19 students and 1 post-grad researcher worked with Redmond at SKBRF from 2001 to 2017. Of these 20 researchers, 17 are male, 2 are female, and 1 is transgender; 15 were Yale undergraduates, 2 were undergraduates at another university, 1 was a graduate of another university, and 2 were in high school.

Students became involved with SKBRF in a variety of ways, but most were recruited by Redmond. In the early 1980s, Redmond met a group of Yale undergraduates on the men's gymnastics team through a study he was conducting on endorphins in gymnasts.[76] Several team members later worked in St. Kitts.[77] He advertised for student research opportunities at SKBRF by posting brochures at Yale and providing copies to the career counseling office at other universities in the early 1990s.[78] More recently, Redmond requested that a flyer be posted on a Morse College bulletin board in 2016 and that an advertisement be included in Morse's weekly email circular in 2017.[79] He further posted on Yale's Symplicity website, a job application site hosted by the Office of Career Strategy.[80] Students also learned about SKBRF directly from Redmond, as he encouraged certain Morse advisees and others who attended his parties to work there with him.[81]

In the 1980s and 1990s, student researchers received free housing at the SKBRF facility, but were required to pay for their airfare and other expenses.[82] From 2001 to 2017, students also lived at the facility, but usually received a stipend from Axion which covered travel and other expenses.[83]

Redmond took steps to separate the SKBRF internship program from Yale. His advertising did not expressly link the program to Yale, except for 1992 and 1994 advertisements which were published on Yale letterhead. Redmond claimed this was inadvertent.[84] The SKBRF liability release forms signed by students that were made available to us (from 1994, 2008, and 2017) disclaim a relationship with Yale.[85] Some students understood that their SKBRF research work was not part of a formal Yale program.[86] Others did not,[87] but most all students believed there was a connection to Yale as they were recruited and supervised by a full-time Yale professor.[88]

IV.    Redmond's Sexual Misconduct

Our investigation revealed five credible accounts of sexual assaults in a shared bedroom, three incidents where Redmond conducted inappropriate medical examinations, and multiple other forms of sexual harassment. These incidents occurred between the early 1990s and 2018, often in St. Kitts, but sometimes in New Haven or other locations when Redmond was traveling with a student. The assaults all occurred in St. Kitts, one in the early 1990s, one in 1994, and three in the 2010s. Two of the exams occurred in the early 1990s and the third exam occurred in the late 2010s. Most, but not all, of the other misconduct occurred after 2005.

We interviewed one individual who described his "consensual" sexual relationship with Redmond in the early 1980s when he was a Yale undergraduate. The relationship began when the student was an intern in St. Kitts and lasted approximately two years. Redmond wrote the student, who is now a practicing physician, a letter of recommendation to medical school. The student believes that Redmond was "opportunistic and manipulative," but does not view himself as "a victim."[89] At the time, such relationships were not prohibited by the University.

A.    Students' Accounts of Abuse

Many of the interns worked at SKBRF in the summer between their freshman and sophomore years.[90] They were aspiring medical students who today are medical school applicants, medical residents, or practicing physicians.[91] Students recounted how they initially considered themselves highly fortunate to have landed an internship, or post-grad research position, with a respected professor supporting cutting-edge research on a Caribbean island.[92] Some of them had positive experiences and consider Redmond to be a valuable mentor to this day.[93] Others bristled under his intensely controlling manner or found the work to be mundane.[94] The remaining students, who are the focus of this Report, are those who reported sexual abuse and other harassing behavior.

Many students described how Redmond closely controlled their time and activities on the island.[95] Students did not have a car available for their personal use, and Redmond discouraged them from leaving the facility without him.[96] Interns from the 1990s reported that Redmond discouraged them from using the only phone at the facility.[97] Some students reported that Redmond made them feel guilty if they did not spend free time during nights and weekends with him.[98] Evening meals were cooked and eaten together, and often included cocktails that Redmond prepared and offered to students.[99] Several students described drinking alcohol frequently and heavily with Redmond during their internship.[100]

During most internships, Redmond required one of the male interns to share a bedroom with him.  In the early years, Redmond and a male intern would stay in a small hut separate from the main residential building.[101]  Interns from three separate years in the 1990s described how Redmond accepted more men into the internship program than the number of available beds in the main residence, which had only two bedrooms (one for males, the other for females) with four beds each.[102]  Later, after the hut was destroyed in a hurricane,[103] Redmond had male interns share a bedroom with him in the main residence.[104]  He offered various excuses as to why the interns could not have their own bedrooms, from claiming that other researchers would be arriving soon to citing concern that the cleaning staff would charge for cleaning two bedrooms rather than one.[105]  Some interns firmly insisted on having their own bedrooms,[106] but others felt they did not have that option.[107]

Our investigation revealed five sexual assaults spanning over twenty-five years, all of occurred when the students were sharing a bedroom with Redmond and after they had been drinking with him.

The evidence indicates that Redmond carefully selected the interns he abused and harassed.  These interns explained how he often isolated them from their peers and flattered them,[108] supported them financially,[109] offered assistance for admittance to medical school,[110] expressed deep affection,[111] discussed intimate sexual matters,[112] and sought time alone with them.[113]  In some cases, he preyed on what some students described as a personal vulnerability, whether it was intellectual insecurity, lack of financial resources, or other feelings of inadequacy and self-doubt.[114]  Much of what these students described reflects textbook grooming behavior: the offender gains access to victims through a series of steps whereby he garners their trust, establishes control, and creates an environment of secrecy and isolation.[115]

The students' reactions to Redmond's abuse and harassment varied.  In one case, a student reacted immediately by moving out of their shared bedroom, leaving the St. Kitts's program prematurely, and reporting the misconduct to others.[116]  But more often, the students, many of whom were just starting their college years, needed time to process their experiences and were confused, ashamed, and/or fearful of upsetting Redmond.[117]  Some felt isolated on a remote island at a facility essentially owned and operated by Redmond, who never acknowledged that anything inappropriate had happened.[118]  Some explained that they did not see an avenue to report the misconduct without significant risk to themselves for confronting a powerful doctor.[119]  Only three sets of complaints were raised to Yale administration.  Other students recounted the abuse to family, friends, or therapists either immediately after it happened or at a later date.

There are no eye-witnesses to the abuse and there is no forensic evidence or physical proof, in part due to the passage of time.  In addition, when Redmond assaulted students, the students were intoxicated after drinking with Redmond.  Several of them described passing out at the time of the abuse or blocking out the memory, so that they are unable to recall the full event in detail.  Nonetheless, we found the students' accounts to be highly credible.  When interviewed, they were straightforward, direct, and candid.  They acknowledged facts that were embarrassing and did not embellish when they had difficulty remembering critical moments or fully explaining what had happened.  While some students were angry about what Redmond had put them through,[120] none were vindictive.  Some noted Redmond's old age and the important research contributions he has made,[121] and others recognized that Redmond helped them professionally by providing

11

recommendation letters and other guidance.[122]   When speaking with the students, many emphasized that they came forward in large part to help prevent future sexual misconduct, and expressed guilt at not coming forward earlier and protecting others from Redmond's abuse.[123]

Moreover, there is powerful corroboration for the students' accounts of abuse.  While most do not know one another and were unfamiliar with the others' accounts of abuse, and while their interactions with Redmond spanned decades, their descriptions of Redmond's conduct are markedly similar.  In addition, we interviewed students' family members, friends, and therapists (with the students' permission) and reviewed documents that further corroborated their accounts.

B.    Yale's Sexual Misconduct Policies

In this Report, we classify the five instances of nonconsensual sexual contact as sexual assaults based on Yale's current sexual misconduct policies and related definitions, which define sexual assault as "any kind of nonconsensual sexual contact, including rape, groping, or any other form of nonconsensual sexual touching."[124]  Notably, although Connecticut criminal law would not apply because the incidents occurred in St. Kitts, Redmond's conduct would also constitute sexual assault under current Connecticut law.  The relevant Connecticut criminal statute defines sexual assault to include when a person "subjects another person to sexual contact without such other person's consent" or when the other person is "physically helpless," which applies here as several of the students were heavily intoxicated at the time of the incidents.[125]  It also appears that Redmond's assaults violated the St. Kitts current criminal code.[126]

It should be noted that starting in 1986, the Yale Faculty Handbook prohibited sexual harassment defined as, "an attempt to coerce an unwilling person into a sexual relationship or to subject a person to unwanted sexual attention, or to punish a refusal to comply."  The Handbook noted that the definition includes a "wide range of behavior."[127]  A few years later, the policy was updated to define sexual harassment as "nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature" when submission or rejection of such conduct is used as the basis for employment or academic decisions, or unreasonably interferes with an individual's performance or creates a hostile environment.[128]  The policy prohibited harassment on or off campus.[129]

In 2011, Yale adopted a policy prohibiting sexual misconduct, in addition to sexual harassment.  The 2011 policy defined sexual misconduct as "a range of behaviors including rape, sexual assault (which includes any kind of nonconsensual sexual contact), sexual harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating, or coercing a person or persons."[130]  The policy was refined over the years, including by defining sexual assault, intimate partner violence, and stalking in separate provisions.[131]  Yale's current sexual misconduct and harassment policies and definitions are available at https://smr.yale.edu/.

Yale's policies regarding teacher-student sexual relationships has also changed over time. In 1993, the Yale Faculty Handbook strongly discouraged "consensual" teacher-student sexual relationships.  The Handbook explained that "[b]ecause of the special trust and the inequality of status inherent in the teacher-student relationship, sexual relations between a teacher and his or her student, even when apparently founded on mutual consent, are potentially coercive, and may be

so regarded if a complaint of sexual harassment arises."[132]  The Handbook went on to advise professors "to recognize the potential problems implicit in such relationships and to avoid them" adding the admonition that "where a complaint of sexual harassment arises out of such a relationship, the faculty member will bear the burden of overcoming a presumption that the activity was not consensual on the part of the student."[133]  On March 3, 1993, the then-Provost sent a letter to the faculty highlighting that the new Handbook specifically addressed teacher-student relationships.[134]

Later, in November 1997, Yale adopted a stricter policy that prohibited teachers from having a sexual relationship with a student over whom they have direct supervisory responsibilities.[135]  That policy was revised in 2010 to prohibit all sexual relationships between teachers and undergraduate students regardless of whether the teacher currently exercises or expects to exercise supervisory responsibilities over the student.[136]

In short, the University's policies on sexual harassment, sexual misconduct, and sexual relationships between professors and students have evolved over time.  But it is clear that Redmond was on notice as early as 1993 that even "consensual" teacher-student relationships were strongly discouraged, and then flatly prohibited in 1997, whenever the teacher was in a supervisory role, as Redmond was in St. Kitts.  Moreover, we find that Redmond's conduct as detailed below was nonconsensual in nature and ranged from sexual assault to sexual harassment to "other conduct of a sexual nature that is nonconsensual, or has the purpose or effect of threatening, intimidating, or coercing a person," all of which is now defined as "sexual misconduct" and prohibited by Yale regulations.

C.     Specific Incidents of Abuse

As noted above, all student witnesses requested confidentiality prior to speaking with us. To protect the students' identities, we have assigned each student a random witness number and omitted other information that might identify the student.  Only a handful of American students worked at SKBRF at any one time, so this Report does not include the dates when individual students worked at the St. Kitts facility and does not present the incidents in chronological order.

1.     The Bedroom Assaults

Five students reported that Redmond engaged in nonconsensual sexual contact with them when they shared a bedroom with him in St. Kitts.

a.     Student A[137]

Student A, who did not attend Yale, joined a group of Yale and other undergraduates one summer in St. Kitts, when he was a rising college sophomore, and was assigned to share a bedroom with Redmond in the separate hut, according to a rotation schedule established by the students. Redmond told the students that one male student would need to room with him because the main residence did not have enough beds.  Some of the male students believed that the shared bedroom would lead to a stronger relationship with Redmond, so they agreed to a rotation system whereby each male student would stay in the hut for two weeks.

One night, after heavy drinking at a beach party, Redmond drove the interns back to the facility in his truck. Both the student and Redmond had been drinking.[138] The student recalls being drunk and on the verge of passing out during the ride. However, the student remembers sitting in the passenger cab of the truck next to Redmond and feeling Redmond's hand rubbing his thigh and then moving upward toward his genitals.

Later that night, back at the facility, the student went to bed in the hut, feeling less intoxicated. At some point in the night, the student awoke because he felt Redmond's hand rubbing his stomach. Redmond then reached beneath the student's underwear and touched his penis. The student immediately grabbed Redmond's hand and squeezed tightly to force Redmond to stop. Redmond did not respond; the student stood up and left the hut. Visibly upset, the student went into the main residence and asked a fellow student to walk into town with him so that he could use a payphone to call his family. The student telephoned his father and sister and told them about Redmond's conduct.[139]

Shortly thereafter, concerned for the student, the interns held a meeting without Redmond. One of the interns typed "a transcript" of the meeting to create a record of the student's account of the assault and other concerns the interns had about Redmond.[140] The interns all decided to leave St. Kitts several weeks before the program was scheduled to end. When they returned to campus, the three Yale students in the program reported the assault and their other concerns to Yale.[141] As discussed further below, their complaints prompted a YSM Inquiry Committee to investigate. Student A did not participate in the investigation because he separately negotiated a confidential Settlement Agreement with Redmond which prohibited him from discussing the incident.

When we interviewed them, five of the interns and two of the student's family members confirmed that Student A reported Redmond's conduct to them shortly after it happened.[142] At the time, the experience shattered the student's trust in adults. He was initially hesitant to pursue legal action against Redmond because he did not want to undermine Redmond's Parkinson's disease research and was concerned about Redmond retaliating against him by harming his chances of admission to medical school. But, the student decided he needed to do everything he could "to keep students away from Redmond," which he attempted to do by negotiating strict conditions in the Settlement Agreement (discussed later in the Report).[143]

Student A is now a practicing physician.

b.    Student B[144]

Student B shared a bedroom with Redmond during his summer in St. Kitts when he was a rising Yale sophomore. Toward the end of the summer, during a dinner to celebrate his birthday, the student drank heavily with Redmond. After dinner and more drinks, the student laid down, wearing shorts and underwear, in the shared bedroom. He said it was difficult to keep his eyes open or to converse at this point. Redmond came into the room and said he would apply aloe to the student's back as he had done on other occasions. While the student lay on his stomach, Redmond applied the aloe, but then flipped the student over and manually stimulated his penis to the point of ejaculation. At this point, the student fell asleep. When he awoke the next morning, he noticed his shorts and underwear pulled partially down around his legs, saw crumpled-up tissue

14

paper scattered around, and an Astroglide lubricant bottle on the bedside table. The student pulled his shorts up and rushed out of the bedroom, where Redmond was still sleeping.

