EXHIBIT 16



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

REGION XI
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, DC

June 28, 2018

Dr. Carol L. Folt
Chancellor
University of North Carolina at Chapel Hill
103 South Building
Campus Box 9100
Chapel Hill, NC 27599-9100

Re:  OCR Complaint No. 11-13-2051
[AMENDED] Letter of Findings[1]

Dear Dr. Folt:

This letter is to notify you of the disposition of the above-referenced complaint the Office for Civil
Rights (OCR) of the U.S. Department of Education (the Department) received on January 17, 2013
against the University of North Carolina at Chapel Hill (the University). The Complainants[2] alleged
that the University discriminated on the basis of sex. Specifically, the Complainants alleged the
following:

1. The University failed to maintain appropriate policies and grievance procedures that provide
   for the prompt and equitable resolution of complaints of sexual harassment, including sexual
   violence.[3]

2. The University failed to promptly and equitably respond to complaints of sexual harassment,
   including sexual violence, of which it had notice, based upon the University's handling of the
   Complainants' complaints and those of other students.[4]

---

[1] This Letter of Findings (LOF) replaces and amends the LOF that OCR initially issued on June 25, 2018. This LOF
clarifies a recipient's obligations regarding the opportunity to appeal for complainants and respondents with respect to
complaints of sex discrimination, including sexual harassment and sexual violence. Specifically, the LOF currently
clarifies, on Pages 10 and 11 herein, that if a recipient, such as the University, chooses to permit appeals regarding its
determinations of responsibility and/or disciplinary sanctions, the recipient may choose to allow an appeal (i) solely by the
respondent or responding party; or (ii) by both the respondent and the complainant, in which case any appeal procedures
must be equally available to both parties.

[2] The complaint
expressed concerns stemming from the Complainants' own experiences and that of other students with respect to the
University's handling of sexual harassment and sexual violence complaints. Although OCR did not specifically address
any of the Complainants' individual claims in this complaint, the information presented by the Complainants informed
OCR's systemic investigation.
[3] Specifically, the Complainants alleged that various changes to the sexual harassment and sexual violence policies and
procedures were confusing to students.
[4] The Complainants asserted that that the University failed to follow its own policies and procedures in responding to or
adjudicating Title IX complaints.

Page 2 – OCR Complaint No. 11-13-2051

## **Jurisdiction**

OCR enforces Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any program or activity receiving Federal financial assistance from the Department.  Because the University receives Federal financial assistance from the Department, OCR has jurisdiction over it pursuant to Title IX.

After carefully considering all of the information obtained during the investigation, OCR identified compliance concerns and a violation regarding the University's compliance with Title IX, which the University agreed to resolve through the enclosed Resolution Agreement, dated June 21, 2018, pursuant to Section 302 and Section 303(b), respectively, of OCR's *Case Processing Manual*.  OCR appreciates the University's cooperation during the investigation and resolution of this complaint. OCR also acknowledges that the University has already taken affirmative steps to improve its response to complaints of sexual harassment and sexual violence.  OCR's findings and conclusions are discussed below.

## **Legal Issues**

1. Whether the University complied with Title IX requirements regarding the designation and notice of a Title IX Coordinator, pursuant to 34 C.F.R. § 106.8(a).
2. Whether the University complied with Title IX requirements regarding the publication of an appropriate notice of non-discrimination, pursuant to 34 C.F.R. §§ 106.8(a) and 106.9(a).
3. Whether the University's sexual harassment and sexual violence policies and procedures, *as written*, comply with Title IX, pursuant to 34 C.F.R. § 106.8(b).
4. Whether, *in practice*, the University provided a prompt and equitable response to complaints of sexual harassment and sexual violence, of which it had notice, pursuant to 34 C.F.R. §§ 106.8 and 106.31.
5. Whether the University's failure to provide a prompt and equitable response to complaints of sexual harassment and sexual violence, resulted in complainants or others being subjected to a sexually hostile environment that denied or limited their ability to participate in or benefit from the University's program, pursuant to 34 C.F.R. §§ 106.8 and 106.31.

## **Legal Standards**

### Sexually Hostile Environment and Duty to Respond Promptly and Equitably

Title IX prohibits discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance.  The Title IX regulation, at 34 C.F.R. § 106.31(a), states that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity operated by a recipient of Federal financial assistance.

Sexual harassment that creates a hostile environment is a form of discrimination prohibited by Title IX. Sexual harassment is unwelcome conduct of a sexual nature, regardless of the sex of the individual.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual

Page 3 – OCR Complaint No. 11-13-2051

violence.[5] Sexual harassment of an individual creates a hostile environment if the conduct is so severe, persistent, or pervasive that it denies or limits an individual's ability to participate in or benefit from the recipient's program or activities.

OCR considers a variety of related factors to determine if a hostile environment based on sex has been created and considers the conduct in question from both an objective and a subjective perspective. Factors examined include the degree to which the misconduct affected one or more individuals' ability to participate in or benefit from the recipient's program or activities; the type, frequency, and duration of the conduct; the identity of and relationship between the alleged harasser and the subject or subjects of the harassment; the number of individuals involved; the age of the alleged harasser and the subject of the harassment; the size of the recipient; the location of the incidents and the context in which they occurred; and other incidents at the recipient.

A recipient has notice of harassment based on sex if a responsible employee actually knew or, in the exercise of reasonable care, should have known about the harassment. A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate officials sexual harassment or any other misconduct by students, employees, or third parties, or an individual who a student or other party could reasonably believe has this authority or responsibility. Accordingly, a recipient needs to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate officials. Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

Sexual harassment of a student or other individual by a faculty member or other recipient employee violates Title IX. If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out the employee's day-to-day responsibilities (such as teaching, counseling, supervising, and advising) engages in sexual harassment, the recipient is responsible for remedying any effects of the harassment on the complainant[6], as well as for ending the harassment and preventing its recurrence. This is true whether or not the recipient has notice of the harassment.

