# EXHIBIT 19



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

400 MARYLAND AVENUE, SW
WASHINGTON, DC 20202-1475

REGION XI
NORTH CAROLINA
SOUTH CAROLINA
VIRGINIA
WASHINGTON, DC

September 21, 2015

Teresa A. Sullivan
President
University of Virginia
P.O. Box 400224
Charlottesville, VA 22904-4224

RE:     OCR Review No. 11-11-6001
        Letter of Finding

Dear Dr. Sullivan:

This letter advises you of the outcome of the above-referenced compliance review that was initiated by the District of Columbia Office of the Office for Civil Rights (OCR), U.S. Department of Education (the Department), against the University of Virginia (the University). OCR's review examined the University's handling of complaints and reports of sexual harassment, including sexual violence, under its policies and procedures to determine if the University has responded promptly and equitably. The review further examined whether any failure to respond appropriately allowed for the creation and continuation of a sexually hostile environment.

OCR investigated this case under the authority of Title IX of the Education Amendments of 1972 (Title IX). Title IX and its implementing regulations, 34 C.F.R. §106, prohibit discrimination on the basis of sex in education programs and activities operated by recipients of Federal financial assistance from the U.S. Department of Education. The University receives such Federal funds and, therefore, is a "recipient" subject to the requirements of Title IX.

In July 2015, the University revised its policy and procedures to satisfy Title IX requirements; OCR finds that as written, this policy and accompanying procedures comply with the requirement of Title IX that grievance procedures provide for prompt and equitable resolution of complaints. During the course of the investigation, OCR also noted that the University consistently provided supports to students who reported being subjected to sexual violence, such as access to counseling, academic adjustments, and changes to housing arrangements. In addition, the University informed OCR that it took other steps to address the issue of sexual harassment, including sexual violence. The University has, among other efforts, created and filled a dedicated Title IX Coordinator position; expanded investigative capacity in the Office of Equal Opportunity Programs; created and filled a Prevention Coordinator position in the Office

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

of the Dean of Students to develop, evaluate, implement, and assess evidence-based prevention strategies that seek to reduce sexual assault, gender-based violence and "high-risk activities in student organizations"; reviewed and enhanced training and prevention programs for students and employees, including alcohol education programming and other student outreach efforts; secured funding to hire additional mental health counselors; and developed a Title IX website to provide a central resource for Title IX resources and educational materials. The University also formed the President's Ad Hoc Group on University Climate and Culture to explore policies, practices, and organizational structure to support the goal of ensuring the safety and well-being of students through developing strategies to prevent sexual violence, respond appropriately to incidents of sexual violence when they occur, and to improve campus climate concerning issues of sexual harassment and sexual violence; developed and launched awareness and marketing campaigns (Not on Our Grounds and #HOOSGotYourBack); and implemented bystander education programming. In addition, in February 2014, the University hosted a national conference, "Dialogue at UVA, Sexual Misconduct Among College Students," which brought together national experts and professionals from approximately 60 colleges and universities to discuss best practices and strategies for prevention and response. These important efforts are commendable and speak to a University commitment to embrace its Title IX responsibilities and promote a safe learning environment.

**Summary of Findings**

The University had four policies pursuant to which it handled complaints[1] of sexual violence since the opening of OCR's review: one that was in place from 2005 through July 2011 (Sexual Assault Policy), another that was in place from July 2011 through March 2015 (Sexual Misconduct Policy), a third that covered the period from March 2015 to July 2015 (Interim Policy), and a policy that has been in place since July 2015 (Policy on Sexual and Gender-based Harassment). OCR finds that the Sexual Assault Policy and the Sexual Misconduct Policy (SMP) did not provide for the prompt and equitable resolution of student and employee complaints in violation of Title IX. As noted above, the University's July 2015 policy is designed to provide a prompt and equitable response to reports of sexual harassment, including sexual violence.

OCR further finds that the University's informal resolution process as set forth in the Sexual Misconduct Policy was not equitable either to complainants or to accused students in that it permitted the University to impose sanctions on the basis of an admission without an independent investigation. OCR also finds that the University's handling of some complaints filed under the formal hearing process was not prompt and equitable as required by Title IX, and that during the 2008-2009 through 2011-2012 academic years, as well as in two reports filed in 2013 and 2014, the University failed to respond in a prompt and equitable manner to many reports of sexual violence that were not filed as formal complaints. In addition, at least through the 2011-2012 academic year the University did not respond promptly and equitably to student complaints involving sexual harassment committed by University employees.

---

[1] As used herein, "complaints" refers to formal complaints that are resolved through the formal hearing process, formal complaints that are resolved through the informal resolution process and reports where a student elects to take no action to resolve the matter.

OCR further determined that a basis for a hostile environment existed for affected students at the University and that the University failed to eliminate a hostile environment and take steps to prevent its recurrence during academic years 2008-2009 through 2011-2012, as well as concerning a report filed by a student in 2013 and a report filed by a student in 2014.  In addition, statements made by a University official that were broadcast on the University's radio station in September 2014 created a basis for a hostile environment for affected students.

During the period from academic years 2008-2009 through 2011- 2012, OCR also found that the Title IX Coordinator did not adequately oversee and coordinate all Title IX complaints and found that the University's notice of nondiscrimination was not adequately distributed.

The University requested to enter into a resolution agreement before OCR had completed investigation of University files for academic years 2012-2013 and 2013-2014.  Accordingly, OCR resolved this investigation pursuant to Sections 302 and 303 of OCR's Complaint Processing Manual.

## Background

The University of Virginia is the flagship public postsecondary education institution in Virginia. For the 2013-2014 academic year, the total enrollment was 21,238, of whom 14,898 were undergraduates.  Of these undergraduates, 55% (8,194) were women and 45% (6,704) were men.

As noted above, OCR reviewed the University's policies and procedures to address Title IX complaints, including procedures that were implemented in 2005, procedures that were revised in July 2011, and procedures that were revised in March 2015 and again revised in July 2015, as well as the University's procedures to address discrimination and harassment by employees. OCR also reviewed documentation regarding reports of sexual harassment, including sexual violence.  In addition, OCR reviewed documentation provided by the University regarding the Title IX Coordinator's role on issues of sexual harassment, including sexual violence.  OCR also conducted on-site interviews of University personnel involved in various aspects of the University's Title IX compliance, and OCR spoke with student focus groups to gather information from approximately 120 students, including some graduate and professional students, resident assistants (RAs), members of fraternities and sororities, members of men's and women's athletic teams, and representatives of the sexual assault peer education groups on campus.  Through the University, OCR also e-mailed a notice to all students inviting them to contact OCR with any information related to their perspectives on, or experiences with, sexual harassment and the culture and climate at the University.  OCR interviewed several current and former students who responded to the e-mailed notice, as well as other individuals who independently contacted OCR to share their perspectives and experiences.

## Legal Authority

The Title IX regulation at 34 C.F.R. § 106.31 provides generally that, except as provided elsewhere in the regulation, no person shall on the basis of sex be excluded from participation in,

denied the benefits of, or subjected to discrimination in education programs or activities operated by recipients of Federal financial assistance.

Under Title IX, colleges and universities that receive Federal financial assistance are responsible for providing students with a nondiscriminatory educational environment. Sexual harassment that creates a hostile environment is a form of sex discrimination prohibited by Title IX. Sexual harassment is unwelcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence. Sexual harassment of a student creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the recipient's program.

