# EXHIBIT 22



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS, REGION I

5 POST OFFICE SQUARE, 8TH FLOOR
BOSTON, MASSACHUSETTS 02109-3921

June 15, 2012

Ms. Dorothy K. Robinson
Vice President and General Counsel
Yale University
2 Whitney Ave
P.O. Box 208255
New Haven, Connecticut 06520-8255

                                            Re:     Complaint No. 01-11-2027

Dear Attorney Robinson:

This letter is to inform you that the U.S. Department of Education's Office for Civil Rights (OCR) is closing the investigative phase of the above-referenced complaint filed against Yale University (University).  As stated in our letter to the University dated April 1, 2011, the complaint alleged that a sexually hostile environment existed on campus at the University, to which the University had not responded in a prompt and equitable manner.  The complaint specifically referenced an October 2010 incident and further alleged an on-going pattern of sexual harassment.  The complaint also alleged that the University did not have a Title IX Coordinator and had an inadequate grievance process for addressing complaints of sex discrimination.

OCR accepted and investigated this complaint pursuant to its authority under Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, and its implementing regulation at 34 C.F.R. Part 106 (Title IX), which prohibit discrimination on the basis of sex.  The University is subject to the requirements of Title IX because it is a recipient of Federal financial assistance from the U.S. Department of Education.

Based on the allegations presented, OCR initiated an investigation of the following legal issues:

1) Whether the University failed to properly designate one or more employees to coordinate its efforts to comply with Title IX and its implementing regulation; and whether the University failed to notify students, employees, and interested parties of such a designation, in violation of 34 C.F.R. Section 106.8(a);

2) Whether the University failed to adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, in violation of 34 C.F.R. Section 106.8(b); and

3) Whether the University allowed a sexually hostile environment to be created on campus, by not responding promptly, effectively and equitably to notice of sexual harassment, in violation of 34 C.F.R. Sections 106.31(a) and (b).

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Vice President Robinson, Yale University, OCR Complaint No. 01-11-2027

During the course of OCR's investigation, the University voluntarily and proactively made changes to its procedures and practices related to compliance with Title IX and notified the University-wide community of these changes. The University has further agreed to continue to follow the steps memorialized in the enclosed Voluntary Resolution Agreement to resolve this complaint. A summary of OCR's investigation, the University's efforts relevant to Title IX and its future commitments as set out in the Agreement are discussed below.

## I.     Investigative Approach

OCR's investigation focused on student-on-student sexual harassment and sexual violence in the University's undergraduate program, Yale College (College). In investigating this complaint, OCR reviewed extensive documentation related to the University's efforts to respond to and prevent sexual harassment and sexual violence in its undergraduate community, including policies and procedures, publications, training material, files maintained by the University regarding formal responses to sexual harassment through its Executive Committee (ExComm); police reports from the Yale Police Department (YPD); and reports from University committees, task forces, and working groups formed over the years to review and respond to sexual harassment issues on campus. Additionally, OCR reviewed correspondence from the University addressing the October 2010 incident involving a fraternity that gave rise to this complaint.

In carrying out its investigation, OCR conducted multiple on-site and telephone interviews of University personnel, speaking with members of: grievance boards; YPD; relevant task forces/committees; individuals identified as Title IX Coordinators; and faculty, staff, and administrators involved in responding to the October 2010 incident. OCR also spoke with representatives from various on-campus resources the University identified for students dealing with issues of sexual harassment, including the Sexual Harassment and Assault Resources & Education (SHARE) Center; and various other administrators involved in the University's response to Title IX issues such as the College Dean, the Deputy Secretary, and the Dean of Student Affairs. In addition, OCR interviewed deans and masters of various residential colleges and other residential college staff. OCR also spoke with numerous students both past and present, as well as community members, regarding the climate at the University with regard to sex and gender discrimination, sexual harassment and sexual violence on campus and the University's efforts to respond to reports and complaints of sexual harassment and sexual violence on campus.

## II.    Legal Standards

The Title IX implementing regulation, at 34 C.F.R. Section 106.31(a), provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance. Specific obligations are set forth at 34 C.F.R. Section 106.31(b), including a recipient's obligation to ensure that its students are not denied or limited in their ability to participate in or benefit from the recipient's programs or activities on the basis of sex.