Later that day, Redmond approached the student and said in substance "so, about what happened" and then began giving some explanation. The student stopped the conversation, demanded his own bedroom with a lock, and said that he never wanted see or hear from Redmond after the St. Kitts program. Redmond nodded and later that day told the student he could move into an empty bedroom in the house.

That day, the student told his then-girlfriend about the incident in a Facebook chat. A transcript of the chat and our interview of the student's then-girlfriend corroborate the student's account.[145] When he returned to Yale, the student struggled with depression and anxiety, and drank heavily. His self-image suffered because he felt he had been chosen as an SKBRF intern because of his physical or sexual value, rather than his intellectual capabilities. He had trouble concentrating and his grades dropped. That winter, Redmond sent an unsolicited Christmas card with a $500 voucher for a Broadway show to the student's Yale address. He felt the voucher was "blood money" and did not want to keep it so he gave it to a family member, whom he told about Redmond's conduct years later. The family member confirmed these events to us.[146]

In early January 2019, before this investigation was publicly announced, the student attempted to file a formal complaint against Redmond, but was advised the University no longer had jurisdiction over Redmond, as he had retired. At the time, the student was not aware that any other students had filed sexual misconduct complaints against Redmond. A Yale administrator advised the student that Yale had taken steps to ensure that Redmond would have no further contact with Yale students.[147]

c.    Student C[148]

Student C, one of Redmond's Morse advisees, was the subject of a disciplinary proceeding as a freshman. Redmond offered the student advice about his proceeding, which the student appreciated at the time because he was struggling and felt overwhelmed and concerned about his future.

As a rising Yale sophomore, Student C worked in St. Kitts during the summer and shared a bedroom with Redmond. The student described how one night, after he had been drinking with Redmond, Redmond applied aloe to his back while the student was in bed. Unlike other nights, however, Redmond asked the student if he could pull down his underwear. "Feeling trapped," the student said "yes." Redmond then touched the student's penis, prompting the student to "squirm away" and leave the room. The student did not raise the incident with Redmond, but he felt uncomfortable and decided to leave St. Kitts earlier than expected. He fabricated an excuse that a family member's illness required him to return to the United States. An SKBRF employee confirmed the student's early departure.[149]

The student maintained a relationship with Redmond throughout college (including by working in Redmond's New Haven lab and in St. Kitts during a winter break) and after graduation, in part because he wanted to secure a recommendation letter from Redmond for his medical school application. Redmond also provided financial and other support, which the student needed.

Redmond funded trips,[150] facilitated a paid position for the student in his New Haven lab, gave the student a credit card and authorized expenditures of $100 per month, and just recently offered the student additional financial support. Emails between Redmond and Student C corroborate some of this information.[151] At times, the student felt that in some ways they had a "grandfather-grandson relationship." But he now believes Redmond treated him like a "pet." The student feels "disgusted," and has sought counseling.

### d.    Student D[152]

Student D worked as a full-time research assistant in Redmond's New Haven lab while completing several Yale undergraduate course credits. The student was vulnerable due to an unstable family and financial situation. He struggled with depression and took antidepressants for a period of time, which Redmond knew. In New Haven, Redmond encouraged the student to take naked saunas with him in the Yale gym, and naked baths together in his house. The student felt uncomfortable, but agreed. Redmond had become a male role model and Student D convinced himself this "must be what guys do."

Student D went to St. Kitts for approximately two weeks in consecutive years. During his second trip, Redmond and the student shared a bedroom in the separate hut at the facility. On the last night of the trip, Redmond provided a bottle of champagne that they split to celebrate the student's admission to medical school. (Redmond had written a letter of recommendation in support of his admission.) The student recalls sitting on the back deck of the hut drinking the champagne with Redmond, but does not remember the rest of the night. The next morning, he woke up to find moisture in his underwear and gel on his penis. He confronted Redmond, asking him what had happened. Redmond deflected, saying something like, "we had a nice time." The student felt violated and believes that Redmond, at a minimum, fondled his penis. He does not know whether he passed out from alcohol (or possibly a "roofie" or another drug placed in his drink) or has simply blocked out the memory as a defense mechanism. His travel back to the United States that day was tense with Redmond continually asking him why he was angry. Once at medical school, he told Redmond to stop contacting him. They have had no further contact.

During medical school, the student described the incident to his then-girlfriend, who confirmed his account when we interviewed her.[153] Years later, the student reported it to therapists, which we also confirmed.[154] The student believes Redmond is a "predator," but also questions how, as a "grown man" he had allowed himself to be Redmond's victim.

The student is now a practicing physician.

### e.    Student E[155]

Student E shared a bedroom with Redmond while working in St. Kitts during the summer as a rising junior at Yale. After drinking heavily with Redmond one night,[156] he fell asleep in his bed, wearing only underwear, and awoke to find Redmond hovering over him and touching his chest and arms. The student said "what are you doing?" Redmond responded that he was applying mosquito repellent. As Redmond's hands moved to the student's legs, he remembers thinking that he would go to sleep and "not deal with this." The student then fell asleep. He believes that

Redmond touched his penis, but does not remember additional details about the night. He did not raise the incident with Redmond.

When the student returned to Yale, he worked in Redmond's lab for the remainder of the summer, once asked Redmond for a recommendation letter, and occasionally had dinners with Redmond, usually accompanied by friends.[157]

A few years later, he told a fellow Yale student that after drinking with a Yale professor, he woke up and felt that he had been physically violated by the professor.[158] He was reticent to discuss the incident in any detail.[159] The fellow student confirmed to us that Student E shared this information.[160] After our investigation was announced, Student E told this friend that the professor was Redmond.[161]

While Student E's recollection of the incident is somewhat less detailed and allows for less corroboration, we found his account to be credible and include it with the other reports of assault, in part because it is markedly similar to the others and fits Redmond's pattern of abuse.

### 2. The Medical Exams

Redmond conducted genital and/or rectal examinations on three students under the guise of performing medical examinations. Two examinations occurred in the 1990s and one occurred recently. We consulted with two independent medical experts, Dr. Wayne Altman and Dr. Stanley Sagov, who concluded that the examinations were inappropriate.

Dr. Wayne Altman is the Chair of Family Medicine at Tufts University School of Medicine, sees patients two times a week in private practice at The Sagov Center for Family Medicine, and is on the medical staff of Mount Auburn Hospital and Cambridge Health Alliance. Dr. Sagov is the Chief of Family Medicine at Mount Auburn Hospital and preceptor of the Family Medicine Residency at the Cambridge Health Alliance. He teaches at Harvard, Tufts, University of Massachusetts, and Boston University Medical Schools. In the 1990s, Dr. Sagov treated patients in family practice and hospitals. We consulted with Dr. Sagov about the exams that took place in the 1990s because he was practicing at that time and could more fully opine on contemporaneous standards of care.

### a. Exam 1[162]

As noted above, Student D visited St. Kitts twice in consecutive years. Upon arriving at the facility for the first trip, Redmond advised the student, who was healthy, that he needed to conduct a physical exam as part of "standard intake." He examined the student in one of the facility's buildings, a non-clinical setting. The student was given a gown to wear and Redmond wore gloves. In addition to other body checks, Redmond conducted a genital exam and a rectal exam. Prior to the rectal exam, the student questioned whether the exam was necessary, and Redmond stated it was part of a normal physical. The student felt uneasy and ashamed, but wondered whether he was overreacting and misjudging the situation given Redmond's medical license.

When interviewed separately, Dr. Altman and Dr. Sagov both advised that it was inappropriate and not medically necessary for Redmond to conduct a physical exam on a healthy

student prior to a short research trip. They also stated that it was inappropriate because Redmond is a non-practicing physician, did not have an established physician-patient relationship with the student, and conducted the exam outside of a medical facility.

Dr. Altman stated that a rectal exam on a young male is not an accepted part of a physical exam and that conducting a genital exam as part of a physical is not best practice by today's standards.[163] Dr. Sagov opined that, in the 1990s, a doctor would not include a rectal or genital exam as part of a physical unless there was a specific concern, such as a change in stool, or a concern that the patient could exacerbate a genital injury during sports. Such concerns were not present in this case.

b.   Exam 2[164]

A Yale rising sophomore worked at SKBRF during the summer in the 1990s. One day, he cut his forehead and scraped the side of his body in a motorcycle accident. Redmond took the student to the town's hospital where he received stitches on his forehead. Later that night, Redmond said he should conduct a "neurological exam" to check for a possible concussion. During the exam, Redmond touched the student's upper genitals and buttocks. The student told other interns about the exam shortly thereafter.[165] When we interviewed the student, he stated that the exam felt clinical and he does not feel as though he was molested. However, he suspects a genital exam is not a normal part of a neurological exam and cannot think of any purpose for the exam because he did not complain of pain in his genital area.

Dr. Altman concluded that this exam was inappropriate. He advised that it is reasonable for a physician to conduct a neurological exam after a motorcycle accident, but that a genital exam is not an accepted component of a neurological exam. A leading medical textbook supports this proposition.[166] Dr. Altman added that he would not conduct a genital exam in this scenario because the student did not complain of an injury to his genital area. Dr. Sagov similarly concluded that the exam was inappropriate, basing his opinion on the fact that there was no established physician-patient relationship, the student did not request the exam or complain of a genital injury, and the student had already received stitches at a hospital, which reduced the need for Redmond to conduct a later exam.

c.   Exam 3[167]

A Yale rising junior who worked in St. Kitts for a summer described experiencing a bout of diarrhea followed by one week of constipation during the summer. On approximately the seventh day, the student experienced severe stomach pain and did not go into work. The student was able to drink fluids but could not eat solid food. Redmond checked on the student, asked about the student's symptoms, and manually palpated the student's stomach, observing faint bowel sounds and no rebound tenderness. Redmond told the student that he should do a rectal exam to rule out appendicitis and fecal impaction. The student said in substance, "I'd rather not" and "I don't think it's necessary," but ultimately consented because Redmond insisted it was medically prudent. Redmond wore gloves and performed a 15-20 second rectal exam. He did not find any evidence of appendicitis or impaction. Later, and without warning, Redmond put a laxative in the student's drink. (He admitted doing so when the student questioned the odd taste of the drink.) The student fully recovered.

Dr. Altman opined that the exam was inappropriate. He noted that appendicitis was an unlikely diagnosis, but found it reasonable for Redmond to consider appendicitis or impaction given the symptoms. While he acknowledged that a rectal exam is a recognized technique for evaluating appendicitis and impaction, Dr. Altman stated that most physicians, including himself, would not do a rectal exam as part of their evaluation because there are other suitable diagnostic tests and a rectal exam does not increase diagnostic accuracy.[168] Dr. Altman considers the patient's history, an abdominal test, and a CT scan or ultrasound to be sufficient for diagnosing appendicitis and impaction.

Notably, Dr. Altman concluded it was "odd, inappropriate, and excessive" for a non-practicing physician to do an "extensive test" like a rectal exam. The fact that the nearest hospital was approximately twenty minutes away by car and did not have American standards of care did not change Dr. Altman's opinion. The student could have been taken to a hospital and, if necessary, transported to a suitable medical facility.

### 3. Other Sexual Misconduct

Redmond engaged in additional sexual misconduct as described below. We found these students' reports of misconduct to be credible, not only because the students themselves were credible witnesses, but also because their accounts were strikingly similar and reflect Redmond's pattern of misconduct. The conduct here occurred in St. Kitts unless otherwise noted.

### a. Student F[169]

Redmond created an unnerving environment for Student F by repeatedly crossing appropriate boundaries when the two shared a bedroom in St. Kitts. In addition to undergoing Exam 3 described above, the student was uncomfortable when walking into their shared bedroom to find Redmond masturbating or waking up to find him masturbating in bed; when Redmond asked about the student's masturbating practices and sexual fantasies; and when Redmond gave the student unwanted massages and extended hugs. Redmond also complimented the student's appearance ("you are nice to look at") and expressed deep affection ("I love you"). During the summer, Redmond gave the student, who had limited finances, spending money, which made the student feel indebted to him.

Multiple witnesses corroborated Student F's account. The student told two other summer interns about some of Redmond's conduct during the summer.[170] Upon returning to Yale, the student also reported the conduct to a psychologist and a Yale professor. With the student's permission, the psychologist confirmed that the student's account to her was consistent with the account given to us.[171] The Yale professor, with the student's permission, recounted how the student broke down crying during office hours at the start of the academic year, revealing that Redmond had "sexually harassed" the student.[172] As a mandatory reporter, the professor relayed the student's account to a Yale Title IX coordinator.[173] Several weeks later, the student reported to an SKBRF manager that the student was sexually harassed by Redmond, but did not provide details. The student ultimately filed a formal complaint with the University, which led to an investigative proceeding and Redmond's retirement.

19

The professor believes that Redmond harmed the student emotionally and academically. But for Redmond's sexual misconduct, Redmond and Student F likely would have published a scientific paper they were working on together over the summer.[174]  The student had contributed significantly to the paper, but ultimately abandoned it to avoid Redmond, despite Redmond's persistent entreaties that the student complete work on the paper.[175]

b.     Inappropriate Touching

We received multiple reports that Redmond inappropriately touched students.  One student, who did not attend Yale and worked at the St. Kitts facility in the 1990s as a rising sophomore, recounted two instances.[176]  First, on the last night that the student shared a bedroom with Redmond in the hut, Redmond provided a bottle of champagne as a "celebration" and drank it with the student.  As the student was later falling asleep, he felt Redmond running a hand across his chest down to his navel, at which point the student turned away and passed out, he believes possibly from alcohol.  He does not know exactly what happened but believes Redmond may have touched his penis.  Several days later, he called his parents to tell them what had happened, describing Redmond as a "molester."  The student's father confirmed the student's account.[177]

A few days later, the student was bitten on his back by a centipede.  He asked Redmond to apply an antidote lotion that Redmond had developed.  Redmond rubbed the lotion down the student's back and underneath his boxer shorts on his buttocks, even though the bite was not near that area.[178]  The student reported both incidents to fellow interns[179] and again during the 1994 investigation.[180]

Another student, who worked in St. Kitts as a rising junior in the 1990s, shared a bedroom with Redmond in the hut.[181]  He described how he was lying on his bed in his swimsuit after going for a run in the rainforest when Redmond came over to the bed and pulled down the student's swimsuit.  The student responded with shock, prompting Redmond to claim he was "checking for ticks."  The student pulled up his swimsuit and told  Redmond he did not need the check.  The student later demanded to move into the main residence with the other interns, and Redmond consented.