A recipient has notice of peer or third party sexual harassment if a responsible employee actually knew or, in the exercise of reasonable care, should have known about the harassment. If a recipient delays responding to allegations of sexual harassment or responds inappropriately, the recipient's own action may subject individuals to a hostile environment.

Once a recipient knows or reasonably should know of possible sexual harassment, it must take immediate and appropriate action to investigate or otherwise determine what occurred. If an investigation or other inquiry reveals that sexual harassment created a hostile environment, a recipient must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment if one has been created, prevent the harassment from recurring and, as appropriate, remedy its effects. These duties are a recipient's responsibility regardless of whether or not the student or other party who was harassed makes a complaint or otherwise asked the recipient to take action. If,

---

[5] From this point onward, when OCR generally refers to "sexual harassment," such references may be assumed to include sexual assault and sexual violence.

[6] The term "complainant" as used throughout this document refers to an individual who is the subject of any alleged sexual harassment, including sexual violence. The term "respondent" refers to an individual accused of any alleged sexual harassment, including sexual violence.

Page 4 – OCR Complaint No. 11-13-2051

upon notice, a recipient fails to take prompt and effective corrective action, the recipient's own failure has permitted the student to be subjected to a hostile environment. If so, the recipient will be required to take corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the student that could reasonably have been prevented had the recipient responded promptly and effectively.

A recipient must consider the effects of off-campus misconduct when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity. This includes a review of misconduct that did not occur in the context of an education program or activity to determine whether that off-campus misconduct has an impact within the recipient's programs and activities. Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities.

In situations where reported sexual harassment may constitute a criminal act, a recipient should notify a complainant of the right to file a criminal complaint with local law enforcement, and should not dissuade a complainant from doing so either during or after the recipient's internal Title IX investigation. Additionally, recipients must take immediate steps to protect the complainant and allow continued access to the recipient's programs and activities. Because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve a recipient of its duty to respond promptly and effectively.

It may be appropriate for a recipient to take interim measures during the investigation of a complaint. In fairly assessing the need for a party to receive interim measures, a recipient may not rely on fixed rules or operating assumptions that favor one party over another, nor may a recipient make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator (or other designated responsive employee(s)), making every effort to avoid depriving any student of her or his education, or an individual's ability to participate in or benefit from the recipient's program or activities. The measures needed by the complainant and the respondent may change over time, and the Title IX Coordinator should communicate with each party throughout the investigation to ensure that any interim measures are necessary and effective based on each party's evolving needs. The recipient also should take steps to prevent any retaliation against the complainant and/or those who provided information.

Once it decides to open an investigation that may lead to disciplinary action against the respondent, a recipient should provide written notice to the respondent of the allegations constituting a potential violation of the school's Title IX policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident. Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the recipient's sexual misconduct policy.

For Title IX purposes, a recipient should also provide written notice of the outcome of disciplinary proceedings to the complainant and the respondent concurrently. This notification must include any

Page 5 – OCR Complaint No. 11-13-2051

initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.[7]  The recipient should inform the complainant whether it found that the alleged conduct occurred, any individual remedies offered to the complainant or any sanctions imposed on the respondent that directly relate to the complainant, and other steps the recipient has taken to eliminate the hostile environment, if the recipient found one to exist.

When a recipient knows or reasonably should know of possible retaliation, it must take immediate and appropriate steps to investigate or otherwise determine what occurred.  Title IX requires recipients to protect against retaliation; at a minimum, this includes making sure that individuals know how to report retaliation, making follow-up inquiries to see if any retaliation or new incidents of harassment have occurred, and responding promptly and appropriately to address any new or continuing concerns.

There is no fixed timeframe under which a recipient must complete a Title IX investigation.  OCR will evaluate a recipient's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence – including both inculpatory and exculpatory evidence – and take into account the unique and complex circumstances of each case.  In addition, a recipient should ensure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.

Any rights or opportunities that a recipient makes available to one party during the investigation should be made available to the other party on equal terms.

Recipients are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.  Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

<u>Title IX Coordinator, Grievance Procedures, and Notice of Non-Discrimination</u>

The Title IX regulation, at 34 C.F.R. § 106.8(a), requires each recipient to designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX, including investigation of any complaint communicated to the recipient alleging any actions which would be prohibited by Title IX.

The Title IX regulation, at 34 C.F.R. § 106.8(b), requires recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints alleging any action that would be prohibited by Title IX, including sexual harassment and sexual violence.  Title IX does not require a recipient to provide separate grievance procedures for sexual harassment complaints, including sexual violence complaints.

Finally, the Title IX regulation, at 34 C.F.R. § 106.9, requires each recipient to implement specific and continuing steps to notify applicants for admission and employment, employees, sources of referral of

---

[7] With respect to postsecondary institutions, such notice is required by the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the Clery Act).

applicants for admission and employment, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient, that it does not discriminate on the basis of sex in any educational program or activity which it operates, and that it is required by Title IX not to discriminate in such a manner. The notice of non-discrimination must include a statement that inquiries concerning Title IX may be referred to the Title IX Coordinator or to OCR (34 C.F.R. § 106.9(a)) and, the University must provide adequate notification of the contact information, including the name (or title), address, and phone number for the Title IX Coordinator (34 C.F.R. § 106.8(a)).

## Background and Summary of Investigation

During the course of its investigation, OCR reviewed documentation that the Complainants and the University submitted, including the University's policies and procedures regarding discrimination on the basis of sex, including sexual harassment and sexual violence, in effect between the 2011-2012 academic year through the present, to determine whether these comply with the requirements of Title IX. OCR also interviewed some of the Complainants and University personnel, including the Interim Title IX Coordinator, the Deputy Title IX Officer, and investigative staff, and participated in student focus group sessions. OCR also reviewed other relevant publicly available information. Further, OCR reviewed the University's handling of individual complaints of sexual harassment and sexual violence made during the 2011-2012 and 2012-2013 academic years, as well as those made during the 2014-2015 academic year and the fall 2015 semester of the 2015-2016 academic year.