OCR considers a variety of related factors to determine if a sexually hostile environment has been created and considers the conduct in question from both an objective and a subjective perspective. Factors examined include the degree to which the misconduct affected one or more students' education; the type, frequency, and duration of the misconduct; the identity of and relationship between the alleged harasser and the subject or subjects of the harassment; the number of individuals involved; the age and sex of the alleged harasser and the subject of the harassment, the size of the school, location of the incidents, and the context in which they occurred; and other incidents at the school. The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. A single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment. A single instance of rape is sufficiently severe to create a hostile environment.

Once a recipient knows or reasonably should know of possible sexual harassment, it must take immediate and appropriate action to investigate or otherwise determine what occurred. A recipient must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, prevent the harassment from recurring and, as appropriate, remedy its effects. These duties are a recipient's responsibility, regardless of whether a student has complained, asked the recipient to take action, or identified the harassment as a form of discrimination. A recipient has notice of peer sexual or third party harassment if a responsible employee actually knew or, in the exercise of reasonable care, should have known about the harassment. If a recipient delays responding to allegations of sexual harassment or responds inappropriately, the recipient's own action may subject students to a hostile environment. If it does, the recipient will be required to remedy the effects of both the initial sexual harassment and the effects of the recipient's failure to respond promptly and appropriately.[2] A recipient's obligation to respond appropriately to sexual harassment complaints is the same regardless of the sex or sexes of the parties involved.

Even if the sexual harassment did not occur in the context of an education program or activity, a recipient must consider the effects of the off-campus sexual harassment when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity

---

[2] *See* OCR's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, at http://www.ed.gov/about/offices/list/ocr/docs/shguide.html (January 19, 2001) (p. 17).

Page 5 – OCR Review No. 11-11-6001

because students often experience the continuing effects of off-campus sexual harassment while at school or in an off-campus education program or activity.

A recipient should notify a complainant[3] of the right to file a criminal complaint, and should not dissuade a complainant from doing so.  Recipients should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the complainant in the educational setting.  A law enforcement investigation does not relieve the recipient of its independent Title IX obligation to investigate the conduct.

Sexual harassment of a student by a faculty member or other school employee also violates Title IX.  If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out the employee's day-to-day responsibilities (such as teaching, counselling, supervising and advising) engages in sexual harassment, the recipient is responsible for remedying any effects of the harassment on the complainant, as well as for ending the harassment and preventing its recurrence.  This is true whether or not the recipient has notice of the harassment.

The Title IX regulation, at 34 C.F.R. § 106.8(a), requires that a recipient designate at least one employee to coordinate its responsibilities to comply with and carry out its responsibilities under that law.  The recipient is further required, by the Title IX implementing regulation at 34 C.F.R. § 106.9(a), to notify all students and employees of the name (or title), office address, and telephone number of the designated employee(s).

The regulation implementing Title IX, at 34 C.F.R. § 106.9, requires that recipients notify applicants for admission and employment, students, employees, sources of referral of applicants for admission and employment, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient that it does not discriminate on the basis of sex in its education programs or activities, and that it is required by Title IX not to discriminate in such a manner.  Such notification shall state at least that the requirement not to discriminate in the education program or activity extends to employment.  The notice must also state that questions regarding Title IX may be referred to the recipient's Title IX coordinator or to OCR.

The Title IX regulation, at 34 C.F.R. § 106.8(b), requires recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints alleging any action that would be prohibited by Title IX, including sexual harassment and sexual assault.  Title IX does not require a recipient to provide separate grievance procedures for sexual harassment complaints, including sexual assault complaints.  A recipient may use student disciplinary or other separate procedures for these complaints; however, any procedures used to adjudicate complaints of sexual harassment or sexual assault, including disciplinary proceedings, must afford the complainant a prompt and equitable resolution.

---

[3] The term "complainant" as used throughout this letter refers to an individual who is the subject of alleged sexual harassment, sexual assault or other forms of sexual violence.

Page 6 – OCR Review No. 11-11-6001

OCR evaluates on a case-by-case basis whether the resolution of sexual violence complaints is prompt and equitable. OCR has noted that, based on its experience in typical cases, there is usually a 60-calendar day timeframe for investigations. Whether OCR considers an investigation to be prompt as required by Title IX will vary depending on the complexity of the investigation and the severity and extent of the alleged conduct. OCR recognizes that the investigation process may take longer if there is a parallel criminal investigation or if it occurs partially during school breaks.

In evaluating whether a recipient's grievance procedures are prompt and equitable, OCR reviews all aspects of a recipient's policies and practices, including the following elements that are critical to achieve compliance with Title IX:

1. notice to students and employees of the procedures, including where complaints may be filed;

2. application of the procedures to complaints alleging discrimination and harassment carried out by employees, other students, or third parties;

3. provision for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and respondent to present witnesses and other evidence;

4. designated and reasonably prompt timeframes for the major stages of the complaint process;

5. written notice to both parties of the outcome of the complaint and any appeal; and

6. assurance that the recipient will take steps to prevent recurrence of any sex discrimination or harassment found to have occurred, and to correct its discriminatory effects on the complainant and others, if appropriate.

To ensure that students and employees have a clear understanding of what constitutes sexual violence, the potential consequences for such conduct, and how the recipient processes complaints, the recipient's Title IX grievance procedures should also include the following in writing:

1. a statement of the recipient's jurisdiction over Title IX complaints;

2. adequate definitions of sexual harassment (which includes sexual assault) and an explanation as to when such conduct creates a hostile environment;

3. reporting policies and protocols, including provisions for confidential reporting;

4. identification of the employee or employees responsible for evaluating requests for confidentiality;

5. notice that Title IX prohibits retaliation;

6. notice of a student's right to file a criminal complaint and a Title IX complaint simultaneously;

7. notice of available interim measures that may be taken to protect the student in the educational setting;

8. the evidentiary standard that must be used (preponderance of the evidence) in resolving a complaint;

9. notice of potential remedies for students;

10. notice of potential sanctions against perpetrators; and

11. sources of counseling, advocacy, and support.

The procedures for addressing and resolving complaints of sexual harassment should be written in language that is easily understood, should be easily located, and should be widely distributed.

Pending the outcome of an investigation of a report or complaint, Title IX requires a recipient to take steps to ensure equal access to its education programs and activities and to protect the complainant and ensure his or her safety as necessary, including taking interim measures before the final outcome of an investigation. The recipient should take these interim measures promptly once it has notice of the harassment allegation and should provide the complainant with periodic updates on the status of the investigation. The recipient should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and work situation as appropriate. The specific interim measures implemented and the process for implementing those measures will vary depending on the facts of each case. In general, when taking interim measures, recipients should minimize the burden on the complainant. Recipients should also check with complainants to ensure that the interim measures are effective and, if ineffective, identify and offer alternatives. Recipients should also ensure that the complainant is aware of his or her Title IX rights and any available resources, such as advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement.

In addition, recipients should provide training to employees about the applicable grievance procedures and their implementation. All persons involved in implementing a recipient's grievance procedures (*e.g.,* Title IX coordinators, investigators and adjudicators) must have training or experience in handling complaints of sexual harassment, as well as training in the recipient's grievance procedures and applicable confidentiality requirements. In sexual assault cases in particular, the fact-finder and the decision-maker also should have adequate training or knowledge regarding sexual assault. Recipients should also provide training about their grievance procedures and their implementation to any employees likely to witness or receive reports of sexual harassment, including faculty, recipient law enforcement unit employees, recipient administrators, recipient counselors, general counsels, health personnel, and resident advisors. Recipients need to ensure that their employees are trained so that they know to report sexual harassment to appropriate officials, and so that employees with the authority to address sexual harassment know how to respond properly.