Page 3 – Vice President Robinson, Yale University, OCR Complaint No. 01-11-2027

Sexual harassment is a form of sex discrimination prohibited by Title IX. Sexual harassment is unwelcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence.[1] Sexual harassment of a student creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the recipient's program. If a recipient knows or reasonably should have known about sexual harassment that creates a hostile environment, Title IX requires the recipient to take immediate action to eliminate the harassment, prevent its recurrence and address its effects.

When responding to alleged sexual harassment, a recipient must take immediate and appropriate action to investigate or otherwise determine what occurred. If an investigation reveals that discriminatory harassment has occurred, a recipient must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring. These duties are a recipient's responsibility, regardless of whether a student has complained, asked the recipient to take action, or identified the harassment as a form of discrimination.

In situations where reported sexual misconduct may constitute a criminal act, a recipient should notify a complainant of the right to file a criminal complaint, and should not dissuade a complainant from doing so either during or after the recipient's internal Title IX investigation. Recipients should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the complainant in the educational setting. A law enforcement investigation does not relieve the recipient of its independent Title IX obligation to investigate the conduct.

Title IX calls for recipients to establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. The Title IX regulation, at 34 C.F.R. Section 106.8(a), specifically requires that each recipient designate at least one employee to coordinate its responsibilities to comply with and carry out its responsibilities under Title IX, including any investigation of any complaint communicated to it alleging noncompliance with Title IX (including allegations that the recipient failed to respond adequately to sexual harassment). This provision further requires that the recipient notify all its students and employees of the name (or title), email and office address and telephone number of the employee(s) so designated. The recipient must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate.

Additionally, the Title IX regulation, at 34 C.F.R. Section 106.8(b), requires recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of

---

[1] The applicable legal standards described herein are more fully discussed in OCR's 2011 Dear Colleague letter on Sexual Violence, which is available at: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (April 4, 2011). *See also* OCR's 2010 Dear Colleague letter on Harassment and Bullying, which is available at: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html (October 26, 2010), and OCR's *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* at: http://www.ed.gov/about/offices/list/ocr/docs/shguide.html (January 19, 2011).

complaints alleging any action that would be prohibited by Title IX, including sexual harassment and sexual violence. Title IX does not require a recipient to provide separate grievance procedures for sexual harassment complaints, including sexual violence complaints. A recipient may use student disciplinary or other separate procedures for these complaints. However, any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary proceedings, must afford the complainant a prompt and equitable resolution.

In evaluating whether a recipient's grievance procedures are prompt and equitable, OCR considers whether the procedures provide for: notice to students and employees of the procedures, including where complaints may be filed; application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties; adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; designated and reasonably prompt timeframes for the major stages of the complaint process; written notice to the parties of the outcome of the complaint and any appeal; and an assurance that the recipient will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

Pending the outcome of an investigation, Title IX requires a recipient to take steps to protect the complainant from further harassment as necessary, including taking interim steps before the final outcome of the investigation. The recipient should undertake these steps promptly once it has notice of a sexual harassment allegation. It should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the recipient may prohibit the alleged perpetrator from having contact with the complainant pending the results of the investigation. When taking steps to separate the complainant and the alleged perpetrator, a recipient should minimize the burden on the complainant and thus should not, as a matter of course, remove the complainant from classes or housing while allowing the alleged perpetrator to remain. In addition, recipients should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling services, and their right to file with local law enforcement.

Grievance procedures generally may include voluntary informal mechanisms (e.g., mediation) for resolving some types of sexual harassment complaints. However, it is improper for a complainant to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the recipient (e.g., participation by a trained counselor, a trained mediator, or, if appropriate, a faculty member or administrator). The complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

Throughout the recipient's investigation and in any hearing, both parties must have equal opportunity to present relevant witnesses and other evidence. Also, in order for a recipient's grievance procedures to be consistent with the Title IX evidentiary standard, the recipient must use a preponderance of the evidence standard for investigating allegations of sexual harassment

Page 5 – Vice President Robinson, Yale University, OCR Complaint No. 01-11-2027

or violence. If a recipient provides for appeal of the findings or remedy, it must do so for both parties. The recipient must maintain documentation of all proceedings.