Several other students described Redmond offering to rub aloe on their bodies or give them massages.[182]  Although these offers made them uncomfortable, they felt compelled to accept some of them.[183]  Two students reported that Redmond sometimes quickly touched their genital area during a massage.[184]  One of them said Redmond once patted his penis during a massage and said, "don't worry, you'll have to pay more for that."[185]  After Redmond again touched his genital area during another massage, the student was cold to Redmond, who said, "Why are you mad at me?  I didn't mean to tag your testicles."[186]

Five students recounted feeling uncomfortable about Redmond's conduct in SKBRF's swimming pool.  Three students, one in the 1990s and two in the 2010s, explained that Redmond orchestrated a "King of the Wall" game, during which players attempted to knock others off a ledge and into the water.[187]  In the water, Redmond grabbed one student's body and another student's crotch.[188]  The third student said that he did not play the game because he felt uncomfortable with Redmond getting physical with the students.[189]  A fourth student shared that

Redmond wrestled him in the pool,[190] and a fifth observed Redmond get extremely physically close to another student while playing water polo.[191]

c.  Spying

A high school student working at SKBRF reported that late one night a few weeks into his stay, he was in the bathroom masturbating when he saw a "thin older white face" watching him through a window.[192]  The student called out and the person disappeared.[193]  Afraid and feeling he was "in danger," the student woke a fellow intern to tell him what had happened.[194]  He also contacted his mother, who corroborated this account.[195]  The next morning, he reported the incident to an SKBRF manager and said that he wanted to leave St. Kitts.[196]  The manager offered to have the student stay at his house outside the facility and drive the student to the airport the next day.[197]  The student accepted both offers and left.[198]

While the student is not able to confirm who spied on him, the circumstances suggest that it was Redmond.  The only other white male at the facility that night was Scientist 1, who was staying in a different building detached from the main residence.[199]  Redmond later emailed the student's mother saying "prowlers" might be responsible as they sometimes "come over the [facility] fence" and "avoid the attention of our guard dogs" on the property.[200]  Neither the student nor his mother credited Redmond's explantation, particularly because no one had ever reported a concern about prowlers, and, in any event, a prowler would most likely have been black as most Kittitians are.[201]  Further, in an effort to minimize the event, Redmond dismissively told the remaining interns that the high school student "had been imagining things and they should move on."[202]

Another student, a Yale undergraduate who worked in St. Kitts and in Redmond's New Haven lab, attended an international research conference with Redmond.[203]  After the conference, Redmond paid for them to vacation in other international cities.[204]  During the trip they shared a hotel room, and once, while the student was taking a bath, he observed Redmond spying on him through a crack in the bathroom door.[205]

d.  Interactions in Baths and Hot Tubs

Several students described incidents with Redmond when they were naked or not fully dressed.  Three of them stated that Redmond encouraged them to join him in a bath/hot tub in his New Haven house (including Student D, described above).  One student recalled watching a movie at the house when Redmond suggested they go in the tub.[206]  The student initially resisted, but then agreed.[207]  Another student described being in the tub while Redmond massaged his shoulders.[208]  In addition, Student C explained that during a trip to a research conference, after Redmond persuaded him to go in a hotel hot tub, Redmond moved within touching distance of him, prompting him to immediately leave the tub.[209]

e.  Sharing Bedrooms

As previously discussed, Redmond shared bedrooms with students at the St. Kitts facility and elsewhere.  Four students described Redmond undressing in front of them;[210] four recounted him walking around or sleeping naked in the bedrooms.[211]  One student, who shared a bedroom with Redmond in the hut in the 1990s, described how Redmond would hang around the hut's

outdoor shower, which did not have a wall and was exposed on one side, while the student was showering.[212]  The student took to wearing a swimsuit during showers.[213]

Students described sharing a hotel room with Redmond in the Caribbean island of Nevis;[214] during research conferences;[215] and at the Yale Club of New York City, where Redmond sometimes invited students, treating them to a Broadway show or other cultural performance.[216] Redmond arranged and paid for the accommodations for these trips and invariably booked only one room.[217]  One student stated that Redmond occasionally booked hotel rooms with only one bed, requiring the student to sleep in the same bed with Redmond.[218]  Another student described Redmond encouraging the student to sleep in his bed with him, after a party at his New Haven house.[219]

### f.    Expressing Affection and Compliments

Redmond expressed intimate affection for students, which made them uncomfortable.  For example, after drinking together, he stated to one student in substance, "I'm so glad you're here, it's been great working with you, and I've been wanting to say that I love you for a while."[220]  Four others recounted that Redmond told them, "I love you."[221]  One noted that Redmond was crying when he said it.[222]  Two students described waking up in a shared bedroom to Redmond gazing at them: one stated he looked "doe-eyed,"[223] and the other said Redmond cupped his face, looking at him longingly and "sexually."[224]

Redmond also complimented students' physical appearance,[225] telling one student, "your body is beautiful,"[226] another "those [swimming] trunks look nice on you—nice and tight" and "your arms look good."[227]  It was a running joke among the second student's fellow interns that Redmond "had a thing" for him.[228]

### g.    Sexually Explicit Remarks

Redmond also made sexually explicit remarks, which at the time or in hindsight made students uncomfortable.[229]  For example, one student said that Redmond asked him what type of pornography he preferred.[230]  Another recalled a party in New Haven where, while watching an episode of the television series Rome in Redmond's bedroom, Redmond noted that men and boys frequently had sex together in Roman times.[231]  While in St. Kitts, Redmond also made jokes at students' expense suggesting that they had been masturbating.[232]

### h.    Impact on These Students

These students who experienced Redmond's sexual misconduct reported a range of consequences.  For some, their involvement with Redmond was deep in the past.[233]  Some found that reliving memories once the complaints came to light was more difficult than anticipated.[234] Other students described how Redmond's misconduct had harmed them.  They reported having complex feelings stemming from their mixed experiences with Redmond, and having sought help from psychiatrists.[235]  On the one hand, Redmond was generous,[236] and had provided opportunities that helped students achieve their career goals.[237]  On the other hand, most students felt anger, shame, and resentment about how Redmond had mistreated them.  They questioned the value of their work with him, and felt guilty about having wanted to maintain the relationship for academic and career reasons.[238]

V.    The 1994 Investigation

We found that the 1994 investigation was flawed, but far more problematic was YSM's failure to institute a meaningful oversight mechanism to ensure that Redmond's interactions with students were monitored.  YSM convened a committee of three medical/public health professors that used *ad hoc* procedures to investigate the complaints, rather than the applicable Provost's Procedures, which, if followed: (1) would have afforded the students more rights; (2) created, at a minimum, the appearance of a more independent review; and (3) might even have prevented Redmond from manipulating the process (as discussed below).  As it is, the committee's weak recommendations and YSM's deficient implementation of those recommendations were wholly inadequate to prevent Redmond's further misconduct.

A.    The Inquiry Committee's Findings and the Settlement Agreement

In September 1994, upon returning to campus, the three Yale undergraduates from that summer's internship program promptly reported their complaints about Redmond, including that he sexually molested and harassed two students, to the then-Chair of the YSM Psychiatric Department ("Psychiatry Chair").[239]  They also gave him a copy of the "transcript" documenting Redmond's misconduct that they created during their meeting in St. Kitts.[240]  The Psychiatry Chair took notes of their complaints and reported the information to the YSM Dean's office.[241]  The then-Dean of YSM ("YSM Dean") and the Deputy Dean formed an *ad hoc* Inquiry Committee ("the Committee") and selected three professors from different departments in the schools of medicine and public health to be members of the Committee.[242]  A Yale Deputy General Counsel (the "DGC") participated in all of the Committee's work as a legal advisor and provided guidance on procedural issues.[243]  We interviewed the Psychiatry Chair, the Deputy Dean, one Committee member,[244] and the DGC.  The YSM Dean and the other Committee members died before our investigation began.

The students made five complaints: (1) that the academic program was inadequate and not as represented by Redmond; (2) that Redmond behaved in a sexually manipulative way; (3) that Redmond caused or encouraged the students to be exposed to inappropriate physical risks; (4) that Redmond behaved in an irresponsible and unprofessional manner by not observing appropriate interpersonal boundaries; and (5) that Redmond sexually molested two male interns.[245]  The Committee interviewed eight witness: the three Yale interns, one intern from Harvard, two YSM students who had previously worked at SKBRF, Professor 1, and Redmond.[246]  The DGC assisted in preparing written summaries of each witness's interview, which the witnesses reviewed for accuracy and signed.[247]  The Committee interviewed one of the interns who alleged sexual molestation, but was unable to interview the other student because Redmond and that student were negotiating a Settlement Agreement that prohibited the student (and Redmond) from discussing the incident.[248]  Redmond, who was represented by counsel when interviewed by the Committee and throughout the investigation, categorically denied any wrongdoing.[249]

It took a year for the Committee to issue findings.[250]  The delay was caused in part by the Committee's repeated but unsuccessful attempts to interview the student who ultimately settled with Redmond.[251]  In a written report, the Committee did not find convincing evidence for the first or second complaint, but found that Redmond should have prevented the excessive alcohol consumption that occurred during the summer (third complaint) and concluded that Redmond

"fail[ed] to maintain professional and appropriate boundaries between himself and his students" (fourth complaint).[252]  The Committee also appropriately concluded that Yale "must consider itself accountable for . . . events . . . at the St. Kitts facility" as long as Yale is "administratively responsible" for the funded research there and Redmond and other faculty work there.[253]

With respect to one of the molestation claims, the Committee determined that the student's account and Redmond's account were "equally credible."[254]  The Committee declined to draw conclusions regarding the other molestation complaint.  It found "ample evidence" that the student told the other interns that Redmond had "touched him sexually" and that the experience had "upset him greatly."[255]  But the Committee stated it was "unable to make findings" because the student and Redmond could not speak to the allegation under the terms of the Settlement Agreement.[256]

When interviewed in this investigation, the DGC stated that the Committee could have confirmed the second molestation claim on the basis of the other student witnesses' reports.[257]  The three Yale interns each stated that the student promptly, and in detail, reported Redmond's conduct to them, and the Committee credited their statements, which were corroborated by the "transcript" they provided to the Committee.[258]  The DGC added that although such hearsay information would have been sufficient to confirm the molestation claim, he did not recall advising the Committee members that they could make the finding on that basis and believes it was reasonable for them to have declined to make any finding because they were unable to interview the student.[259]

The Committee's report included three recommendations: (1) that the St. Kitts summer program for students be suspended until an enforceable alcohol policy was established, and facilities were developed that always provided for separate housing for male and female students, and for students and faculty; (2) that YSM "develop[] a mechanism to monitor the Program" to ensure "the well-being of the students is given highest priority;" and (3) that Redmond be reprimanded for failing "to set and maintain acceptable professional boundaries between himself and his students" and that he be given guidelines for establishing such boundaries.[260]

Prior to the issuance of the report, Redmond advised the Committee that the St. Kitts summer research program had been terminated.  Redmond reiterated this claim in a letter to the YSM Dean before the Dean made a decision on the Committee's conclusions and recommendations.[261]  He stated "the summer research program [had been] abolished by action of the Axion board of directors in the Spring of 1995 because of concerns over liability and insurance issues for facility-related illness or injury" and that "[t]here [were] no plans to reinstitute that program."[262]  However, Redmond carved out an exception stating that "individual investigators may, from time to time, be accompanied by students who will work with them on their research projects."[263]

Redmond also confirmed that "Axion's board of directors enacted a housing policy in the Spring of 1995 that requires separate facilities . . . for faculty and students, should any students be at the facility."[264]  Redmond's representation that there was a new housing policy was supported by a letter, dated May 23, 1995, from Professor 1, who at that time was on the boards of both Axion and SKBRF, addressed to Redmond, which confirmed that the policy would be adopted and "added to the [Policies] and Procedures Manual in St. Kitts."[265]  We were unable to determine whether this letter was ever given to the Committee, though it was in the file of the 1994 investigation.

The Committee and other YSM administrators did not independently verify whether the research program was abolished or the housing policy was enacted. In an effort to confirm whether Axion actually took these actions, we requested meeting minutes of the Axion Board of Directors from Axion's legal counsel. He declined to provide copies, but represented that he had reviewed all available meeting minutes and that they do not include any references to the termination of the internship program or a post-1995 SKBRF housing policy mandating separate housing for faculty and students.[266] We also asked Axion's legal counsel and an SKBRF manager for historical versions of the SKBRF Policies and Procedures Manual. We received versions effective as of 1999 and 2005, which we were told are the only historical procedures relating to housing that were located.[267] Both versions include a provision requiring that "researchers and faculty over 21 not share bedroom facilities with Foundation students who are under 21 years of age."[268]

Shortly after the Committee issued its report, Redmond executed the Settlement Agreement in which he promised to "eliminate the program," "not recruit students to work with him at St. Kitts," "abide by Axion's policy providing for separate housing" for faculty and students, and "not be the supervisor of any students" "working or studying at St. Kitts" with other investigators.[269] Although Redmond and the student were the sole parties to the Agreement, it included an enforcement provision under which Professor 1, in his capacity as an Axion Director, "acknowledges that Axion will enforce" Redmond's agreements to terminate the program and to stop recruiting and supervising students. Professor 1 also signed the agreement on behalf of Axion.[270]

B.    The YSM Dean's Decision and the Failure to Monitor Redmond

In a letter to Redmond, dated January 16, 1996, the YSM Dean accepted the Committee's factual findings and conclusions, and addressed its recommendations.[271] Regarding the recommendation that the program be suspended until alcohol and housing policies were adopted, the Dean was satisfied with Redmond's representation that a separate student/faculty housing policy was adopted in 1995, and advised Redmond to adopt a written alcohol policy.[272] As for the monitoring recommendation, the Dean wrote that "although the formal program has been discontinued, you have pointed out that individual investigators may, from time to time, be accompanied by students who will work with them on their research projects."[273] The Dean thus required one of the Committee members to periodically meet with Redmond to discuss student activity at St. Kitts and to report any problems to the Dean. Finally, the Dean stated that his letter to Redmond would constitute the recommended reprimand and asked another Committee member to meet with Redmond to advise him on appropriate boundaries.[274]