## Factual Information and Analysis

1. **Whether the University complied with Title IX requirements regarding the designation and notice of a Title IX Coordinator, pursuant to 34 C.F.R. § 106.8(a).**

2. **Whether the University complied with Title IX requirements regarding the publication of an appropriate notice of non-discrimination, pursuant to 34 C.F.R. §§ 106.8(a) and 106.9(a).**

### *Title IX Coordinator*

At the outset of OCR's investigation, the University identified the University's Director of the Equal Opportunity/ADA Office (EO Office), subsequently renamed the Equal Opportunity and Compliance Office (EOC Office)[8] as the individual serving as the Title IX Coordinator. She continued in that dual role until April 2013, when the University first created a full-time, designated Title IX Coordinator position; in December 2013, that position was filled by an individual who had extensive expertise in Title IX, including based on his 18 years at OCR.[9] He remained in that position until early December 2014, when the University appointed another individual to serve as the University's Interim Title IX Coordinator. Thereafter, in February 2016, the University hired an Associate Title IX Coordinator, who has legal, advocacy, and compliance experience, to oversee complaint investigations and support and monitor the University's compliance with Title IX. In August 2017, the Associate Title IX Coordinator became the University's current Director of Title IX/Title IX Coordinator. In reviewing the University's website in January 2018, OCR found that the University's website, including the web

---

[8] During the course the investigation, the University subsequently renamed the office responsible for Title IX matters from the EO to the EOC office. In this document, OCR refers to this office as "EOC" or "EOC Office" interchangeably.

[9] In the interim, between April and December 2013, the Director of the Carolina Women's Center took a leave of absence to serve as the Title IX Coordinator while the University conducted a national search for its Title IX Coordinator.

page for the EOC Office, identifies the current Title IX Coordinator and provides the required corresponding contact information, including the Title IX Coordinator's name and/or title, office and email addresses, and telephone number.[10]

*Notice of Non-Discrimination*

The University's current Policy Statement on Non-Discrimination affirms the University's commitment to an inclusive and welcoming environment free of discrimination, including sex/gender discrimination, and it clearly states that the University does not discriminate on the basis of sex in any program or activity, which also extends to employment. The notice of non-discrimination also provides specific language to be used on educational and employment materials, states that inquiries regarding Title IX may be referred to the identified Title IX Coordinator and OCR and provides the appropriate contact information for that individual/entity, and is widely disseminated.[11] In reviewing the University's website in January 2018, OCR determined the version of the notice found on the EOC website contained outdated information for the designated Title IX Coordinator, as it continued to refer to the former Interim Title IX Coordinator. However, as of February 2018, the University revised the notice as posted on its website, which OCR verified and determined that it satisfies the requirements of 34 C.F.R. §106.8(a).

*Conclusion*

During the course of OCR's investigation, OCR determined that, consistent with Title IX requirements, the University has designated a Title IX Coordinator. In addition, OCR's initial concern regarding the University's failure to adopt a notice of non-discrimination that appropriately identifies the designated Title IX Coordinator has since been corrected and resolved due to changes made by the University. Accordingly, OCR determined that no additional action is required by the University to satisfy the requirements of 34 C.F.R. §§ 106.8(a) and 106.9(a), respectively.

### 3. Whether the University's sexual harassment and sexual violence policies and procedures, *as written*, comply with Title IX, pursuant to 34 C.F.R. § 106.8(b).

OCR has identified a number of elements in determining if grievance procedures are prompt and equitable, including whether the procedures provide for: (a) notice to students and employees of the procedures, including where complaints may be filed, that is easily understood, easily located, and widely distributed; (b) application of the procedures to complaints alleging discrimination or harassment carried out by employees, students, and third parties; (c) adequate, reliable, and impartial investigation, including an equal opportunity to present witnesses and evidence; (d) designated and reasonably prompt timeframes for major stages of the grievance process; (e) written notice to parties of the outcome and any appeal; and, (f) an assurance that the institution will take steps to prevent further harassment and to correct its discriminatory effects on the complainant and others, if appropriate. A recipient may use student disciplinary or other separate procedures for these complaints; however, any procedures used to adjudicate complaints of sexual harassment or sexual violence, including

---

[10] During the course of OCR's investigation, the University has provided significant internal and external training to its Title IX staff. Generally, OCR found that those serving as Title IX Coordinators on either an interim or permanent basis, as well as the Deputy Title IX Coordinators, Title IX Associate Coordinator, and the corresponding investigators, to be well-qualified for carrying out their Title IX responsibilities at the University.

[11] For example, it is readily accessed on the University's website in a number of locations, including the Central Repository for all University Policies, the EOC Office webpage, and various department and individual school web pages.

disciplinary proceedings, must afford the complainant and the respondent a prompt and equitable resolution.

OCR reviewed the University's policies and procedures pertaining to sexual harassment and sexual violence, in effect from the 2011-2012 academic year through the present. Generally, OCR found that the University's prior and current policies and procedures failed to satisfy the required elements described above. However, OCR recognizes that the evolution of the University's policies and procedures reflect the University's ongoing efforts to comply with Title IX. OCR has limited its discussion to the University's current policies and procedures as discussed below.

### *The University's Current Title IX Policy and Procedures*

The University revised its policy related to sexual harassment and sexual violence, effective August 28, 2014. The policy provisions related to sexual harassment and sexual violence are contained in the University's general harassment policy: Policy on Prohibited Discrimination, Harassment And Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence and Stalking (Current Policy).[12] The Current Policy is disseminated to the University community through publications, new employee orientations, student orientations, and email correspondence. It also is readily accessible through the University's EOC Office website and a website devoted to Title IX issues.[13] The Current Policy also has corresponding grievance procedures (Current Procedures), as described below.