Throughout the recipient's investigation and in any hearing, both parties must have equal opportunity to present relevant witnesses and other evidence and to otherwise participate in the grievance process. Also, the recipient must use a preponderance of the evidence standard for adjudicating allegations of sexual harassment. If a recipient provides for appeal of the findings, it must do so for both parties. The recipient must maintain documentation of all proceedings.

For Title IX purposes, if a student requests that his or her name not be revealed to the accused or asks that the recipient not investigate or seek action against the accused, the recipient should inform the student that honoring the request may limit its ability to respond fully to the incident, including pursuing disciplinary action against the accused.  The recipient should notify students of the information that will be disclosed, to whom it will be disclosed, and why.  The recipient should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. If the student still requests that his or her name not be disclosed to the accused or that the recipient not investigate or seek action against the accused, the recipient will need to determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students, including the student who reported the harassment.  If the school determines that it can respect the student's request not to disclose his or her identity to the accused, it should take all reasonable steps to respond to the complaint consistent with the request.

Title IX also prohibits the University and others, including students, from retaliating against any individual "for the purpose of interfering with any right or privilege secured by [Title IX]," or because that individual "has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title IX.

When a recipient knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred.  OCR has advised recipients to be aware that complaints of sexual harassment/assault may be followed by retaliation by the alleged perpetrator or his or her associates.  For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. Title IX requires recipients to protect the complainant and witnesses and ensure their safety as necessary.  This includes making sure that complainants and witnesses know how to report retaliation by university officials, other students, or third parties.  As an example, this in part can be executed by making follow-up inquiries to see if any retaliation or new incidents of harassment have occurred and responding promptly and appropriately to address any new problems.

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints; however, it is improper for a complainant alleging harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the recipient (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a university faculty member or administrator).  The complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  Moreover, in cases involving allegations of sexual assault/violence, mediation is not appropriate even on a voluntary basis.  OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault/violence complaints.

## Facts and Analysis

### I.  Grievance Procedures

Between 2005 and July 8, 2011, allegations of sexual misconduct and assault were handled under the University's Sexual Assault Policy, pursuant to which a finding of "responsible" had to be supported by "clear and convincing evidence."  All subsequent policies that the University implemented during the course of OCR's review required that findings be supported by a preponderance of the evidence.

Between July 8, 2011 and March 29, 2015, the Sexual Misconduct Policy (SMP) applied to complaints of sexual misconduct filed by students against students, and the Equal Opportunity Policy applied to complaints of sexual misconduct filed by students against employees of the University and to complaints of sex discrimination, other than sexual misconduct, filed by students against another student or against an employee.

On March 30, 2015, the University released substantial changes to its procedures for investigating and resolving reports of sexual harassment and violence against students and employees.  The University subsequently made additional changes to the procedures and adopted a final version as of July 1, 2015,[4]  Pursuant to which complaints of sexual harassment filed by students against students are handled through the Procedures for Reports Against Students, and complaints of sexual harassment filed by students against employees are handled through the Procedures for Reports Against Employees.

### A. Complaints Filed by Students Against Students

### Overview of the 2011 – March 2015 Sexual Misconduct Policy (SMP)

The SMP was published on the University's website on its Sexual Violence Education and Resources page, which is maintained jointly by the Office of the Dean of Students and the Women's Center.  The Undergraduate Record contained a link to this page and the Undergraduate Record contained a link directly to the SMP.

The SMP defined sexual misconduct as including Sexual Exploitation, Sexual Harassment, Non-Consensual Sexual Contact, and Non-Consensual Sexual Intercourse.  Each of these terms was defined in the SMP.  The SMP referred a student wishing to report an incident of sexual misconduct by another student to the Office of the Dean of Students.  A student who went to the Office of the Dean of Students to report sexual misconduct met either with the Associate Dean of Students, who was also the Chair of the Sexual Misconduct Board (SMB), or with the Dean of Students.  During the initial meeting, the administrator listened to the student's version of events, provided the student with a referral for counseling and medical services, determined whether the student needed academic support or accommodations, and, if so, assisted the student in obtaining them.

---

[4] The revised procedures are available at http://vpsa.virginia.edu/titleix-vawa.

The SMP gave the Dean of Students the authority to issue no-contact orders. In almost all cases, the administrator asked for the student's consent to issue a no-contact order to the accused. If the student consented, the University issued a letter to both students instructing them to have no further contact with one another.

The administrator informed the student of the student's options to file complaints with the University and with the police.[5] The SMP recognized that if a student did not wish to pursue formal or informal resolution and/or requested confidentiality, Title IX still requires the University to investigate and take reasonable action in response to the student's information. The SMP stated that the Dean of Students may make a preliminary investigation of the alleged sexual misconduct and weigh the student's request for confidentiality against the seriousness of the allegations, whether there have been previous allegations of sexual misconduct against the same accused student, and the accused student's rights to receive information about the allegations under FERPA. The University was to notify the student if it could not honor the request for confidentiality. The University tracked reports of alleged student-on-student sexual misconduct in a computer database, regardless of whether the student chose to file a formal complaint under the SMP.

If the student chose to file a formal complaint with the University, he or she was to send an e-mail notifying the Dean of Students, who was the Deputy Title IX Coordinator for Student Sexual Misconduct. At that point in the process, the student had to choose either the formal resolution process, which involved an investigation and hearing, or the informal resolution process, which involved a facilitated meeting between the parties. Both are discussed more fully below.

If the student chose the formal resolution process, the Dean of Students contacted the two University administrators who are trained to investigate complaints of sexual misconduct. The investigators wrote a report summarizing the information obtained and made recommendations as to whether there was good cause to grant a hearing by the SMB and as to what type of sexual misconduct may have occurred, and identified the open factual issues for the SMB to consider when making a decision.

The SMB was a standing group composed of students, faculty and staff. Each of the SMB members was trained annually on sexual misconduct, as defined by the SMP; including how to apply the definitions contained in the SMP to the facts of specific cases, and their responsibilities as SMB members. Formal resolution under the SMP involved a hearing before a panel that included at least one University student, and at least two University faculty and/or staff who were SMB members (Panel). In practice, the Panel typically included five SMB members, including two students and three faculty or staff.

---

[5] The SMP stated that filing a sexual misconduct complaint with the University was independent of any criminal complaint or proceeding, but that the University's investigation may be delayed temporarily while the police were collecting evidence. The SMP stated that the University would not wait for the conclusion of a criminal investigation or proceeding to start its own investigation.

In addition to convening a hearing panel and scheduling a date for the hearing, the Chair of the SMB assigned advisors to the complainant and the accused. Each advisor completed the SMB training and was assigned to support and assist the parties during the prehearing, hearing, and appeal stages of the process, although the advisor could not stand in either party's stead in any part of the process. Before the hearing, the Chair of the SMB scheduled a pre-hearing meeting, the purpose of which was to determine what evidence would be included at the hearing and what evidence would be excluded. Before the pre-hearing meeting, the Chair of the SMB gave the complainant and the accused a date by which each had to provide her a list of witnesses that each proposed to call, and copies of documents and a description of any other information each proposed to present at the hearing. According to the SMP, any witnesses or other information submitted by the parties after the deadline could be introduced at the hearing only at the discretion of the Chair of the SMB for "good cause."

The setting for both the pre-hearing meeting and the hearing was a conference room in which the parties and their advisors sat across a square table from each other. According to the SMP, closed circuit television could be available to complainants who did not want to be present in the same room at the same time as the accused. However, according to the Chair of the SMB and the Title IX Coordinator, this option was not routinely offered to complainants.