For the remainder of this letter, sexual harassment/sexual violence under Title IX will hereinafter be referred to as "sexual misconduct." This is the term used by the University to refer to sexual harassment and sexual violence.

### III.    Summary of Investigation

*Title IX Coordinator:*

Regarding coordination of the University's compliance under Title IX, OCR learned that the University had designated a University-wide Title IX Coordinator and deputy coordinators for each school within the University, whose names were published annually in a pamphlet entitled "Promoting Diversity and Equal Opportunity at Yale University: Policies, Resources and Procedures." While published in this pamphlet, both students and employees interviewed by OCR were not aware of the various Coordinators' designations. Particularly, students cited not being able to locate the Coordinators' names or information online.

OCR noted a lack of clarity among those designated to coordinate compliance under Title IX regarding how their duties related to the University's obligations under Title IX. The designated University-wide Coordinator was involved largely in human resource issues. OCR noted that historically, her office handled sexual misconduct matters related to employees and dealt with few complaints. The complaint process at the Coordinator level was informal and did not include a mechanism for disciplining students. OCR also learned that there was only one instance in which an interim measure was put into place for a student through this process. Further, the University-wide Coordinator had no relation with the other Title IX complaint mechanisms at the University for students or any mechanism for tracking such complaints. Similarly, OCR learned that the College-level Coordinator was unclear on her role and responsibilities and the requirements of Title IX. After OCR's issuance of its April 2011 Dear Colleague Letter (DCL), the University appointed a new College Coordinator to avoid a conflict of interest as the previous Coordinator sat on a disciplinary board.

To address any confusion that existed regarding the Coordinators' identities and their duties, the University has since implemented a new Title IX Coordinator structure and has widely publicized information regarding its Title IX Coordinators. The University has designated a new Deputy Provost (the University Title IX Coordinator) to oversee University-wide Title IX compliance, with a focus on student issues, as well as the deputies at each school. The former University-wide Coordinator will now serve as coordinator solely for employee issues. The University has widely published in print and on-line the names and contact information for the University Title IX Coordinator and deputy Coordinators, and their duties. Further, the current Coordinators have received extensive training on: the University's obligations under Title IX; its applicable regulations regarding sexual misconduct; relevant resources available on campus; the procedures governing the University's new Title IX grievance process – the University-Wide Committee on Sexual Misconduct (see below) – including accepting, processing and investigating complaints of sexual misconduct; interacting with victims of sexual misconduct;

gathering relevant evidence and assessing it in the Title IX context; the importance of confidentiality, fair process, impartiality, and applicable legal standards; safety considerations when determining interim and remedial measures and disciplinary sanctions; and current research on sexual misconduct on campuses.

The University Title IX Coordinator responsibilities now include: providing for communication among the employee-related Coordinator, deputy Coordinators and relevant student services offices; conducting reviews of reports made and complaints filed, whether informal or formal, to identify and address any patterns or systemic problems; communicating with YPD regarding Title IX issues; publishing reports on complaints and their resolutions; and periodically assessing the University's overall compliance with Title IX.  The Coordinator is also now responsible for leading the University's efforts to improve campus climate with regard to sex and gender discrimination, sexual harassment and sexual violence and to maintain an environment that is safe and supportive of all students and in compliance with Title IX; and overseeing: the development and delivery of education and training to the University community on issues involving sexual misconduct; the development of programs that raise awareness on campus about sexual misconduct; publication of the University's resources for preventing and responding to sexual misconduct; and periodic assessments of campus climate regarding these issues.

*Grievance Procedures:*

With respect to Title IX grievance procedures, during OCR's investigation, the University identified to OCR two main processes available to undergraduate students raising allegations of student-on-student sexual misconduct under Title IX: the Sexual Harassment Grievance Board (SHGB) and ExComm.  OCR heard from students, and numerous University reports cited, that the multiple avenues for filing complaints were unclear and confusing.  OCR explored both the policies and procedures governing the SHGB and ExComm, in addition to how both processes were implemented by the University in response to reports or complaints of sexual misconduct.