In addition, the YSM Dean instructed the Deputy Dean to inform the student complainants that the Committee had concluded its investigation and the Dean had taken "appropriate action," but that under Connecticut law governing personnel records, no further details could be disclosed without Redmond's consent.[275] Neither the Yale students nor the Deputy Dean recall whether the Deputy Dean or anyone else relayed this information to the students.[276] One student expressed understandable frustration that he never heard the results of the investigation.[277]

Approximately five months later, the assigned Committee member had a telephone conversation with Redmond about student activity at SKBRF.[278] Redmond advised him that there were no students in 1995 and that one postdoctoral trainee would be accompanying Professor 1 to

St. Kitts in the summer of 1996. The Committee member reported this back to the YSM Dean.[279] We found no evidence that YSM took any independent steps to confirm Redmond's representations. In light of the fact that the Committee member planned to retire in a year and the YSM Dean was leaving his position shortly, the member suggested in writing that Yale "develop a reasonable long-term oversight mechanism to apply to any and all 'off site' student programs which in one way or another involve Yale."[280] The YSM Dean agreed with this suggestion.[281] Several months later, in a letter to Redmond, dated August 6, 1996 and copied to the Committee member and the Deputy Dean, the YSM Dean stated that he would ask the Deputy Dean "to explore developing such a mechanism to replace the *ad hoc* oversight of the St. Kitts program developed pursuant to the inquiry."[282]

When we interviewed the Deputy Dean, he acknowledged that he never implemented any monitoring mechanism for the St. Kitts program or any other off-site student program.[283] He did not recall being asked to create such a mechanism, but acknowledged that the August 6, 1996 letter effectively assigned him the responsibility to do so.[284] He has no specific memory of why he took no further steps, but, like others, he seems to have been lulled into a false sense of confidence that Redmond had permanently terminated the program.[285]

From an administrative standpoint, the Psychiatry Chair might have been the most logical person to oversee Redmond's conduct in St. Kitts. He was Redmond's supervisor, and was also aware of the students' complaints and the Committee's findings.[286] However, he stated to us that he was never asked to monitor Redmond's conduct and we found no evidence to the contrary.[287]

In short, no one at YSM took any ongoing responsibility for ensuring that the program had in fact permanently closed or that Redmond's misconduct had stopped. The YSM administration heard no further complaints about Redmond or the program and did not revisit the issue. In 1997, a new Dean from outside of YSM took over the school's leadership. No one at YSM told him or the new associate dean for administration about the investigation or the discipline imposed on Redmond.[288] Somewhat surprisingly, outgoing YSM administrations, at least at that time, did not provide substantive briefings to incoming administrators.[289]

For several years, Redmond appears to have abided by his representations that the internship program had been terminated. But beginning in at least 2001[290] and through the summer of 2017, he consistently violated the SKBRF housing policy, the Settlement Agreement, and his representations to YMS. He recruited students to work with him in St. Kitts, supervised some of their work, oversaw them during non-work hours, and continued to have students sleep in his bedroom just as he had before the reprimand.[291]

In retrospect, the remaining Committee member recognizes that someone at Yale should have been responsible for monitoring Redmond and the interns at SKBRF.[292] Her recollection was that the Committee had recommended that the program be closed rather than merely suspended, although when she reviewed the contemporaneous documents, she acknowledged that her recollection was incorrect.[293] The DGC also recognizes, in hindsight, that the written reprimand and minimal monitoring were insufficient.[294]

We conclude that YSM's response to the 1994 complaints was wholly inadequate. Requiring only the suspension of the internship program until a new housing policy was adopted

was far too weak of a remedy.  YSM made no effort to independently verify that the policy was ever implemented; and the YSM Dean knew that Redmond had left open the possibility that students would accompany professors, including Redmond himself, to St. Kitts "from time to time."[295]  The YSM Dean was too willing to accept Redmond's promises at face value and without scrutiny.  Most of all, there was a systemic failure to monitor Redmond's interactions with students in St. Kitts.  YSM further neglected an opportunity for institutional introspection regarding the monitoring of professors during off-campus programs to better ensure students' well-being.

### C.    Procedural Observations about the 1994 Investigation

We find that YSM should have used the established, university-wide Provost Procedures to address the complaints rather than rely on *ad hoc* procedures guided by the DGC.  At the time of the investigation, the Provost Procedures were most applicable as they governed student complaints, including sexual harassment complaints, against faculty members who are not members of the complainant's school.[296]  The 1994 complaints fell under the jurisdiction of the Provost Procedures because they were raised by Yale undergraduates against a YSM professor.[297]  We raise this not simply as a procedural matter, but because the Procedures would have resulted in more equal treatment for the students and a more thorough process, and potentially more meaningful oversight of Redmond.

As an initial matter, the Provost Procedures would have brought greater visibility to the process, and created, at a minimum, the appearance of a more independent and balanced review.  At the outset, the students would have been required to file a written complaint with the Yale College Dean making the College aware of the matter, rather than keeping it solely within the jurisdiction of YSM.[298]  Instead, the investigation and its conclusions were ultimately—and in our view, inappropriately—siloed in the Medical School.

If the College Dean was not able to resolve the matter to the students' satisfaction, the complaint would have been escalated to the Provost and referred to the Provost's Advisory Committee on Student Grievances ("the Provost's Committee").[299]  The Provost's Committee was a standing committee composed of six members appointed annually by the Provost, including two students, one from Yale College and one from the Graduate or Professional Schools, at least two faculty members, and two administrators, staff or faculty.[300]  Redmond and the students would have been able to challenge members for cause.[301]  We have no reason to believe the members of the Inquiry Committee were biased in their review of the complaints, but their findings and recommendations might well have benefited from the input of a more diverse group.

In meetings with the Provost's Committee, both the students and Redmond could have been accompanied by a non-legal advisor from the Yale community, whereas in the Inquiry Committee's interviews, Redmond had an attorney while the students had no advocate.[302]  Under the Provost Procedures, both Redmond and the students would have been able to read the findings of fact, conclusions, and summary of testimony, and to suggest clarifications, but neither party would have been entitled to a copy of the report.[303]  The Provost would then have made a decision and conveyed that decision in writing to the parties.[304]  In contrast, during the Inquiry Committee's investigation, Redmond received a draft copy of the report and gave the YSM Dean his written comments relating to its findings and recommendations, some of which the Dean adopted;[305] while the students never saw a copy of the Report.[306]

27

Finally, the YSM Dean decided that one copy of the Committee's report and the reprimand letter would be kept in a "sealed file" in the YSM Dean's office and one copy of the complete investigatory file would be kept in the OGC.[307]  All other copies were destroyed.[308]  His decision seems to have been made to appease Redmond's concern about the "eventual disposition" of the Committee's files and "public disclosure" of the investigation and its conclusions.[309]  At the time of our investigation, the "sealed file" in the Dean's office could not be located.  The copy in the General Counsel's office might never have surfaced, but for the persistence of the decision-maker in Redmond's recent 2018 disciplinary process who asked that office to conduct a further search for any information about Redmond.  If the Provost Procedures had been followed, the Provost's office might well have weighed in on the importance of creating a permanent record of Redmond's misconduct and discipline.[310]  When interviewed, the DGC expressed his regret (and took some responsibility) for the fact that the record of the 1994 investigation had been sealed.[311]  He stated that Redmond's discipline should have been made "part of the record" and "taking it out of the record risk[ed] making it less effective."[312]  As he recognizes, by putting the record of the 1994 investigation in "a locked box," "the system failed here."[313]  Redmond knew the records would likely never see the light of day and took full advantage of it.[314]

VI.    Other Missed Opportunities

We found no evidence that anyone in Yale's administration had actual knowledge of Redmond's sexual misconduct before it was reported or that anyone affirmatively covered up for Redmond knowing that he had committed sexual misconduct.  There were, however, incidents and indications that should have prompted certain of Redmond's colleagues—particularly Professor 1—to scrutinize Redmond's conduct.  Appropriate scrutiny might well have detected and possibly prevented further misconduct.

A.    Professor 1

As noted above, Professor 1 has closely collaborated with Redmond for over 35 years, been a member of the Axion and SKBRF boards since their inception, and became the acting president of Axion when Redmond stepped down from that position.  He was interviewed during the 1994 investigation and signed the Settlement Agreement on behalf of Axion in 1995.[315]  We find Professor 1's conduct to be particularly concerning because: (1) he did not confront, or seek further information from, Redmond about the 1994 complaints; and (2) he failed to enforce the Settlement Agreement and the SKBRF housing policy.

When we interviewed Professor 1, who was represented by counsel during the interview, he stated that he did not recall discussing the 1994 investigation with Redmond at the time or being interviewed by the Committee.  The summary of his 1994 interview does not discuss his knowledge of, or reaction to, the sexual molestation charge except to say that Professor 1 "heard indirectly, not from [] Redmond, that a student had claimed that [] Redmond had sexually harassed him."[316]  Professor 1 told us that a Committee member informed him that a complaint of sexual harassment was made, but he did not know the details.  He recalled seeing a picture of Redmond with his arm around a female intern, which he thought was innocuous.  He also acknowledged that at some point he had heard that Redmond shared a bedroom with students.  While Professor 1 thought this was "a bad idea," he never discussed it with Redmond.

Professor 1 knew that Redmond had represented to Yale that Axion had adopted a separate housing policy at SKBRF as a result of the investigation. While serving on the boards of Axion and SKBRF, [317] Professor 1 wrote a letter to Redmond, dated May 23, 1995, stating the new policy would be endorsed by the Axion board.[318] Professor 1 admitted, however, that he did not know whether the policy was ever actually implemented.

Professor 1 emphasized that the SKBRF summer internship program was abolished after the investigation. When we pointed out that Redmond nevertheless continued to bring students to St. Kitts for almost twenty years, Professor 1 drew a distinction between "the program"—which he described as a summer student experience to conduct basic science and assist with ongoing projects under a team of investigators—and students accompanying Redmond to St. Kitts on an *ad hoc* basis to assist with individual research projects. He asserted that "the program" stopped after 1994 and that Redmond's ongoing work with students in St. Kitts was not prohibited by the recommendations of the Inquiry Committee. We find this distinction to be artificial and meaningless, as the entire purpose of ending the program was to ensure that Redmond would no longer interact with students in St. Kitts.

Professor 1 did not recall ever seeing or signing the Settlement Agreement, but does not question that it contains his signature. Through his counsel, he claims that he did not read the Agreement before signing it because if he had, he would have remembered its content. He provides no explanation for why he would have signed the Agreement without reading it. In any event, he acknowledged that the Agreement imposes restrictions on Redmond, and directs the student to contact Professor 1 if he believes Redmond breached the Agreement. Further, the Agreement states that "[b]y signing this Agreement on behalf of Axion, [Professor 1] acknowledges that Axion will enforce" it.[319] Professor 1 recognizes that Redmond violated the contract in that he continued to recruit, supervise, and share a bedroom with students in St. Kitts. From 1995 to 2017, although Professor 1 was only occasionally at SKBRF and rarely there in the summer months, he was generally aware that a number of Yale students worked on research projects with Redmond and that some of them likely did research in St. Kitts.[320]

In sum, Professor 1 failed to enforce the Settlement Agreement or the SKBRF housing policy during a time when he was an Axion and SKBRF board member and continued to be Redmond's research partner. If he had taken a more proactive and responsible role, he might well have uncovered, at a minimum, Redmond's violations and potentially stopped further abuse.

B.    Scientist 1[321]

Scientist 1 is the president of Company 1, a for-profit research company that uses SKBRF resources and facilities. He has worked with Redmond for over 25 years and is a Yale adjunct professor with no teaching responsibilities. While Scientist 1 did not have any actual knowledge of Redmond's misconduct, when he learned of instances where SKBRF interns were upset about an interaction with Redmond, he failed to investigate or to press Redmond and the students for details. Had he done so, he too may have uncovered Redmond's misconduct.

Scientist 1 has taken hundreds of research trips to the SKBRF facility since 1989 when he first visited as an undergraduate student. He visited only sporadically until 2003, but since then has gone to the facility regularly. During trips, Scientist 1 stayed in a building separate from the

residential building where Redmond and students slept.  When interviewed, he stated that he does not know of any specific student who shared a bedroom with Redmond, except for Student F (who reported Redmond's misconduct to SKBRF after the internship concluded, which ultimately ended the program).  Nevertheless, Scientist 1 should have been more attuned to the possibility of inappropriate sleeping arrangements and investigated where students were sleeping because he was aware that there were limited bedrooms in the residential building, and he himself had shared a bedroom with Redmond at the facility in the 1990s.

Further, there are three incidents relating to St. Kitts interns that involve, to differing degrees, Scientist 1.  First, in the 2010s, Scientist 1 learned that Student B (whose experience is described above) became upset while working in St. Kitts.  Scientist 1 remembers Redmond alerting him, without providing any details, that the student was upset, and Scientist 1 surmised that it was due to a personal conflict with Redmond.  According to Scientist 1, he asked the student "if he was okay," and the student responded that he was "ready to leave" St. Kitts.  The student has a different recollection of the conversation; he recalls telling Scientist 1, in substance, "I just want to be alone, I want my own room, and I do not want to interact with [Redmond] if I don't have to."[322]  The student did not reveal that Redmond sexually assaulted or harassed him.[323]  In any case, Scientist 1 did not ask either the student or Redmond any follow-up questions.  In hindsight, Scientist 1 acknowledged, he might have pressed harder for details.

Second, an SKBRF manager recalls emailing Scientist 1 and Redmond about the spying incident involving the high school intern.  He told them that the student saw someone spying on him in the bathroom and was now staying at the manager's house before leaving the island prematurely.[324]  The manager could not locate the email and did not have an in-depth conversation with Scientist 1 or Redmond about the situation.[325]  Scientist 1, who was staying at the facility at the time of this incident, had no specific recollection of the incident.

Third, several months after Student F's internship, the student reported Redmond's sexual misconduct, without going into details, to an SKBRF manager.[326]  The manager promptly emailed Scientist 1 and another SKBRF manager about the student's report, stating that Redmond and the student shared a bedroom and that there may have been "unwelcome sex."[327] Scientist 1 agreed to follow-up with the student but did not contact the student until seven weeks later.[328]  (He ultimately met with the student when next in New Haven).[329]  While the suggestion of "unwelcome sex" turned out to be overstated, Scientist 1 should have immediately contacted the student to address such a disturbing report.  His delayed response understandably concerned the student.  We recognize that after learning of Student F's report of sexual misconduct, Scientist 1, and the two SKBRF managers, became sufficiently concerned about Redmond's conduct that they ultimately ended the internship program.[330]

C.    Morse College Administrators

Redmond's interactions with his Morse advisees raised concerns for Heads and Deans of Morse College.  We emphasize that the Morse administrators did not have any actual knowledge of Redmond's sexual misconduct in St. Kitts or elsewhere.  But if the goal is to create a culture that is vigilant about preventing sexual misconduct, it is critical to recognize warning signs that should trigger further scrutiny and appropriate action.