The Current Policy prohibits all forms of discrimination and harassment based on an individual's protected status, including sex and gender, and extensively defines harassment, including sexual harassment and sexual violence. The Current Policy also includes a statement regarding conduct occurring on- and off-campus; a statement prohibiting retaliation; an explanation of and a link to a list responsible employees at the University; title and contact information of individuals to whom an individual can make a report; notice of available interim measures; sources of counseling, advocacy, and support; and an assurance that the University will take steps to eliminate and prevent recurrence of harassment and to address its discriminatory effects.[14]

The Current Policy prohibits discrimination and harassment against and by University students, employees, and third parties.[15] The Current Policy designates the following procedures for reports arising under the Policy based on the relationship of the Reporting Party or Responding Party to the University:

- Procedures for Reporting and Responding to Complaints of Discrimination, Harassment, and Related Misconduct Involving a Student as a Responding Party; and

---

[12] *See* http://www.policies.unc.edu/files/2013/04/PPDHRM.pdf.

[13] *See* http://eoc.unc.edu and https://safe.unc.edu/learn-more/policies-regulations/.

[14] OCR notes that the Current Policy and Procedures also: address confidentiality, including an explanation of the factors by which the Title IX Coordinator or the EOC Office will assess whether a request for confidentiality may be honored; explain which individuals are considered to be confidential resources who may receive information about sexual harassment while preserving confidentiality; and specify the evidentiary standard (preponderance of the evidence) to be used in resolving complaints of sexual harassment and sexual violence.

[15] Employees include faculty members, Exempt from Public Act (EPA) non-faculty employees, and State Personnel Act (SPA) employees. Under "Scope and Applicability," the Current Policy states that the non-discrimination provisions of the Policy apply to contractors and other third parties "under circumstances within the University's control."

- Procedures for Reporting and Responding to Complaints of Discrimination, Harassment, and Related Misconduct Involving a Student as a Reporting Party and a University Employee as a Responding Party.[16]

Overall, OCR considered whether the University's Current Policy and Procedures apply to complaints alleging discrimination and harassment carried out by students, employees, and third parties. While the Current Policy's coverage appears to extend to third parties, none of the associated procedures include a reporting process for third parties or otherwise cover complaints against third parties, as required by Title IX.[17]

*Analysis of the Current Policy and Procedures Involving Complaints Against Students*[18]

OCR first considered and determined that the Current Policy and Procedures provide widespread notice of the process for initiating and responding to reports of "Prohibited Conduct," including sexual misconduct, adequately identify how and to whom complaints/reports of discrimination and harassment may be filed, and do so in a manner that is easily understood and widely distributed. OCR also determined that the Current Policy and Procedures include safeguards to ensure an adequate, reliable, and impartial investigation of complaints for both parties, and adequately designate reasonably prompt timeframes for the major stages of the complaint process. Finally, OCR determined that the Current Policy and Procedures provide adequate assurance that the University will take steps to the prevent recurrence of any sexual harassment and remedy discriminatory effects on the complainants and others, if appropriate.

However, with respect to notice to the parties of the outcome of the complaint, OCR determined that the Current Policy and Procedures fail to specify whether notice will be provided to either party regarding any further review or appeal to the Board of Trustees or the Board of Governors, even though they provide for written notice of the outcome at the preceding stages. Therefore, OCR determined that the Current Policy and Procedures involving complaints filed against students, as

---

[16] The University also maintains two additional procedures pertaining to employees. The first is "Procedures for Reporting and Responding to Concerns of Exempt from Public Act (EPA) Faculty and Non Faculty Employees Regarding Allegations of Discrimination, Harassment, and Related Misconduct." Under the State Personnel Act (the Act), EPA employees are administrator level positions. The Act was revised to the State Human Resources Act, so EPA employees are currently referred to as Exempt Human Resources Act (EHRA) employees. The second is "Procedures for Reporting and Responding to Concerns of (State Personnel Act) SPA Employees Regarding Allegations of Prohibited Discrimination, Harassment, and Related Misconduct." SPA Employees generally hold administrative assistant or other related positions. As noted above, the Act was revised to the State Human Resources Act; therefore, SPA employees are currently referred to as State Human Resources Act (SHRA) employees. OCR reviewed the respective procedures for SPA Employees and EPA Employees and determined that they were substantially similar to the procedures involving complaints against employees as discussed below. The University informed OCR that is in the process of revising its procedures for complaints involving EPA and SPA employees with the intention of consolidating the procedures related to complaints involving University employees.

[17] OCR located on the University's website a separate Policy and Procedure on Non-discrimination for Program Participants designed to provide for prompt and equitable resolution of complaints by at least some third parties, namely University visitors or program participants, who allege unlawful discrimination, harassment or retaliation. See https://eoc.unc.edu/our-policies/policy-on-non-discrimination-for-visitors-and-program-participants/. Further, OCR's review of complaints handled by the University led to further confusion regarding third party complaints. Specifically, OCR's review revealed that the University handled third party complaints in accordance with the Current Policy and Procedures pertaining to students. To remedy the potential confusion and provide greater clarity, the University should revise its various policies and procedures to provide greater specificity regarding the applicable policies and procedures available for the handling of complaints filed by or against third parties.

[18] An analysis of the procedures addressing student complaints against employees is addressed in a subsequent section.

currently written, fail to provide for the prompt and equitable resolution of complaints of discrimination, as required by Title IX.

*Analysis of the Current Policy and Procedures[19] Involving Student Complaints Against Employees*

In cases in which allegations of sexual harassment or sexual violence are raised against a University employee, students may file a complaint with the EOC Office or to a department chair, associate dean, or other administrator in accordance with the outlined procedures. Students may also seek redress directly through the Student Grievance Committee.[20] Because the Current Policy and Procedures did not explain or differentiate between the two grievance processes, OCR found that notice to students where complaints may be filed was not easily understood.

In addition, there is a lack of specificity regarding the provision that the EOC Office will initiate a review if informal attempts at resolution have been unsuccessful. Neither the Current Policy nor the Current Procedures address what the informal process entails or whether the informal process is required prior to moving forward with an investigative process.[21] Further, OCR is concerned that the relevant Dean, Director, or Department Chair is empowered to either accept or reject any recommendations for corrective actions contained in the Administrative Review report; it is also unclear whether they may also reject the investigative findings. While someone sufficiently removed from the chain of command such as a Dean may not pose a conflict interest, the involvement of individuals such as a Director or Department Chair who serves as an immediate supervisor for employees could pose a conflict of interest and raise issues of inequitable treatment.[22] Finally, OCR found that the Current Policy and Procedures involving employees, as written, do not specify that written notice of the outcome will be provided to both parties, and they only provide an opportunity to appeal for the complainant.