At the pre-hearing meeting, the complainant and the accused were given the opportunity to argue against the admissibility of evidence on the other's list and, if evidence was opposed by the other party, to defend the admissibility of the evidence on his or her own list. The Chair of the SMB determined what evidence would be included and what evidence would be excluded. Possible reasons the Chair of the SMB might exclude a witness or a piece of evidence from one of the parties' lists were because she believed it to be redundant, highly prejudicial to one of the parties, or irrelevant to the issues being heard at the hearing. In addition, the SMP provided that evidence of the complainant's past sexual history would not be admitted unless relevant to the complaint. At the pre-hearing meeting, the Chair of the SMB could add witnesses or other evidence to the lists. The decision of the Chair regarding what evidence would be admitted at the hearing was memorialized in an e-mail to both the complainant and the accused after the prehearing conference. This e-mail did not memorialize what evidence had been excluded or the reason evidence was excluded.

A day or two in advance of the hearing, members of the Panel were provided a copy of the investigative report and provided access to other evidence that the Chair of the SMB had determined at the pre-hearing conference should be admitted. For example, based on the agreement between the University and the local police departments, any materials from a police investigation were not to be reproduced or distributed beyond the University's investigators. In addition, the parties could agree that certain other evidence would not be reproduced and distributed in advance. Thus, the members of the SMB were asked to come early to the hearing so that they could review this type of evidence before the hearing.

The SMP provided that at the hearing both parties had the opportunity to present witnesses and evidence (previously agreed upon at the pre-hearing meeting), ask questions of each other and of the other's witnesses through the Chair of the SMB, and make opening and closing statements. The Chair of the SMB was a non-voting member of the hearing panel, facilitated the hearing,

asked clarifying questions of both the complainant and the accused, and guided the Panel in its questioning of witnesses. Members of the SMB were permitted to ask questions of the witnesses at the hearing and request further evidence if necessary.

Following the hearing, the members of the Panel deliberated and made a decision regarding whether sexual misconduct had occurred and what, if any, sanction was appropriate. Under the SMP, a student could be found responsible for sexual misconduct if, by a unanimous vote, the SMB concluded that sexual misconduct more likely than not occurred. In all cases in which a student was found responsible for sexual misconduct, the SMP required an SMB panel to consider whether expulsion or suspension was an appropriate sanction. However, the Panel was permitted to assign any sanction that it believed was fair and proportionate to the violation. The sanction was determined by majority vote. The decision of the SMB was then conveyed orally to the parties and, soon thereafter, in a decision letter. The Chair of the SMB wrote the first draft of the decision letter and circulated it among the Panel members for revisions.

Each party had 14 days to appeal the SMB's decision and, if applicable, the sanction, to the University's Judicial Review Board, and the Judicial Review Board Appeals Procedure governed appeals. If the complainant or the accused appealed the Panel's decision, it was the job of the Chair of the SMB to defend the SMB decision. The Appeals Procedure indicated that the Appellate Review Panel should include at least one student, "to the extent practicable."

### *Analysis of the SMP*

The SMP improved the University's procedures as compared to its 2005 Sexual Assault Policy; the University's correction of some prior policy flaws during the course of OCR's review was an important step toward ensuring safety for students. Nonetheless, the SMP contained some significant failures to satisfy the Title IX requirement to operate procedures for prompt and equitable resolution of complaints of sexual harassment, including sexual violence.

A grievance procedure, such as the SMP, must contain a reasonably prompt timeframe for the major stages of the complaint process. Although the SMP stated that the investigative stage of the procedure would typically be completed within 60 days, there were no timeframes for the hearing process, including the scheduling of the pre-hearing conference and hearing, providing notice of the hearing to the parties, and providing the SMB panel with the investigative report and other relevant evidence in advance of the hearing. While the SMP provided that the SMB's decision would be announced at the conclusion of the hearing, and that both parties would receive a copy of the Final Outcome Letter within ten calendar days following the conclusion of the hearing, it stated also that the Chair of the SMB could determine a later time "for good cause." OCR is concerned that the SMP did not make clear that the parties would receive any notice as to the reason for the delay. The SMP further stated that each party had 14 days to appeal the SMB's decision to the University's Judicial Review Board, and that the Judicial Review Board Appeals Procedure would govern appeals. However, the Judicial Review Board Appeals Procedure did not contain a timeframe for resolution of the appeal, as required by Title IX. Thus, OCR found that the University failed to comply with Title IX because the SMP, as written, did not include a timeframe for the appeals process and, thus, could not ensure prompt resolution of complaints of sexual harassment filed under Title IX.

OCR additionally finds that structural flaws in the informal resolution process in the SMP violate Title IX's requirement for prompt and equitable resolution. The informal resolution process provided an opportunity for the complainant to confront the accused student, facilitated by the Chair of the SMB or a designee, and to communicate his or her feelings and perceptions regarding the incident, the impact of the incident, and his or her wishes and expectations regarding protection in the future. The accused then had an opportunity to respond. If, during the informal resolution, the accused student elected to acknowledge his or her actions and take responsibility for the alleged sexual misconduct, the informal resolution would be concluded and the Chair of the SMB would propose a sanction. If both the complainant and the accused student agreed to such proposed sanction, the complaint would be resolved without any further rights of appeal by either party. If either the complainant or the accused student objected to the proposed sanction, a hearing before the SMB would be convened only for determining a sanction. If the accused student contested the complaint of alleged sexual misconduct, the Chair of the SMB could nevertheless impose a protective order with or without the parties' agreement based on information derived from the informal resolution proceedings together with any other relevant information known to the University at the time of the informal resolution.

A predicate to proposing a sanction through the informal resolution process in the SMP was for an accused student to acknowledge actions and take responsibility for the alleged sexual misconduct. This predicate is a necessary element of a resolution process that excludes independent investigation from the University itself: absent either an acknowledgement of responsibility from a student or confirmation of responsibility following investigation from the University, the University has no basis to know whether any sanction would be fitting to impose. OCR's file review reflected that, in practice, the University often proposed sanctions in the absence of that predicate. Likewise, the SMP's provision for conducting a hearing to determine a sanction without having first conducted an investigation provides a necessarily insufficient basis on which to ground a decision for what sanction, if any, is appropriate. The design and implementation of the informal resolution process to provide for proposing sanctions in the absence of either an admission or an independent investigation and confirmation of misconduct is necessarily inequitable to both complainants and accused students: the design allows for the University's imposition of sanctions for conduct that the University has not determined to have occurred. Thus, the SMP's informal resolution process was structurally flawed because it uses a process that prevents the University from having information sufficient to make a determination of how to proceed.

### *Implementation of the SMP: Prompt and Equitable Resolution of Complaints*

In addition to adopting and publishing a grievance procedure that, on its face, provides for prompt and equitable resolution of complaints of sex discrimination, including sexual harassment, a university must implement these procedures in a manner that actually provides prompt and equitable resolution of such complaints.

### *Complaints Addressed Through the Formal Resolution Process*

OCR found that the University failed to promptly resolve a complaint filed in XXXX. During the investigation, OCR learned of several other female students who allegedly had nonconsensual sexual contact with XXXX. XXXX Sentence Redacted XXXX. The final investigative report was forwarded to the Dean of Students approximately eight weeks after receipt of the complaint; the report found that "there is a substantial basis for a hearing" and stated that the parties had been advised that "a Chair [of the Sexual Assault Board] will soon be appointed and will schedule a pre-hearing meeting."

However, the University did not begin to coordinate with XXXX to schedule the pre-hearing conference and the Sexual Assault Board hearing until a month after the investigative report was complete. XXXX Sentence Redacted XXXX. A pre-hearing conference was held more than nine months after the University first met with the Student regarding the alleged assault, and nearly five months after the University completed its investigation. The parties settled the matter two days before the hearing; the University reimbursed the complainant for the tuition paid for the semester and provided training on sexual misconduct.