OCR learned that the SHGB was an informal mechanism for dealing with sexual misconduct issues and was comprised of a rotating mixture of staff and students.  As an informal process, OCR learned that the SHGB did not keep records and was not intended to be a fact-finding or investigatory body, and thus did not formally interview or otherwise gather and consider evidence from students and witnesses.  Instead, the SHGB was a victim-driven process where an alleged student victim could learn about resources on campus or obtain informal remedies such as separate class schedules from an alleged perpetrator or having an alleged perpetrator talked to by a SHGB member to understand that his/her behavior was wrong, as a means to educate the perpetrator.  OCR learned, however, that the SHGB ultimately had no authority to enforce these informal remedies, which were often contingent upon the cooperation of the alleged perpetrator.  OCR was unable to obtain more precise information regarding the sexual misconduct-related matters that the SHGB handled in the 2010-2011 school year, or prior school years, because the SHGB did not have a reliable system for maintaining records of its activities during those times.

OCR learned that ExComm was the only formal process available to undergraduate students wishing to address student-on-student claims of sexual misconduct under Title IX.  ExComm is

the disciplinary body charged with enforcing the University's Undergraduate Regulations, including academic and nonacademic infractions. OCR reviewed ExComm files and learned that from 2007 to June 2011, ExComm handled thirteen cases dealing with sexual misconduct issues. OCR determined that five of the thirteen sexual misconduct cases from 2007 to June 2011 specifically involved allegations of sexual violence and/or sexual assault, three of which were from the 2010-2011 school year. Of those thirteen cases, seven (including the October 2010 incident described below) were filed during the 2010-2011 school year under the ExComm procedures described below.

After reviewing ExComm's policies and procedures, interviewing those responsible for overseeing and serving on ExComm, and examining the thirteen ExComm complaint files, OCR noted concerns with the ExComm process. In particular, the ExComm procedures, as ExComm is traditionally a disciplinary body, focused on the alleged perpetrator and his/her rights and not on affording the complainant a prompt and equitable resolution of his/her sexual misconduct complaint. In a number of the cases OCR reviewed, the alleged perpetrator elected to admit to the validity of the charges and chose a disposition proceeding, which is a hearing before a subgroup of ExComm where there is no investigation or input from the complainant. After the issuance of the DCL, the University provided complainants with the right to appeal decisions of ExComm – a right which was not previously afforded. Students told OCR that they felt the ExComm process was very unfriendly to victims of sexual misconduct, resulting in only a small number of cases being brought forward to ExComm. Students also expressed concern that they could not bring a complaint directly to ExComm, instead having to go through a University administrator, dean or master, to file on their behalf.

OCR also noted that ExComm did not set forth timeframes for the investigation of a complaint. In a few of the complaints OCR reviewed, the ExComm proceedings were delayed until after criminal investigations were completed. Complaints brought before ExComm that did not go to a disposition proceeding were investigated by a fact-finder who was also a faculty member. OCR heard that many felt that sexual misconduct cases presented unique issues and required more time and resources than ExComm was equipped to handle. When a violation of the Undergraduate Regulations was found, ExComm focused on disciplining the perpetrator and not on providing any remedies for the complainant. Further, through the ExComm process, OCR heard that students were unclear on how to seek interim protective measures during the course of an ExComm investigation/procedure, as ExComm was not the vehicle to provide these.

In various studies of the University's processes, the University acknowledged the confusion regarding the processes available to students for sexual misconduct claims and that ExComm and the SHGB were not the best means of addressing these issues. As a result, prior to the filing of this complaint, the University was in the process of developing a University-wide system for dealing with allegations of sexual misconduct both informally and formally. On July 1, 2011, the University-Wide Committee on Sexual Misconduct (UWC) became operational. An informal process through the UWC seeks to resolve issues between an alleged victim and an alleged perpetrator without a formal investigation or hearing, and typically does not result in disciplinary sanctions for an alleged perpetrator. A formal process through the UWC involves an investigation conducted by an outside fact-finder followed by a hearing, and can result in disciplinary sanctions if an alleged perpetrator is found to have violated the University's

regulations on sexual misconduct. The University has since eliminated the SHGB and the use of ExComm for sexual misconduct matters and has widely publicized the UWC and its procedures.