One such sign was when Redmond proposed to share a bedroom with a St. Kitts intern. He invited a freshman advisee to St. Kitts for spring break and told the student that they would need to share a bedroom.[331] The student's parents objected to the proposed sleeping arrangement and advised him not to go.[332] They also reported their concern to the then-Morse Head in an email and at an in-person meeting at Yale, discussing their unease with the shared bedroom[333] and asking that their son be assigned a new advisor.[334] The Head respected their concerns and facilitated the assignment of a new advisor.[335] But the Head thought the parents were over-protective and internally minimized their concern, because he thought Redmond had been an exemplary advisor to other students.[336] Rather than brushing aside the parents' concerns, the Head should have investigated, spoken to Redmond, and carefully considered whether Redmond should continue to serve as an advisor.

The parents also told the Head that they understood Redmond was consistently assigned male advisees.[337] The Head reported back to them that several years of data showed no gender disparity.[338] In fact, our subsequent review of the available data revealed that approximately two-thirds of Redmond's advisees, from 1998 to the time of the parents' inquiry, had been male. Nonetheless, the Head recalled that either he or the Dean told Redmond that Redmond needed more female advisees.[339] Whether due to the administrator's intervention or otherwise, Redmond was subsequently assigned more female advisees, so that from 1998 to 2018 he was assigned roughly equal numbers of male and female advisees.

Later, a different Morse Head was concerned by Redmond's behavior during a male advisee's hospitalization and subsequent related disciplinary process. The Head felt that Redmond "inserted himself" in the situation and "disrespected" the authority of the Head and the Dean to determine discipline and remedial actions to ensure the well-being of the student and others involved.[340] The Head described how Redmond "seized" on the student when he was in a vulnerable state to garner both his affection and dependence.[341] Redmond's behavior caused the Head to direct the Dean not to assign Redmond any more male advisees, but the Dean failed to follow this instruction, and the Head did not follow up.[342] As a result, for a number of years, Redmond continued to have male advisees. When a male advisee was later hospitalized for psychiatric reasons and Redmond strongly advocated for his release, two Deans were taken aback by Redmond's response.[343] One Dean found Redmond's behavior to be a "little inappropriate" and interfering.[344] Although these Deans had the discretion not to assign any advisees to Redmond,[345] they failed to exercise it despite their unease with Redmond's behavior toward students.

It should be noted that Morse administrators may have minimized warning signs in part because they saw Redmond as a responsive and enthusiastic Fellow. He often attended Fellows' dinners, always volunteered to serve as an advisor, regularly arranged meetings and dinners with advisees, and offered more support than many other advisors.[346] And Redmond made it known that some students considered him a good mentor. For example, Redmond forwarded to a Morse Dean an email from a former advisee thanking Redmond for his recommendation letter and for providing the student with many opportunities.[347]

VII.    Redmond's Retirement from Yale

Part of our mandate was to investigate the facts and circumstances surrounding Redmond's departure from Yale.  As Yale's January 28, 2019 statement indicates, Redmond retired in July 2018 with disciplinary proceedings pending against him.  We reviewed the procedures used, the decisions made, and the conduct of the individuals involved in this disciplinary proceeding.  As part of our review, we specifically examined whether Yale administrators caused any delay in the proceeding in an effort to change the outcome in order to benefit Redmond.  We investigated that issue in part to address a concern raised in a March 5, 2019 Yale Daily News ("YDN") article that "the Provost allowed [Redmond] to retire[.]"[348]

Pursuant to university policy, the recent investigative and disciplinary proceeding concerning Redmond is confidential.  We believe it is important to abide by the policy and maintain the confidentiality of the proceedings so that the policy is perceived as one that is honored and on which future parties can rely.  Therefore, we will not report the details of the proceeding.  We will, however, share our conclusion that Yale did not engage in any inappropriate conduct with respect to the proceeding.  The delay in reporting the disciplinary outcome was caused not by an effort to permit Redmond to retire unscathed, but rather the discovery of the file documenting the 1994 investigation.  During such proceedings, it is standard to check with the respondent's school to determine whether the respondent has faced any prior discipline.[349]  Here, the standard check did not reveal the 1994 file or Redmond's reprimand letter.[350]  Only after the decision-maker asked the General Counsel's Office to conduct a further search for any information on Redmond did the file surface.[351]    After the file was discovered, Redmond was notified that Yale planned to implement punishment.[352]  Once notified, Redmond promptly submitted his retirement letter.[353]  Under these circumstances, and as faculty members may retire from Yale at any time, we conclude that Yale did not act inappropriately.

Following Redmond's retirement, the Provost sent him a letter outlining the restrictions that would accompany his retirement including that Redmond: (i) would not be voted for *Emeritus* status or eligible for any privileges associated with retired faculty; (ii) was banned from entering any part of the Yale campus or attending any Yale-sponsored events on or off campus; (iii) could have no direct or indirect contact with any Yale students, postdoctoral fellows, residents, or research associates; and (iv) could not represent himself as currently affiliated with Yale.  In addition, the Provost stated that SKBRF is prohibited from recruiting, inviting, or accepting Yale students for as long as Redmond is associated with SKBRF.[354]

Redmond has published several journal articles with co-authors since retiring.  In accordance with the restrictions imposed by the Provost, Redmond did not represent himself as being affiliated with Yale in these publications.  One article was published by the student-run Yale Journal of Biology and Medicine in September 2018 before the Journal was aware that Redmond had retired with discipline pending.[355]  The Journal considered retracting the article, but decided against doing so after conducting their due diligence, including speaking with the Title IX Coordinator and one of the article's co-authors.[356]  The Journal's decision was in part impacted by a concern that a retraction could result in unfair collateral damage to the article's co-authors, including a visiting student.[357]    Moreover, after learning of the circumstances prompting Redmond's retirement, the Journal declined to publish a subsequent article Redmond co-authored.[358]  We provide this background as the March 5 YDN article about Redmond was

somewhat critical of the Journal's publication of Redmond's September article.[359]  Given the information available to us, we find that the Journal's decision not to retract the article was reasonable.

Redmond retained the funds in his 403(b) retirement account.  He was legally entitled to these funds which were fully vested when he retired.[360]  Yale does not contribute to 403(b) plans once a faculty member reaches 35 years of employment, so it had no longer contributed to Redmond's plan for some time.[361]  Redmond also continues to receive health care coverage for the approximately 20% of his care that is not covered by Medicare.[362]

## VIII.   Redmond's Response to the Investigation

As stated above, Redmond declined to be interviewed unless we disclosed to him in advance the names of students who had made allegations against him and provided him copies of all notes and documents relating to our interviews of those students.  We did not agree to these conditions because they are unreasonable from an investigative perspective and would violate the students' requests for confidentiality.

Publicly, Redmond has denied any wrongdoing.  In response to the January 28, 2019 YDN article describing the initiation of our investigation, Redmond advised the paper that he "categorically and vehemently" denies the "slanderous and defamatory" allegations.[363]  A few weeks before the article was published, Redmond sent at least five former students almost identical emails informing them that the YDN would be publishing sexual harassment allegations brought against him, denying those allegations, and seeking sympathy.[364]

Later, Redmond attempted to obstruct our investigation by encouraging students and those connected to SKBRF not to cooperate with the investigation.  He strongly discouraged some from speaking to us, and directed others to provide us false information and to withhold relevant information.

Specifically, he emailed at least three students in April 2019, asking if they had spoken to us, emphasizing that there was "absolutely no obligation" to do so, and claiming that Yale was trying to "send [him] to jail."[365]  Earlier, on January 30, 2019, two days after the public announcement of our investigation, Redmond sent a similar email to two SKBRF managers, copying Professor 1 and Scientist 1, advising them that they have "no obligation to cooperate" as "Yale is clearly hostile and is mostly investigating to try to damage me and the Foundations [a reference to SKBRF and Axion]."[366]  But in this email he went a step further and instructed these managers to make false statements and to withhold information.  Redmond wrote "[t]he important points that we are emphasizing are that the summer employment opportunities are part of the SKBRF program and are run and supervised by SKBRF . . . I quit running an internship program in 1995."[367]  Redmond's main "point" is demonstrably false.  Almost all the students who worked in St. Kitts after 1995 reported that Redmond oversaw their SKBRF experience; he recruited them, interviewed them,  and supervised some of their work and all of their time after working hours as they lived with him in the residential house.[368]  When interviewed, a SKBRF manager also made clear that Redmond was exclusively responsible for the students after work hours as he and other SKBRF managers went home at the end of the day.[369]

Even more disturbing, Redmond's January 30 email instructed the SKBRF managers to "not provide the names of any [U.S.] students [who interned at SKBRF]" to our investigative team.[370]  This was a clear attempt by Redmond to obstruct our investigation as a primary goal of the investigation, as stated in Yale's January 28 statement, was to "learn whether there are additional survivors who wish to come forward."[371]

Finally, Redmond asked a SKBRF manager and Scientist 1 to deliver a letter he wrote, dated January 29, 2018, to the SKBRF staff.[372]  In the letter, he referenced the investigation, denied all claims, and stated, "[t]he media, former students and friends of yours may contact you in an effort to use information against me. I trust that if anyone contacts you about this case, that you'll respect the advice of my counsel by not discussing it with anyone unless legally obligated to do so."[373]  Rather than deliver copies of the letter to the staff, as Redmond had requested, the manager and Scientist 1 held an all-staff meeting at which they read the letter, excluding the language quoted above.[374]  Despite Redmond's efforts to obstruct the investigation and to discourage employees from cooperating, SKBRF and Company 1 chose to cooperate: relevant documents were provided and nine of their employees agreed to be interviewed.[375]

IX.    Yale's Efforts to Address Sexual Misconduct

Yale has instituted a number of policies, procedures, and programs to address sexual misconduct and abuse during the approximately 40 years since Redmond began working with students in St. Kitts.  These include, but are not limited to, the following measures:

- Adding in 1986 a policy to the Faculty Handbook that prohibits sexual harassment.[376]

- Standardizing in 1988 the definition of sexual harassment to be used by all Yale schools when investigating sexual harassment complaints.[377]

- Introducing in 1993 language in the Faculty Handbook discouraging teacher-student consensual relationships.[378]

- Implementing in 1997 the Yale Policy on Teacher-Student Consensual Relations.  The policy prohibits teachers from having a consensual sexual relationship with students over whom they have or will have "direct supervisory" responsibilities.[379]  In 2010, the policy was expanded to prohibit consensual relationships between teachers and any undergraduate student, regardless of whether the teacher supervises the student.[380]

- Creating in 2006 and expanding in 2011 the Sexual Harassment and Assault Response & Education Center ("SHARE"),[381] which offers in-person and telephonic counseling for members of the Yale community, support for students, and educational services.[382]

- Implementing in 2011 the University-Wide Committee on Sexual Misconduct ("UWC"). The UWC handles formal and informal complaints of sexual misconduct, aiming to resolve them within a specific time limit.  Formal complaints are heard by a panel of five UWC Members, who are drawn from a committee of students, faculty, and administrators from throughout the University.[383]

- Publishing a semi-annual Report of Complaints of Sexual Misconduct beginning in 2011. The reports, which do not reveal the names of involved parties, state whether the complainants and respondents are students, faculty, or staff; whether a formal complaint

was filed; whether an investigation is still taking place; and any decision that Yale has made after an investigation concludes.[384]

- Implementing in 2011 the Communication and Consent Educators ("CCE") program, in which selected undergraduate students work to foster a more positive sexual and social climate, under the guidance of the Yale College Assistant Dean of Student Affairs. CCEs lead research-based student trainings and workshops, and undertake intervention projects.[385]

- Hiring a Sensitive Crimes and Support Coordinator within the Yale Police Department in 2011 to focus on investigating cases of sexual misconduct and serve as a liaison between victims and the Yale Police Department.[386]

- Establishing in 2011 a protocol wherein "mandatory reporters" must report any knowledge of sexual misconduct to a Title IX Coordinator.[387]

- Participating in the Association of American Universities' ("AAU") 2015 Campus Climate Survey on Sexual Assault and Sexual Misconduct to obtain a quantitative value of students' experiences of sexual misconduct and campus climate.[388] Yale recently participated in the AAU's second campus climate survey in February 2019.[389] Results have not yet been published.

- Expanding the Bulldog Mobile (LiveSafe) app in 2017, through which members of the Yale community can communicate anonymously with the SHARE Center and Yale police, and submit confidential messages to the Title IX Office and Office for Equal Opportunity Programs.[390]

- Implementing in 2018 a mandatory, annual, online 20-minute sexual misconduct training program for all faculty, staff, and graduate and professional school students.[391]

- Mandating in 2018 annual Title IX training for all Yale undergraduate students, rather than solely freshmen and sophomores.[392]

- Publishing a brochure in 2019 by the Center for International and Professional Experience, which provides information on resources available to Yale community members traveling away from campus and reminds readers that the SHARE Center offers confidential counseling and support by telephone even when an individual is off-campus.[393]

In 2018, Yale was positively recognized for the steps it has taken to address and respond to sexual harassment in a report about sexual harassment in academic settings published by the National Academies of Sciences, Engineering, and Medicine.[394] The report highlighted the creation of the UWC and the SHARE center, and Yale's publication of the semiannual Report of Complaints of Sexual Misconduct and annual campus safety report.[395]

X.    Recommendations

Yale's current efforts to prevent and address sexual misconduct are laudable. However, based on what we learned during our investigation, we believe there is room for improvement. Sexual misconduct policies and procedures are ultimately ineffective without meaningful controls that ensure the polices are embraced and that any discipline or responsive action is fully

implemented.  At the outset, we note that since the recent complaints against Redmond surfaced, Yale has already taken a number of remedial steps.