Based on the foregoing, OCR determined that the Current Policy and Procedures involving student complaints filed against employees, as currently written, fail to provide the following: notice to students and employees of the procedures, including where complaints may be filed, that is easily understood, easily located; adequate, reliable, and impartial investigation of complaints; a right to appeal either by both parties, in which case the appeal procedures must be equally available to both parties, or solely by the respondent or responding party; and written notice to the parties of the

---

[19] Effective August 28, 2014, the University revised its Policy, which applies to complaints filed against students or employees. The University also revised its procedures, but only for complaints against students. Consequently, the 2012 procedures for complaints against employees remain in effect, and the University informed OCR that these procedures are currently under revision. In the interim, Title IX staff indicated that complaints against employees are being addressed through the Current Policy and Procedures for complaints against students.

[20] In addition to concerns previously identified with respect to the Student Grievance Policy, OCR found that the Student Grievance Policy permitted without limitation that the grievant and the respondent have the "right to cross-examine witnesses." OCR discourages a school from allowing parties to personally question or cross-examine each other during a hearing on alleged sexual violence" as that practice may be traumatic or intimidating and may perpetuate a hostile environment. OCR further discourages schools from allowing students to serve on hearing boards in cases involving sexual violence, which is permitted by the Student Grievance Committee.

[21] In instances where an informal process is pursued, the University should not require the student to work out an issue directly with the respondent employee, although both parties may engage voluntarily in such a process and the University should notify the parties of the right to end the informal process and begin a formal process at any time.

[22] Instead, the Interim Title IX Coordinator told OCR that in practice, administrators do not reject corrective action recommendations, and that the purpose of the clause, as written, is to involve an administrator in the respondent's chain of command to sufficiently address and impose the recommended corrective action. Notwithstanding the University's explanation, OCR notes that this clause, as written, could be perceived as a conflict of interest.

outcome of the complaint.[23]  The Current Policy and Procedures therefore fail to provide for the prompt and equitable resolution of complaints of discrimination, as required by Title IX.

Notably, the University informed OCR that it is currently reviewing the Current Policy and Current Procedures for addressing allegations of sexual harassment or sexual violence by University employees.  In the interim, the Title IX Coordinator informed OCR that with limited exceptions, the University processes complaints against employees consistent with investigations for complaints against students.

*Conclusion*

Accordingly, for the reasons stated herein, OCR determined that the University has failed to adopt and publish grievance procedures that provide for the prompt and equitable resolution of student, employee, and third-party complaints alleging discrimination on the basis of sex, as required by the Title IX regulation, at 34 C.F.R. § 106.8(b).  On June 21, 2018, the University agreed to implement the enclosed Resolution Agreement, which commits the University to take specific steps to address this violation, pursuant to Section 303(b) of OCR's *Case Processing Manual*.

4. **Whether, *in practice,* the University provided a prompt and equitable response to complaints of sexual harassment and sexual violence, of which it had notice, pursuant to 34 C.F.R. §§ 106.8 and 106.31.**

5. **Whether the University's failure to provide a prompt and equitable response to complaints of sexual harassment and sexual violence, resulted in complainants or others being subjected to a sexually hostile environment that denied or limited their ability to participate in or benefit from the University's program, pursuant to 34 C.F.R. §§ 106.8 and 106.31.**

*Individual Sexual Harassment/Violence Complaints (2011-2012 and 2012-2013 Academic Years)*

The University identified 102 complaints/reports of sexual harassment and sexual violence filed during the 2011-2012 and 2012-2013 school years.[24]  OCR reviewed a selection of the complaint files to assess whether the University's handling of the complaints met the requirements of Title IX and identified the following concerns:

---

[23] Specifically, OCR determined that the Current Policy and Procedures involving employees were not easily understood given the option to pursue a separate process through the Student Grievance Committee without clear explanation or cross-reference; and therefore did not constitute sufficient notice.  They also failed to specify written notice of the outcome to both parties as required;  and provided complainant-only appeal rights (in addition to other equitability concerns between the parties) and presented potential conflict of interests, which in totality, undermine the requirement for adequate, reliable, and impartial investigation of complaints.

[24] The University provided information on all student complaints of sexual harassment and sexual violence, for the 2011-2012 academic year, and for those complaints received from the beginning of the 2012-2013 academic year through March 4, 2013, the date the University received OCR's initial Data Request Letter.

In summary, OCR found that the complaint files processed during the 2011-2012 and 2012-2013 academic years reflect that some University staff members were not adequately trained to implement its own procedures, resulting in a failure to respond promptly and equitably to some complaints.[25]  The University's own records from that time period suggest improper action, or inaction, by University staff at different levels of the complaint process.  Additionally, the University's inadequate recordkeeping made it difficult to determine the extent of any noncompliance during this period.

## _Individual Sexual Harassment Complaints (2014-2015 Academic Year and Fall 2015 Semester)_

While on-site at the University in June 2016, OCR staff reviewed 285 files of complaints/reports of sexual harassment and sexual violence, filed under the Current Policy and Procedures with EOC during the 2014-2015 academic year and the fall 2015 semester of the 2015-2016 academic year.[26]  OCR's review of the records indicated that the University generally conducted adequate, reliable and impartial investigations of the complaints.  However, based on a lack of documentation, OCR identified Title IX compliance concerns regarding whether the University provided timely resolution of complaints[27]; and, in the context of a complainant's request for confidentiality, whether the University

---

[25] Such staff included, but was not limited to, those students that the University employed as resident assistants or used in the hearing process.