OCR found that the University's response in this case did not comply with Title IX. First, the five month delay in the process for scheduling the hearing after completion of the University's investigation did not provide for prompt resolution of the complaint; indeed, there was a provision in the 2005 policy governing sexual assault allegations that was in effect at the time, stating that an accused student's decision not to testify shall not preclude a hearing panel from proceeding and "determining the complaint" on the basis of the facts and circumstances presented. While OCR acknowledges that XXXX and a delay caused by events outside the University's control, OCR concludes that the University itself is responsible for much of the delay through its own actions, including XXXX and failing to schedule a hearing. Second, the University had an obligation to move forward with a disciplinary hearing or other action, based on the investigative report and evidence gathered by the University, given the seriousness of the alleged sexual assault, XXXX and the existence of other students who alleged that they were victims of nonconsensual sexual contact XXXX. Third, the University's response failed to consider whether broader remedies were needed to address the effects of the alleged harassment.

In a complaint alleging sexual assault filed in XXXX, OCR found that the University implemented its procedures in a way that was inequitable, allowing the accused student to file a cross-claim to be heard together with the complainant's claim but without a separate investigation and failing to give the complainant adequate time to prepare. In that case, a female student filed a formal complaint of sexual misconduct against a male student. The University conducted an investigation, interviewed witnesses, and the investigators recommended that the case be heard by the SMB. The day before the pre-hearing conference, the accused student informed the Chair of the SMB that he would like to file a sexual misconduct complaint against the complainant alleging that she had nonconsensual sexual contact with him XXXX. The Chair of the SMB allowed the accused to file the cross-complaint and told the parties it would be heard by the SMB at the same time as the original complaint. A few days later, the complainant decided to withdraw from the formal hearing process and chose instead to resolve her complaint against the accused student through the informal process. The complainant told OCR in an

Page 15 – OCR Review No. 11-11-6001

interview that she made this decision because she was given no time to prepare to defend against the cross-claim and because the University conducted no investigation of the cross-claim separately from the original complaint. OCR concludes that the University's decision to allow the accused student to file a late cross-claim that would be addressed at the already scheduled hearing, without a separate investigation, was inequitable, in violation of Title IX.

> *Concerns: Appearance of Conflict of Interest regarding the Duties of the Chair of the SMB*

Furthermore, the multiple roles played by the Chair of the SMB over the course of the complaint process created the appearance of a conflict of interest. The individual who served as the Chair of the SMB was also an Associate Dean of Students. She was often the first point of contact for a student who believed she or he had been the victim of sexual misconduct. The SMP described her role at that point as providing an understanding of the policy and identifying "forms of support or immediate interventions available." She followed up with students who reported alleged sexual misconduct, sometimes making multiple follow-ups over the course of an academic year to see how they were doing and whether they needed further counseling services. Consistent with the SMP, she put in place actions "to support and protect the complainant," including measures such as a change in housing arrangements for the accused or the complainant or victim, no contact orders, or a change in class schedules. She coordinated measures taken with security, housing, and academic departments.

When a student filed a complaint of sexual misconduct, the Chair of the SMB also selected a hearing panel, assigned advisors to the complainant and the accused, and scheduled a pre-hearing conference and a hearing. At the pre-hearing conference, the Chair of the SMB determined what evidence would be admitted at the hearing and what evidence would be excluded as "irrelevant" or "prejudicial." She was a non-voting member of the hearing panel, running the hearing, asking clarifying questions of both the complainant and the accused, and guiding the Panel in its questioning of witnesses and deliberations. She wrote the first draft of the decision letter, and circulated it among the Panel members for revisions. If the complainant or the accused appealed the Panel's decision, it was the job of the Chair of the SMB to defend the decision. Therefore, the same individual went from being tasked under the SMP to "identify forms of support or immediate interventions" for the complainant to being a neutral decision-maker, and then to possibly defending a decision of the SMB Panel on appeal. The SMP did not clearly explain the many roles played by the Chair of the SMB in the sexual misconduct grievance process, thus failing to identify a potential conflict of interest. OCR's review found that the Chair of the SMB typically fulfilled the same functions as the Deputy Title IX Coordinator for Student Sexual Misconduct. Because she had these responsibilities as well as the multiple roles associated with serving as the Chair of the SMB, there was an appearance of a conflict of interest among these multiple duties.

> *Concerns: Training of Panel Members*

In addition, OCR noted that the University did not ensure that SMB members had resources or training available to them concerning the interpretation of relevant medical and forensic

evidence. According to several SMB members whom OCR interviewed, if panel members required more information about medical or forensic evidence, they turned to the Chair of the SMB to interpret the information for them. The Chair of the SMB did not have a medical background, and SMB members did not receive training on how to interpret medical and forensic evidence, including results of medical examinations and drug or alcohol tests, particularly when this evidence is introduced at hearings.

*Concerns:  Determination of Relevant Evidence*

OCR notes that the University's heavy reliance on the parties to identify relevant evidence may in some cases have undermined its ability to meet its responsibility to conduct an adequate, reliable, and impartial investigation. During the hearing process, each party was required to provide a list of witnesses and other evidence he or she wished to present at the hearing and ensure the presence of his or her witnesses at the hearing. In addition, the Panel members were provided in advance a copy of the investigative report and other evidence that the Chair of the SMB had admitted at the pre-hearing conference, and were permitted to ask questions of the witnesses at the hearing and request further evidence, if necessary, to make a determination. However, the SMP nowhere made clear that the Chair of the SMB or any other individual had the responsibility to determine what evidence, beyond that proposed for submission by the parties at the pre-hearing conference, may have been necessary to allow the Panel to make an informed decision. The University had the responsibility to make an informed and independent judgment of what evidence the Panel needed to make a decision in a case of sexual harassment, including sexual violence. If the University had information relevant to the case being considered it should have provided it to the Panel, regardless of whether the complainant or the accused requested that it be admitted or argued against admitting it at the pre-hearing conference.

### Reports Where the Student Elects to Take No Action

OCR determined that at least through the 2011-2012 academic year the University's handling of informal reports of possible sexual misconduct was not compliant with Title IX.[6] As discussed below, in many cases the University had sufficient information to investigate or otherwise take steps necessary to ensure it is providing a safe and nondiscriminatory environment for all students, including the student who reported the possible harassment. The University did not do so. As a result, the University failed to determine whether a hostile environment existed or to consider whether broader remedies were necessary to remedy the effects of such an environment and to provide a nondiscriminatory environment to all students.

OCR reviewed documentation associated with 50 reports of possible sexual harassment, including sexual violence, by students who chose not to file a formal complaint or proceed through the informal resolution process during the 2008-2009 through 2011-2012 academic years. Of those 50 reports, the University failed to take appropriate action in 22. Twenty-one of those reports alleged sexual assault, some including rape and gang rape.

---

[6] The University requested to enter into a Resolution Agreement before OCR completed review of University documentation for later academic years.

Of the 22, OCR identified nine situations in which a complainant requested confidentiality, requested that no investigation occur, or chose not to pursue formal resolution; there is no indication that the University evaluated these requests in the context of its responsibility to provide a safe and nondiscriminatory environment for all students, including students other than the student who makes the allegation. An additional four reports were referred to local authorities, with no indication in the University's records that the University conducted its own Title IX investigation. In an additional nine reports of sexual assault, the University's records do not indicate that any investigation or inquiry was conducted.