The UWC provides for the prompt and equitable response to grievances of students and third party complainants alleging sexual misconduct. It enforces a newly revised and expanded definition of sexual misconduct in the University's Undergraduate Regulations. UWC members have received extensive training alongside the University's Title IX Coordinators. The UWC has clearly designated timeframes and uses trained, outside fact-finders to ensure adequate, reliable and impartial investigation of complaints. Additionally, complainants can receive interim measures as they use the process. The procedures also allow for the University Title IX Coordinator to pursue a complaint through the UWC's formal process, even if the complainant does not wish to participate. Complainants can also choose to resolve sexual misconduct complaints informally, through either the Title IX Coordinators or the UWC. Through the UWC's informal resolution process, complainants can ask questions about procedures; request advice (including whether certain behavior constitutes sexual misconduct); secure interim measures to support and protect themselves; and seek informal investigation, counseling, or other means of resolving their complaint. In all cases, participation in an informal resolution is voluntary and complainants may end the informal process at any time and either choose to bring a formal complaint or choose not to pursue the matter further. OCR found that the UWC procedures are consistent with Title IX requirements and, as described in the Agreement, OCR will continue to monitor their implementation.

Further, during OCR's investigation, the University followed up with ExComm complainants from the 2010-2011 school year who were still enrolled as students to make them aware of available resources at the University and to offer assistance in accessing them, including the UWC, and to explore whether they were satisfied with their ExComm proceedings.

To address concerns that students were not made fully aware of the outcome of ExComm and SHGB cases and the penalties imposed on perpetrators, the University has begun to publish reports to the University community regarding the outcomes of complaints processed by both the UWC and the Title IX Coordinators. As delineated in the UWC's procedures, these reports will not include any information that would reveal the identities of the parties involved. The University issued its first of such reports to the community on January 31, 2012, which showed an increase in the number of documented complainants coming forward to the University. The report also showed that a large proportion of complainants chose to informally resolve their concerns, through either the UWC or the Title IX Coordinators. OCR discussed the report with the University, who explained that complainants are given the same options for complaint resolution at their first point of contact with the University whether it be SHARE or their dean or master, or one of the Title IX Coordinators and that complainants most often choose informal resolution. The University also told OCR that it is proactively seeking feedback from complainants who utilize the informal and/or formal processes available.

OCR also learned during the course of its investigation, that students may contact YPD for incidents of sexual misconduct. OCR learned that while YPD officers were well equipped and trained to deal with issues of sexual misconduct of a criminal nature, the coordination between YPD and the University on these matters seemed somewhat informal and inconsistent. In line

with the other changes discussed above, the University has implemented a coordination protocol between YPD and the rest of the University.  The protocol calls for YPD to inform complainants that in addition to filing a criminal complaint, he/she has the right to bring a complaint to the University Title IX Coordinator or the UWC.  Further, YPD will provide written information to students about the various resources on campus related to sexual misconduct.  Additionally, YPD will provide the University-wide Title IX Coordinator a synopsis of YPD complaints and investigations for purposes of the Title IX Coordinator's overall tracking of the University's compliance with Title IX.  As described in the Agreement, OCR will monitor the implementation of this coordination and the commitment the University has made to continue its practice of providing YPD with training on these issues.

*October 2010 Incident:*

Regarding the October 2010 incident raised in this complaint, OCR learned that on the evening of October 12, 2010, approximately 20 pledges from a fraternity stood blindfolded outside of the University's Women's Center (which is located on Old Campus, where almost all freshman students live), chanting sexually aggressive comments.  This chanting occurred while approximately 35 other fraternity members looked on, and some encouraged the pledges to chant more loudly.  OCR learned that this event was planned as part of a pledging event.

The chanting incident was recorded and circulated throughout the University community on YouTube.  With the circulation of the video, the event gained great publicity both in and out of the University.  In the days after the event, numerous petitions were circulated and published in the University's newspaper, signed by thousands of students, past and present, calling for the University to take action against the fraternity, citing that students wanted to feel that they could walk to their dormitories without hearing "misogynistic chanting."