A.    Yale's Actions

1.    Record-Keeping for Faculty Disciplinary Action

With respect to record-keeping, Yale has asked the dean of each school to report to the Provost, copying the University's Title IX Coordinator, any faculty disciplinary actions taken in response to allegations of sexual misconduct, academic misconduct, or violations of the Faculty Standards of Conduct, and to maintain a record of the disciplinary action in the dean's office.[396] The Office of the Provost and the Title IX Office will also maintain the disciplinary records provided by deans in a tracking database.  Moreover, efforts are being made to collect records of all past discipline, such as the reprimand letter issued to Redmond.  For example, the Special Advisor to the YSM Dean has been asked to collect such records on behalf of YSM.  We strongly encourage diligent efforts to collect and maintain past discipline records as the Redmond case makes starkly clear how important these records can be for the University.

In addition, the Title IX Coordinator advised the deans that before resolving any complaint that a faculty member violated any University policy, including the sexual misconduct policy, the secretary of the disciplinary body reviewing the complaint and the decision-maker will request the faculty member's disciplinary history from the Provost's Office and the relevant dean's office.[397] To codify this protocol, proposed language for a revised version of the UWC Procedures specifies that when the UWC makes findings regarding a faculty respondent, the secretary of the UWC will request any disciplinary history from the Office of the Provost and the custodian of faculty disciplinary records in the relevant school to ensure that it is considered during the proceeding.[398]

2.    Monitoring of Off-Campus Programs

Yale is in the process of developing a protocol to monitor off-campus programs to ensure participants' well-being.  The protocol is expected to include a system in which faculty or staff will register certain off-campus overnight activities for students that faculty organize.  To ensure the enforcement of any relevant disciplinary restrictions, Yale plans to have an administrator check the disciplinary record for the registering faculty or staff member in the files maintained by the Office of the Provost, the Title IX Office, and Human Resources.  In addition, the registering member will be reminded that Yale policies apply to off-campus conduct, and standards will be set for these activities, such as requiring separate housing accommodations for faculty/staff and students.[399]

We recommend that Yale consider including in the protocol a mechanism to communicate—in person when practicable—with participating students to remind them that Yale support resources remain available to them when they are off-campus, and to encourage them to report any concerns and to seek help, if needed.

3.    Report to Connecticut Department of Public Health

Given Redmond's active Connecticut physician's license, Yale submitted a report to the Connecticut Department of Public Health on August 6, 2019, stating that a student's complaint of

sexual harassment against Redmond, for conduct occurring in St. Kitts, was substantiated, and that Yale has been advised of other allegations that Redmond made unwanted sexual advances toward students in St. Kitts.[400]

B.    Recommendations

In addition to fully implementing the above-described record-keeping and monitoring practices, we recommend that Yale consider taking the following steps. Our recommendations focus on, and are limited to, issues directly raised by this investigation.

1.    Implementation and Monitoring of Faculty Discipline

We recommend that an implementation and monitoring plan be established whenever formal or informal discipline, restrictions, or accommodations are implemented in connection with a substantiated sexual misconduct complaint against faculty or staff. This investigation revealed Yale's failure to monitor Redmond's conduct and student activity at SKBRF after the conclusion of the 1994 investigation. Had there been meaningful monitoring, Redmond's later sexual assaults and misconduct might not have occurred. Going forward, the disciplinary body or office that responds to a misconduct complaint should designate at least one individual to be responsible for monitoring and enforcing the discipline, restrictions, or accommodations that may be imposed. The designated individual should have oversight responsibility for the disciplined person, such as a deputy dean, the chair of a department, or the chair of a department section. Further, we recommend that the designated individual be required to send periodic reports to the Title IX Office describing ongoing monitoring and enforcement activities.

2.    Bystander Intervention Training

With respect to the community culture, we recommend that Yale emphasize the need for bystander intervention as part of its existing sexual harassment training for all faculty, staff, and supervisors. We found that certain Yale employees, some in supervisory roles, either had concerns themselves or were made aware of others' concerns about Redmond's interactions with students. Yet, they were not sufficiently attuned to these warning signs. We recommend additional and more detailed training to reinforce the bystander's responsibility to be vigilant and to intervene, when appropriate. Such training would highlight for faculty, staff, and supervisors their need to be sensitive to warning signs and to act upon them.

3.    Faculty Reference Checks

We recommend that Yale consult with employment counsel and review its policies and practices relating to: (1) information that can be provided regarding former employees or faculty members who have engaged in sexual misconduct, leave Yale, and seek employment at another educational institution; and (2) the hiring of new employees and faculty members.

The issue of sharing information relating to former employees is complicated. The risk that warrants consideration of the question is apparent in this case. But for his age, the now-public complaints against him, and this investigation, Redmond may well have sought employment at another institution where he would have direct contact with students—potentially without that institution even knowing that he resigned from Yale with sexual misconduct disciplinary

37

proceedings pending against him. If that institution did inquire of Yale, the University would have to grapple with how to respond to such a request for information while complying with Connecticut law, which limits an employer's ability to disclose to third parties information contained in an employee's personnel file.[401]

Educational institutions across the nation are wrestling with how to mitigate this risk and share information about sexual misconduct by former teachers and employees. The Connecticut legislature recently recognized the danger of such situations, and passed laws in 2016 and 2017 requiring elementary and secondary schools that are considering hiring a job applicant who will have direct student contact to solicit information about any substantiated or pending sexual misconduct allegations from applicant, relevant prior employers, and the Connecticut Department of Education.[402] Employers who provide information in accordance with this law and do not knowingly supply false information are immune from liability.[403]

In the context of higher education, there are indications that this issue may be addressed at the national level with policies and practices that many colleges and universities would implement to ensure consistency across institutions. Currently, two national organizations are focusing on this issue. In April 2019, the National Academies of Sciences, Engineering, and Medicine announced the launch of the Action Collaborative on Preventing Sexual Harassment in Higher Education, of which Yale is one of twenty-eight founding members.[404] One goal of the Collaborative is to research and provide guidance on hiring practices.[405] In June 2019, the AAU announced the creation of an Advisory Board on Sexual Harassment and Gender Discrimination composed of twenty-two senior administrators from AAU institutions, including Yale's Title IX Coordinator.[406]

As part of the national effort to improve hiring practices, we recommend that Yale consult with employment counsel and consider procedures that will enable it to share information regarding sexual misconduct by former employees who seek employment at another educational institution.

With respect to new employees, we recommend that Yale consider implementing procedures requiring: (1) a set of consistent questions for all job applicants about whether they have ever been accused of sexual misconduct and the outcome of any such accusations or proceedings; and (2) any applicants who will have contact with students to waive any statutory or other privacy protections for personnel files at former employers and expressly authorize the release of any information about sexual misconduct.

One of the AAU Advisory Board members recently testified before the House Committee on Science, Space and Technology about sexual harassment in science. His testimony highlighted a pilot program at UC Davis for the 2018-2019 hiring year relating to conducting reference checks on final candidates for academic appointments with tenure or security of employment. Candidates are required to authorize the release of information from prior institutions where the candidate was employed about any misconduct related to teaching, research, service, and, if applicable, clinical care. UC Davis considers sexual misconduct with students or trainees to be related to teaching and misconduct with staff or colleagues to be related to service.[407] Yale should consider implementing similar requirements.

    4. <u>Discipline</u>

   We recommend that the appropriate Yale individual, committee, or governing body consider whether discipline for Professor 1 is warranted in light of his failure to protect students by enforcing the terms of the Settlement Agreement and the SKBRF housing policy in the aftermath of the 1994 investigation.  We recognize that the Yale Faculty Handbook provides review procedures for complaints about violations of the Faculty Standards of Conduct.  If, under these procedures, a review is warranted, we recommend that it be undertaken.

XI. <u>Final Thoughts</u>

   This Report is occurring at a time of unprecedented attention and scrutiny of sexual misconduct in educational settings and workplace environments.  Those who have been found to be offenders are almost always in an actual or perceived position of authority.

   The facts here involve the abuse of young male adults, and one transgender adult, as well as doctor-patient abuse.  Such abuse is commonly underreported[408] and often misunderstood.  These survivors frequently experienced shame, self-doubt, and confusion caused in part by the power imbalance that existed as their offender was a professor, mentor, and physician.  Patients can be reluctant to report for similar reasons, in addition to concerns that they will not be believed and their own confusion about whether abuse actually occurred.[409]

   We recognize that there may be additional instances of Redmond's abuse that have not been reported to us.  Anyone who has experienced sexual misconduct involving Redmond or any other Yale employee or student is encouraged to report to a Title IX Coordinator, the UWC, or the Yale Police Department.  We also respect how difficult it is to reveal, read about, and be reminded of painful events.  Any current or former Yale students or employees seeking support are encouraged to contact the SHARE center.

   One potential benefit from the intense public focus on sexual misconduct is that institutions will set high expectations for the behavior of their employees and dedicate themselves to the creation of cultures where every effort is made to detect and stop sexual misconduct.  This is particularly important in educational settings where the employees are teachers who have a special influence and authority over students.  As a prominent university, Yale has a unique opportunity here.  The University's decision to make this Report public reflects its commitment to ongoing improvement and to the ideal of a university environment free of abuse and harassment.  As an institutional leader openly grappling with the challenges of sexual misconduct, Yale can help to set an even higher standard for all educational institutions to follow.

1   *Sexual misconduct complaints to be subject of investigation*, YaleNews public statement, dated January 28, 2019.

2   We received twelve messages on our hotline or dedicated email, most of which were from students. We responded to all except for one message from a reporter.

3   While Redmond was elected as a Morse Fellow in 1976, the available records of his advisees go back to only 1998.

4   We received written responses to written questions from one witness, an Axion administrator who declined to be interviewed in person.

5   Of the six current and former professors we interviewed, three are from YSM, two are from Yale College, and one is from the School of Public Health.

6   Of the twenty-eight current and former administrators we interviewed, twelve are from YSM, six are from Morse College, three are from the OGC, and seven are from other offices.

7   Some witnesses fall into multiple categories, but were only counted once and in the category most relevant to the Report's findings.

8   Redmond *curriculum vitae*, dated October 29, 1981.

9   *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 26, dated March 1, 2003.

10  *Id.*

11  American Board of Psychiatry and Neurology certification information is available at https://application.abpn.com/verifycert/verifyCert_details.asp?p=113141.

12  *Lifetime Certificate Holders*, American Board of Psychiatry and Neurology, Inc., *available at* https://www.abpn.com/maintain-certification/maintenance-of-certification-program/lifetime-certificate-holders/.

13  Connecticut Department of Public Health physician certification information available at https://www.elicense.ct.gov/lookup/licenselookup.aspx.

14  *Id.* Redmond has an active Controlled Substance Registration for Practitioner on file with the Connecticut Department of Consumer Protection.  He was first issued this license in March 1999 and his current registration expires in 2021. Information on physicians who have completed controlled substance registration with the Connecticut Department of Consumer Protection is available at https://www.elicense.ct.gov/lookup/licenselookup.aspx.

15  *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 26, dated March 1, 2003.

16  DER NIH CV.pdf, attachment to email from Redmond to Collaborator, dated September 22, 2017.

17  *Id.*; *Translational Studies in Monkeys of Human Embryonic Stem Cells for Treatment of Parkinson's Disease*, Connecticut Stem Cell Research Grants Program Draft Grant Application, p. 73, dated 2007.

18  DER NIH CV.pdf, attachment to email from Redmond to Collaborator, dated September 22, 2017.

19  W79 Interview; *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 22, dated March 1, 2003.

20  *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 80, dated March 1, 2003.

21  W61, W63, W73, W79 Interviews.

22  W46, W60, W61, W63, W67 Interviews; *Translational Studies in Monkeys of Human Embryonic Stem Cells for Treatment of Parkinson's Disease*, Connecticut Stem Cell Research Grants Program Draft Grant Application, p. 59, dated 2007.

23  DER NIH CV.pdf, attachment to email from Redmond to Collaborator, dated September 22, 2017.

24  *Id.*

25  W35, W37, W63, W71, W73 Interviews; see also Mark Fineman, *St. Kitts Struggles to Reduce a Centuries-Old Monkey Glut*, Los Angeles Times, September 18, 2000; Jamie Shreeve, *The Other Stem-Cell Debate*, The New York Times Magazine, April 10, 2005.

26   W36, W47, W48, W55, W75, W80, W82, W83 Interviews.

27   Redmond *curriculum vitae*, dated October 29, 1981; W40 Interview.

28   Email from Yale Administrator, attaching list of Redmond's Morse College advisees from 1998-2018.

29   W2, W7, W11, W13, W28, W30, W34, W40 Interviews.

30   W12, W21, W26, W29, W30, W40, W43 Interviews.

31   W11, W12, W13, W28, W35, W47 Interviews.

32   W2, W16, W22, W26, W28, W30, W33 Interviews.

33   *Id.*

34   W22, W26, W28, W30, W33 Interviews.

35   *Id.*

36   W6, W30, W43, W44, W66, W68, W87, W93 Interviews.

37   W6, W43, W44, W66 Interviews.

38   *Id.*

39   W6 Interview. This individual did not respond to our request for an interview.

40   W6, W43, W44, W66 Interviews.

41   W31 Interview.

42   *Id.*

43   1994 Investigatory File (summary of Professor 1's interview).

44   W79 Interview; *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 22, dated March 1, 2003; Letter from Axion's former legal counsel to YSM administrator, dated January 6, 1986.

45   Letter from Axion's former legal counsel to YSM administrator, dated January 6, 1986.

46   *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 80, dated March 1, 2003.  SKBRF is accredited by AAALAC International, formerly known as the Association for Assessment and Accreditation of Laboratory Animal Care International.  DER NIH CV.pdf, attachment to email from Redmond to Collaborator, dated September 22, 2017.

47   W79 Interview; Email from Axion legal counsel to D. Daly, dated July 16, 2019.

48   W73, W79 Interviews.

49   W79, W99 Interviews.  Axion and SKBRF are connected through a Facility Access and Collaborative Research Services Agreement which gives Axion full, unrestricted, and exclusive access to the SKBRF facilities.  *See* Amended and Restated Facility Use And Research Services Agreement, dated July 1, 2016.  Though connected, Axion and SKBRF are required to be maintained as separate entities to satisfy local St. Kitts law.  *See* Letter from Axion's former legal counsel to YSM administrator, dated January 6, 1986.  Company 1 utilizes the SKBRF facilities through a Facility Use Agreement with Axion.  *See* Amended and Restated Facility Use And Research Services Agreement, dated July 1, 2016.

50   DER NIH CV.pdf, attachment to email from Redmond to Collaborator, dated September 22, 2017; Letter from Axion's former legal counsel to YSM administrator, dated January 6, 1986.  Axion's legal counsel informed us that Redmond resigned as president and director of Axion on February 12, 2019.