[26] Of the 285 files OCR reviewed, 18 complaints resulted in formal investigations. EOC used an informal process to resolve or to attempt resolution for the remaining complaints without formal action through an investigation or adjudication. Rather, during the informal process, EOC conducted an initial assessment of the alleged conduct; any risk or harm to those involved or the broader campus community; and the need for any interim measures, resources, and support for both parties. For matters where a reporting party requested confidentiality or stated preference not to pursue formal action, the University balanced requests not to pursue formal action against the University's obligation to provide a safe and nondiscriminatory environment. In weighing such interests during the informal process, EOC considered several factors including, but not limited to, the nature and scope of the alleged conduct; the risk posed by not proceeding with a formal investigation; whether the report revealed a pattern of misconduct or use of a weapon; and whether the University possessed other means to obtain relevant evidence.

[27] Although there is no fixed timeframe in which the University must complete an investigation of sexual harassment or sexual violence, OCR nevertheless reviewed individual complaints to determine whether the University's investigations were conducted in a timely manner, considering: the University's own imposed timeframe; the complexity of the investigations; and the severity and extent of the alleged harassment. OCR's examination of 18 formal cases revealed that only 5 complaints were resolved within the timeframes specified in the Current Policy and Procedures. For the remaining complaints, the investigation and adjudication process extended up to 213 days, and on average, approximately 126 days, until resolution. While many of these cases presented extenuating factors that could explain the duration of the complaint

Page 13 – OCR Complaint No. 11-13-2051

appropriately and timely weighed such a request against its responsibility to provide a safe and nondiscriminatory environment.[28]

*Conclusion*

Based on the foregoing, OCR has concerns regarding whether the University provided prompt and equitable responses to complaints of sexual harassment and sexual violence, of which it had notice; and, if not, whether such failure allowed individuals to continue to be subjected to a sexually hostile environment that denied or limited their ability to participate in or benefit from the University's program, as required by the Title IX regulation, at 34 C.F.R. §§ 106.8 and 106.31. However, as discussed above, given the inadequacy of the documentation regarding these complaints, OCR is currently unable to assess the extent of its concerns, which would require further investigation by OCR. Accordingly, OCR determined that resolving such concerns through a Resolution Agreement pursuant to Section 302 of OCR's *Case Processing Manual* is appropriate.[29]

On June 21, 2018, the University agreed to implement the enclosed Resolution Agreement, which commits the University to take specific steps to address these compliance concerns, pursuant to Section 302 of OCR's *Case Processing Manual.*

**Conclusion**

Throughout OCR's investigation and resolution of this complaint, the University expressed its ongoing commitment and willingness to make the changes necessary in furtherance of its efforts to comply with Title IX, including in response to OCR's investigation, as well as through its agreement to implement the enclosed Resolution Agreement (the Agreement), which it signed on June 21, 2018. For example,

---

resolution, OCR identified 6 complaints where OCR could not resolve timeliness concerns in the absence of adequate documentation.

[28] In weighing or balancing a complainant's request for confidentiality, a recipient should consider a range of factors in assessing if the recipient's obligation to provide a safe and nondiscriminatory environment is compromised by not conducting an investigation. These factors include, but are not limited to, circumstances that suggest that: there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence; there is an increased risk of future acts of sexual violence under similar circumstances; whether the sexual violence was perpetrated with a weapon; the age of the student/complainant subjected to the sexual violence; and whether the recipient possesses other means to obtain relevant evidence.

[29] In making its determination, OCR considered the University's most recent demonstrated efforts to promptly and equitably respond to complaints of sexual harassment and sexual violence. In reviewing the University's recent complaints, OCR found that the University: appropriately offered interim measures to complainants and respondents, which included no-contact directives, housing and parking accommodations, and counseling and support options; imposed appropriate sanctions; provided appropriate final remedies to complainants including counseling and academic accommodations and generally took meaningful steps to remedy the effects of sexual harassment and sexual violence and to prevent it from recurring. Moreover, the University has implemented several initiatives consisting of Title IX awareness and prevention training for employees and students; bystander intervention training; awareness campaigns; and educational efforts for athletics, fraternities, and sororities' educational efforts. OCR notes that such efforts further enhance the University's response to ensure a safe and nondiscriminatory environment. Finally, Title IX staff also reported to OCR increased efforts to track and analyze pattern and trend data through a case management database and coordination between University offices including Residential Housing, Department of Public Safety and the Office of the Dean of Students. OCR determined that such efforts enhance the University's ability to respond promptly to allegations of sexual harassment and sexual violence and to prevent its recurrence.

the University has taken numerous steps to improve its response to complaints of sexual harassment and sexual violence, by: regularly reviewing and revising its written policies and procedures; hiring a full-time Title IX Coordinator, an additional Deputy Title IX Coordinator/Student Complaint Coordinator, and additional investigative staff; implementing extensive student, faculty, and staff training and prevention programs as well as numerous outreach efforts; developing a Title IX website[30] with resource information and links to policies and procedures; and implementing a Title IX team approach whereby staff members meet twice weekly to discuss reports of sexual harassment and sexual violence, consider requests for confidentiality, and to track complaints and identify trends that may need to be addressed, all with a goal of ensuring a comprehensive and prompt and equitable response to such complaints.

As stated above, on June 21, 2018, the University agreed to implement the Agreement, which commits the University to take specific steps to address the identified compliance concerns and violation of Title IX, pursuant to Section 302 and Section 303(b) of OCR's *Case Processing Manual*. Under Section 302 of OCR's *Case Processing Manual*, the Agreement, when fully implemented, will resolve the allegations identified in this complaint. The provisions of the Agreement are aligned with the allegations and issues raised by the Complainants, as well as the information obtained during OCR's investigation, and are consistent with applicable law and regulation. OCR will monitor the University's implementation of the Agreement until the University is in compliance with the statutes and regulations at issue in the complaint. Failure to implement the Agreement could result in OCR reopening the complaint. Under Section 303(b) of OCR's *Case Processing Manual*, a complaint will be considered resolved and the University deemed compliant if the University enters into an agreement that, fully performed, will remedy the identified area of noncompliance.

The University understands that by signing this Agreement, it agrees to provide data and other information in a timely manner. Further, the University understands that during the monitoring of this Agreement, OCR may visit the University, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the University has fulfilled the terms of this Agreement and is in compliance with the regulation implementing Title IX at 34 C.F.R. Part 106, which was at issue in this complaint. Upon completion of the obligations under this Agreement, OCR shall close this complaint.