OCR also completed review of files of two reports of sexual assault in 2013 and 2014. OCR finds that at least in these two instances the University did not promptly investigate information in cases that involved fraternities. In one of the cases, the Chair of the SMB took the written position that "unfortunately, the actions of our office are limited to the assistance and support of the survivor at this point as [the student who reported the sexual assault] does not wish to file a complaint through the SMB." In addition to reflecting the absence of a prompt investigation, the files do not reflect the University evaluating steps necessary to protect safety of the broader University community.

The documentation in these cases does not reflect that the University made a decision concerning whether each of these cases, or a combination of the cases, created the need for broad response by the University to address the issue of sexual harassment and violence in the campus community. As a result, the University failed to satisfy the Title IX requirement to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, prevent the harassment from recurring and, as appropriate, remedy its effects.

Although OCR did not complete its review of reports of sexual harassment, including sexual assault, made between the 2012-2013 academic year and December 2014, it notes concerns regarding 29 of the 87 informal reports from that time period. The documents OCR reviewed for these files raise concerns about whether the University investigated reports of sexual assault and whether it evaluated whether its responsibility to provide a safe and nondiscriminatory environment for all students necessitated overriding a request that the University not investigate or pursue a formal resolution.

The files that OCR reviewed reflect that the University generally did take interim measures to support complainants, even when a complainant wished the University to take no action against the accused. However, providing interim measures alone is not sufficient to satisfy the University's Title IX obligations. If a complainant does not want a formal investigation, the University must weigh this request against the seriousness of the allegation and its obligation to provide a safe and nondiscriminatory environment for all students. Without some type of an investigation of reports of sexual misconduct, the University does not know what steps would be appropriate to resolve any violations of Title IX, including its obligation to remedy any hostile environment that may exist, including for the broader University community where appropriate. While providing counseling services and academic support as interim measures can help to remedy the effects of a hostile environment on an individual student, and a no-contact order can, if enforced, keep the same student from being harassed by the same accused, without some

determination by the University of what occurred, the University is not meeting its obligation to end the harassment and prevent it from recurring.

**B. Complaints Filed by Students Against Employees: the Equal Opportunity Program Policy**

*Overview of the EOP Policy*

A separate policy and procedure applied to complaints of sexual misconduct brought by students, faculty, and employees against faculty and staff (IDHRM-009 or "EOP policy"). The Director of EOP was also the Title IX Coordinator for the University.

The EOP Complaint Procedures stated that "[a] complaint may be filed with EOP by any Academic Division, Medical Center or College at Wise present or former employee or student, applicant for admission or employment, or participant in the University's programs or activities who believes that (s)he has been unlawfully discriminated against or harassed on the basis of . . . sex (including pregnancy)."

The procedures provided that the EOP would investigate all formal (i.e., written) complaints and determine based on its investigation if the allegations were substantiated. The EOP would then submit its findings and recommended course of action, including discipline for the accused student and relief for the complainant, to the Vice President for the University who had authority for making the final decision on the complaint and notifying the parties of the outcome.

The EOP Complaint Procedures also provided the EOP with "the authority to initiate an administrative review of a department or area at any time, in absence of a formal complaint, when in the judgment of the Director, such action is warranted, or when requested by a manager/supervisor/chair, Human Resources/Employee Relations official, or a Vice President or Dean who has become aware of alleged discrimination or harassment in her/his area. Administrative review involves a similar investigative process as the investigation of a complaint." Under the EOP policy, a faculty or staff member of the University could be found responsible for harassment, after an investigation by the Office of Equal Opportunity Programs (EOP), if EOP concluded that the complainant's allegations were substantiated.

On March 30, 2015, the University released substantial changes to its procedures for investigating and resolving reports of sexual harassment and violence against students and employees. OCR reviewed those policies and procedures and found that as written, they comply with the requirement of Title IX to provide a prompt and equitable response to reports of sexual harassment, including sexual violence.

*Review of Student Reports of Sexual Harassment Against Employees*

OCR reviewed documentation related to a series of at least seven complaints between XXXX and XXXX against XXXX in the XXXX. All of the complaints, some of which were raised by students, involved conduct of a sexual nature. The complaints referenced numerous sexually suggestive comments (*e.g.*, XXXX), including one incident that escalated to inappropriate touching. The department chair notified the EOP of the initial complaint in XXXX. EOP

counseled the chair to confront the employee, ensure he was current on his Title IX training, and advise the student of her right to file a complaint. At that time, the department chair issued the first in a series of letters of counseling to the employee, warning him that corrective action may be taken if the conduct continues. EOP was next notified of complaints against this staff member in XXXX, although documentation shows similar complaints were made to the department in XXXX, XXXX, and XXXX, and that the department issued a second letter of counseling to the employee in XXXX. In XXXX, a XXXX student filed a written complaint against this staff member. EOP investigated the complaint and determined that the allegation, if true, did not rise to the level of a violation of policy. The case was resolved through a negotiated resolution between the parties, and the department issued another letter of counseling. In the XXXX, an employee in the department filed a complaint with University Human Resources (UHR) alleging this staff member directed suggestive comments and innuendo to her on multiple occasions. EOP was not notified of this complaint, which was resolved through a third letter of counseling. This complaint was followed later the same year by a complaint to the department that the staff member verbally harassed six females. At this point, UHR initiated an inquiry and notified EOP of its actions. UHR proposed to the department heads that UHR conduct a climate survey of the department, but the department heads rejected the idea, and in the XXXX the department issued a fifth letter of counseling.

The EO Officer for ADA Compliance and EO Training acknowledged to OCR that he was aware that two or three of the complaints involved unwelcome conduct of a sexual nature, and that he believed that the department addressed them, though there is no documentation that EOP followed up with the department. The EO Officer explained the series of complaints as isolated behaviors over a number of years that were not severe or pervasive, yet EOP never fully investigated the matter or considered whether the employee's persistently inappropriate and sexually charged behavior was creating a hostile environment for women in the department. The University informed OCR in XXXX that it dismissed the staff member.

OCR also reviewed documentation associated with a complaint against a professor that was raised in XXXX by three female students and one male student enrolled in the professor's class. The complaint alleged that the professor made comments of a sexual nature, particularly concerning rape, on numerous occasions during the semester, creating a hostile environment for the class. For instance, on one occasion, the professor said, "XXXX Sentence Redacted XXXX." The students confronted the professor by e-mail, citing the professor's frequent references to XXXX, which they believed were directed at individual students and presumed an intimacy not present in the class. The complaint e-mail to the professor asks that he stop using rape as a decontextualized example. The students elected not to file a complaint; however, the EOP had knowledge that previous allegations of inappropriate comments of a sexual nature were made in XXXX against the same professor. On the advice of EOP, the department chair met with the students and offered them an opportunity to voluntarily complete the course without attending the professor's class. The department chair also asked the professor to complete additional training on sexual harassment offered by EOP. E-mail communications between the department chair and the Title IX Coordinator reveal that EOP declined to take any further action on the matter in the absence of a formal complaint. There is no indication that the department investigated the matter or considered the possible impact of the professor's behavior on other students in the class. The XXXX documentation also makes no reference to the XXXX

complaint of sexual harassment by the professor, although the University had an obligation to consider the XXXX allegations in determining the seriousness of the XXXX allegations and how to respond to them.

### Analysis of the EOP Policy

OCR finds that the EOP fell short of its obligation to respond promptly and equitably to all Title IX complaints.  In practice, most of the student complaints involving sexual harassment/violence committed by a University employee were handled within the academic departments, either by department chairs or other academic officers, who receive minimal training on sexual harassment and misconduct and no investigative training at all.  OCR found that, as a result, there often was minimal or no investigation at the department level.  In addition, although EOP staff told OCR that department heads are instructed to inform the EOP of complaints received at the department level, many departments did not do so.  Even when departments reported complaints to the EOP, EOP had only sporadic and limited involvement in and oversight of departments' responses to student complaints.  In short, OCR determined that the EOP failed to monitor and review responses to complaints of sexual harassment/sexual violence at the departmental level to ensure that student complaints against employees are addressed in a prompt and equitable manner, in violation of Title IX.  In March 2015, the University revised its procedures for investigating and resolving reports of sexual harassment and violence against students and employees which, if applied appropriately, are designed to provide a prompt and equitable response to reports of sexual harassment, including sexual violence.