University staff stated to OCR that they became aware of the October 12, 2010 incident the next day.  At that point, the administration asked the fraternity for a list of members and emailed the University community about the event.  On October 14, 2010, representatives from the fraternity, the Women's Center, and the University met for the fraternity to express an apology, and in the days that followed, multiple forums were held to discuss the event.  The College Dean also formed committees to look at sexual misconduct on campus and to study hazing and initiations (see below).  On October 20, 2010, after calls for greater University action from the community, the Dean of Student Affairs and the College Dean filed a complaint with ExComm charging the members of the fraternity with "imperiling the integrity of the University" (OCR learned that this is a common catch-all charge used for any type of behavior that goes against the values of the University, such as intoxication).  After some fact-finding, an additional charge of "harassment and intimidation" was added.  Although ExComm was not able to find out with certainty who was present that night, due to those interviewed not being forthcoming, ExComm decided to focus on the leadership of the fraternity.  OCR learned that the University did not identify other witnesses to the event other than the fraternity members.

OCR learned that ultimately, ExComm issued a decision on May 2, 2011 that the fraternity, "as an organization, had threatened and intimidated others, in violation of the Undergraduate Regulations of Yale College as they pertain to 'harassment, coercion or intimidation' and

Page 10 – Vice President Robinson, Yale University, OCR Complaint No. 01-11-2027

'imperiling the integrity and values of the University community,' and several fraternity members had also, as individuals, violated the same regulations." Individuals penalized were given reprimands (a notation on one's internal University file). ExComm also sanctioned the fraternity itself by enforcing its Undergraduate Regulations for unregistered groups, prohibiting the organization for the next five years from: conducting activities on University property, communicating through University bulletin boards or email, using the University's name, and recruiting new members on University property.

Interviews and documentation revealed to OCR that fraternities had staged similar events around the same time of year and in the same location with some regularity in the past. Other public incidents with University students included an event in 2008, in which members of another fraternity stood in front of the Women's Center at night holding a misogynistic sign and chanting. Students interviewed expressed concern about the 2010 fraternity incident being part of such a chain of incidents to which the University did not effectively respond. Students expressed that the fact that the event took place in front of the Women's Center was especially distressing.

In response to students' concerns and to reaffirm the University's commitment to ensuring that it maintains an environment that is safe and supportive of all students, the University formed the Advisory Committee on Campus Climate charged with looking at the University's policies, practices and resources and advising the President on how sexual misconduct could be more effectively responded to and prevented on campus. The Committee spoke with students, alumni, staff, and representatives from various University organizations. Similar to concerns OCR heard, the Committee found that there was confusion over the complaint processes available to students for sexual misconduct claims and that processes were not prompt (the UWC was implemented after the start of the Committee's work, but prior to its report). Also, the Committee found that there was a lack of awareness of the resources available on campus (such as SHARE) and the options they provide. The Committee also found a need for more discussions with students and training on these issues. In response to the Committee report and student concerns prior to the report, the University implemented many initiatives to address these issues.

In addition to the creation of the UWC and the re-structuring of the Title IX Coordinators, the University has also designated a Vice President for Student Life who, beginning in the 2012-2013 school year, will be an integral part of the University's efforts to provide a safe environment for all students. The University has also created a Title IX working group composed of the various components involved in the University's Title IX compliance, which meets regularly. The University has also implemented a comprehensive website outlining all of the University's policies and procedures related to sexual misconduct, the UWC, the Title IX Coordinators, and resources on campus, as well as indicating the level of confidentiality each process affords. The University is widely promoting SHARE and has further committed to ensuring SHARE has adequate resources to provide services to students and has taken actions to raise the awareness of SHARE's functions (such as its 24/7 'on-call' counselors).