51   W79, W86, W109 Interviews.  Neither Redmond nor Professor 1 receive any salary from SKBRF or Axion.  *See* Letter from Axion's former legal counsel to YSM administrator, dated January 6, 1986; *Translational Studies in Monkeys of Human Embryonic Stem Cells for Treatment of Parkinson's Disease*, Connecticut Stem Cell Research Grants Program Draft Grant Application, p. 109, dated 2007.

52   W79 Interview.

53   W53, W65, W73 Interviews.

54   W99 Interview.

55   W1, W2, W8, W18, W19, W22, W23, W26, W74, W76, W85 Interviews; 1994 Investigatory File (summary of Professor 1's interview).

56   W79 Interview.

57   *Id.*

58   W53 Interview.

41

59   W73 Interview.

60   W65 Interview.

61   *Id.*

62   W21, W39, W71, W73, W79 Interviews.

63   Data on Redmond's NIH grants is available at the NIH RePORT (Research Portfolio Online Reporting Tools) website through the RePORTER (RePORT Expenditures and Results) tool, *available at* https://projectreporter.nih.gov/reporter.cfm.

64   *See* NIH RePORTER; *see e.g.*, *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 11, dated March 1, 2003.

65   In 2008, the Connecticut Stem Cell Research Grants-in-Aid Program (established in 2005) awarded Redmond $1.12 million, the second highest award granted through that program that year. *Connecticut Stem Cell Research Grants-in-Aid Program*, Connecticut State Department of Public Health, *available at* https://portal.ct.gov/DPH/Stem-Cell/Stem-Cell-Research-Program---Grants.

66   W39, W73 Interviews.

67   W73, W79 Interviews.

68   *Id.*

69   W73, W79 Interviews; NIH RePORTER.  It is worth noting that from a financial perspective, the significance of grant awards to YSM's revenue has decreased over time.  About fifteen years ago, half of the school's revenue came from grants and only one-third came from clinical revenue.  For example, in fiscal year 2004, 50.8% of the school's revenue came from grants and 30.5% came from clinical revenue.  Last year, only 34.9% of the school's revenue consisted of grant awards and clinical revenue contributed 50.9% of the revenue.  Currently, the Medical School has a $1.8-1.9 billion budget.  Within the category of grant funding, NIH funding accounts for 60% of the grant money.  W52 Interview.

70   We obtained this information from a YSM operations manager.

71   W73, W79 Interviews; see e.g., *GDNF Delivery to MPTP Monkeys by EIAV lentivirus and AAV*, Department of Health and Human Services Grant Application, p. 11, dated March 1, 2003.

72   W79 Interview.

73   We obtained this amount and information from Yale based on a compilation of data from Yale's legacy and current financial systems.  Based on the available data, it is not clear exactly how much of the payments to Axion were subsequently paid to SKBRF.

74   W86 Interview.

75   Letter from Redmond to YSM Dean, dated October 25, 1995.

76   W18 Interview.

77   *Id.*

78   W112 Interview; Letter from Redmond's lab manager to 1994 Inquiry Committee member, dated November 3, 1994.

79   Email from Redmond to Morse administrator re. St. Kitts internship, dated April 21, 2016; Email from Morse administrator to Morse list-serv re. Dots and Dashes, dated March 27, 2017.  Redmond also posted, or attempted to post, a listing on the iNet Internship Network Consortium website, which is available to eleven consortium schools including Yale.  Email from Redmond to Axion administrator re. iNet internship listings, dated February 21, 2017.

80   W1, W42 Interviews.

81   W2, W19, W22, W26, W33 Interviews.

82   W18 Interview; 1994 Investigatory File (research opportunity advertisement, dated February 1, 1992); 1994 Investigatory File ("Preparing for Summer Term St. Kitts Biomedical Research Foundation" document).

83   W90 Written Responses to Questions.

84   When asked about this during the 1994 investigation, Redmond said it was a mistake. Inquiry Committee Report, dated September 29, 1995.

85   SKBRF Liability Disclosure and Release Statements, dated 1994, 2008, and 2017.

86   W6, W17, W22, W23, W25, W33, W42 Interviews.

87   W3, W8, W26, W57, W59 Interviews.

88  W1, W2, W17, W22, W23, W25, W33, W42 Interviews.

89  W18 Interview.  There is no direct corroboration for the sexual relationship, but the student's suitemate at the time suspected a relationship between the student and Redmond that went beyond a traditional student-teacher relationship and noted that she and other friends were "uncomfortable" when Redmond sent the student "a huge box of chocolates."  W92 Interview.

90  W2, W3, W9, W17, W19, W22, W94, W103 Interviews.

91  W2, W8, W9, W19, W22, W23, W26, W64, W72, W77, W103 Interviews.

92  W1, W2, W3, W8, W9 Interviews.

93  W16, W23 Interviews.

94  W54, W72, W85 Interviews.

95  W1, W2, W8, W22, W25, W26, W42, W72, W112 Interviews.

96  W1, W2, W25, W42, W112 Interviews.

97  Inquiry Committee Report, dated September 29, 1995.

98  W8, W26 Interviews.

99  W1, W2, W3, W8, W9, W19, W25, W26, W33, W42, W72, W108 Interviews.

100  W3, W8, W9, W19, W26, W33 Interviews.

101  W3, W9, W17, W54, W59, W64, W77, W85, W94, W103, W112 Interviews.

102  W3, W9, W17, W57, W72, W77, W94, W112 Interviews.

103  W74 Interview.

104  W1, W2, W8, W19, W26, W33 Interviews.

105  W2, W8, W26 Interviews.

106  W16, W22 Interviews.

107  W1, W2, W8, W19, W33 Interviews.

108  W3, W9 Interviews.

109  W1, W19 Interviews.

110  W3, W8, W9, W19, W22, W26, W64 Interviews.

111  W1, W3, W8, W19, W26 Interviews.

112  W1, W8, W26 Interviews.

113  W1, W3, W8, W9, W22, W26, W33 Interviews.

114  W1, W2, W8, W19, W26, W64 Interviews.

115  Daniel Pollak, *Understanding Sexual Grooming in Child Abuse Cases*, American Bar Association, November 1, 2015, *available at* https://www.americanbar.org/groups/public_interest/child_law/resources/child_law_practiceonline/child_law_practice/vol-34/november-2015/understanding-sexual-grooming-in-child-abuse-cases/; Winters, G., Jeglic, E. *Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters*, Deviant Behavior. 2017; 38(6):724-733, available at https://doi.org/10.1080/01639625.2016.1197656.

116  W9 Interview; 1994 Investigatory File (student "transcript," dated July 18, 1994).

117  W2, W8, W19, W22, W26, W33, W64 Interviews.

118  W1, W8, W19 Interviews.

119  W2, W19 Interviews.

120  W2, W33, W64 Interviews.

121  W2, W33 Interviews.

122  W19, W64 Interviews.

123  W2, W9, W19, W33, W64 Interviews.

124  Yale Sexual Misconduct Policies and Related Definitions, dated July 25, 2019, *available at* https://smr.yale.edu/find-policies-information/yale-sexual-misconduct-policies-and-related-definitions.

125  Conn. Gen. Stat. § 53a-73a.

126 St. Kitts law provides that it is a crime to ''attempt[] to commit [sodomy] . . . or . . . any assault with intent to commit the same, or of any indecent assault upon any male person.'' Offences Against the Person Act Chapter 4.21 §§ 56, 57 (2002). In both jurisdictions, the offense is a misdemeanor.

127 Yale University Faculty Handbook, p. 105, dated November 1986.

128 Yale University Affirmative Action and Nondiscrimination Policies and University Grievance Procedures brochure, dated November 5, 1990.

129 *Id.*

130 *Report to the President and Fellows of Yale University of the Advisory Committee on Campus Climate*, September 15, 2011, n. 12, *available at* https://provost.yale.edu/sites/default/files/files/Report_Advisory_Committee_Campus_Climate_Sept2011.pdf.

131 Yale College Undergraduate Regulations, p. 47-49, dated September 10, 2013; Yale University Report to the Connecticut General Assembly Pursuant to Public Act 14-11, dated September 30, 2015; Preventing and Responding to Sexual Misconduct: Building a Climate of Safety and Respect at Yale brochure, dated August 2019.

132 Yale University Faculty Handbook, p. 106, dated January 1993.

133 *Id.*

134 Letter from Yale Provost to Members of the University's Faculties, dated March 3, 1993.

135 Yale University Affirmative Action and Equal Opportunity Policies and University Grievance Procedures brochure, dated December 7, 1998; *Yale Bans Sex Between Students and Faculty*, The New York Times, November 15, 1997.

136 Promoting Diversity and Equal Opportunity at Yale University: Policies, Resources, and Procedures brochure, dated June 2010.

137 The account of Student A's experience is based on an interview we conducted with that student, W9.

138 In response to a later interview question about the party, Redmond admitted to having two shots of tequila and one shot of whiskey, but claimed he was not intoxicated.  1994 Investigatory File (Summary of Redmond's interview).

139 W9, W95, W96 Interviews.

140 1994 Investigatory File (student ''transcript,'' dated July 18, 1994).

141 W17, W21, W72, W94 Interviews; Inquiry Committee Report, dated September 29, 1995; 1994 Investigatory File (typed notes of Psychiatry Chair).

142 W3, W17, W72, W77, W94, W95, W96 Interviews.

143 W9, W95 Interviews.

144 The account of Student B's experience is based on an interview we conducted with that student, W2.

145 W15 Interview; Facebook chat between W2 and W15.

146 W14 Interview.

147 Email from Yale administrator to W2; W2 Interview.

148 The account of Student C's experience is based on an interview we conducted with that student, W19.

149 W62 Interview.

150 Redmond funded a recreational trip to Nevis while the student was working in St. Kitts, as well as a trip to Florida for a research conference where they shared hotel rooms.

151 Email correspondence between Redmond and W19.

152 The account of Student D's experience is based on an interview we conducted with that student, W64.

153 W89 Interview.

154 Notes from one psychiatrist, shared with us by the student, reflect that the student reported he was "sexually abused [] during a research trip to the Caribbean."

155 The account of Student E's experience is based on an interview we conducted with that student, W33.

156 The student said he often drank alcohol with Redmond in St. Kitts. In the fall following his internship, Redmond discussed with the student the possibility that he may have a sensitivity to alcohol and encouraged him to limit his consumption.  Email from Redmond to W33.

157 W33 Interview; Email correspondence between Redmond and W33.

[158] W88 Interview.

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] The account of Exam 1 is based on an interview we conducted with the student who underwent the exam, W64.

[163] According to Dr. Altman, physicians would not conduct a rectal or genital exam as part of a routine physical unless screening for prostate or testicular cancer, respectively. Even then, Dr. Altman referred us to the United States Preventive Services Task Force (USPSTF) recommendations, which do not recommend conducting a rectal or genital exam to screen for prostate or testicular cancer. More specifically, the USPSTF does not recommend rectal exams as a screening tool for prostate cancer for men older than 55 years because there is a lack of evidence of the benefit. *Final Recommendation Statement: Prostate Cancer: Screening*, U.S. Preventive Services Task Force, October 2018, *available at* https://www.uspreventiveservicestaskforce.org/Page/Document/RecommendationStatementFinal/prostate-cancer-screening1. According to Dr. Altman, there is no explicit USPSTF recommendation regarding men younger than 55 years because it is not an accepted practice to screen for prostate cancer in young men. In addition, the USPSTF recommends against screening for testicular cancer in adolescent or adult men. *Final Recommendation Statement: Testicular Cancer: Screening, U.S. Preventive Services Task Force*, December 2016, *available at* https://www.uspreventiveservicestaskforce.org/Page/Document/RecommendationStatementFinal/testicular-cancer-screening.

[164] The account of Exam 2 is based on an interview we conducted with the student who underwent the exam, W17.

[165] 1994 Investigatory File (student "transcript," dated July 18, 1994).

[166] Lynn Bickley & Peter Szilagyi, *Bates' Guide to Physical Examination and History Taking*, 681, 701 (11th ed., 2013) (a neurological exam includes examination of mental status, the cranial nerves, the motor system, the sensory system, and reflexes).

[167] The account of Exam 3 is based on an interview we conducted with the student who underwent the exam, W1 (also identified as Student F below), and files from an investigative proceeding concerning Redmond.

[168] See Petroianu, A. *Diagnosis of acute appendicitis*. Int J Surg. 2012; 10(3):115-9 ("rectal examination offers little towards furthering diagnostic accuracy"); Brewster, G., Herbert, M. *Medical myth: A digital rectal examination should be performed on all individuals with possible appendicitis*. West J Med. 2000; 173(3):207-8 (a literature review does not support the routine use of rectal exams in all patients with possible appendicitis because it is uncomfortable, may be traumatic, and rarely changes management plans).

[169] The account of Student F's experience is based on an interview we conducted with that student, W1.

[170] W25, W42 Interviews.

[171] W27 Interview.

[172] W51 Interview.

[173] *Id.*

[174] *Id.*

[175] W1 Interview; Email correspondence between Redmond and W1.

[176] W3 Interview.

[177] W97 Interview.

[178] W3 Interview.

[179] 1994 Investigatory File (student "transcript," dated July 18, 1994).

[180] 1994 Investigatory File (summary of W3's interview).

[181] W112 Interview.

[182] W8, W19, W26 Interviews.

[183] *Id.*

[184] W8, W26 Interviews.

[185] W26 Interview.

[186] W26 Interview.

[187] W2, W59 Interviews.