As stated in the Agreement entered into by the University on June 21, 2018, the University understands and acknowledges that OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of this Agreement. Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10) or judicial proceedings to enforce this Agreement, OCR shall give the University written notice of the alleged breach and a minimum of sixty (60) calendar days to cure the alleged breach.

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the University's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR complaint. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

---

[30] *See* http://safe.unc.edu.

Page 15 – OCR Complaint No. 11-13-2051

Please be advised that the University must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, or participates in an OCR proceeding. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released, to the extent provided by law.

OCR greatly appreciates the University's cooperation during the investigation and resolution of this complaint. In particular, OCR acknowledges the cooperation of Kara E. Simmons, Associate Vice Chancellor and Senior University Counsel. If you have any questions regarding this letter, please contact the attorneys assigned to this complaint: Betsy Trice at 202-453-5931 or betsy.trice@ed.gov and Erika Westry at 202-453-7025 or erika.westry@ed.gov.

Sincerely,

Letisha Morgan
Team Leader
Office for Civil Rights
District of Columbia Office

Enclosure

cc:    Kara E. Simmons, Associate Vice Chancellor and Senior University Counsel, via email at kara_simmons@unc.edu

**RESOLUTION AGREEMENT**
**University of North Carolina at Chapel Hill**
**OCR Complaint No. 11-13-2051**

Without admitting to any violation of law, The University of North Carolina at Chapel Hill (the University) agrees to implement this Resolution Agreement (the Agreement) in the above-referenced complaint investigated by the U.S. Department of Education, Office for Civil Rights (OCR) under Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulation at 34 C.F.R. Part 106. The Agreement includes terms that resolve an allegation under Section 303(b) of OCR's *Case Processing Manual* (CPM). The Agreement also includes terms to resolve an allegation that was not fully investigated prior to the conclusion of the investigation in accordance with Section 302 of the CPM. OCR appreciates the University's cooperation during the investigation and resolution of this complaint.

During the course of its investigation, OCR recognizes that the University has been proactive regarding its efforts to maintain a campus environment free from discrimination, harassment, and related misconduct, including sexual violence and sexual assault, including through strengthening its Title IX response policies, procedures, resources, and outreach.

## Action Item A: Title IX Policies and Grievance Procedures

The University will continue to review its Title IX policies and grievance procedures with the assistance of the Title IX Coordinator, and will consider consolidating its policies and procedures into one document. The University will ensure that the procedures addressing complaints of sex discrimination (including sexual harassment and sexual violence) do not unnecessarily overlap with its other policies and procedures, are clear and easily understood and provide for the prompt and equitable resolution of student, employee, and third party complaints/reports alleging sex discrimination (including sexual harassment and sexual violence) filed against students, employees, and third parties. The University will ensure that all documents are internally consistent with respect to defined terms, reporting options, timelines, and investigation and appeal procedures, and that they do not contain any conflicting/contradictory information. The University may choose to add cross-references or links between documents and/or it may decide to delete some documents.

1. The University will review and, if necessary, revise its Title IX policies and grievance procedures to ensure they include, at a minimum, the following:

   a. Notification to students, employees, and third parties about the policy and procedure that shall be utilized for complaints/reports of sex discrimination or sexual harassment/violence when filed by or against any member of the aforementioned groups, and clear and consistent explanations in all documents of the specific University policy and/or procedure that applies to each type of complaint/report investigation and of the scope of coverage.

   b. A statement that to the extent permissible and consistent with FERPA, both/all parties will receive equitable written, concurrent notice of the completion and/or outcome of all stages of the grievance process, including but not limited to the investigation, adjudication and appeal phases.

UNC Chapel Hill: OCR Complaint No. 11-13-2051
Page 2 of 5 – Resolution Agreement

c. A statement to provide a description of the informal resolution process, including a reasonably prompt timeframe, factoring in the complexity of the matter and the severity and extent of the alleged harassment, and a statement that the process is voluntary and that the parties have a right to proceed to the formal resolution process at any time.

d. Clarification that a Dean, Director or Department Chair may not reject investigative findings and recommendations of corrective actions in complaints against employees, to avoid conflict of interests and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.

e. A statement or links to descriptions of appeal procedures available to both/all parties involving complaints against employees.

**Reporting Requirements:**

1. By November 1, 2018, the University will provide to OCR, for review and approval, its revised Title IX policies and grievance procedures developed in accordance with Action Item A above.

2. By the beginning of the Spring 2019 academic semester, or within 45 days of written notification from OCR of its approval of the revised grievance procedures, whichever is later, the University will provide documentation to OCR demonstrating that the revised procedures were adopted and implemented and that all faculty, staff and students were provided with written notice regarding the grievance procedures for resolving Title IX complaints/reports together with information on how to obtain a copy of the grievance procedures. The University, at a minimum, will publish this notification on the University's website; through email messages to faculty, staff, and students; and through any regularly issued newsletters (in print or online), or by any other means of notification the University deems effective to ensure that the information is widely disseminated and easily located. The University will also provide to OCR copies of or a link to its revised student handbooks, employee/faculty/staff handbooks, student codes of conduct, and any other publications that contain the procedures, and a link to its webpage where the revised Title IX procedures are otherwise located.

3. Once the University adopts the revised policies and procedures specified herein, the University will not substantially modify them during the period of the Agreement without the review and approval of OCR. All requests to modify such policies and procedures must be made in writing at least 90 days before the University proposes to adopt the modification.

**Action Item B: Documenting Title IX Complaints/Reports**

The University will continue to maintain and implement a confidential and centralized case management procedure or system for the maintenance of material records related to each incident or complaint/report of discrimination on the basis of sex (including sexual harassment and sexual

UNC Chapel Hill: OCR Complaint No. 11-13-2051
Page 3 of 5 – Resolution Agreement

violence) received by the University, whether formal or informal, written or verbal.[1]  The University will provide OCR with the name of the individual(s) responsible for collecting, maintaining, and reviewing these records, as well as the location where such records will be retained.