## II.    Hostile Environment

OCR analyzed fifty reports of sexual harassment made to the University between 2008-2009 and 2011-2012.  Of those fifty reports, the University failed to take prompt and equitable action in twenty-two.  Twenty-one of those reports alleged sexual assault, some including rape and gang rape.  In all of these cases, the University failed to investigate or otherwise determine what occurred.  The University did not assess whether a hostile environment existed for complainants and for the University community and did not take steps to eliminate a hostile environment and prevent its recurrence.

In addition, the University's failure to respond promptly and equitably to two complaints that were handled through the formal hearing process and to two reports of sexual assault that were filed in 2013 and 2014 allowed a hostile environment to exist for affected students.

The design of the University's informal resolution process, providing for the imposition of sanctions by the University for conduct that the University has not determined to have occurred, creates an additional and independent basis for a hostile environment for affected students.  The University continued to resolve complaints of sexual assault through the informal resolution process until it created its new proposed policy in March 2015, raising a concern about an ongoing hostile environment flowing from the operation of that policy including because students may not have come forward because of their perception of the University's process.

Finally, statements from the Chair of the SMB in a radio interview that was broadcast to the University community constitute an additional basis for the existence of a hostile environment for affected students.  When asked why the University had never expelled a student for sexual assault, the Chair said that the SMB has not felt that it has ever had enough evidence to expel a student found responsible for sexual misconduct.  She further stated that if the SMB is only 51% certain that a person is guilty, it is not comfortable expelling a student permanently.  When asked why a student who admits responsibility in the informal resolution process is not expelled, the Chair of the SMB stated that there is no advantage to admitting responsibility in the informal process, and if a person is willing to admit responsibility that should be taken into account in sanctioning.  She stated also that because there is no investigation in the informal resolution process, one is never 100% sure what occurred, even if the accused student admits responsibility. The Chair of the SMB's statements indicated that the University does not consider expulsion as a possible sanction where a finding of sexual misconduct is based on a preponderance of evidence standard or even when there is no question as to the accused student's culpability because he or she has admitted to the conduct.  The statements also indicate that the University process is designed to discourage admission of responsibility and then to reward such an admission, when it is forthcoming, with the absence of enforced or commensurate sanction.  That the University publicized these views in a campus radio interview communicates the official position of the University that limited sanctions would be imposed for sexual misconduct brought to the University's attention.

OCR's interviews of students confirmed that they are aware of the University's position. Students expressed a belief that the University has failed to impose what they see as "serious disciplinary sanctions," i.e., suspension or expulsion, and that this indicates to them that the University does not take complaints of sexual misconduct seriously.  Students explained to OCR that this perception makes students less likely to use the University's grievance process.

The University similarly failed to fulfill its Title IX obligations with regard to complaints of sexual harassment raised against University employees.  Between 2005 and 2012, at least seven complaints were filed against one University employee alleging inappropriate behavior, including sexually suggestive comments and inappropriate touching.  The employee's department issued the employee five letters of counselling.  However, the University made no determination of whether the employee's persistently inappropriate behavior created a hostile environment for female students in the department.  The University inadequately investigated allegations of sexual harassment against employees and failed to take any steps to end the harassment and prevent it from recurring, thereby allowing a hostile environment to exist.

## III.    Notice of Nondiscrimination

The University has posted on the Office of Equal Opportunity Programs (EOP) web page, under the link for Title IX at the University of Virginia, a statement that the University prohibits discrimination in employment as well as in all programs and activities on the basis of sex, as required by Title IX.  Under the same link can be found the names and contact information of the Title IX Coordinators.  In addition, also on the EOP web page, under the link for Resources and EOP Archives, the following statement is found:

> The University of Virginia does not discriminate on the basis of age, color, disability, marital status, national or ethnic origin, political affiliation, race, religion, sex (including pregnancy), sexual orientation, veteran status, and family and genetic information, in its programs and activities as required by Title IX of the Education Amendments of 1972, the Americans with Disabilities Act of 1990, as amended, Section 504 of the Rehabilitation Act of 1973. Title VII of the Civil Rights Act of 1964, the Governor's Executive Directive, and other applicable statutes and University policies. The University of Virginia prohibits sexual harassment, including sexual violence.

Thus, the University has developed two statements that it does not discriminate on the basis of sex in the education programs or activities it operates. Both statements include the name and contact information for the Title IX Coordinator and the Deputy Coordinators at the University and state that questions regarding Title IX may be directed to one of the Title IX Coordinators or to OCR.

The statement that is included in the University's publications is the University's Equal Employment Opportunity and Affirmative Action statement, which is directed at employees and applicants for employment, but which does not address students in its broader programs and activities.[7]

OCR found that the University did not include a compliant notice of nondiscrimination in locations other than the EOP website. In particular, print publications, including those used for recruitment of students and employees, did not include a compliant notice. As of May 14, 2015, the University has revised its notice of nondiscrimination published at http://www.virginia.edu/eop/pdfs/NonDiscriminationandEqualOpportunity.pdf.

## IV.    Title IX Coordinator

The University currently has designated a Title IX Coordinator and three Deputy Title IX coordinators to coordinate its efforts to comply with and carry out its Title IX responsibilities. The University's Director of Equal Opportunity Programs serves as the Title IX Coordinator; she reports directly to the University President. Until spring 2015, the University designated the Dean of Students as the Deputy Title IX Coordinator for Student Sexual Misconduct and the Senior Associate Athletics Director for Programs as the Deputy Title IX Coordinator for Athletics.[8] As of March 2015, the Associate Dean of Student serves as the Deputy Title IX Coordinator for students and the Equal Opportunity Officer for Policy and Legal Compliance serves as the Deputy Title IX Coordinator for employees.

---

[7] The affirmative action statement reads: "The University of Virginia is committed to equal employment opportunity and affirmative action. To fulfill this commitment, the University administers its programs, procedures and practices without regard to age, color, disability, gender identity, marital status, national or ethnic origin, political affiliation, race, religion, sex (including pregnancy), sexual orientation, veteran status, and family medical or genetic information and operates both affirmative action and equal opportunity programs, consistent with resolutions of the Board of Visitors and with federal and state requirements, including the Governor's Executive Order Number One (2014)."

[8] The Deputy Title IX Coordinator for Athletics does not have any responsibilities related to investigating or responding to complaints of sexual harassment.

The University's notifications about its Title IX Coordinator and Deputy Title IX Coordinators are sufficient to meet the requirements of Title IX. The University provides notice about its Title IX Coordinators on its website on the Office of Equal Opportunity Programs page, which includes the name, title, office location, telephone number, and relevant website address of the Title IX Coordinator and the Deputy Title IX Coordinators. In addition, the University includes notices about its Title IX Coordinators and their contact information in a variety of on-line publications, such as websites for Title IX at UVA, the Policy and Procedures for Student Sexual Misconduct Complaints, and employment and internship opportunities. Each edition of the Equal Opportunities Program (EOP) newsletter provides the name of the Title IX Coordinator and the Deputy Title IX Coordinator for Student Sexual Misconduct. The Darden School of Business publication regarding its MBA program has the University's nondiscrimination statement and information about the Title IX Coordinator. Other pages on the University's website, such as the Office of Undergraduate Admission, the School of Law, and the School of Medicine list the Title IX Coordinator's office location and phone number and vary on whether there is information about the Deputy Title IX Coordinators.