As well as training for various staff, faculty and administrators, the University has revamped its freshmen training, and will be instituting sophomore training, focusing on the Undergraduate

Page 11 – Vice President Robinson, Yale University, OCR Complaint No. 01-11-2027

Regulations regarding sexual misconduct, resources on campus, the UWC, reporting requirements and other topics it deems relevant such as bystander intervention. Further, the University has and will continue to hold annual training for leaders of registered student groups and varsity athletic teams on the critical role student organizations play in creating and maintaining a safe learning and living environment at the University.

In an effort to further educate students on these issues, the University has also employed students trained as undergraduate Consent and Communication educators who "provide education and create dialogue about a wide range of issues," including issues related to sexual misconduct. Additionally, the University has added an additional Student Affairs Fellow, who works with students to prevent high risk drinking and sexual misconduct.

The University has also acknowledged issues on campus regarding alcohol and hazing by student groups. In response, the University has and will continue to work to create campus organizations and student programs designed to promote norms of responsible conduct regarding sexual misconduct and alcohol. As a continuation of the committee formed to study hazing and initiations, the University is also holding discussions with sororities and fraternities to discuss their role on campus and to promote positive behavior. Lastly, following the recommendations of the committee formed to study hazing and initiations, the University announced in Spring 2012 that it is no longer permitting Fall rush for freshman students. The University noted to OCR that there were not any further incidents during the 2011-2012 school year that were similar to the October 2010 incident. The University also told OCR that should public conduct of a sexual nature occur in the future, it would be handled under the UWC, which is well-equipped to process complaints expeditiously.

As part of its continuing efforts in this area, the University will also conduct periodic assessments (at least annually) of campus climate with regard to gender discrimination, sexual misconduct and Title IX. In such assessments, the University will seek input from students and student groups, including women's groups, as well as a wide variety of other sources. The University will consider such assessments in identifying future actions to ensure that it maintains an environment that is safe and supportive to all students and in compliance with Title IX.

### IV.   Conclusion

As discussed above, the University has voluntarily and proactively made changes to its procedures and practices related to Title IX compliance. The University has committed to continuing these steps as outlined in the Agreement. OCR will review information on the University's notification to the community of its Title IX Coordinators; the outcome of the University Title IX Coordinator's review of all informal and formal complaints of sexual misconduct; the coordination between the University Title IX Coordinator and YPD; and the results of the University Title IX Coordinator's assessment on trends, patterns, and the efficacy of the University's Title IX compliance. The University will also report to OCR on notices it provides to the community about its Title IX grievance procedures (e.g., the UWC), including any changes that are made to them and records of complaints processed under them. In addition, the University will report to OCR on training it will continue to provide for relevant students and staff. Further, the University will provide OCR with documentation relating to its periodic

Page 12 – Vice President Robinson, Yale University, OCR Complaint No. 01-11-2027

climate assessments; efforts to ensure adequate resources for SHARE and notice of SHARE to students; and efforts to promote responsible drinking, expand student leadership councils to promote norms of responsible conduct, and address hazing and initiations.

Consistent with its usual practices, OCR will monitor the University's implementation of the Agreement and the University's compliance with Title IX concerning sexual misconduct.  OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of this Agreement.  Before initiating administrative enforcement (34 C.F.R. Sections 100.9, 100.10), or judicial proceedings to enforce this Agreement, OCR shall give the University written notice of the alleged breach and a minimum of sixty (60) calendar days to cure the alleged breach.

This letter is a resolution letter issued by OCR to address an individual OCR case.  Resolution letters are not formal statements of OCR policy and they should not be relied upon, cited or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

Please note that complainants may have the right to file a private law suit in Federal court, whether or not OCR identified compliance concerns.  Also, it may be necessary to release this document and related records upon request, as the information is subject to release under the Freedom of Information Act.  In the event OCR receives such a request, we will seek to protect, to the extent provided by law, personal information, which, if released, could constitute an unwarranted invasion of privacy.

We appreciate the University's proactive efforts to ensure that it maintains an environment and culture that is safe for all students and that the University appropriately responds to incidents of sexual misconduct.  Thank you for the courtesy and cooperation that you and your staff extended to OCR during the investigation.  If you have any questions regarding this letter, please do not hesitate to contact me at (617) 289-0011.

    Sincerely,

    /s/

    Thomas J. Hibino
    Regional Director

Enclosure