[188]  *Id.*
[189]  W76 Interview.  Another intern who recalled playing this game did not find it uncomfortable, but said he could see how it might make someone else feel uncomfortable because it involved grabbing others.  W111 Interview.
[190]  W33 Interview.
[191]  W25 Interview.
[192]  W76 Interview.
[193]  *Id.*
[194]  W76, W108 Interviews.
[195]  W58 Interview.
[196]  W76 Interview.
[197]  W76, W62 Interviews.
[198]  *Id.*
[199]  W62 Interview.
[200]  Email from Redmond to W58.
[201]  W58, W76 Interviews.
[202]  W108 Interview.
[203]  W22 Interview.
[204]  *Id.*
[205]  *Id.*
[206]  W8 Interview.
[207]  *Id.*
[208]  W28 Interview.
[209]  W19 Interview.
[210]  W1, W8, W26 Interviews.
[211]  W1, W8, W26, W103 Interviews.
[212]  W112 Interview.
[213]  *Id.*
[214]  W1, W19 Interviews; 1994 Investigatory File (summary of W94 interview).
[215]  W8, W19, W22 Interviews.
[216]  W8, W16 Interviews.  See also W2 Interview (Redmond suggested staying at the Yale Club after seeing a Broadway show, but the plan did not materialize).
[217]  W1, W8, W19, W22 Interviews.
[218]  W8 Interview.
[219]  W28 Interview.
[220]  W3 Interview.
[221]  W1, W8, W19, W26 Interviews.
[222]  W26 Interview.
[223]  W8 Interview.
[224]  W19 Interview.
[225]  W1, W8, W22, W26, W108 Interviews.
[226]  W8 Interview.
[227]  W59 Interview.
[228]  *Id.*
[229]  W1, W3, W8, W26, W108 Interviews.
[230]  W8 Interview.
[231]  W26 Interview.
[232]  W3, W9, W96, W108 Interviews; 1994 Investigatory File (student "transcript," dated July 18, 1994).
[233]  W3, W8, W22, W26 Interviews.

234  W26, W112 Interviews.

235  W8, W22, W26 Interviews.

236  W22, W26 Interviews.

237  W8, W22 Interviews.

238  W8, W22, W26 Interviews.

239  Inquiry Committee Report, dated September 29, 1995; 1994 Investigatory File (typed notes of Psychiatry Chair).

240  *Id.*

241  *Id.*

242  W10, W20 Interviews.  The professors selected were from the Internal Medicine and Pediatrics departments of YSM and the Epidemiology department of the School of Public Health.

243  W31 Interview.

244  That committee member reported that before the Committee began its work, the YSM Dean told her that Redmond's work was "very important."  She found the Dean's comment "disturbing" at the time, but believed that it did not bias the work of the Committee.  W10 Interview.

245  Inquiry Committee Report, dated September 29, 1995.

246  *Id.*  One of the three Yale interns reported to us that, during his interview, the DGC offered him $3000 to reimburse him for expenses for the trip to St. Kitts and in exchange for signing a non-disclosure agreement barring him from discussing the claims against Redmond.  The student stated that no agreement was reached and he did not have a copy of the proposed agreement. W94 Interview.  We did not find evidence to corroborate this account.

247  Inquiry Committee Report, dated September 29, 1995.

248  *Id.*

249  *Id.*

250  *Id.*

251  *Id.*; W10 Interview.

252  Inquiry Committee Report, dated September 29, 1995.

253  *Id.*

254  *Id.*

255  *Id.*

256  *Id.*

257  W31 Interview.

258  1994 Investigatory File (summaries of W17, W72, and W94 interviews); Inquiry Committee Report, dated September 29, 1995; 1994 Investigatory File (student "transcript," dated July 18, 1994).

259  W31 Interview.

260  Inquiry Committee Report, dated September 29, 1995.

261  Letter from Redmond to YSM Dean, dated October 25, 1995.

262  *Id.*

263  *Id.*

264  *Id.*

265  Letter from Professor 1 to Redmond, dated May 23, 1995.

266  Email from Axion legal counsel to D. Daly, dated July 16, 2019.

267  Email from Axion legal counsel to D. Daly, dated July 16, 2019.

268  St. Kitts Biomedical Research Foundation Policies and Procedures Manual, dated December 1999; St. Kitts Biomedical Research Foundation Policies and Procedures Manual, dated 2005.

269  Settlement Agreement between Redmond and Student A, dated November 3, 1995.

270  *Id.*

271  Letter from YSM Dean to Redmond, dated January 16, 1996.

272  *Id.*

273  *Id.*

274  *Id.*

275  *Id.*

276  W17, W20, W72, W94 Interviews.

277  W94 Interview.

278  Letter from Committee Member to YSM Dean, dated May 29, 1996.

279  *Id.*

280  *Id.*

281  Letter from YSM Dean to Redmond, dated August 6, 1996.

282  *Id.*

283  W20 Interview.

284  *Id.*

285  *Id.*; W10, W31 Interviews.

286  W21 Interview.

287  *Id.*

288  W50, W70 Interviews.

289  *Id.*

290  Email from Axion legal counsel to D. Daly, dated February 5, 2019 (indicating that the first known intern to receive a stipend from Axion worked at SKBRF in 2001).

291  In 2013, a new research manager was hired to assist in the management of the interns, but even then Redmond recruited the interns and supervised them outside of working hours.  W62 Interview.

292  W10 Interview.

293  *Id.*

294  W31 Interview.

295  Letter from Redmond to YSM Dean, dated October 25, 1995.

296  *See* Yale University Affirmative Action and Nondiscrimination Policies and University Grievance Procedures brochure, dated November 5, 1990; Yale University Affirmative Action and Equal Opportunity Policies and University Grievance Procedures brochure, dated November 7, 1994.

297  There is the jurisdictional nuance that the complaint was brought by a number of complainants, some of whom were not Yale students, and the conduct occurred off-campus at a program not formally sponsored by or affiliated with Yale which, the DGC speculates, may have been why the Committee did not use the Procedures. W31 Interview; *see also* W100 Interview.

298  Yale University Affirmative Action and Nondiscrimination Policies and University Grievance Procedures brochure, dated November 5, 1990; Yale University Affirmative Action and Equal Opportunity Policies and University Grievance Procedures brochure, dated November 7, 1994.

299  *Id.*

300  *Id.*

301  *Id.*

302  *Id.*; Inquiry Committee Report, dated September 29, 1995.

303  Yale University Affirmative Action and Nondiscrimination Policies and University Grievance Procedures brochure, dated November 5, 1990; Yale University Affirmative Action and Equal Opportunity Policies and University Grievance Procedures brochure, dated November 7, 1994.

304  *Id.*

305  Letter from Redmond to YSM Dean, dated October 25, 1995.

306  Letter from YSM Dean to Redmond, dated January 16, 1996.

307  Letter from YSM Dean to Redmond, dated January 16, 1996.

308  *Id.*

309  Letter from Redmond to YSM Dean, dated October 25, 1995.

310  YSM Sexual Harassment Grievance Procedures in effect at the time of the 1994 investigation recognized the potential need for such permanency by specifying a possible sanction for misconduct as a "report . . .in [the] permanent personnel or academic record" of a professor. These Procedures did not apply here because they were reserved for grievances between complainants and respondents from the same School.  Sexual Harassment Grievance Procedures for Yale University School of Medicine, draft dated March 2, 1994; Yale University School of Medicine Board of Permanent Officers Minutes, dated June 1, 1994 (adopting March 2, 1994 revisions to Sexual Harassment Grievance Procedures).

311  W31 Interview.

312  *Id.*

313  *Id.*

314  *Id.*

315  Inquiry Committee Report, dated September 29, 1995; Settlement Agreement between Redmond and Student A, dated November 3, 1995.

316  1994 Investigatory File (summary of Professor 1's interview).

317  *Id.*; W79 Interview.

318  Letter from Professor 1 to Redmond, dated May 23, 1995.

319  Settlement Agreement between Redmond and Student A, dated November 3, 1995.

320  W79 Interview; Email from Axion legal counsel to D. Daly, dated July 16, 2019.

321  Information about Scientist 1 is based on an interview we conducted with Scientist 1, W53.

322  W2 Interview.

323  *Id.*

324  W62 Interview.

325  *Id.*

326  W1, W62 Interviews.

327  Email from SKBRF manager to Scientist 1 and SKBRF manager.

328  W53, W62 Interviews; Email from Scientist 1 to Student F.

329  W1, W53 Interviews.

330  W53, W62, W66 Interviews.

331  W7 Interview.

332  *Id.*

333  W7, W11 Interviews.

334  W11 Interview.

335  W7, W11 Interviews.

336  W11 Interview.

337  *Id.*

338  *Id.*

339  *Id.*

340  W34 Interview.

341  *Id.*

342  *Id.*

343  W13, W32 Interviews.

344  W32 Interview.

345  *Id.*

346  W11, W34, W40 Interviews.

347  Email from Redmond to Morse Dean, dated 2008.

348  Jever Mariwala, Alice Park, & Marisa Peryer, *I saw what I saw*, Yale Daily News, March 5, 2019.

349  W105, W110 Interviews.

350  *Id.*

351  W106 Interview.

352  *Id.*

353  *Id.*

354  Letter from Provost to Redmond, dated July 31, 2018.

355  W98 Interview.

356  *Id.*

357  *Id.*

358  *Id.*

359  Jever Mariwala, Alice Park, & Marisa Peryer, *I saw what I saw*, Yale Daily News, March 5, 2019.

360  Letter from Provost to Redmond, dated July 31, 2018.

361  W104 Interview.

362  *Id.*

363  Jever Mariwala, Alice Park, & Marisa Peryer, *University orders investigation into sexual misconduct complaints against former professor*, Yale Daily News, January 28, 2019.

364  W8, W16 Interviews; Email from Redmond to W19; Email from Redmond to W22; Email from Redmond to W26.

365  Email from Redmond to W8; Email from Redmond to W19; Email from Redmond to W26.

366  Email from Redmond to SKBRF managers, Professor 1, and Scientist 1, dated January 30, 2019.

367  *Id.*

368  W1, W2, W8, W19, W22, W23, W25, W26, W33, W42 Interviews.

369  W62 Interview.

370  For fuller context, this portion of Redmond's January 30, 2019 email reads: "I do not believe that we have any records identifying US students before 1995. (They were volunteers so that we do not have financial records to go by).  *Do not provide the names of any students* but you could indicate how many local interns there were each year that the data are available." (emphasis added).  Although both U.S. and local Kittitians have interned at SKBRF over the years, only American students have reported Redmond's sexual abuse and harassment.

371  *Sexual misconduct complaints to be subject of investigation*, YaleNews public statement, dated January 28, 2019.

372  W53, W66 Interviews.

373  Letter from Redmond to SKBRF Staff, dated January 29, 2018.

374  W53 Interview.

375  W53, W62, W65, W66, W68, W73, W87, W93, W99 Interviews.

376  Yale University Faculty Handbook, p. 105, dated November 1986.

377  Yale University Affirmative Action and Nondiscrimination Policies and University Grievance Procedures brochure, dated November 14, 1988.

378  Yale University Faculty Handbook, p.106, dated January 1993.

379  Yale University Affirmative Action and Equal Opportunity Policies and University Grievance Procedures brochure, dated December 7, 1998.

380  Promoting Diversity and Equal Opportunity at Yale University: Policies, Resources, and Procedures brochure, dated June 2010.

381  Nine things you need to know about how Yale addresses sexual misconduct on campus, Yale CCE Program, *available at* https://cce.yalecollege.yale.edu/nine-things-you-need-know-about-how-yale-addresses-sexual-misconduct-campus.

382  For more information on Yale's SHARE Center, visit https://sharecenter.yale.edu/.  Another counseling service available to undergraduates is Walden Peer Counseling.  It was founded in 1975 and offers an anonymous and confidential hotline and in-person peer counseling services staffed by Yale undergraduates.  For more information on Walden Peer Counseling, visit https://walden.sites.yale.edu/.

383  For more information on the UWC, visit https://uwc.yale.edu/.

384  For copies of the semi-annual reports, visit https://provost.yale.edu/title-ix/reports.  From July 2011 to December 2018, roughly equal amounts of sexual harassment complaints were brought forward against faculty members and Yale College students.  However, during the same time period, 228 complaints of sexual assault

were brought against Yale College students, but only 8 complaints of sexual assault were brought against faculty members.

[385] For more information on the Communication and Consent Educators program, visit https://cce.yalecollege.yale.edu/.

[386] For more information on the Sensitive Crimes & Support Coordinator, visit https://your.yale.edu/community/public-safety/police/sensitive-crimes-support.

[387] *Report to the President and Fellows of Yale University of the Advisory Committee on Campus Climate*, September 15, 2011, p. 36, *available at* https://provost.yale.edu/sites/default/files/files/Report_Advisory_Committee_Campus_Climate_Sept2011.pdf.

[388] The results of the survey are *available at* https://provost.yale.edu/title-ix/yale-report-aau-campus-climate-survey.

[389] *2019 student survey will assess campus climate on sexual misconduct*, YaleNews public statement, February 4, 2019.

[390] *Resources for students to address discrimination, harassment concerns*, YaleNews public statement, October 5, 2017.

[391] *Sexual Misconduct Response & Prevention: Required Training*, Yale University, available at https://smr.yale.edu/; Alice Park, *Yale expands Title IX training requirements*, Yale Daily News, November 1, 2018.

[392] Alice Park, *Yale expands Title IX training requirements*, Yale Daily News, November 1, 2018.

[393] A copy of the brochure is available at https://cipe.yale.edu/hsa.

[394] *Sexual Harassment of Women: Climate, Culture, and Consequences in Academic Sciences, Engineering, and Medicine*. National Academies of Science Sciences, Engineering, and Medicine, 2018.

[395] *Id.* at 104.

[396] Email from Yale University Title IX Coordinator to Yale University Deans.

[397] Email from Yale University Title IX Coordinator to Yale University Deans.

[398] Email from Yale University Title IX Coordinator to UWC Secretary.

[399] Email from Yale Administrator to D. Daly.

[400] Department of Public Health Petition Form, dated August 6, 2019.

[401] *See* Conn. Gen. Stat. § 31-128f.

[402] *See* Conn. Gen. Stat. § 10-222c.

[403] *Id.*

[404] For more information on the Action Collaborative on Preventing Sexual Harassment in Higher Education, visit http://sites.nationalacademies.org/sites/sexualharassmentcollaborative/index.htm.

[405] Email from Yale University Title IX Coordinator to D. Daly.

[406] For more information on the AAU Advisory Board on Sexual Harassment and Gender Discrimination, visit https://www.aau.edu/newsroom/mary-sues-desk/aau-expanding-fight-against-sexual-misconduct-campus.

[407] For more information on the UC Davis pilot program, visit https://academicaffairs.ucdavis.edu/reference-checks.

[408] Stemple, L., Meyer, I. *The Sexual Victimization of Men in America: New Data Challenge Old Assumptions*, Am J Public Health. 2014 June; 104(6):e19-e26; DuBois, J. et al., *Sexual Violation of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101 Cases*, Sexual Abuse. 2019; 31(5):503-523.

[409] DuBois, J. et al., *Sexual Violation of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101 Cases*, Sexual Abuse. 2019; 31(5):503-523; Carrie Teegardin & Danny Robbins, *Still Forgiven*, The Atlanta Journal-Constitution, April 26, 2018.