Under its procedure or system, the University will continue to maintain at a minimum, the following:

Documentation of the date and nature of the complaint or other report (e.g., impacted party, bystander or responsible employee report); the name of the complainant or indication that the report was anonymous; the location and date of the alleged conduct; identification of the alleged complainant/victim and the alleged respondent/perpetrator; whether the reporter/complainant made any request for confidentiality; an explanation of how the University balanced a request for confidentiality with the University's Title IX obligations to ensure campus safety; the name of the person(s) who received the complaint or made the report; the name(s) of the person(s) assigned to investigate the complaint, provide any interim measures, and bring disciplinary charges (where relevant); and any interim measures provided to the complainant, respondent, or for the University community.    Documentation regarding any investigation, including witnesses interviewed, documents reviewed, and other information considered and related to the investigation, to include all relevant dates; final disposition of the complaint, including the date and basis for the disposition; standard of evidence used; corrective actions or disciplinary measures, if issued; records of any appeals; the date(s) and written notice to the parties of any decisions, including any appeals; and the date(s) of status updates provided to the parties during the pendency of the investigation.

**Reporting Requirements:**

1.   By October 1, 2018, the University will provide to OCR for review and approval the above-referenced procedure.  OCR will review the sufficiency of the procedure to ensure, as asserted by the University, that the University maintains, at a minimum, the elements identified in Action Item B above.

2.   Within 45 days of OCR's approval of the procedure, the University will provide to OCR an assurance that such system is being maintained and consistently utilized; that appropriate training has been provided to those employees who are authorized to use the system; and provide several examples of the University's use of such system, including a screenshot or other information reflecting that all required elements of a material record, as set forth above, are included.

3.   For academic year 2018-2019, by December 31, 2018, and again on September 1, 2019, the University will submit to OCR for its review a spreadsheet from the electronic database documenting all complaints/reports involving students that it received/obtained that allege

---

[1] A material record is one that is or reflects a substantive step in all of these phases of the process and includes, but is not limited to, information regarding: the complainant, the respondent, and witnesses; any statements or other evidence submitted or collected; interview notes; material correspondence relating to the investigation; corrective actions or disciplinary measures, if issued; cross-references to any prior University findings of sexual harassment and/or sexual violence, including any sanctions issued; records of findings and outcomes communicated to the parties; and records of any appeals.

UNC Chapel Hill: OCR Complaint No. 11-13-2051
Page 4 of 5 – Resolution Agreement

sexual harassment and sexual violence for the 2018-2019 academic year. The spreadsheet will reflect the information, documentation, and evidence, as described in Action Item B above. If the spreadsheet the University submits contains any complaints/reports that are not yet complete, the University will flag those complaints/reports as incomplete and will re-submit a spreadsheet providing the information listed above regarding those complaints/reports after they are completed. OCR may request a copy of the complete file for each complaint/report at a later date. To the extent OCR identifies any concerns regarding the information presented, OCR will schedule a meeting with the University to discuss any concerns and a proposal for corrective actions, if needed.

## Action Item C: Title IX Training and Professional Development

1. The University will continue its existing comprehensive training program for all University students and employees, and (in consultation with the Title IX Coordinator) will augment that training with information about the revised policies and procedures, as developed in accordance with Action Item A.

2. In addition, the University will augment (in consultation with the Title IX Coordinator) its existing training program for:

    a. Responsible Employees who are directly involved in receiving complaints/reports of sex discrimination, including sexual harassment and sexual violence. The training will include, but is not limited to the following:
        i. The protocol for handling Title IX reports, including an explanation of the duty of responsible employees to share information with the Title IX Coordinator; and
        ii. A written assessment requiring participants to demonstrate that they have learned the material in the Title IX training.
    b. University employees who are directly involved in receiving, investigating, and/or resolving complaints/reports of sex discrimination, including sexual harassment and sexual violence, or who will otherwise assist in the coordination of the University's compliance with Title IX, including investigators, responsible employees, campus police, Equal Opportunity and Compliance Office personnel. The training will include, but is not limited to the following:
        i. The protocol for handling Title IX reports, including an explanation of the duty of responsible employees to share information with the Title IX Coordinator;
        ii. For employees involved in the Initial Assessment of reports, information clarifying the protocol to be used in conducting an Initial Assessment, including the scope of inquiry and decision-making; and
        iii. A written assessment requiring participants to demonstrate that they have learned the material in the Title IX training.

## Reporting Requirements:

1. By April 1, 2019, the University will provide OCR with verification that the training program(s) for all University students and employees includes information about the revised policies and procedures developed in accordance with Action Item A.

UNC Chapel Hill: OCR Complaint No. 11-13-2051
Page 5 of 5 – Resolution Agreement

2. By April 1, 2019, the University will provide OCR with a draft of the proposed employee training materials and the name and title of the individual(s) to provide the training described in Action Item C(2) for review and approval.

3. The University will implement the employee training as outlined in Action Item C(2) within 60 days of OCR review and approval and provide documentation that the training has been provided, including: a copy of the training materials, dates(s), the name and contact information of the individual(s) who conducted the training, and the sign-in sheet identifying the name and position of each individual who received the training, along with a list of University employees within 15 days of completion.

## Monitoring: General Principles

The University understands that OCR will review the University's revised Title IX policies and grievance procedures, its case management system procedure, and its comprehensive training program (as described in Action Items A, B, and C above) to ensure that, in their entirety, they comply with Title IX.

The University understands that by signing this Agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this Agreement. Further, the University understands that during the monitoring of this Agreement, if necessary, OCR may visit the University, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the University has fulfilled the terms of this Agreement. Upon completion of the obligations under this Agreement, OCR will close this complaint.

The University understands and acknowledges that OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of this Agreement. Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10) or judicial proceedings to enforce this Agreement, OCR will give the University written notice of the alleged breach and sixty (60) calendar days to cure the alleged breach.

6/21/2018
Date

Dr. Carol L. Folt
Chancellor
University of North Carolina at Chapel Hill