Schools must make sure that all employees designated as Title IX Coordinators have adequate training as to what conduct constitutes sex discrimination and sexual harassment and are able to explain how the school's grievance procedures operate. Through interviews and reviews of records, OCR confirmed that both former and current designated Title IX Coordinators and Deputies have received adequate training on sex discrimination, sexual harassment, and investigations.

As discussed in more detail above, OCR found that the University failed to comply with Title IX between 2008 and 2012 because the Title IX Coordinator did not adequately coordinate and oversee all Title IX complaints with regard to employees. The University reported to OCR that it has corrected this area of noncompliance.

## **Conclusion**

The SAP and SMP did not comport with Title IX, in violation of 34 C.F.R. § 106.8(b).

In situations where a formal complaint was filed, the University failed to resolve them promptly and equitably, including by not instituting remedies that were sufficient to eliminate the hostile environment (including for the broader University community, where appropriate) or prevent its recurrence, in violation of 34 C.F.R. §§ 106.8(b) and 106.31(a)(b).

The University's informal complaint resolution process was  inequitable for both parties because it allowed sanctions to be imposed without an investigation of what occurred or an admission of responsibility by the respondent, in violation of 34 C.F.R. §§ 106.8(b) and 106.31(a)(b). The University also failed to investigate or adequately address student reports of sexual assault in the absence of a formal complaint during the 2008-2009 through 2011-2012 academic years. Once a school knows or reasonably should know about such harassment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects. The University failed to do so. Instead, OCR found that based on the University's

documentation of informal reports of sexual misconduct, the University's practice was that, while it implemented interim measures to support students who were the alleged victims, unless the student chose to file a formal complaint, the University did not pursue the matter through the disciplinary process or consider the broader impact of alleged incidents on the campus community.

The University's failure to provide prompt and equitable responses to reports of sexual misconduct therefore contributed to the existence of a hostile environment for affected students, in violation of 34 C.F.R. § 106.31.

The Title IX Coordinator was not adequately overseeing and coordinating all Title IX complaints and the University's notice of nondiscrimination was not adequately distributed, in violation of 34 C.F.R. §§ 106.8(a) and 106.9.

On September 17, 2015, the University entered into the enclosed Resolution Agreement (Agreement), which commits the University to take specific steps to address the identified areas of noncompliance and areas of concern. When fully implemented, the Agreement entered into by the University will resolve the issues of noncompliance and areas of concern.

The Agreement commits the University to continue implementing the steps it has already taken to address sexual harassment and sexual assault on campus and to take additional measures to ensure the University's compliance with Title IX. Under the Agreement, the University will address sexual harassment, including sexual violence, in a comprehensive manner that requires clear notice of its commitment and the applicable processes for responding in a prompt and equitable manner, and also requires the University to assess the effectiveness of the steps it takes and, with OCR review and approval, take additional steps that may be necessary to ensure that students are not subjected to a sexually hostile environment. Among other provisions, the Agreement requires the University to:

- Continue to implement its July 1, 2015 Policy and Procedures and to notify OCR of any proposed revisions to the Policy and Procedures during the pendency of OCR's monitoring to ensure that the Policy and Procedures continue to provide an easily accessible and user-friendly system for the prompt and equitable resolution of reports alleging sexual harassment and sexual violence.

- Ensure that its agreements with student organizations, including fraternities and sororities, clearly state that sexual harassment, sexual violence, and retaliation are prohibited, that failure of the organization's members to comply with the University's policy related to Title IX may result in the University severing all ties with the organization., and that the University's investigation of reports of sexual harassment, sexual violence, and retaliation may result in sanctions, including restrictions on the use of University facilities, access to University services and resources, or the ability to hold itself out as associated with the University.

- Ensure that all members of the University community – including students, faculty, administrators and other staff – are trained regularly on issues related to sexual harassment

and sexual violence, including the University's prohibition against sexual harassment, sexual violence, and retaliation; the University's policies and procedures for responding to student reports of possible sexual harassment, including sexual violence; how to recognize forms of sex discrimination; and the requirements of Title IX.

- Develop and implement a system for tracking and reviewing reports investigations, interim measures, and resolutions of student and employee conduct that may constitute sexual harassment or sexual violence to ensure that such reports are adequately, reliably, promptly, and impartially investigated and resolved.

- Widely disseminate its notice of nondiscrimination by including it in a variety of publications, additional locations on its website, the student handbook, course registration materials, pamphlets, and other electronic and printed publications that provide information to employees and students about University services and policies.

- Ensure that the University's Title IX Coordinators continue to have expert knowledge of the Policy and Procedures; oversee all Title IX reports received by the University; oversee the efforts of deputy Title IX coordinators; develop and coordinate Title IX training for the University community; and address patterns and systemic problems that arise as well as assess overall efficacy of response by the University to sexual harassment and sexual violence.

- Improve outreach to and feedback from students, including conducting focus groups, conducting an annual climate assessment to determine students' attitudes and knowledge regarding sexual harassment and sexual violence, determine whether students know to whom and how to report such conduct, identify potential barriers to reporting, and solicit input on how the University can encourage reporting of sexual harassment and sexual violence and better respond to such reports..

- Review all reports heard by the SMB, those resolved informally under the SMP, and those reported as "informal contacts" during the 2011-2012, 2012-2013, and 2013-2014 academic years to determine, among other things, whether there is evidence of a continuing pattern of conduct, provide any appropriate remedies that may still be available, and provide remedies that may be necessary to address the climate of the larger University community.  In the case of "informal contacts," the University will determine whether additional investigation is necessary to determine what occurred and will consider whether it has an independent obligation to investigate the alleged incident by weighing a complainant's request for anonymity against risk factors identified in University Policy, as appropriate.

- Annually submit to OCR copies of all reports alleging sexual harassment, including sexual violence, filed by students commencing with the 2014-2015 academic year, as well as documentation of the University's response to each report.

Pursuant to Section 304 of OCR's Case Processing Manual, a complaint will be considered resolved and the recipient deemed compliant if the recipient enters into an agreement that, fully performed, will remedy the identified areas of noncompliance (pursuant to Section 303(b)). OCR

Page 26 – OCR Review No. 11-11-6001

will monitor closely the University's implementation of the Agreement to ensure that the commitments made are implemented timely and effectively.  OCR may conduct additional visits and may request additional information as necessary to determine whether the University has fulfilled the terms of the Agreement and is in compliance with Title IX with regard to the issues raised.  As stated in the Agreement entered into the by the University on  September 17, 2015, if the University fails to implement the Agreement, OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of the Agreement.  Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10), or judicial proceedings to enforce the Agreement, OCR shall give the University written notice of the alleged breach and a minimum of sixty (60) calendar days to cure the alleged breach.

Based on the commitments the University has made in the Agreement, OCR has determined that it is appropriate to consider this complaint resolved.  This letter of findings sets forth OCR's determination in an individual compliance review and should not be construed to cover any other issue regarding the University's compliance.  This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

It is unlawful to harass, coerce, intimidate or discriminate against any individual who has filed a complaint, assisted in a compliance review, or participated in actions to secure protected rights.

This letter of finding should not be construed as covering any other issues regarding compliance with Title IX that may exist and are not addressed herein.

If you have any questions, please contact me at 202-453-5932 or via email at alice.wender@ed.gov.

Sincerely,

/s/

Alice B. Wender
Regional Office Director

Enclosure